## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| J.R., | |
|     Plaintiff, | CIVIL ACTION FILE |
| v. | NO. |
| LINCOLN BANCORP, LLC, | |
|     Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff files her Complaint and shows the Court as follows:

1.

J.R. is a victim of sex trafficking at the Super 8 located at 4979 Old National Highway, College Park, Georgia 30349. In 2020 and 2021, J.R. was sold for sex at the hotel starting when she was a child of only 15 years. Given the nature of the case, Plaintiff J.R. is identified in this Complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel will disclose her full name to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.[1]

---

[1] Contemporaneously with this Complaint, Plaintiff filed a Motion for Protective Order and Leave to Proceed Anonymously because the allegations in the Complaint, which include child sex trafficking, are intimate and personal in nature and raise concerns for J.R.'s own personal safety.

2.

Defendant Lincoln Bancorp, LLC is a foreign limited liability company organized under the laws of California and authorized to transact business in Georgia. Service can be made on said Defendant by serving its registered agent: Registered Agents, Inc., 8735 Dunwoody Place, Suite R, Atlanta, Georgia 30350.

3.

Defendant has been properly served with process in this action.

4.

Jurisdiction and venue are proper as to Defendant.

5.

Defendant knew that sex trafficking and prostitution were rampant at the hotel for years—before, during, and after Plaintiff's trafficking. Defendant knew because:

(a)  Defendant knew about Plaintiff while she was sold for sex at the Super 8;

(b)  Defendant's employees knew of and permitted sex trafficking and prostitution to occur at the Super 8;

(c)  Defendant knew about several other sex trafficking victims at the Super 8 before, during, and after Plaintiff;

(d)  Defendant knew about frequent and similar crimes occurring at the Super 8;

(e)  Defendant knew about the reports of Super 8 guests regarding sex

trafficking and prostitution-related activities; and

(f)    Defendant had knowledge of sex trafficking generally in the Atlanta area and at the Super 8 specifically.

6.

A person under the age of 18 cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e., "minor sex trafficking") is criminal sex trafficking under federal and Georgia law, regardless of whether the child had a trafficker/pimp or was subjected to "force, fraud, or coercion." 18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B). Every person who engages in commercial sex with a child is sex trafficking that child under § 1591(a)(1).

7.

Sex trafficking and prostitution were common occurrences at the Super 8 and Defendant chose to ignore, allow, condone, facilitate, support, or permit such activity at the hotel. Defendant is liable to Plaintiff for its actions and failure to act. Defendant's liability to Plaintiff is straightforward:

(a)    The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person **_knew or should have known_** has engaged in an act in violation of" the TVPRA. 18 U.S.C. § 1595(a).

Defendant knowingly benefited from participation in a venture that it knew or should have known engaged in an act in violation of the TVPRA. While operating the hotel, a common undertaking involving risk and potential profit, Defendant (i) rented a room to Plaintiff's traffickers so Plaintiff could be violently sold for sex at the hotel, (ii) collected fees for rental of those rooms, and (iii) did so despite what it knew or should have known about Plaintiff being a victim of sex trafficking at the hotel. As a result of Defendant's conduct, Plaintiff suffered physical and mental harms, and Defendant is liable to Plaintiff for the damages arising from those harms under the TVPRA.

(b) Defendant negligently breached duties imposed by law, assumed by contract and behavior, and voluntarily undertaken. Defendant knew or should have known of the foreseeable risk of sex trafficking and other sex crimes at the Super 8 and failed to act as similarly situated businesses would in like circumstances. As such, Defendant is liable to J.R. for her damages under Georgia common law.

(c) Because J.R. was a child when she was trafficked at the Super 8, and because Defendant knowingly facilitated her trafficking, Masha's Law, 18 U.S.C. § 2255, provides a civil remedy to J.R. for the substantive violation of 18 U.S.C. § 1591.

8.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant at the Super 8.

**I.    J.R.'s trafficking at the Super 8.**

9.

In 2020 and 2021, beginning when she was only 15 years old, J.R. was sold for sex at the Super 8. Her traffickers regularly brought her to the Super 8, where they would stay for extended periods—sometimes for weeks or months at a time—while she was sold for sex.

10.

J.R. was trafficked by three separate individuals: two older men and an older woman.

11.

One of J.R.'s traffickers transported her and other victims in a U-Haul truck, forcing them to ride in the cargo area. She was dropped off and picked up at the Super 8 while riding in the back of the U-Haul truck.

12.

J.R. was sold for sex on the backside of the Super 8 property, where sex trafficking victims were intentionally placed by Defendant to keep them out of public view. By intentionally placing J.R. in the rear of the hotel, Defendant concealed J.R.'s traffickers' operation and minimized their risk of detection.

13.

J.R.'s traffickers kept her under the continual influence of drugs and imposed a strict daily quota, requiring her to generate no less than $500 per day. While J.R. was trafficked at the Super 8, she was made to have sex with roughly 10–15 men each day. Defendant knew or should have known that the number of daily, older male visitors to the room was clearly indicative of child sex trafficking.

14.

J.R. was trafficked with other girls at the Super 8. At times, she shared a room with eight other victims, all of whom were also being trafficked for sex and many (if not all) of whom were children under the age of 18. On other occasions, the trafficker rented multiple rooms at the hotel to accommodate the large number of victims he was exploiting.

15.

J.R. was forced to participate in "two girl specials," during which two victim girls had sex with the same buyer at the same time.

16.

J.R. and the other victims each saw roughly the same number of "dates" per day, with approximately 80 to 100 total sex buyers visiting their rooms daily.

17.

Defendant knew of the unusually high volume of foot traffic to and from the rooms. When the activity became too loud or the number of sex buyers entering and exiting the room drew too much attention, hotel staff would call the room and tell them to "chill out."

18.

Defendant knew or should have known that the number of daily, older male visitors to the room was clearly indicative of child sex trafficking.

19.

In addition to having sex with sex buyers in the room, J.R. was forced to perform 20 or more commercial sex acts in cars in the Super 8's parking lot. She estimates that, at any given time, there were 8 to 9 other girls who were also seeing sex buyers in the parking lot.

20.

Defendant had a policy not to call the police regarding known or suspected sex trafficking at the hotel. Defendant followed this policy in the case of J.R. as well as other sex-trafficking victims.

21.

Employees of the Super 8 were familiar with and accommodated J.R.'s traffickers and their sex trafficking operation. Hotel staff, including a male Asian employee who worked at the front desk and who was regularly present during J.R.'s trafficking, referred to her traffickers by their street names, "Scar" and "Goose," and exchanged casual head nods with them as they passed through the property, which signaled a level of familiarity and rapport that went beyond mere recognition.

22.

J.R. encountered this front desk employee every day, often at the front desk or outside smoking cigarettes. The employee regularly supplied J.R. with towels, soap, and other room items. She encountered him approximately 50–100 times during her trafficking at the Super 8.

23.

Once, early in J.R.'s trafficking, she tried to get help from the hotel to escape her traffickers at the Super 8 and the hotel refused in deference to her traffickers. J.R. asked the Asian front desk employee for directions to the nearest train station to escape her traffickers and the man told her he couldn't help her because she was with "Scar" and "Goose." When J.R. then asked to simply use the hotel's phone, he also refused, saying, "No public phone, no public phone."

24.

By refusing to assist the visibly underage and distressed child in deference to her traffickers, the employee actively harbored J.R. and facilitated her trafficking and false imprisonment, knowingly furthering her traffickers' operation at the Super 8.

25.

Ms. Phillips, whose declaration is attached to this Complaint,[2] was employed as a housekeeper and resided at the Super 8 for approximately a year and a half, from 2020–2022. During that time, she was at the Super 8 "practically 24 hours a day."

26.

Ms. Phillips has identified J.R. and admitted that, during her employment at the Super 8, the housekeeper saw J.R. at the hotel and knew that she was being sold for sex on the premises.

27.

It was common practice for individuals—including hotel employees such as housekeeping staff—to act as lookouts by shouting "12" (slang for police) to warn others of law enforcement presence at the Super 8. These warnings prompted traffickers and buyers, including J.R.'s traffickers, to momentarily pause their conduct

---

[2] *See* Ex. 1, Santana Phillips Declaration.

until the police left, after which the criminal activity, including the sex trafficking of J.R. and other women and girls, resumed without interruption.

28.

J.R. encountered housekeeping staff on a daily basis—either around the hotel or when they entered the room where she was being trafficked. While cleaning the room J.R. was trafficked in, housekeeping found trash cans filled with dozens of condoms and other paraphernalia indicating sex trafficking was occurring in the room, including boxes of condoms and pregnancy tests in plain view, and young girls in revealing clothing. Defendant knew or should have known that these signs, among others, were signs of J.R.'s trafficking at the Super 8.

29.

On a regular basis, Defendant's employees knowingly removed and disposed of evidence of trafficking from the traffickers' room. This destruction of evidence was carried out in coordination with or for the benefit of the traffickers, with the effect of hindering any potential investigation into J.R.'s trafficking.

30.

In addition to cleaning, housekeeping staff also entered the room on multiple occasions to purchase drugs from J.R.'s traffickers. During these visits, they would have seen the same clear indicators of sex trafficking present during cleaning

including dozens of used condoms, boxes of condoms, pregnancy tests, and young girls in revealing clothing.

### 31.

J.R.'s traffickers routinely yelled at and publicly demeaned her, as well as the other trafficking victims, in and around the Super 8. These verbal assaults were often loud, aggressive, and humiliating. Such behavior occurred openly on the property.

### 32.

While she was trafficked at the Super 8, J.R. exhibited in the common areas numerous well-known and visible signs of a child sex trafficking victim, which Defendant knew or should have known, including her young age and inappropriate appearance, fatigue, sleep deprivation, injuries, loitering, soliciting male patrons, and monitoring and control of J.R. by her traffickers.

### 33.

J.R. was required to walk up the long driveway of the Super 8 to meet sex buyers, often passing directly in front of the front desk while wearing revealing and overtly sexual clothing, what J.R. would refer to as "whore" clothes. On multiple occasions, the Asian male who worked the front desk was outside smoking a cigarette as J.R. walked by to pick up dates.

34.

While J.R. was trafficked at the Super 8, she saw many other girls and women who were obviously being sold for sex at the hotel. These women and children wore skimpy clothes throughout the hotel parking lot and there was a constant stream of traffic throughout the day of men with no luggage visiting the hotel rooms of these women and children for short periods of time before leaving and being followed by other anonymous men.

35.

J.R. and other sex trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches wearing very little clothing. Often, these women and children could be seen loitering around the hotel soliciting buyers of sex. Defendant knew or should have known that these were signs of sex trafficking at their hotel.

36.

Defendant knew or should have known that J.R. was being trafficked based on these signs and behaviors.

37.

Illicit activity at the hotel was pervasive. J.R. regularly heard sounds of sexual activity, loud music, shouting, and arguments in and around the premises.

38.

Traffickers were violent with young girls and women being sold for sex at the Super 8. It was not uncommon for J.R. to witness other traffickers who were running sex operations out of the Super 8 physically assault other women and girls being sold for sex. She observed victims being dragged into hotel rooms, punched, beaten, and, in some cases, left naked outside their rooms. These acts of violence occurred openly, and often in the presence of hotel employees, who failed to intervene or call the police.

39.

Once, J.R. witnessed a girl being forced out of her room by her trafficker while wearing nothing but a towel. The girl was hysterical and clearly in crisis. Rather than help or contact law enforcement, hotel employees approached the girl and pleaded with her to calm down, expressing concern that the police might be called. A few minutes later, the trafficker let her back into the room.

40.

Guests who attempted to contact law enforcement to report criminal activity at the Super 8 were subject to a policy of retaliation by hotel staff. Specifically, guests who called the police were promptly kicked out of the hotel. And employees were discouraged from involving law enforcement and feared they would lose their jobs if they called the police.

41.

J.R. purchased condoms from a woman known as the "candy lady," who lived at the Super 8 and sold snacks, candy, drugs, and condoms to guests and residents at the hotel, including the women and children being sold for sex. The "candy lady" openly engaged in these activities, and her conduct was widely recognized and well-known to Super 8 employees, including Ms. Phillips.

42.

Defendant maintained a policy or practice of allowing and facilitating sex trafficking at the Super 8, including the trafficking of J.R. This policy was implemented, in part, by agreeing to house J.R.'s traffickers' trafficking ventures, associates, and victims, knowingly placing J.R. on the backside of the motel, concealing her sex trafficking and protecting her traffickers from detection, and providing lookout services to evade law enforcement intervention. Additionally, Defendant knowingly and actively disposed of and destroyed physical evidence of J.R.'s trafficking for her traffickers, protecting them from potential investigation by the police.

## II.    Defendant's knowledge of crime at the Super 8.

43.

The Super 8 had a well-established reputation for criminal activity, including prostitution and sex trafficking. It was commonly known that people came to the Super 8 to buy two things: sex or drugs (or both).

44.

Defendant owned and operated the Super 8 and employed the employees there, giving it specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the hotel during that period.

45.

The back of the hotel had constant activity, with buyers of commercial sex coming and going from multiple hotel rooms after staying for short periods.

46.

Before, during, and after J.R.'s child sex trafficking at the Super 8, prostitution, sex trafficking, and child sex trafficking were rampant and frequent occurrences at the hotel and were obvious to employees and guests.

47.

Beginning in 2020, another child was trafficked for sex at the Super 8 when she was just 16 years old.

48.

Beginning in 2021, another child was trafficked for sex at the Super 8 when she was just 17 years old.

49.

According to former housekeeper Ms. Phillips, there was prostitution around the clock at the Super 8. She observed numerous men coming and going from guest rooms in short intervals, consistent with prostitution and sex trafficking.

50.

And Ms. Phillips witnessed pervasive drug activity and prostitution on the property. She regularly observed girls who appeared to be very young—likely of middle- or high-school age—walking around the hotel dressed in revealing clothing. These girls were "always walking around the hotel looking for men to buy them for sex at the hotel."

51.

Ms. Phillips witnessed Super 8 staff regularly rent rooms by the hour for purposes of prostitution, accept payments from traffickers to act as lookouts, and even warn the traffickers when police were present. She also witnessed employees buy sex from girls at the hotel.

52.

While cleaning the hotel rooms, Ms. Phillips would find various sex paraphernalia, including condoms, lubricants, multiple AIDS tests, and other sex items.

53.

According to Ms. Phillips, Defendant's policy was to not call the police for drugs or prostitution at the hotel.

54.

Defendant provided a market and beds for sex traffickers to sell victims to buyers of commercial sex. That is why J.R.'s sex traffickers brought her to the

Super 8 to be sold for child sex.

55.

Defendant knew or should have known of sex trafficking, prostitution, and other criminal activity at the Super 8 before J.R.'s sex trafficking there.

56.

Defendant had actual or constructive knowledge of the Super 8's publicly available online reviews that reported prostitution and crime at the hotel, including the following (reproduced verbatim):

1. August 22, 2014, from Yelp.com:

   The motel is the cheapest in the city and i guess its like the saying goes, u get what u pay for! however i did not pay for roaches,MOLD, mildew, prosititution or any other disgusting thing u can think of! however they did have beautiful rooms in the front of the motel and upstairs i guess thats the non smokers section!O and dont be mislead by the continental breakfast... wifi messes up ur technology!

2. December 12, 2015, from Yelp.com:

   I have never given a bad review--but in this case I feel a responsibility to warn others that this place is scary filthy and that it has become a prostitute haven. . . .

3. July 13, 2016, from Yelp.com:

   This place is beyond horrendous. I ended up sleeping in my car. While driving out of this location I realized the women running to the doors and walking around are prostitutes. NASTY! I rated this place with one star because I could not post my review without one. But Super 8 own me stars.

4. <u>May 2017, from Google.com:</u>

I will start by saying that this place is very ghetto! I was scared to take my child to the pool and when we did go it was closed because people from other places where there, the water and pool looked nasty. Breakfast literally sucks! Next to a very busy high way. I will say the room was okay but very old fashion and the restroom need some work done. I believe prostituion goes on, drug deals, ect. Employee don't care smoke on the job. DONT WAIST YOUR TIME OR MONEY HERE !

5. <u>July 2017, from TripAdvisor.com:</u>

This place was horrible. it had an awful smell to the rooms. there were holes in the walls. The breakfast was not eatable. customer service was awful. bad attitudes. the shower curtain had mold on it! The floor was so dirty that the bottoms of her feet were black from just walking and playing without socks or shoes on! There was trash all over the ground outside. There were prostitutes there using the rooms to do their business! You could tell by looking at the people that they were working girls. The TV had to warm up before it would play so that we could see it. The noise from the traffic that is right beside the hotel interferes with your sleep. No microwave. No refrigerator. The bed sheets were not changed once while we were there. Had to ask for clean towels and rags. Do not stay here please. It was awful. We stayed gone all day because we did not want to sit in those rooms all day.

6. <u>July 2017, from TripAdvisor.com:</u>

This place was disgusting. I could understand if it was $40 but we paid $91 at a DISCOUNT! We booked it through the Super 8 hotline while on the road stating we just needed a clean room to stay in between drives. This place was advertised as just that. The sink regurgitated something of throw up (noodles), the tv and internet didn't work, the a/c didn't work, the bathroom was gross and the toilet leaked on the floor, there were wiped stains on the curtains. We looked at the conditions of the check out policy and we wouldn't have been refunded after the first 15 minutes. Also, we were 2 women that were in a city on a Saturday night and it was raining.

We had no choice but to stay. I complained to the the attendant in the office and she said no one from housekeeping was there. I asked for liquid plummer for the sink. It was under lock and key so I asked for a coke to see if that would unclog it. Then a prostitute came in. She was nice but funny she even said it was overpriced! We tried to sleep. Until I felt something crawl on me. A bed bug!!! We asked for garbage bags to put our things in until we could get home. Most disgusting place EVER!!!

7. <u>July 2017, from Kayak:</u>

This is not a hotel for travelers, bring wet wipes, and some twenties for the professional "ladies"

8. <u>May 2018, from Google.com:</u>

It's a dump full of drugs and prostitution

9. <u>November 5, 2018, from Expedia.com:</u>

**DO NOT STAY HERE.**

Look at the pictures.....nuff said. Condoms in the vending machine right next to the Oreos....

10. <u>September 24, 2018, from Expedia.com:</u>

I paid extra for breakfast however the breakfast was just a few bagel, bread, and muffins and orange juice. Although I asked for a non-smoking room but when I was in there with my fiancée and 9 month-old son, the room smelled like a drug infested room. In addition, we weren't able to sleep throughout the night because there were people making noise and banging on the next door like it was prostitution or drugs dealing.

11. <u>July 2019, from TripAdvisor.com:</u>

**Dirty, Noisy, Unsafe**

Overall safety is a concern on this property. There are constantly people walking around look like they are not staying at the hotel. It

has a very drug dealer / prostitution feeling about it. Although none of that can be confirmed, it does affect the feeling of the environment. There's too much loitering in my opinion. The room that I had was not cleaned very well. Hair was in the toilet and bathtub. There are stains of either blood or ketchup or BBQ sauce on the walls and sheets. I was only there for two nights and that is the reason why I did not report these things to the front desk. I just needed my stay to be fluid and without incident as much as possible. However, these concerns definitely need to be addressed. I understand that the price is low, but a good reputation is always precedent over money. If this hotel would invest in the upkeep & creating a safer culture then it could probably charge more. It should also be noted that aircrafts land overhead which is very noisy and hotel is located right on the interstate and that means lots of noise from the traffic.

12. July 9, 2019, from Expedia.com:

ROACHES EVERYWHERE. PROSTITUTION. OLD BUILD-ING. TERRIBLE. STAY AWAY I SHOULD HAVE LISTENED TO THE PEOPLE DOING REVIEWS.

13. July 31, 2019, from Yelp.com:

Stayed here two months and was discriminated against due to being trans and the staff member MIKE sexually harassed me the whole time off and on I was place on do not rent for not performing sexual request to mike who is the person who works front desk and walk into guest rooms unannounced while guest are away from property items come up missing they don't know what happened mike will lie on you and say you did something that u couldn't have done and when caught in a lie he get mad and says you are yelling at him etc this Super 8 is staffed with horrible disgusting people who are money hungry don't care about customer service at all I would recommend the best American inn, Ramada, quality inn, days inn Super 8 will be a WASTE OF MONEY PROSTITUTION AND STAFF INDULGENCE STAFF SNORT COCAINE AT WORK SMOKE WEED AT WORK WHILE ON THE CLOCK STAFF BRING THEY CHILDREN TO WORK WITH THEM AND LET THEM RUN WILD AROUND THE PROPERTY LEAVING TOYS ETC STAFF BREAKING INTO CARS belonging to people

who park and fly DONT PARK AND FLY HERE DONT LEAVE
YOUR CAR HERE THEY DONT WATCH ANYTHING CAM-
ERASDONT WORK

14. February 2, 2020, from Expedia.com:

Found sex toy in room management refused to do anything about it
reimbursing money and had to sleep in a dirty room on the floor
because they refused to reclean or move me to a new room. DO NOT
STAY HERE

15. March 9, 2020, from Expedia.com:

There were gunshots that woke us up at 1 AM. Our non smoking
room still smelled of smoke.

16. March 2021, from TripAdvisor.com:

**Horrible & Unsanitary**

The place needs to be closed. The trims stink, no amenities, paint
chipped walls, filthy carpet, uncomfortable bedding. It looks like a
prostitution hotel. Definitely not a safe.

Even the person checking me in had a gun in their hip and looked
like a drug dealer. Drug users hanging outside.

17. August 10, 2021, Expedia.com:

Horrible place, condoms and fresh stains on bed spread

18.  August 31, 2021, from Expedia.com:

Security walking around pulling guns on people talking bout it's his
trap…. People sitting all out on balcony distributin drugs… and
prostitution activities

19. September 14, 2021, from Expedia.com:

Kids cleaning rooms instead of hotel staff..no towels or washcloths
in the room as well as roaches all over the place while prostitution
was evident....i will never go there again in life nor book for a family

member that came from orlando for a function. There is no word to describe the experience but poor.

20. <u>May 2022, from Google.com</u>:

Place was filthy and dirty... roaches and wholes in the wall . Rude staff and a horrible place overall. Also the person at front desk got into an altercation with a guest and guns were involved. NON refund was so ever.... DO NOT STAY HERE !!!

21. <u>May 2024, from Google.com</u>:

DON'T STAY HERE. Eventhough the staff members treated me very well, this place is dangerous. Rooms were nothing like the pictures, they were not clean, had small roaches inside, did not even had a trash can in the bathroom, the bedroom smelled awful. No airport shuttle and no breakfast. Non-guests wandering around the facilities. Reception is not 24/7, they leave at around 9 or 10. Went to check-out and there was nobody, even called the "security" phone line and of course no answer. No matter how low budget you are travelling, HIGHLY AVOID.

22. <u>May 2024, from Google.com</u>:

This place literally made me so nervous i left 15 minutes from the time i checked in . From the time i checked in the staff made me feel uncomfortable, then apparently my Uber driver caught one of them looking at me as i walked into the room, the room itself looks AB-SOLUTELY NOTHING LIKE the pictures you guys have posted . The locks were questionable, The sheets were dirty the bathroom was disgusting , the towels smelled, the ac didn't work well . Everything about that room made the hairs on my arm stand up and all kinds of red flags were waved . The fact that i can't get a FULL refund is crazy but I'll take half if that means i have my safety

**Safety** Felt like I was going to be sleeping at either a brothel or a place where sex trafficking took place.

23. *July 2024, from Google.com:*

Worst place to stay. No cleaning of rooms. Had to beg for a broom just so I could sweep the place. Lots of hookers and drugs around. A lot of people live there so dirty laundry gets aired in the streets. They raise rates without telling you. The location is right off the 285 but the whole area is full of crime. Do not stay here. You will regret it.

24. October 2024, from Google.com:

DO NOT STAY HERE. I can't believe you charge people money to stay here. Multiple health and safety violations. This place should be shut down. Didn't feel SAFE at all!!! Random people walking in and out of The entire room and hotel was FILTHY!!! I came in solo for a two day seminar and i felt safer sleeping in my car at a walmart parking lot on both nights. They wouldnt refund me so i ended up only using the room to take showers. There were many homeless people in the hallways, garbage everywhere, found multiple roaches in my room and burn marks and stains on the sheets. (Clearly wasnt washed or changed before i came)



57.

Defendant knew or should have known of these and other customer reports showing the dangerous nuisance of the property and the rampant crime that occurred on the premises.

## III. Defendant's Knowledge of Sex Trafficking Generally.

58.

Defendant knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Victims of Trafficking and Violence Protection Act of 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

59.

Defendant knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at the Super 8. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta has one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly earnings of roughly $33,000.[3] Over the last two decades, sex trafficking has generated billions of dollars

---

[3] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM (last visited June

in illicit profits in metro Atlanta alone. Defendant received and retained some of those illicit profits through renting hotel rooms used for the trafficking of J.R.

60.

Defendant knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[4] and as "the number one city for child sex trafficking."[5]

61.

Defendant knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as… rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J. and Thomas, J.).

---

31, 2025); *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 30-32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited June 6, 2025).

[4] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month* (Jan. 29, 2015), https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited June 6, 2025).

[5] *Id.*

62.

Defendant knew or should have known the following: The National Human

Trafficking Hotline has reported that over 91 percent of the calls it received involv-

ing motels and hotels reported sex trafficking, and another 2.6 percent reported a

combination of sex and labor trafficking.[6] A 2012 study found that 63 percent of

trafficking incidents occurred in motels.[7] And the Polaris Project found that "75 per-

cent of [trafficking] survivors…reported coming into contact with motels at some

point" during their exploitation.[8] Unfortunately, "94 percent" also "disclosed they

never received any assistance, concern, or identification from motel staff."[9]

63.

Defendant knew or should have known that attorneys for the motel industry

---

[6] National Human Trafficking Hotline, *National Hotline Cases Occurring in Motels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://humantraffickinghot-line.org/sites/default/files/Motel%20and%20Motel%20Topical.pdf (last visited Sept. 9, 2024).

[7] Jon Conte et al., *Businesses Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), https://web.ar-chive.org/web/20210511135432/https://www.bestallance.org/up-loads/5/0/0/4/50047795/ittprogram_evaluation.11_without_appendix.pdf.

[8] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polaris-project.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited Sept. 9, 2024).

[9] *Id.* at 23.

estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in or around motels,[10] and that the industry had been warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[11]

64.

Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[12]

65.

Defendant knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps motels and hotels can take:

(a)  Establish corporate policy and procedures against sexual exploitation of

---

[10] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), https://web.archive.org/web/20191030203754/http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983.

[11] *Id.* at 19.

[12] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited June 31, 2025).

children;

(b)   Train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

(c)   Include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(d)   Provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(e)   Support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(f)   Report annually on the company's implementation of Code-related activities.

## 66.

Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given motels and hotels the tools to address the scourge of sex trafficking.

## 67.

Defendant knew or should have known that during the relevant period the Department of Homeland Security published guidelines to help motels and hotels detect and respond to human trafficking. DHS's guidelines instruct housekeeping maintenance, front desk, and security, among other personnel, to be vigilant in

looking for signs of human trafficking at motels and hotels, such as:

(a)   Persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(b)   Persons who lack freedom of movement or are constantly monitored;

(c)   Persons who have no control over or possession of money or ID;

(d)   Persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e)   Requests for room or housekeeping services (additional towels, new linens, etc.), but denial of motel staff entry into the room;

(f)   The presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(g)   Extended stay with few or no personal possessions in the room;

(h)   Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.)

(i)   The same person reserves multiple rooms;

(j)   A room is rented hourly, less than a day, or for an atypical extended stay;

(k)   Attempts to sell items to or beg from patrons or staff;

(l)   Cars in the parking lot regularly parked backward, so the license plates

are not visible; and

(m)  Loitering and solicitation of male patrons.

## COUNT I
## STATUTORY LIABILITY: SEX TRAFFICKING
## 18 U.S.C. § 1595

68.

Plaintiff incorporates the paragraphs above as if fully restated herein.

69.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendant knowingly benefitted from participating in a venture that Defendant knew or should have known engaged in acts in violation of the TVPRA.

70.

Defendant knowingly benefitted from Plaintiff's sex trafficking by receiving revenue generated by the operation of the Super 8, including the revenue generated for the rooms in which Plaintiff was trafficked. Each day Plaintiff was trafficked at the Super 8, Defendant knowingly benefitted by receiving money from Plaintiff's trafficking in the form of room-rental fees.

71.

Defendant participated in a hotel venture and knew or should have known that the hotel engaged in acts prohibited by the TVPRA such as harboring, maintaining,

and providing J.R., who was being falsely imprisoned, so that she could be sold for sex at the Super 8.

72.

As part of her sex trafficking, Plaintiff was falsely imprisoned at the Super 8. Defendant's harboring J.R. during her sex trafficking constituted false imprisonment. At times, J.R.'s false imprisonment at the Super 8 was independent of any other aspect of her trafficking, such as sexual encounters, assaults, or batteries she may have endured.

73.

The venture in which Defendant participated was in or affecting interstate commerce.

74.

Defendant knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives, participated in Plaintiff's sex trafficking at the Super 8. Defendant knew or should have known of this participation.

75.

Defendant knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives knew or should have known of other sex trafficking and sex crimes at the hotel

before and while Plaintiff was trafficked for sex at the Super 8.

76.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of its agents and representatives.

77.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendant's participation in this venture.

78.

Defendant is liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

79.

Defendant is jointly and severally liable for damages arising from the indivisible injuries it caused Plaintiff, whose damages were proximately caused by the acts discussed in this count.

## COUNT II
## NEGLIGENCE

80.

Plaintiff incorporates the paragraphs above, as if fully set forth herein.

81.

At all relevant times, Defendant controlled the operation and management of the Super 8.

82.

At all relevant times, Defendant owed a duty to invitees at the Super 8, including Plaintiff, to exercise ordinary care in keeping the premises and approaches of the Super 8 safe from criminal activity, especially child sex trafficking. Defendant also voluntarily undertook actions that created additional duties to provide adequate safety and security at the Super 8.

83.

At all relevant times, Defendant owed a duty to licensees and trespassers at the Super 8, including Plaintiff, to exercise ordinary care to protect them from hidden perils, and to not injure licensees willfully or wantonly. Defendant did so willfully or wantonly injure Plaintiff by its acts and the acts of its agents and employees described in this complaint.

84.

Defendant breached its duty to J.R. and failed to act as similarly situated businesses would in like circumstances by failing to exercise even ordinary care to keep the premises and approaches of the Super 8 safe and by negligently permitting criminal activity, especially child sex trafficking, to exist and flourish at the Super 8.

85.

Defendant knew or should have known the steps to take to prevent the Super 8 from being used as a venue for J.R.'s child sex trafficking. "The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity . . . . From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property . . . With proper training, a front desk agent or a housekeeper can notice that something is not right and respond."[13]

86.

Defendant knew or should have known ECPAT's Code. Regardless, Defendant negligently failed to implement appropriate steps to prevent child sex trafficking at the Super 8, such as:

(a)    establishing corporate policies and procedures against sexual exploitation of children;

(b)    training employees in children's rights, the prevention of sexual exploitation, and how to report suspected cases;

(c)    including a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

---

[13] https://www.ecpatusa.org/hotel-training (last visited June 31, 2025).

(d)    providing information to travelers on children's rights, the prevention of sexual exploitation of children, and how to report suspected cases;

(e)    supporting, collaborating, and engaging stakeholders in the prevention of sexual exploitation of children; and

(f)    reporting annually on the company's implementation of Code-related activities.

87.

Defendant knew or should have known the Department of Homeland Security's guidelines on the prevention of sex trafficking. Yet Defendant negligently failed to implement appropriate steps, such as training its employees, managers, and agents, on those guidelines and on warning signs that indicate the presence of sex trafficking on the hotel premises, including:

(a)    persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(b)    persons who lack freedom of movement or are constantly monitored;

(c)    persons who have no control over or possession of money or ID;

(d)    persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e)    requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

(f)     the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(g)     extended stay with few or no personal possessions in the room;

(h)     excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

(i)     the same person reserves multiple rooms;

(j)     a room is rented hourly, less than a day, or for an atypical extended stay;

(k)     attempts to sell items or beg from patrons or staff;

(l)     cars in the parking lot regularly parked backward, so the license plates are not visible;

(m)     loitering and solicitation of male patrons;

(n)     waiting at a table or bar and picked up by a male (trafficker or customer);

(o)     persons asking staff or patrons for food or money; and

(p)     persons taking cash or receipts left on tables.

88.

ECPAT's Code and DHS's guidelines were only two of the many authorities Defendant could and should have relied on to address and combat sex trafficking at the Super 8. For example, the American Hotel and Lodging Association links to a

"free" ECPAT training that is only "30-minute[s]" and easily available "online."[14] Defendant knew or should have known it had access to such free training materials for its employees, managers, and agents.

89.

Despite what Defendant knew or should have known about the illegal activity at the Super 8, including multiple reports and arrests related to sex trafficking and other sex crimes at the Super 8 before Plaintiff's child sex trafficking, Defendant negligently failed to implement reasonable, appropriate, and adequate measures to protect its invitees, including J.R., from becoming a victim of sex trafficking at the Super 8. To the contrary, Defendant continued its venture to profit from the operation of the Super 8 and the child sex trafficking and other sex crimes incorporated into the Super 8's operations.

90.

Defendant negligently failed to implement policies and procedures to prevent, identify, and deter sex trafficking at the Super 8 and to ensure it was not profiting from sex trafficking, as required by state and federal law.

91.

Before and during the time when J.R. was trafficked at the Super 8, Defendant negligently maintained, inspected, secured, patrolled, managed, and operated the

---

[14] https://www.ahla.com/issues/human-trafficking (last visited June 31, 2025).

Super 8. Defendant had knowledge, both actual and constructive, of the need to properly maintain, secure, inspect, patrol, manage, and operate the premises but negligently failed to exercise ordinary care, thereby creating an unreasonable risk of injury to invitees, licenses, and trespassers, including Plaintiff.

92.

Defendant had actual and constructive knowledge of criminal activity, including sex trafficking and other crimes, at and around the Super 8 before Plaintiff's child sex trafficking.

93.

Defendant had actual and constructive knowledge of the dangerous and hazardous conditions existing at the Super 8 due to the knowledge of its employees, managers and agents and due to the prior criminal activity and dangers associated with the property and surrounding high-crime area.

94.

Plaintiff's child sex trafficking was foreseeable to Defendant because it knew or should have known about the actual events with J.R. at the Super 8 as well as the history of sex trafficking and other sex crimes at the Super 8 and other hotels in the area and the history of criminal activity at or around the Super 8 and in the surrounding high-crime area.

95.

Defendant breached the duty it owed to Plaintiff by failing to exercise ordinary care to keep its premises safe and negligently permitting criminal activity, especially child sex trafficking, to exist and remain at the Super 8.

96.

Defendant knew of or in the exercise of ordinary care should have known of the dangerous and hazardous conditions existing on the premises, and that its failure to maintain, inspect, secure, patrol, and manage the premises breached Defendant's duty as a hotel operator. The dangerous and hazardous conditions at the Super 8 were likely to, and did, result in sex trafficking and other sex crimes at the Super 8 and again to Plaintiff.

97.

Despite its actual or constructive knowledge of criminal activity, including child sex trafficking, Defendant negligently failed to protect invitees, licensees, and trespassers, including J.R., from the risks of child sex trafficking and other violent crimes.

98.

Despite its actual and constructive knowledge of criminal activity, including child sex trafficking, Defendant negligently failed to warn Plaintiff and other invitees, licensees, and trespassers of the dangers at or around the Super 8.

99.

Despite its actual and constructive knowledge of criminal activity, including child sex trafficking, Defendant negligently failed to maintain adequate security devices and personnel to ensure proper use of the property, thereby causing an unreasonable risk of injury to invitees, licensees, and trespassers, including J.R.

100.

Despite its actual and constructive knowledge of criminal activity, including child sex trafficking, Defendant negligently failed to maintain policies, procedures, or systems for investigating, reporting, and warning of child sex trafficking and other crimes, and negligently maintained the Super 8.

101.

Despite its actual and constructive knowledge of criminal activity, including child sex trafficking, Defendant negligently failed to maintain policies, procedures, or systems for investigating, reporting, and warning of child sex trafficking and other crimes, and negligently maintained the Super 8.

102.

Despite its actual and constructive knowledge of criminal activity, including child sex trafficking, Defendant failed to take appropriate action to remedy or reduce the danger to its invitees and allowed the dangerous environment at the Super 8 to worsen and continue to exist unabated, thereby creating a nuisance.

103.

Because Defendant had knowledge of or in the exercise of reasonable care should have known of the dangerous environment at and around the Super 8, Defendant is liable for the negligent supervision, hiring, training, and retention of its managers, agents, and employees and the entrustment of said property to its managers, agents, and employees. Said negligence proximately caused the damages and injuries to J.R.

104.

Defendant negligently represented to invitees, licensees, and trespassers that the Super 8 was properly maintained and that the property was safe.

105.

Defendant was negligent and said negligence proximately caused J.R.'s injuries in the following ways:

(a)    Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

(b)    Negligently failing to keep the premises in a state of good repair;

(c)    Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

(d)    Negligently failing to provide appropriate and effective security personnel during J.R.'s child sex trafficking at the hotel;

(e)     Negligently failing to properly inspect and maintain the premises;

(f)     Negligently failing to properly train and supervise its employees regarding sex trafficking and other sex crimes at the hotel;

(g)     Negligently failing to properly retain, hire, train, and supervise said employees;

(h)     Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

(i)     Negligently failing to respond to online reviews and publicly available information;

(j)     Negligently failing to prevent loitering and trespassing;

(k)     Negligently failing to remove loiterers and trespassers;

(l)     Negligently failing to inspect, patrol, or appropriately monitor the property;

(m)     Negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access, adequate signage, cameras, patrols, inspections, physical, and other landscaping adjustments, and other measures available;

(n)     Negligently failing to remediate a long history of crime at the Super 8 and the area nearby;

(o)    Negligently failing to warn invitees, licensees, and trespassers of known hazards at the property; and

(p)    Negligently representing to invitees, licensees, and trespassers that the property was safe.

106.

Each of the foregoing acts and omissions constitute an independent act of negligence on the part of Defendant and one or more or all of the above-stated acts were a proximate cause of the injuries sustained by J.R.

107.

Defendant is liable for J.R.'s injuries sustained, pain and suffering, the expenses of treatment, and all other elements of damages allowed under the laws of the State of Georgia, including all special, compensatory, incidental, consequential, and punitive damages.

108.

Defendant is liable for the child sex trafficking of J.R.

109.

Defendant's negligence discussed in this count was a cause in fact and a proximate cause of J.R.'s substantial physical, emotional, and psychological harm and other damages.

## COUNT III
## FALSE IMPRISONMENT

### 110.

Plaintiff incorporates the paragraphs above, as if fully set forth herein.

### 111.

Aspects of Plaintiff's sex trafficking constituted false imprisonment. Defendant's actions in harboring J.R. constituted false imprisonment. At times, J.R.'s false imprisonment at the Super 8 was independent of any other aspect of her trafficking, such as sexual encounters, assaults, or batteries she may have endured.

### 112.

As described above, Defendant falsely imprisoned J.R., in violation of her personal liberty, without legal authority, contrary to the laws of Georgia, by assisting and facilitating J.R.'s sex trafficker in confining J.R. to the Super 8 so that she could be sold for sex as a minor there.

### 113.

Defendant's actions in falsely imprisoning J.R. discussed in this count were a cause in fact and a proximate cause of J.R.'s substantial physical, emotional, and psychological harm and other damages.

## COUNT IV
## STATUTORY LIABILITY: MASHA'S LAW, 18 U.S.C. § 2255

### 114.

Plaintiff incorporates the paragraphs above, as if fully set forth herein.

115.

As described above, Defendant directly participated in the child sex trafficking of J.R. by knowingly assisting and facilitating J.R.'s sex trafficking at the Super 8 because Defendant's employees actively participated in J.R.'s trafficking, *supra* ¶¶ 9–42. Thus, Defendant committed the predicate offense of a violation of 18 U.S.C. § 1591 as of to J.R.

116.

J.R. was under the age of 18 when she was trafficked at the Super 8.

117.

J.R. was a victim of violations of 18 U.S.C. § 1591 at the Super 8.

118.

J.R. suffered injuries as a result of Defendant's violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255.

119.

Defendant knew or recklessly disregarded that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause J.R. to engage in commercial sex acts at the Super 8.

120.

Defendant knowingly harbored, falsely imprisoned, provided, obtained and maintained J.R. at the Super 8 by providing J.R. and her traffickers rooms in the hotel, extra illegal services, in and affecting interstate commerce.

121.

Defendant knowingly benefitted financially or by receiving anything of value, from participation in the ventures of renting rooms to J.R.'s sex traffickers who violated 18 U.S.C. § 1591 as to J.R.

122.

Thus, as described herein, Defendant is jointly and severally liable to J.R. for compensatory and punitive damages, in an amount to be determined at trial.

**COUNT V - NUISANCE**

123.

Plaintiff incorporates the Paragraphs above, as if fully set forth herein.

124.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

125.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

126.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

## Public Nuisance

127.

The Super 8's history of rampant crime and illegal sex activity created a spill-over effect that led to other crime occurring in the surrounding area.

128.

The Super 8 caused or contributed to a blighting effect on the surrounding community, so that the Super 8 negatively damaged all persons who came into contact with the illegal sex crimes on its premises, although the effects on each person may have varied.

129.

The illegal prostitution and sex trafficking nuisance occurring at the Super 8 had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

130.

The public nuisance at the Super 8 was the rampant crime the motel permitted, including illegal prostitution and sex trafficking.

131.

The acts and omissions of Defendant in permitting prostitution and sex trafficking at the Super 8 caused special damages to Plaintiff, as she was the victim of sex trafficking at Defendant's nuisance motel and suffered damages to her health, including mental and emotional harm, pain and suffering, and Defendant is liable to Plaintiff for all such damages.

**Public Nuisance Per Se**

132.

The Super 8 motel constituted a nuisance per se under Georgia law because the motel knowingly and/or negligently turned a blind-eye and permitted illegal sexually related crimes to occur at the motel including rampant prostitution, pandering, pimping, and sex trafficking.

133.

A business where illegal practices are permitted constitutes a nuisance.

134.

A business, like the Super 8, that allows prostitution and sex trafficking is a per se public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

135.

Plaintiff was directly harmed as a result of the sex crime nuisance at the Super 8 that permitted illegal sexual activity to occur there.

136.

Defendant is liable for nuisance (public nuisance and/or per se public nuisance) by reason of its failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious condition and of which Defendant had express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

## DAMAGES

137.

Plaintiff incorporates the paragraphs above as if fully restated herein.

138.

As a proximate and foreseeable result of Defendant's violations of the TVPRA, Masha's Law, and Georgia law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible

under Georgia and federal law against Defendant for injuries suffered in the incident at issue, and to recover for all special damages, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiff seeks all compensatory, special, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

(a)  Personal injuries;

(b)  Past, present and future conscious pain and suffering;

(c)  Loss of enjoyment of life;

(d)  Medical expenses;

(e)  Mental anguish and emotional distress;

(f)  All special, compensatory, punitive, and other damages permissible under Georgia and federal law; and

(g)  Consequential damages to be proven at trial.

139.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendant and its employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

140.

Defendant's actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover their necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to them and against Defendant for the following:

(a) Process issued as provided by law;

(b) Plaintiff be awarded actual damages in amounts to be shown at trial from Defendant;

(c) Plaintiff be awarded all general, special, compensatory, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

(d) Plaintiff be awarded a trial by jury; and

(e) Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on August 15, 2025.

ANDERSEN, TATE & CARR, P.C.

*/s/ Patrick J. McDonough*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

ANDERSEN, TATE & CARR, P.C.

*/s/ Patrick J. McDonough*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile