# EXHIBIT L

In The Matter Of:

***JR vs. Lincoln Bancorp***

Deposition Of:

***30(b)(6) Tony Tran***

Taken On:

*4/1/2026*

Pope Reporting & Video, LLC
4355 Cobb Pkwy SE
Suite J207
404-856-0966
www.popereporting.com

POPE REPORTING & VIDEO
EXPERIENCED · PROFESSIONAL · DEPENDABLE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

J.R. )
Plaintiff, ) CIVIL ACTION FILE NO.
vs. ) 1::25-CV-04629-JPB
LINCOLN BANCORP, LLC, )
Defendant. )

________________________

The 30(b)(6) deposition of TONY TRAN taken in person before Dennis W. Davis, CCR, 6061-6949-2566-8352, Certified Court Reporter, at One Sugarloaf Centre 1960 Satellite Boulevard, Suite 4000 Duluth, Georgia 30097, commencing at 1:00 p.m. on Wednesday, April 1, 2026.



APPEARANCES (via TELECONFERENCE)

ON BEHALF OF THE PLAINTIFFS:

Jonathan S. Tonge
ANDERSEN, TATE & CARR, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard,
Suite 4000
Duluth, Georgia 30097
770.822.9680
jtonge@atclawfirm.com

Carson Wynn, Esq
THE STODDARD FIRM
11534 N. Decautur Rd NE,
Atlanta Ga 30307
P: 470-467-2200
carson@legalhelpga.com

ON BEHALF OF THE DEFENDANTS:

Ankur Trivedi
GROTH MAKARENKO KAISER EIDEX
One Sugarloaf Centre
1960 Satellite Blvd
Suite 2000
Duluth, GA 30097
678-730-7512
at@gmke.law



INDEX

CROSS-EXAMINATION
BY MR. JONATHAN TONGE Page 4
CROSS-EXAMINATION
BY MS. CARSON WYNN Page 196
DIRECT-EXAMINATION
BY MR. ANKUR TRIVEDI Page 212

EXHIBITS


| EXHIBIT NUMBER | DESCRIPTION | PAGE MARKED/ IDENTIFIED |
|---|---|---|
| P - 1 | Notice of Deposition | - Page 9 |
| P - 2 | Ariel Images of property | - Page 40 |
| P - 3 | Interrogatories with responses | - Page 52 |
| P - 4 | Employee Policy Handbook | - Page 87 |
| P - 5 | Poster for trafficking awareness | - Page 97 |
| P - 6 | State of Georgia training | - Page 97 |
| P - 7 | Employees signature form | - Page 104 |
| P - 8 | Complaint/Review May 2021 | - Page 139 |
| P - 9 | Same Complaint/different image | - Page 140 |
| P - 10 | Review August 2021 | - Page 142 |
| P - 11 | Review from August 21, 2021 | - Page 144 |
| P - 12 | Review from August 10, 2021 | - Page 146 |
| P - 13 | Review from 2021 | - Page 147 |
| P - 14 | Review from 2021 | - Page 148 |
| P - 15 | Review | |
| P - 16 | Review | - Page 151 |
| P - 17 | Review | - Page 153 |
| P - 18 | Customer Care Case form | - Page 156 |
| P - 19 | Costumer Care Report | - Page 158 |
| P - 20 | Review from James | - Page 161 |
| P - 21 | Review with pictures | - Page 163 |
| P - 22 | Review from Davis Peppers | - Page 164 |
| P - 23 | Review From Ms. Joseph | - Page 164 |
| P - 24 | Review from Robert | - Page 165 |
| P - 25 | Review from Steven Hoyt | - Page 166 |
| P - 26 | Review Stephanie Beachum | - Page 166 |
| P - 27 | Incident report/missing juvenile | - Page 169 |
| P - 28 | Incident/Investigation report | - Page 171 |
| P - 29 | Incident/Investigation report | - Page 171 |





| | | |
|---|---|---|
| P - 30 | Incident/Investigation report | - Page 174 |
| P - 31 | Incident/Investigation report | - Page 174 |
| P - 32 | Incident/Investigation report | - Page 175 |
| P - 33 | Incident/Investigation report | - Page 178 |
| P - 34 | Incident/Investigation report | - Page 179 |
| P - 35 | Incident/Investigation report | - Page 184 |
| P - 36 | Incident/Investigation report | - Page 185 |
| P - 37 | Incident/Investigation report | - Page 187 |
| P - 38 | Image of woman 1 | - Page 187 |
| P - 39 | Image of woman 2 | - Page 188 |
| P - 40 | Incident/Investigation report | - Page 188 |
| P - 41 | Police report | - Page 198 |
| P - 42 | Responses/Objections to Discovery | - Page 201 |


TRANSCRIPT LEGEND

| | |
|---|---|
| . . .(ellipsis) | Halting speech or an unfinished sentence in dialogue or an omission when reading written material |
| -- (dashes) | Break in speech continuity |
| (ph) | Spelled phonetically |
| (sic) | In its original form |
| Uh-huh | Nonverbal in the affirmative |
| Unh-uh | Nonverbal in the negative. |

Page 5

PROCEEDINGS

1:00 p.m.

(Whereupon, the court reporter complied with the requirements of O.C.G.A. 9-11-28(d).)

MR. VIDEOGRAPHER: We are now on the record for April 1, 2026. The time is 1:07 p.m. Will the Court Reporter please swear in the witness.

THE REPORTER: Mr. Tran, if you would please raise your right hand.

(Whereupon, the Witness was sworn.)

MR. REPORTER: The deponent is with you.

MR. TONGE: Okay. Mr. Tran, again, my name is Jonathan Towns. I represent three of the plaintiffs in these cases. And this is Carson Wynn and she represents the fourth plaintiff in the case. This will be the deposition of Lincoln Bancorp LLC. And also the 30B6 deposition of Lincoln Property Management LLC. This is taken pursuant to notice and agreement of counsel in four cases. T.H. v. Lincoln Bancorp, #125CV04310. N.N. v. Lincoln Bancorp #1:25cv04313. J.R. v. Lincoln Bancorp, #125CV4629. And, D.B. v. Lincoln Bancorp and Lincoln Property Management, LLC. #125CV05391. It's taken for all purposes allowed under the Federal Rules of Civil Procedure, including use at

Page 6

trial. Ankur, would you like to reserve the objections again?

MR. TRIVEDI: Yes. Sure. I reserve.

Whereupon,

TONY TRAN

was called as a witness herein and, having been duly sworn, was examined and testified as follows:

CROSS EXAMINATION

BY MR. JONATHAN TONGE:

Q. Okay. I believe I know your name, but can you state your full name for the record?
**A. Tony, last name, Tran. T-R-A-N.**
Q. What was the middle name? Can you spell that for me?
**A. Middle name? I don't use middle name, just, only Tran.**
Q. Okay. You said last name, Tran.
**A. Yeah, last name Tran.**
Q. I'm sorry. Do you go by any other names?
**A. Used to be Chung Tran, C-H-U-N-G Tran.**
Q. Okay. And have you ever given a deposition before today?
**A. I don't remember. No, I don't think so.**
Q. Something like this where you testified before?

Page 7

**A. No, I don't think so. Yeah.**
Q. Have you ever testified in court?
**A. No.**
Q. Okay. You understand that your testimony will be used by the judge and the jury in this case?
**A. Yes.**
Q. Okay. And, you agree to give complete and truthful answers...
**A. Yes.**
Q. -- to questions?

MR. TRIVEDI: Sorry. You just let him finish the whole question.

MR. TRAN: Okay. I'm sorry.

MR. TONGE: (Resuming)

Q. Yeah. We'll get into that a little. But he's taken that down. He's writing down everything everybody's going to say. And so, because of that, if you could let me finish my question and then answer, and I'll let you finish saying what you were saying before... So, we don't try to talk over each other. And also, it's important to give yes or no answers instead, you know, uh-huh or uh-huh or shaking your head, so that he can write something down.
**A. Yes, okay.**
Q. And I might ask a bad question. It might be

Page 8

confusing. So, if I do that, if you don't understand what I'm asking, just ask me to repeat it. Or to rephrase it, and I'll ask it a different way until we understand each other.
**A. Okay.**
Q. And, if you answer a question that I ask though, I'm going to take that to mean that you understood the question. Is that fair?
**A. Yes.**
Q. Okay. So, speak up if you don't understand what I'm saying.
**A. Okay.**
Q. Let's see. You understand that today we're going to be talking about the Super 8 motel located at 4979 Old National Highway in College Park, right?
**A. Yes.**
Q. Okay. And I may call it the hotel, I may call it the Super 8, you know, but that's what I'm talking about, okay? And when I'm asking you questions about the hotel, I'm asking you questions only about the time period that Lincoln Bancorp owned it.
**A. Okay.**
Q. So, when I say something about the Super 8, I'm asking between when you guys bought it in 2019 and when you sold it in 2021. That's the time period I'm

Page 9

talking about.
**A. Okay.**
Q. Do you understand that your testimony today is on behalf of the company, Lincoln Bancorp. and Lincoln Property Management, that's named as defendants in these cases?
**A. Yes.**
Q. Okay. And you understand that your answers are binding for those companies in this case?
**A. Yes.**
Q. Okay. I'm going to show you what I'll mark as Exhibit 1. This is the notice for today's deposition. Have you seen this before?
**A. I don't remember. I don't know if I have.**
Q. Okay. Flip to the third, fourth, fifth page. Flip to the fifth page that says Exhibit A at the top. You there? Right here?
**A. Well, which page?**
Q. Keep going. Come back one.
**A. What page?**
Q. It says number one at the bottom, but it's number one of Exhibit A. So keep going. Turn that one.
**A. This one?**
Q. Yes, that's it. Yes. So, Exhibit A, these numbered lists, this is a list of topics that you've

Page 10

been designated as the representative for Lincoln Bancorp. and Lincoln Property Management. You can flip through these. Do you see those? These are the topics that I'm going to ask you questions about today.
**A. Okay.**
Q. Okay. Do you agree that for Lincoln Bancorp and Lincoln Property that you are the best person to answer these questions?
**A. Yes.**
Q. Okay. Mr. Tran, where do you live currently?
**A. I live in California.**
Q. Okay. What is your address there?
**A.** REDACTED **Alameda, California.**
Q. Okay. How long have you lived there?
**A. I lived there for maybe twenty years.**
Q. Okay.
**A. Or more.**
Q. Can you just give me a brief overview of where you grew up? Did you go to high school, college?
**A. I finished high school. I graduate high school and college, yeah.**
**A. Okay.**
Q. Where did you go to high school?
**A. Mission High.**

Page 11

Q. Is that in California?
**A. Yes.**
Q. In Alameda?
**A. Yeah.**
Q. Okay.
**A. I'm not finished high school. I m sorry.**
Q. Okay. That's fine, yeah. So, did you grow up in Alameda?
**A. Yes.**
Q. Okay. When did you first start working in hotels?
**A. That s when I bought the hotel, in 2019.**
Q. So, that's the first experience you had in the hotel business?
**A. Yeah. Before that I had some Airbnb, but...**
Q. Okay.
**A. But, that's the first hotel I had.**
Q. Okay. What was your work experience before that? Your professional work experience? What kind of jobs did you have?
**A. Oh, I'm a handyman.**
Q. Okay. And what does that entail? Is that for residential houses?
**A. Yeah, residential houses and some commercial.**
Q. Okay. And at some point you personally owned

Page 12

an Airbnb?
**A. Right.**
Q. Okay. And is that what you did in your adult life, mainly until 2019?
**A. Yes. Yes. Yeah.**
Q. Okay. And so, you worked for yourself, I take it?
**A. Yes.**
Q. Okay. And so, when I say the word you and I'm saying, you know, ask the question like you, did you do this or did you do that? I'm referring to Lincoln Bancorp or Lincoln Property, okay. The companies. And so does Lincoln Bancorp or Lincoln Property own any other hotel or have they ever owned any other hotel besides the Super 8?
**A. Even during this time?**
Q. At any time, yeah.
**A. After Super 8, they own another hotel. It's called Chatau Mar.**
Q. It's called what now?
**A. It's Chateau, C-H-A-T-A-U, Mar, M-A-R.**
Q. Okay. Where is that?
**A. That in Florida.**
Q. What town in Florida?
**A. It's Ormond Beach.**

Q. Ormond Beach.
**A. Yeah.**
Q. Okay. And did you buy that after you sold the Super 8?
**A. Yes.**
Q. Okay. Okay. And is that owned by Lincoln Bancorp?
**A. Yes.**
Q. Okay. So, let's go back to the time period and the Super 8. So, we're talking about 2019, 2021, and the Super 8. What was your role in running the Super 8?
**A. You mean when the time this thing?**
Q. Mm-hmm.
**A. Probably three years after I sold Super 8, three years.**
Q. Okay. I think we were actually misunderstanding each other. What was your job title at the Super 8?
**A. Oh, my job title. Oh, I am an owner and supervisor.**
Q. Okay. Were you an employee of, and now I'm saying, were you, Tony Tran, an employee of Lincoln Bancorp? Did you get a paycheck?
**A. Yes.**


Q. Okay. And, did somebody else, I understand that you, Tony Tran, own a percentage of Lincoln Bancorp. Does somebody else own another percentage?
**A. My wife.**
Q. Okay. Is your wife Debbie To? How do you say that? Is it Toe?
**A. Debbie, last name is T-O.**
Q. Okay. And, what percentage does she own?
**A. I think 50-50.**
Q. It's 50-50 between the two of you?
**A. Yes.**
Q. Okay. Besides you, Tony, and Debbie, does any other person or entity...
**A. No.**
Q. -- get profits from Lincoln Bancorp. or Lincoln Property?
**A. No. I don t think so.**
Q. Okay. And, so, Lincoln Bancorp LLC is an LLC, and so it's the property company, I believe. Yes. And so yourself, Tony Tran, and Debbie are the two members of the LLC?
**A. Yes.**
Q. Okay. Do either of you have corporate titles, like CEO, President, Secretary, anything like that?
**A. No. No.**


Q. Okay. Has anyone else ever been involved in the operation of Lincoln Bancorp or Lincoln Property Management besides you and Debbie?
**A. No, mostly myself.**
Q. Okay. How are decisions made for Lincoln? And when I say Lincoln, I'm going to be referring to both Lincoln Bancorp, and Lincoln Property, but who makes the decisions for Lincoln?
**A. What's your question again?**
Q. So, if the business wants to make a decision, like purchasing a different hotel, how is that decision made? Who makes that decision?
**A. I make the decision.**
Q. Okay. You alone?
**A. Yes.**
Q. Okay.
Q. Is that true for Lincoln Bancorp and Lincoln Property?
**A. Say again?.**
Q. Is that true for both companies?
**A. Yes. Lincoln Bancorp, actually, that is the only company. The other one, I set it up, but never operated.**
Q. Well, I guess that might make this easier then. Tell me about Lincoln Property. Did it ever do anything?


**A. No, nothing.**
Q. Okay. So, it has no involvement at the Super 8?
**A. No involvement, nothing, yes.**
Q. Okay.
**A. Zero involvement.**
Q. Okay. So, as far as you know, that company never conducted any business of any kind?
**A. Never, nothing, nothing.**
Q. Nobody ever worked for that company?
**A. No, nothing. (Cross talk)**
Q. I'm sorry.
**A. Oh, okay. Sorry.**
Q. Nobody ever worked for that company?
**A. No.**
Q. And that company never made any money?
**A. Yes.**
Q. Correct?
**A. Correct, yes. Correct.**
Q. Okay. Then unless Carson tells me to change anything later, then from now on I'm just going to talk to you about Lincoln Bancorp.
**A. Okay.**
Q. And so, let me know if there's something I

Page 17

need to pivot on there. Well, I guess, did Lincoln Property have a bank account or anything like that?
**A. I don't think, I opened any account on that one.**
Q. Okay. Did Lincoln Bancorp. have a bank account?
**A. Yes.**
Q. Okay. And, is that where the revenue from the Super 8 was deposited?
**A. At that time, yes.**
Q. Okay. And is that where hotel bills were paid from?
**A. Oh, wait. Can you repeat the question again?**
Q. Yeah, the revenue from the Super 8 motel when you owned it, from 2019 to 2021 when it sold, was the revenue from the hotel deposited in the Lincoln Bancorp. bank account?
**A. Yes.**
Q. Okay. And, were the hotel bills paid from that bank account?
**A. Yes.**
Q. Okay. When the company dissolved, or I guess the company didn't dissolve, when you sold the Super 8, what happened to the money in Lincoln's bank account?
**A. It stayed there.**

Page 18

Q. Okay. Did you use that money to purchase the hotel you have now?
**A. No. Actually, when I sold it, I don't make money out of Super 8. We flat, we don't make money. But, some money we make, we put more into the account.**
Q. So, overall, you're saying that the Super 8 basically broke even?
**A. Yes.**
Q. Okay. Did you ever use a personal, a personal like Tony Tran bank account for the motel's business?
**A. Do I use my personal account?**
Q. To conduct any business for the hotel?
**A. I don't remember. I don't know. So, many times, so many things, I don't know.**
Q. Okay. So it's possible that something...
**A. Yeah, probably not. I don't know.**
Q. Okay. Let's see. And so, Lincoln bought the Super 8 about December 30, 2019.
**A. Yes.**
Q. Is that right? And then sold the hotel about December 6, 2021. Correct?
**A. 2021.**
Q. Yes.
**A. Yes.**
Q. December 6, 2021.

Page 19

**A. Yes.**
Q. And Lincoln sold the motel for $3.65 million. Is that correct?
**A. 3.6? Yes, something like that.**
Q. Okay. Did Lincoln have a mortgage or owe money to a bank for the Super 8?
**A. We have a mortgage, yes. We owe the bank.**
Q. Okay. So, you had to pay off a bank when you sold the hotel?
**A. Yes, yes, yes.**
Q. As in, did the owners of the company, meaning you and Debbie, did you get any distribution after the hotel sold? Did you guys take money out of Lincoln Bancorp at that time?
**A. No, no.**
Q. Okay. And so, Lincoln bought the hotel from a company called Safi Investment Incorporated. Does that sound right?
**A. What's the name?**
Q. Safi Investment, S-A-F-I. You don't have this, by the way.
**A. I don't remember that company at all.**
Q. But you remember buying the hotel from a company?
**A. I remember buying... I remember what now?**

Page 20

Q. Did you know.... Scratch all that. Did you know anyone at the company that you bought the Super 8 from? Did you know any of the people with the company you bought it from?
**A. Do I know the people? Yeah, I know the guy, the owner, yes.**
Q. Okay. How did you know the owner of the Super 8?
**A. I got introduced through the broker. And from the broker, we know the owner, so we do the transaction, final the transaction.**
Q. Okay. And, so you met the previous owner through the broker while you were shopping for the hotel?
**A. Yes, yes.**
Q. Okay. And then Lincoln sold it to a company called Five Star Hotel Group Incorporated.
**A. Yes, yes.**
Q. Do you know any of those people?
**A. Not really.**
Q. Okay.
**A. I mean, I know them. I shake their hand and talk to them, but not personally.**
Q. Okay. And as far as Debbie, I mean, so she owned 50%. Did she do any work for Lincoln?

Page 21

A. **Not much. She did paperwork.**
Q. Okay. What kind of paperwork?
A. **You know, like the bill.**
Q. Okay.
A. **The receipt I throw to her. She just try to organize, so follow the tax. Things like that.**
Q. Okay. So, she does taxes, bills, administrative type stuff?
A. **No. She just like the regular account bookkeeping.**
Q. Okay. Bookkeeping. On one of the filings with the Georgia Secretary of State, it was submitted by Brandon Tran. Is that a relative of yours?
A. **Yes.**
Q. Who is that?
A. **That's my son.**
Q. Okay. Did he work for Lincoln?
A. **No, he don't work for Lincoln.**
Q. Okay. Does he do anything for Lincoln? I mean, did he say anything?
A. **I ask him sometimes, like, I'm no good in computer, and I ask him for network connection. You know, how to get the Wi-Fi, extend folder, here and there.**
Q. Okay.

Page 22

A. **Things like that, but not that I do, yeah.**
Q. Okay. I want to ask you a little bit about what you did to prepare. So, what have you done to prepare for today's deposition so that you'll be knowledgeable and be able to testify on these topics?
A. **I have not prepared. I have to come and tell you the best that I know.**
Q. Okay. Did you look at any documents or anything?
A. **No.**
Q. Okay. Did you speak to anybody else who worked at the Super about the deposition?
MS. WYNN: I didn't hear that answer.
MR. TONGE: (Resuming)
Q. Did you speak to anybody else at the Super 8 about the deposition?
A. **No, no.**
Q. Okay. So, the first two topics are about the complaints filed in this case, the answers, and the discovery, searching for documents that you guys have produced in this case.
MR. TRIVEDI: And, John, I'm so sorry. I just wanted to make sure.
MR. TONGE: Yeah.
MR. TRIVEDI: You did speak with me.

Page 23

MR. TONGE: Okay.
MR. TRIVEDI: Just, it s privileged.
MR. TONGE: (Resuming)
A. **Okay.**
Q. So, at some point you also met with your lawyer. Okay. That's fine. And, just throughout today, don't ever tell me anything you talked to your lawyer about, just in general. That's between y'all.
A. **Excuse me. So, you are the...**
Q. I'm the lawyer for the girls...
A. **Oh, for the girls...**
Q. -- who are suing the hotel, yes. Okay. As you know, we asked for documents and you guys produced some documents. Who searched for the documents when we were asking for those?
A. **Repeat the question again?**
Q. Yeah. Who searched for the documents that you guys produced in this case?
A. **Who searched for the document?**
Q. Who searched for them? When we asked for documents, who went and found them?
A. **I go to ask my wife to look up for me.**
Q. Okay. So, you and your wife looked for the documents. How did y'all search? What were you looking on?

Page 24

A. **I lost. So, okay. So, when you're asking for documents, give me example.**
Q. So, you guys produced a couple of policies about the hotel and some payroll records and the documents, and you'll see some of those.
A. **I asked my wife to produce it.**
Q. Yeah. And so what I'm asking is, where did you find those documents?
A. **We have a box in the storage, something like that. We have to go and look up the date and we pick it out.**
Q. Okay. And so, were there any documents that were on a computer?
A. **No, no, no. Some on the computer, yes. Some. Some have paper, some on the computer, yes.**
Q. Okay. When you sold the motel, did you keep the computer?
A. **No. When I sold the hotel, the computer, it's from that computer. That's the most important.**
Q. Yeah.
A. **And that goes with the hotel.**
Q. Okay. So, when you say that you found some documents on a computer, were those documents in an email account, or do you know where they were located?
A. **Try to help me understand one more time.**

Page 25

Q. Yeah. So, there were some documents that you found in a box in a storage place, and then there were some documents that you got off a computer. And so, when you got documents off the computer, were those documents in an email account? Were they stored in files on the computer? Do you know where they came from?
**A. I have no idea. Maybe somewhere, whatever I could find. When you look it up, a lot of different documents, I don't know.**
Q. Okay.
**A. Whatever I could find, really, I threw them out.**
Q. Was Debbie the one that searched for the documents?
**A. Sometimes Debbie, sometimes me.**
Q. Okay.
**A. Most of the time it's Debbie.**
Q. Okay.
**A. Yeah.**
Q. Did the hotel have an email address?
**A. Yes, they do.**
Q. What was that email?
**A. To be honest with you, I can't remember.**
Q. Okay.

Page 26

**A. But something related to, I don't know, Super 8 Hotel, Wyndham Hotels, something like that.**
Q. Did you search an email account when you were looking for documents in this case?
**A. No, no.**
Q. Okay. Did you ever use a personal email account related to the Super 8?
**A. Mostly I tried to use the corporate email.**
Q. Okay.
**A. So I got everything into one place, yeah.**
Q. I saw in the franchise agreement it listed an email of the letter C88tony at gmail.com.
**A. Yeah, that is my personal email.**
Q. That's your personal. Did you search that email for any documents?
**A. What, sir?**
Q. Did you search that email account for any documents?
**A. Mostly I don't have a personal document in here. When I do business, I separate out, I use my email to return something. I forgot what I returned the email at Wyndham. So, everything goes to Wyndham.**
Q. So, you had a Wyndham account, a Wyndham email account.
**A. Yeah, I think so, yeah.**

Page 27

Q. And do you have access to that anymore?
**A. No.**
Q. Okay. And so, you don't use that C88tony for anything related to the Super 8?
**A. Maybe some, but I don t think so. Maybe some, I don t remember exactly.**
Q. Okay. And there was some kind of Wyndham account, but that's the only other email account?
**A. Yes.**
Q. For the Super 8, I mean. Okay. Can you tell me, do you know what the software system was for checking people in and making reservations at the hotel?
**A. Okay. Repeat the question again.**
Q. Do you know what the software system was for the Super 8? When you were checking people in or putting their names in, do you know what computer program that was?
**A. I don't remember the name of the software, but it's from Wyndham, they provide us the software.**
Q. Okay.
**A. And, that's all we know we use on them. I can sign it, operate something. I can't remember, but... Wyndham, you can go back on that day, so they only have one hotel.**
Q. Okay.

Page 28

**A. I mean one system for all the hotels.**
Q. Right. Do you know if that system you can search by guest name, the date they stayed, that kind of thing?
**A. Yes.**
Q. Okay. And the whole time that Lincoln owned the hotel, they just used that one software system?
**A. Yes, yes.**
Q. Okay. Was there a system that kept the calendars or hours for employees?
**A. They have a time clock. And the time clock it comes up every week, it's like a couple of employees come up, this much, this much, a couple of boxes. But after I left, I think everything gone. There's a fire, all the smoke, the ash, messed up, and I don't know. So, probably it's gone. It's gone.**
Q. Okay. But that was the only way that you kept records was on the cards that they punched?
**A. Yes.**
Q. Okay. Did the hotel keep any record of customer complaints?
**A. Yes. When customer complained, they go to the system.**
Q. Through the Wyndham system?
**A. They got two types of customer complaints.**

Page 29

**One, if they come to the front desk, they make a complaint. The other one, they file a complaint online. They contact Wyndham directly to make a complaint.**

Q. Okay.

**A. So, Wyndham should have the record.**

Q. Okay. And did Wyndham let you know if there was a negative complaint or something?

**A. Yes. Yes.**

Q. What would happen?

**A. We have to deal with them. We have to call them and tell them this is not true. They can complain about a room with cockroach. They come in like three hours, and they sleep for three, four hours. When they check out, they want the money back. And we don't give the money back. They file a complaint to get the money back. So, we have to come up and tell them, hey, you check in at 2 o'clock. You check out at 7 o'clock p.m. I cannot give you money back. So, we write that on the system so Wyndham can see it and also the customer can see it.**

Q. And so if you guys don't deal with a negative complaint, Wyndham can charge you a fee, right?

**A. Yes.**

Q. Did the Super 8 keep any record of police visits to the hotel?

Page 30

**A. Yeah, I have that. Sometimes, yeah, I have that in my office.**

Q. So what would that look like?

**A. Box, box, box, and I stack it up, but it's all gone.**

Q. Okay. What was in those boxes?

**A. Like, pull up person... No, no, no. Police report trespassing.**

Q. Trespassing, okay. What was the first one you said? I'm sorry, before trespassing? Did you say a different kind of...

**A. I don't remember.**

Q. So in the box, there are trespassing records about people that you guys trespassed off the property, right?

**A. Right, maybe some police report.**

Q. Okay. Did you ever request police reports from College Park Police or anything?

**A. No, because when they come, they help me take out the tenant, the bed tenant. And some car damage, things like that, stolen car. They write a report, whatever, but I have no reason to keep it. I have no reason to ask them, so I don't ask them.**

Q. Okay. Did the hotel keep any housekeeping records?

Page 31

**A. Yes, I do. That is housekeeping keeping records that every day we print out from computer. Like how many rooms checking out, and we give out to housekeeper. So, after the day, housekeeper, they do all the room, and which room is missing the pillow, sofa damage, things like that. So, they put a report, they give back to me.**

Q. Okay. And is that in the Wyndham system that you've been talking about, or that's a piece of paper?

**A. That's a piece of paper.**

Q. Okay, and those records are gone also?

**A. Yes, yes.**

Q. Okay. Actually, and I asked, did Lincoln own any other hotels? Does Lincoln own any other kind of business?

**A. Which one? The hotel?**

Q. Lincoln Bancorp, does that company, it owns this hotel in Florida. Does it own any other kind of business besides hotels?

**A. We own a strip mall.**

Q. Okay. Where's the strip mall?

**A. Also in Florida.**

Q. What town? What town?

**A. Ormond Beach, the same ast the...**

Q. The same.

Page 32

**A. Yeah.**

Q. Do you happen to know the address of hand?

**A. What now?**

Q. Do you know the address off hand?

**A. It's 124 Nova Road.**

Q. Okay. And so, Lincoln Bancorp operated and managed the hotel the whole time that it owned it, correct?

**A. Operated the whole time it owned what?**

Q. Owned the Super 8.

**A. Did Lincoln operate the whole time? Yes.**

Q. Was there any other third party management company or anything like that?

**A. No.**

Q. Okay, and Wyndham did not operate the hotel day to day, correct?

**A. No.**

Q. Okay. We talked about this. So, you were the owner, manager of the hotel?

**A. Correct.**

Q. Did you stay at the hotel? Did you live there?

**A. I lived at the hotel.**

Q. Okay. And I'll get a picture out in a minute. Do you remember what room you lived in?

Page 33

A. At random. I go around.
Q. So it would be different rooms at the hotel?
A. Yes.
Q. Earlier, it sounded like somebody said, there was an apartment kind of connected to the front desk. You were not staying in there?
A. No, I let the manager stay there.
Q. Okay. And so, how often would you stay there overnight?
A. I'd stay there a whole year.
Q. Okay.
A. A whole year, yeah.
Q. So, you guys linked and owned the hotel for about two years?
A. Yeah.
Q. Did you stay there for two years?
A. I stayed there for a year and a half. After that, I moved out to the apartment.
Q. Okay. Where is the apartment?
A. It's in East Point, but I don't know exactly the address.
Q. It's in what town?
A. East Point.
Q. Oh, East Point?
A. Yes.

Page 34

Q. Okay. And so, for the first year and a half or so, you stayed at the Super 8, and then you got an apartment in East Point? Is that right?
A. Say it again.
Q. For the first year, year and a half, you stayed at the Super 8, and then for the last half a year or more...
A. Yes. Correct, yes.
Q. -- you had an apartment at East Point?
A. Yes.
Q. How often did you work at the Super 8? Did you have a shift, or how did that work?
A. I worked there a lot. I worked there maybe ten hours a day.
Q. Okay.
A. Ten hours, twelve hours a day.
Q. Did you work seven days a week?
A. Seven days a week.
Q. Okay. And so, that was the first hotel that you had worked at. Did you, prior to buying, before you bought the Super 8, had you had any training on running a hotel?
A. No.
Q. Okay. When you bought the Super 8, what kind of training did you get about hotels?

Page 35

A. I go to Wyndham and they train me.
Q. Tell me a little bit about that. Where did you have to go?
A. I forgot where I go. I go to Wyndham Corporate. I fly out. It not here. Different state. I forgot. They train me about the system. How to get in the system, the computer system.
Q. How long did that last, do you think?
A. I stayed there two days.
Q. Two days.
A. But I forgot what I learned from there. I forgot.
Q. Did they give you any training on safety and security there?
A. It was a lot of training, and I forgot. They got a big booklet, and then it was a lot of training, a lot of things they talked about. But I cannot remember the details. It s been too long. I cannot remember.
Q. Do you remember anything about safety and security that they taught you?
A. I don't remember by now.
Q. Okay.
A. I cannot come up in my head.
Q. Okay. That's fine.
A. Sorry.

Page 36

Q. No, no. It's okay. If you don't remember something, just say so.
A. It s been too long, yeah. After that, I know that they give me certificates.
Q. Okay. Do you still have any? You mentioned a booklet. Do you have any of that?
A. The booklet?
Q. Yeah.
A. After I go, everything was dark. When I left, I took a walk out. I'm tired. So I don't know. I didn't. And everything was... I put it in the box. I tried to go back and pick it up. But after I go back, and then, you know, everything is messy. The whole room is dark. Everything is smoky.
Q. Where were the... Let's talk just for a second about the fire. Where were the boxes, like the records and things, kept?
A. In the office.
Q. In the office. And so were they damaged by the fire in the hotel?
A. The laundry room is underneath. And one room on top is also fire. Maybe the other side. But when they put a can of water, four or five cans of water in two, three hours, and you see the smoke coming into different rooms. You could come and smoke, and then ash

Page 37

**go everywhere.**

Q. Okay. And that was close to when you sold it, right?

**A. No, that was after I sold it, like three days.**

Q. Oh, that was after you sold it.

**A. After, sale.**

Q. I see. Yeah. Did that mess up the sale in any way?

**A. No, the sale, it go through.**

Q. Okay.

**A. We closed already and everything. I was still in the work in the transition, heo transfer.**

Q. So, I want to talk a little bit about your day-to-day at the Super 8. When you were at the property working, what were you doing? Describe your job to me.

**A. What do I do?**

Q. Yes.

**A. I do almost everything. I mostly do handyman, you know, fixing the room, little things. I do laundry. I show people do laundry. I show people how to do housekeeping. I also dump the garbage. Because I have a truck, so I put the garbage in the back, dump it to my truck, and I go dump it. Almost everything, dirty work, hard work, I do everything.**

Page 38

Q. Okay. If it had to be done, you could do it?

**A. Yes.**

Q. Okay. So, I just want to make sure that we cover all this. So, you oversaw the property?

**A. Yes, correct.**

Q. You monitored the property?

**A. I am what?**

Q. Did you monitor the property?

**A. Yes.**

Q. With your eyes?

**A. Yes.**

Q. You supervised the staff at the hotel?

**A. Yes.**

Q. Okay. Were you the boss at the hotel?

**A. I am what? I'm the boss?**

Q. Were you the boss? You were the main supervisor over everybody that worked for the hotel? It depends.

**A. It depends. From that, I let the manager at the front desk do it.**

Q. Okay.

**A. I mostly do in the back.**

Q. Okay.

**A. But sometimes I just go back and forth in and out all the time.**

Page 39

Q. Okay.

**A. If they need help, I jump in and help them. Otherwise, I go back to take care of my business in the back.**

Q. So who was the front desk manager?

**A. I have a couple of people like Louis Vu.**

Q. Okay.

**A. I have Andrew Washington. I have Shanisha Watson.**

Q. Okay.

**A. I don't know. Maybe a couple of people I cannot remember the name.**

Q. So, those three, at some point, would have been considered front desk managers?

**A. Yes. They are the work, as I can remember right now, yes.**

Q. Okay. And so what about for housekeeping? Was there a manager for housekeeping?

**A. Housekeeping? Mostly, I'm the main guy.**

Q. So, you basically supervised the housekeeping staff?

**A. Yes.**

Q. Okay. Did you work the front desk sometimes?

**A. Sometimes.**

Q. Did you walk the property to see what was happening around the hotel?

Page 40

**A. Yes, I do.**

Q. Did you monitor the video surveillance system?

**A. Yes, I do.**

Q. And you said you worked ten hours a day.

Q. Do you think you were working seventy hours a week?

**A. Yes.**

Q. Okay. Was there any other employee who was at the hotel more than you?

**A. No.**

Q. Okay. Is there any employee at the hotel who's more knowledgeable about the hotel than you?

**A. No.**

Q. Okay. All right, let me grab some of this. I don't think that matters. So, I'm going to make this exhibit two. And, you can just flip through those.

MR. TRIVEDI: The easiest thing to do here. It's going to be to move one to the side.

MR. TRAN: Okay.

MR. TRIVEDI: Focus on that one.

MR. TONGE: Let me... I'm going to modify this exhibit. I think that my assistant did something. I think there was something else on the printer. So, you're back three, four pages.

Page 41

MR. TRIVEDI: Is it confidential?
MR. TONGE: No, it's not about this case. It's about a real estate closing. That just means that something else was on the printer. So,s I'm taking four pages out that are a resume and an email. Sorry about that. Okay.
MR. TONGE: (Resuming)
Q. So, the remaining pictures. Can you tell me what these are pictures of?
**A. The Super 8 Hotel.**
Q. Okay. Are all these pictures of the Super 8 Motel?
**A. All of what?**
Q. Are all of these pages different pictures of the Super 8 Motel?
**A. Correct.**
Q. Just looking at this first page. There we go. So, this is an overhead shot of the Super 8 Hotel?
**A. Yes.**
Q. Okay. If I give you a pen, do you know offhand where the cameras are located at the hotel?
**A. Yes.**
Q. Can you put a little X where all the cameras are?
**A. Yes.**

Page 42

Q. Would you mind doing that?
**A. Here. Go that way. Come right here. Go this way. Do you have a smaller?**
Q. I have a blue one, yeah.
**A. This way. This way. This way. This way. This way...**
**(Whereupon, deponent pointing out cameras and marking on the exhibit.)**
**A. Yeah, so for now, I don't know, you can see it, one here, one point back, one point front, one point back, one point to the side here, to the side here, one goes all the way to this side. And this one have another camera here. One go up, one go down, one go up. And maybe one I see the track camera right here, okay. So, one there, so something like that, but they got like more than 24 cameras.**
Q. Okay. And you can keep this, the court reporter will keep it, so we'll have that record. And so basically it looks like they're on most of the corners...
**A. Yes.**
Q. -- facing down the walkways of the hotel.
**A. Yes, sir.**
Q. Okay. And does it cover the entire hotel?
**A. Yes, sir.**

Page 43

Q. Are there any problems with covering the whole hotel?
**A. No, they didn't cover the whole hotel.**
Q. Okay. Does it record, you can see the people coming in and out of every room of the hotel?
**A. Yes, sir, I see people come in and out. I can see people come in, the car come in, the car come out, I can see all that.**
Q. Okay. Yeah, let's not write any more on it.
**A. All right.**
Q. Yeah, let me just take the pen, so it's habit, I would do the same, I would do the same thing.
**A. Okay.**
Q. Let's just keep it where the cameras are there. All right. So, the cameras would capture every car that comes in and out of the hotel?
**A. Yes. Yes.**
Q. And then if you look at the second picture, I just drew a little measurement here, mainly because I was curious, this one, you have it right, this is measuring that distance?
**A. Right, right, right.**
Q. So, is that about right, that it's about a little over feet from the front of the hotel to the highway, does that sound right to you?

Page 44

**A. That's about right, yes.**
Q. Okay. And then, so if you're standing in the front office, where can you start seeing cars coming up this driveway?
**A. We can see all the way up to probably big area.**
Q. Okay. So, there's a point where you can't see it.
**A. Yeah, all the way there, I can see all the way.**
Q. Okay. And then when the cars get to the corner of the building here, they either have to turn right or go straight to the side, right?
**A. Right, right, right.**
Q. So, can you see every car that comes on the property if you're working at the front desk?
**A. Yes, yes, yes, yes, because the camera is right here, so I see every car come in, come out.**
Q. You see it from the camera?
**A. Yes.**
Q. Can you see it with your eyeballs if you're the one working the front desk?
**A. What do you mean by eyeball?**
Q. Not looking at the camera, but if you're standing at the front desk, it's there, are the windows

situated in a way that you would see every car coming in and out of the property?

**A. Oh yes, yes, yes, definitely, yes. 00**

Q. Okay. I might come back to that one, but I think you can set it aside and we ll see. And so, you can see every car, like that would apply to police cars also, right? If you can see every car that comes to the hotel, that means you can see every police car that comes to the hotel also?

**A. Correct. Yes.**

Q. Okay. I've done the cameras. And then, just actually while you have that picture. Right there where the red little marker is, is that the front office?

**A. Where?**

Q. This little thing that juts out of the front of the hotel.

**A. Which one is that? Can you show me?**

Q. Yeah. Is this the front office right there?

**A. Right.**

Q. That's what I'm asking, is that the front office?

**A. No, that is just the shape for the parking.**

Q. Okay. So, you drive under that?

**A. Yes, drive under, yes.**

Q. Okay. And so is the front office located



right behind that?

**A. Right here, right here. That's it. This is only the shape.**

Q. Okay.

**A. Yeah.**

Q. Okay, and so the front office is right inside from there?

**A. Right.**

Q. Okay. Gotcha. And then, is there a night window for the lobby? Is there a night window? Is the lobby closed and you can do business through a window?

**A. Yes, yes.**

Q. Okay. Can you access any of the guest rooms from the lobby? I know you said there's an apartment in the, like connected to the front office. Can you get to any other guest rooms from the lobby?

**A. No, no.**

Q. So, the only way to access the guest rooms are from the doors on the outside?

**A. No, backdoor, it not open.**

Q. Okay. All right, I want to kind of focus on some big picture, principles for a minute and see if you agree or disagree with these. But yeah, we can set that aside for now. Is it important for the hotel to be safe? Is it important for the Super 8 to be safe?



**A. Yes.**

Q. Okay. Is there anything more important than guests and employees being safe?

**A. Yes.**

Q. Yes, there is something more important or yes, you agree?

**A. It is important, I agree, yes.**

Q. Okay. And Lincoln is the entity that's responsible for keeping the hotel safe?

**A. Yes.**

Q. Okay. And that includes protecting guests from criminal activity at the hotel?

**A. Yes.**

Q. Does that include sex trafficking?

**A. Yes.**

Q. And Lincoln expects its employees to identify and report suspicious activity, right?

**A. Repeat the question again?**

Q. Yes. Do you, Lincoln, expect your employees at the Super 8 to identify and report suspicious activity?

**A. Yes.**

Q. Okay. And the purpose of doing that is to protect guests from being harmed, right?

**A. Yes.**



Q. Okay. Lincoln is aware that hotels and motels are used for sex trafficking, right?

**A. Repeat the question again?**

Q. Sure. Lincoln is aware that hotels and motels are used for sex trafficking, hotels and motels in general?

**A. I don't know that.**

Q. Okay. Let's see. Does Lincoln know what commercial sex means?

**A. Commercial sex? Yeah, I understand what commercial sex means.**

Q. Okay. Can you tell me what you understand that to mean?

**A. You know, maybe no. Commercial sex. What do you mean commercial sex? I m confused.**

Q. Not everybody says it that way. Yeah, so that we understand each other. When I say commercial sex, I mean any kind of sex that is paid for, whether with money, drugs, with anything, okay? And so, when I'm talking about commercial sex, commercial sex includes prostitution and sex trafficking.

**A. Okay.**

Q. If I'm talking about one or the other, I'll say prostitution or sex trafficking. But when I say commercial sex, I mean both things put together.

Page 49

**A. So what's your question for me?**
Q. Okay. Well one, I wanted to make sure we understood each other. What's the hotel's definition of prostitution?
**A. What the hotel definition?**
Q. Can you tell me what you understand the word prostitution to mean?
**A. It's bad, it's illegal.**
Q. Okay, but what is it?
**A. It's prostitution.**
Q. Yeah, I just want to make sure that we're understanding each other. Do you understand that prostitution is when someone sells themselves for sex?
**A. Yes.**
Q. Okay. Can you tell me your understanding of what sex trafficking means?
**A. Sex trafficking doesn't mean people get kidnapped, people selling other girls for sex.**
Q. Okay, when other people do it.
**A. Other people, yeah.**
Q. Okay. So, what should a hotel do in response to suspected prostitution?
**A. What the hotel do?**
Q. What should they do?
**A. Mostly I call the police or I kick them out.**

Page 50

Q. Okay. Have you ever called the police for prostitution?
**A. I don't see it in my hotel, to be honest with you.**
Q. Okay.
**A. I see a gangbang here and there, but I don't see prostitution in my hotel.**
Q. So, you said you see gangbang sometimes?
**A. Yeah, gangbang. You know. They come in like gangbang youngster, come smoke weed, things like that. Drive car turn, turn on the music very loud, things like that.**
Q. Okay. And so, you said you had never seen it, so have you never seen, you've never once suspected prostitution of happening at the Super 8?
**A. Not to my knowledge, yes.**
Q. Okay. And, have you ever once suspected sex trafficking to be happening at the Super 8?
**A. Repeat the question again?**
Q. Sure. Have you ever once suspected sex trafficking happening at the Super 8?
**A. So your question, do I want the sex trafficking happen at Super 8?**
Q. No, no, that's not my question. So, I asked, had you ever suspected prostitution? And you said no.

Page 51

**A. Right.**
Q. And so, now I'm changing that question to say, have you ever suspected sex trafficking happening at the Super 8?
**A. I don t know. Can I put Google for clear translation to understand exactly what you did?**
MR. TRIVEDI: He s asking if you thought it was happening.
MR. TONGE: Okay.
MR. TONGE: (Resuming)
Q. Okay. Have you ever thought that sex trafficking was happening at the Super 8?
**A. To be honest with you, I don't know.**
Q. Okay. Sitting here today, can you recall any instance where you thought sex trafficking was happening?
**A. To be honest with you, 100%, I don't know. I don't know, I don't think so. I don't see them, but this is something very shocked me. But I don't know, I don't see them, I don't see things like that. I have a girl myself, if something happens, I will protect them to the best of my heart.**
Q. Okay.
**A. But I don't see, I don't know.**
Q. Did you carry a gun when you worked at the

Page 52

Super 8?
**A. Di I what?**
Q. Did you carry a gun when you were working at the Super 8?
**A. I don t carry a gun. But I carry a flashlight. People make a noise, I can flashlight, and tell shut up, you know, nighttime.**
Q. Okay.
**A. Keep quiet down.**
Q. And also, just if we have a translation, if there's a particular word or anything that I'm ever using that you don't understand, just, you know, we'll keep trying it until then.
**A. Okay. Okay.**
Q. And I appreciate that help. I'm open to just understanding each other. All right. I want to get this. And I don't have y'all's, I don't know if you have anything in there. Just make sure there's no extra emails.
MS. WYNN: That can go after you, if you want.
MR. TONGE: Yeah, yeah, we'll just do that.
MS. WYNN: Okay.
MR. TONGE: (Resuming)
Q. So, this will be three. There you are. Have you ever seen this before?

Page 53

**A. No.**
Q. Okay. I'll just tell you, these are questions that we asked and these have our questions and Lincoln's responses to the questions. Okay. Is what this is. If you turn to page five at the bottom.
**A. Okay.**
Q. And if you just look at number five there.
**A. Okay.**
Q. And so, the question that we asked here was if Lincoln had any, if Lincoln knew of any incidents of, quote, violent crime, sexual assaults, rapes, commercial sex, prostitution, pimping, indecent exposure, sex trafficking or other sex crimes at the Super 8 from 2017 to December 6, 2021. And you can read that. Is that, that's correct. That's the question we asked there. Is that what that says?
**A. This the question, right?**
Q. Yes. I'm asking, did I summarize the question correctly?
**A. Okay.**
Q. Okay. And then your response was, there's some objections, including that, you know, you guys didn't own the hotel until 2019. And then, flip to the next page. And then that, that second paragraph there, it says subject to and without waiving said objections,

Page 54

defendant discloses the case of Charlie Rocker Jr. versus Lincoln Band Corp. LLC. It gives the Fulton County and the case number arising out of an assault and battery on or about August 13th, 2021. And that the claim settled for $150,000. And so, we ask if Lincoln was aware of several crimes; violent crimes, sexual assaults, rapes, commercial sex, prostitution, pimping, indecent exposure, sex trafficking or other sex crimes. And you disclosed this one assault. And so, does Lincoln know about any of those other crimes? Are you aware of any of those other crimes ever occurring at the Super 8 while Lincoln owned the hotel?
**A. I'm confused with the question.**
Q. Okay. That's fair. All right. So, I'll do it a little bit differently and just go one by one. When Lincoln owned the hotel, are you aware of any incident of violent crime?
**A. Yes, I do aware of some violent crime.**
Q. Okay. What are the ones you're thinking of?
**A. Like, girlfriend and boyfriend, they fight in the room. Fight in the room with a guy. Guy fight, until we call the police.**
Q. Like fights outside?
**A. Huh?**
Q. Like fights outside like you were talking

Page 55

about earlier with the guys?
**A. Yeah, yeah, yeah, yeah.**
Q. Okay.
**A. Yeah, know, know, know, something like that happened.**
Q. Okay. All right, so, is Lincoln, and so I'm just going to go down this list of the kinds of crimes that we ask about.
**A. Okay.**
Q. Is Lincoln aware of any sexual assaults at the Super 8 while you owned it?
**A. No, I don't aware of that.**
Q. Okay. Is Lincoln aware of any rapes that happened at the Super 8 while you owned it?
**A. I not aware of that.**
Q. Is Lincoln aware of any prostitution at the Super 8?
**A. I not aware of that.**
Q. Is Lincoln aware of any pimping that occurred at the Super 8?
**A. I not aware of that.**
Q. Okay. Is Lincoln aware of any indecent exposure case at the Super 8?
**A. What do you mean exposure?**
Q. When people are naked or taking their clothes

Page 56

off or something like that?
**A. No, no, no, not like that, no.**
Q. And I think you've already answered, but is Lincoln aware of any sex trafficking that occurred at the Super 8?
**A. No, no, not that I know of, yeah.**
Q. Outside of those, is Lincoln aware of any other kind of sex crime at the Super 8?
**A. No.**
Q. Okay. I looked a little bit at that Charlie Rocker case. Is that something that you remember?
**A. The what now?**
Q. The other lawsuit that was an assault case involving a guy named Charlie Rocker.
**A. I saw that, but I don't remember that case. Probably that case I wasn't there.**
Q. Okay.
**A. But there was a report and a lawsuit, things like that. So, I reported it and now I bring it up, I remember. But other than that, I don't remember, yeah.**
Q. I was wondering, in that complaint he alleged that he was punched in the face by an employee. Do you know which employee he was talking about?
**A. I have no idea.**
Q. Okay.

Page 57

**A. Do they have the name of the employee? You can look up my payroll and hopefully I can recognize it. But, I don t know**
Q. Yeah, no, that's okay. I'm not asking you to guess or anything. It didn't have it in the complaint. I was just wondering.
**A. Okay.**
Q. Does the hotel look for signs to try to figure out if people are engaging in prostitution?
**A. Ask my question again?**
Q. Are there things the hotel looks for to try to figure out if people are doing prostitution at the hotel?
**A. So, the hotel tries to look out?**
Q. Yes. Are there signs that the hotel is looking for to try to determine if people are prostituting at the hotel?
**A. What the question is. Let me understand the question again.**
Q. Sure, yeah. Let me try to think if there's a better way to say it. Does the hotel want people to engage in prostitution at the Super 8?
**A. No.**
Q. Okay. So, what would the hotel look for to try to stop that from happening?

Page 58

**A. Because there's nothing sufficient. Nothing happens. Something like that.**
Q. Say, I m sorry.
**A. Nothing specific.**
Q. Nothing specific in general?
**A. Yeah.**
Q. In general, what would the hotel look for to try to identify people that were prostituting at the hotel?
**A. I don't see that happen, so that's why I'm not looking for it.**
Q. Okay.
**A. If I see that happen, I'll pay more attention, but I don't see that happen.**
Q. Yeah, and I guess that's what I mean. If you saw it happen, how would you know that's what you saw? What would it look like?
**A. That s the thing, you know, the cops, if they come, and then there's a lot of traffic coming in. And the girls they wear, you know, very sexy clothes in and out of the room. And maybe I can see it, and I will pay attention, and then I'll look to my employee, but I don't see that happen.**
Q. Okay. So, a lot of foot traffic coming in and out of one room, and then girls in real skimpy clothes

Page 59

would be some signs?
**A. Something like that, and then I will pay attention.**
Q. That would be stuff that you might look for?
**A. Yes, yes.**
Q. Okay. Anything else like that that comes to mind? Any other kind of things you would look for like that?
**A. No, that's what I can think of right now.**
Q. Okay.
**A. Yes.**
Q. And you had mentioned, you had said this earlier when I asked if you were aware of any pimping. Do you know what a pimp is?
**A. Yes. Yes. I understand.**
Q. Okay. So, similar to the last question, what would the hotel look for to determine if somebody at the hotel was a pimp?
**A. There's no way I can know what the pimp looks like. They can wear regular clothes, jeans, and jacket. So, they do the same thing, so I don't know.**
Q. Okay.
**A. Unless they bring a lot of traffic, come to the room, knock on the door, and then car after car comes in and out of that spot. Then I can recognize**

Page 60

**something suspicious, right? But other than that, I cannot tell.**
Q. So, basically the same thing as the prostitution, if you saw the men coming in and...
**A. Right, right, right.**
Q. -- out and that sort of thing. Okay. What should a hotel do if it thinks someone is prostituting at the hotel?
**A. I either kick them out, knock them out of the room, or I call the police.**
Q. Okay.
**A. Yes. I call the police a lot in that hotel.**
Q. Okay.
**A. Yeah.**
Q. But you don't recall ever calling the police about prostitution or sex...
**A. I don't remember nothing like that.**
MR. TRIVEDI: Just let it finish, okay?
MR. TRAN: Oh, I'm sorry. I'm sorry.
MR. TONGE: (Resuming)
Q. It's okay. But yes, we need to try to make a record, yeah.
**A. Yeah, that's my personality, so.**
Q. No, no. I talk a lot too. I think I'm just as bad as anyone else. When did the hotel first learn

Page 61

what sex trafficking was?
**A. Ask the question again?**
Q. Yeah. When did you first learn what sex trafficking was?
**A. After a couple of months, I bought the hotel, and we have the poster there already, from the State Department. They brought down for me the poster of sex trafficking. And they make sure I post it up. They make sure employees acknowledge it, you know, everybody can see it. So, we post it in the bathroom, we post it in the laundry, we post it in my office, and that's where I learn.**
Q. Okay. Was that the first time you'd ever really heard anything about sex trafficking?
**A. Yes, yes.**
Q. Okay. And you said someone from the State came down and brought you back?
**A. Yes, yes.**
Q. Okay. Do you recall what they told you? Did they tell you anything about sex trafficking, or just you need to hang this poster?
**A. They said, this is the law, so you're going to have to read, understand, post it up, make sure everybody can see it, tell your employees.**
Q. Okay.

Page 62

**A. Things like that.**
Q. Do you think that sex trafficking is a risk at any hotel?
**A. Do I think what now?**
Q. Is sex trafficking a risk to happen at any hotel?
MR. TRIVEDI: Object to form. You can answer that.
MR. TONGE: (Resuming)
**A. Sex trafficking is a risk?**
Q. Yes. Do you think that sex trafficking is a risk at any hotel or motel?
**A. I think so, yes.**
Q. Okay. Other than what you talked about earlier about with the prostitution, the men coming to the room, the clothing they wear. Are there any kind of signs that you would look for other than those to determine if somebody was being sex trafficked at the Super 8?
**A. That's what it is. So, at least, you know, like female, they wear sexy more than normal. It's just pull out. People come in and out, or they're walking around. That's something I will note in my eye.**
Q. Okay.
**A. Yeah.**

Page 63

Q. But you've never seen that at the Super 8?
**A. I don't see that, yes.**
Q. Okay. Have you seen it anywhere else?
**A. No, I don't see it anywhere else.**
Q. Okay. How many men do you think it would take to make you think that was suspicious?
**A. It's more than probably... Let's say the room, you went out for one person or two persons, and four or five men come in and out, and they're not there, and then they come, you know, so maybe that's something suspicious. Yeah, that's what I think.**
Q. Okay. Is it reasonable for the Super 8 to allow drug dealing on the property?
**A. What's your question again?**
Q. Would it be reasonable for...
**A. No, no, no, no, no reasonable.**
Q. Okay, why not?
**A. Because that, they bring more bad guys to the hotel. They bring more crazy things to the hotel.**
Q. Okay.
**A. And I try to prevent that, you know.**
Q. Okay.
**A. I'm a decent guy. I try to run a decent hotel.**
Q. Is it, would it be reasonable for the hotel to

Page 64

allow pimps on the property?
**A. No, no, no, no.**
Q. Why not?
**A. That is another thing, security. They can bring in a lot of messed up, out of control, crazy for the hotel. So, not allowed.**
Q. Would it be reasonable for the hotel to allow prostitution?
**A. No.**
Q. Why not?
**A. Same problem. They bring crazy people in, traffic, and we don't make money off that, you know. And that is a lot of problem, and then we, something we don't want to get involved.**
Q. And would it be reasonable for the hotel to allow sex trafficking?
**A. No.**
Q. Why not?
**A. That's bad. That's illegal. That is not right, yeah.**
Q. Has the hotel, when you owned it, ever rented rooms by less than a day, for an hour, half an hour, anything?
**A. No, we don't rent by hour. We rent whole day.**
**A. Okay. We don't rent an hour or half a day,**

**nothing like that.**
Q. Okay. So I'm going to ask you a series of statements here. There's kind of a lot, frankly. And, I'm just asking whether you agree with this statement or not. So, it's just yes or no.
**A. Okay.**
Q. Okay. And so, I'm just going to read one and ask you if you agree.
**A. Okay.**
Q. Anyone under the age of 18 who is sold for sex is a victim of sex trafficking.
MR. TRIVEDI: Object to form.
MR. TONGE: (Resuming)
Q. Do you agree?
**A. Yes.**
Q. Hotels can reduce the risk of sex trafficking on their property by providing training to employees.
Q. Do you agree?
**A. Yes.**
Q. The sex trafficking training should include how to identify victims, buyers, and traffickers.
Q. Do you agree?
**A. Yes.**
Q. The sex trafficking training should also include steps employees should take if they suspect sex



trafficking is occurring. Do you agree?
**A. Yes.**
Q. Written human trafficking policies can help hotels detect, prevent, and respond to sex trafficking. Do you agree?
**A. Say it again.**
Q. Written human trafficking policies can help hotels detect, prevent, and respond to sex trafficking.
**A. Yes.**
Q. Policies addressing identification, suspicious activity, and reporting can help reduce illegal activity on hotel property. Do you agree?
**A. Yes.**
Q. Requiring guests to provide identification can make it more difficult for individuals to remain anonymous while engaging in illegal activity. Do you agree?
**A. Could you repeat the question again?**
Q. Sure. Requiring guests to provide identification can make it more difficult for individuals...
**A. Yes.**
Q. -- to remain anonymous while engaging in illegal activity.
**A. Yes. Yes.**



Q. Do you agree?
**A. Yes.**
Q. Online reviews may contain information about illegal or suspicious activity occurring at a hotel. Do you agree?
**A. Yes.**
Q. Monitoring online reviews can help a hotel become aware of potential safety or security issues on its property. Do you agree?
**A. Say it again.**
Q. Monitoring online reviews can help a hotel become aware of potential safety or security issues on its property. Do you agree?
**A. I don't know.**
Q. Let me change the word from monitoring to, keeping up with and regularly looking at, online reviews, can help a hotel become aware of potential safety or security issues on the property. Do you agree?
**A. Yes.**
Q. Sex trafficking is a risk at any hotel. Do you agree?
**A. Yes.**
Q. Sex trafficking and prostitution are associated with other criminal activity, including



violence. Do you agree?
**A. Say it again.**
Q. Sure. Sex trafficking and prostitution are associated with other criminal activity, including violence. Do you agree?
**A. Yes.**
Q. When a hotel becomes aware of ongoing illegal activity on its property, it can take steps to address that illegal activity. Do you agree?
**A. Say it again.**
Q. Take another crack. When a hotel becomes aware of ongoing illegal activity on its property, the hotel can take steps to address that illegal activity.
**A. Yes.**
Q. Hotels have the ability to contact law enforcement when illegal activity is suspected. Do you agree?
**A. Yes.**
Q. Hotels have the ability to refuse service or remove guests involved in illegal activity.
**A. Yes.**
Q. Taking action in response to known illegal activity can reduce the risk of harm to guests.
**A. Say it again.**
Q. Taking action in response to known illegal

Page 69

activity can reduce the risk of harm to guests.
**A. Yes.**
Q. Certain patterns of activity at a hotel can indicate illegal conduct. Do you agree?
MR. TRIVEDI: Object to form. You can answer.
MR. TONGE: (Resuming)
**A. Say it again.**
Q. Certain patterns of activity at a hotel can indicate illegal conduct.
**A. Certain pattern?**
Q. Yeah, that's probably not a fair objection. All right. Let's get to specific patterns then, or specific activities. Frequent short-term male visitors to a single room can be a sign of sex trafficking. Do you agree?
**A. Say it again.**
Q. Frequent short-term male visitors to a single room can be a sign of sex trafficking.
**A. Yes. Yes. Yes.**
Q. Do you agree?
**A. Yes.**
Q. Repeated cash payments and room extensions can be a sign of sex trafficking. Do you agree?
**A. Repeated cash payments?**
Q. And room extensions can be a sign of sex

Page 70

trafficking.
**A. At the room what?**
Q. And room extensions, extending the room day to day.
**A. Yes and no. Because some poor people, they stay, the whole family, they have no house. Especially that area. And they have no house, so they have to extend, extend. They have nowhere to go. So, you know. Some of their family, but if single guy or single girl, and they do that all the time, there may be some problem. So I don't know how that's...**
Q. Well I think you answered it, so let me just see if you agree with this. And so, you're saying that could be a sign of sex trafficking, but it could be a lot of other things too.
**A. Okay.**
Q. Is that fair?
**A. Yes.**
Q. Okay. Refusal of housekeeping over multiple days can be a sign of sex trafficking. Do you agree?
**A. Yes.**
Q. Young female guests who appear to be controlled or fearful can be a sign of sex trafficking.
**A. Yes.**
Q. Do you agree?

Page 71

**A. Yes.**
Q. Young women who are not allowed to speak for themselves can be a sign of sex trafficking.
**A. Yes.**
Q. Young women who seem confused or on drugs can be a sign of sex trafficking.
**A. Yes.**
Q. Young women with visible signs of physical injuries could be a sign of sex trafficking. Do you agree?
**A. Yes.**
Q. Young women who appear exhausted or sleep deprived could be a sign of sex trafficking. Do you agree?
**A. Yes.**
Q. Young women in overly sexual or inappropriate clothing can be a sign of sex trafficking. Do you agree?
**A. Yes.**
Q. Young women soliciting men in the parking lot can be a sign of sex trafficking. Do you agree?
**A. Yes.**
Q. A hotel room containing a large number of condoms in the trash can, can be a sign of sex trafficking. Do you agree?

Page 72

**A. Yes.**
Q. A hotel room that requests too many towels can be a sign of sex trafficking. Do you agree?
**A. No.**
Q. Okay. Why?
**A. Maybe, I don't know. I have people like, they have a lot of kids, four or five kids, and they very dirty the towel. They take the towel, they clean the floor, and after that it's very messy. I cannot wash it. And they just want to request a towel, towel. Some of them abusing. Some of them maybe sex trafficking. They need a lot of showers. Maybe, I don't know.**
Q. So kind of like the other, it could be, but it could be a sign of many other things too.
**A. Yes.**
Q. Is that fair?
**A. Yes. Half and half, yes.**
Q. Okay.
**A. A room containing sexual paraphernalia can be a sign of sex trafficking.**
Q. Can I say that again?
Q. Do you know what that word means, paraphernalia?
**A. I don't understand.**
Q. Okay. A room containing sex toys can be a

Page 73

sign of sex trafficking.
**A. Oh yes, yes.**
Q. A room with bodily fluids and stains on the bed can be a sign of sex trafficking.
**A. Yes. It could be, but not 100%, right?**
Q. Right, right. It could be, and that's all I'm asking. I'm not saying every single time this is that.
**A. Okay, okay.**
Q. But my next one is, if the hotel sees several of those signs together, does that increase the likelihood that sex trafficking is occurring?
**A. Probably, yes.**
Q. Hotel employees are in a position to observe guest behavior and activity on the property. Do you agree?
**A. Yes.**
Q. Hotel employees can report suspicious activity to management. Do you agree?
**A. Yes.**
Q. Reporting suspicious activity allows a hotel to respond to potential security problems. Do you agree?
**A. Say that again?**
Q. Yeah. Employees reporting suspicious activity allows the hotel to respond to potential security

Page 74

problems. Do you agree?
**A. Yes.**
Q. Ongoing activity, well, let me rephrase that. Ongoing illegal activity over time is more likely to be noticed by hotel staff. Do you agree?
**A. I don't understand the question.**
Q. Sure, there's a difference between something happening one time and then something happening over and over and over. If some of these signs that we've talked about happen over and over and over, does that increase the likelihood that the hotel staff would notice it?
**A. Yes.**
Q. Hotels control whether the rooms are rented to guests. Do you agree?
**A. Hotel what?**
Q. Controls whether rooms are rented to guests.
**A. Not really. Sometimes the hotel, they book online and the room is already assigned to them. We automatically assign the room to them. So, sometimes we can control, sometimes we don't control.**
Q. Okay. Can you refuse service to any guest?
**A. Yes, we can.**
Q. Okay. So, you can choose not to rent a room to someone in your discretion?
**A. Okay, say it again?**

Page 75

Q. You, the hotel, can choose not to rent a room to someone if you have a reason to do that?
**A. Yes, yes.**
Q. Okay. Hotels can deny or kick out guests who are engaged in illegal activity. Do you agree?
**A. Yes.**
Q. Hotels control access to rooms through keys and key cards. Do you agree?
**A. Say that again?**
Q. Hotels control access to rooms through keys or key cards?
**A. Okay. Hotels control the guest's key card.**
Q. Hotels control the access to the rooms by distributing key cards and keys. Is that correct?
**A. Yes, yes.**
Q. Hotels, scratch that. The Super 8 generated revenue by renting rooms to guests.
**A. The Super 8 can do what?**
Q. The Super 8 made money by renting rooms to guests. Do you agree?
**A. The Super 8 made money by renting rooms... Yes.**
Q. Okay. Continued occupancy, do you know what that means?
**A. No.**

Page 76

Q. If somebody stays in the same room over and over and over, keeps renting the room.
**A. Right.**
Q. Do you understand? So, that's what I'm saying, continued occupancy means. If a guest stays in the room and keeps renting the room, that results in more revenue for the hotel. Is that right?
**A. Now to generate the revenue, if the guest continues to stay, that's what you said, right?**
Q Yes.
**A. Okay, yes.**
Q. Okay. Intervention by a hotel can reduce or stop ongoing illegal activity.
**A. Intervention, yes.**
Q. Taking action in response to suspicious activity can reduce the harm to individuals involved.
**A. Say that again?**
Q. Yeah, the hotel taking action in response to suspicious activity can reduce the harm to the people involved.
**A. Yes.**
Q. Failing to act when you see suspicious activity can allow that activity to continue. Do you agree with that?
**A. Can you repeat the question again?**

Page 77

Q. Sure, the one before that was taking action can reduce the harm.
**A. Right.**
Q. Taking no action when you see suspicious activity can allow that harm to continue.
**A. Yes, yes.**
Q. Is that right?
**A. Yes.**
Q. Sorry, that was kind of painful. Is everybody good? Do you need a break, a bathroom break or anything like that?
**A. No, I'm okay.**
Q. Okay, cool.
**A. If I can finish early, I'll go home early.**
Q. Yeah, we can power through, man. Traffic is traffic.
MR. TRIVEDI: Let me just ask you real fast. He has a flight at 8 something. I told him I thought we were going to be until 5 or 6.
MR. TONGE: I don't think we're going to be later than that.
MR. TRIVEDI: Okay, all right.
MR. TONGE: So, yeah, let's keep going.
MR. TRAN: Maybe go home early.
MR. TONGE: Yeah, I think. Let's just keep

Page 78

moving then.
MR. TONGE: (Resuming)
Q. Who decides whether to hire somebody at the Super 8?
**A. Me.**
Q. Okay.
**A. Sometime it's like 30% of Louie.**
Q. Okay, Louie?
**A. 30%, yeah. 70% is me.**
Q. Okay. And would Louie just be involved in front desk staff? Would he just be involved in hiring a front desk person?
**A. Yeah, yeah, front desk person, yes.**
Q. What are... You said there were about three or four front desk managers and that you oversaw the housekeepers. The front desk managers, what are their kind of job responsibilities?
**A. They are more knowledgeable, so they make the decision to call the police. They make the decision to adjust the rate. Or they make a recommendation for me who to hire, who a good worker, and things like that.**
Q. Okay. Who decides how much people are paid?
**A. Who decides what?**
Q. How much you pay the different staff members?
**A. Mostly we do a minimum wage.**

Page 79

Q. Okay.
**A. And they all know the rate.**
Q. Okay. What is your process for hiring somebody? If you need somebody to work at the hotel, when you own the hotel, what would you do to find someone to work there?
**A. Okay. What my process? What the process? I don't know, so people come in, they say they're looking for front desk. So, I ask them, do you have experience, who did you work for? And they say they have experience, they work for somebody, and I ask them for reference, so I can call and verify, and things like that. And then that's my process, yes.**
Q. Do you do a criminal history check?
**A. Yes, sometimes I request them to go get me the background report.**
Q. Okay.
**A. They know, so they bring it with them.**
Q. Okay. Did most of the people that work at the Super 8 bring you a background report?
**A. Some of them, yes.**
Q. Did you ever see anything on those that troubled you?
**A. No.**
Q. Okay. And I assume you don't have any of

Page 80

those documents anymore?
**A. No.**
Q. You don t have, like the background checks that people brought in?
**A. No.**
Q. If you found out that somebody on your staff had a criminal history, would you still hire them?
A. Probably not.
Q. Okay. Why not?
**A. Oh, because they can speak to the guests, so therefore I protect the guests and try not to.**
Q. Okay. And so you would not want to hire somebody if they had a criminal history of sexual battery or sexual assault, right?
**A. Yeah, If I know, yes.**
Q. You wouldn't want to hire somebody who had a history of terroristic threats?
**A. Say it again?**
Q. Would you want to hire somebody who had a criminal history of making threats?
**A. Of making threats? It depends what type of threats.**
Q. Okay, that's a good question. So you might look into that more?
**A. Right, right.**

Page 81

Q. Would you want to hire somebody that had a history of forgery?
**A. Forgery? Yeah, that maybe, maybe no.**
Q. Okay. Would you want to hire somebody with a history of fraud?
**A. Fraud? It depends.**
Q. Okay. Might look into it more?
**A. Yeah.**
Q. Would you want to hire somebody with a history of aggravated assault?
**A. No.**
Q. Would you want to hire someone with a history of theft?
**A. Theft, no.**
Q. Would you want to hire someone with a history of aggravated assault with a deadly weapon?
**A. That's scary, yeah.**
Q. Sounds like it.
**A. I don't know. I don't know, I've never run into that, so I don't know.**
Q. Okay. But would you, would that be a reason not to hire somebody?
**A. Yeah, probably, no, yeah.**
Q. Would you want to hire somebody with a history of dealing drugs?

Page 82

**A. Dealing drugs. Maybe no.**
Q. Okay. Would you want to hire somebody with a history of armed robbery?
**A. No.**
Q. Would you want to hire somebody with a history of false imprisonment?
**A. No, no, no, no.**
Q. Would you want to hire somebody with a history of assault with a firearm?
**A. No.**
Q. Would you want to hire somebody with an attempted murder charge?
**A. No.**
Q. Okay. Did you ever hire guests who lived at the hotel to work at the hotel?
**A. Sometimes, yes.**
Q. For which positions, do you remember?
**A. I cannot remember, yeah.**
Q. And was it common for people that worked at the hotel to either start out living at the hotel or they started living there after they started working there?
**A. No, they worked there to go home.**
Q. Okay. So, most employees did not live at the Super 8?

Page 83

**A. No, no, no, yeah.**
Q. Okay.
**A. Mostly I don't allow that because it's a conflict of interest, yeah.**
Q. You listed a lot of employees, well not in records, there are listed a lot of employees. The W-2s have I think 18 employees and then there's another document that has a bunch more. When's the last time that you spoke to anybody that worked at the Super 8?
**A. What the last time? I don't remember.**
Q. Do you think that you've talked to any of your former employees since the hotel sold?
**A. The hotel sold? Yeah, not a long time, maybe for a while ago, I don't remember, yeah.**
Q. That's what I'm asking, do you remember staying in touch with any of your employees after you sold this hotel?
**A. After I sold the hotel, yeah, maybe some time, yeah.**
Q. Okay. But not recently?
**A. Not recently, yeah.**
Q. Okay.
**A. I don't remember. I think I'm going to skip some of that. All right. Let's discuss that in a minute. There was, and I'm going to skip some of these**

Page 84

**exhibits in the interest of time. There was a quarterly tax and wage report that showed a payment of $4,000 to a Fiona Tran.**
**A. Yes.**
Q. Is that another relative?
**A. That is my daughter.**
Q. Okay. Did she work at the Super 8?
**A. She would help me with random things. Maybe like some software, they were block or something like that, we missing files, and she helped me go there and research and bring it back up.**
Q. Okay. Did she do that from California or was she ever?
**A. She did that in California.**
Q. Okay. So, she just kind of did a project for you and she just did a kind of one-off project to help the hotel?
**A. Yeah, yeah, yeah. Only one time or two times, that's it.**
Q. And so, I'll just tell you that it looks, from the names that I saw, it looked like the Super 8 had about 36 different employees in two years. Does that sound about right to you?
**A. Right**
Q. Was there a lot of turnover?

**A. Yes.**
Q. Okay. So, a lot of these people worked a short period of time and then left?
**A. They leave and they come back, leave and come back.**
Q. Okay. Were any of these people paid in cash?
**A. No. Mostly they are the W-2 or 1099.**
Q. Okay. You said mostly, were there some employees that were paid in cash or?
**A. No, not that I remember of.**
Q. Okay. How many people would work at the Super 8 in one 24-hour period?
**A. Nobody do 24 hours.**
Q. No, not that. I'm saying how many different people would work? So, like there's three shifts, right?
**A. Oh, in 24 hours.**
Q. So, how many different people are working at the hotel in the course of one day?
**A. I'm not sure of the question. Ask me the question again.**
Q. Sure. Well, how many people worked on the day shift?
**A. Day shift, maybe two, three people.**
Q. Okay. And then how many people worked in the



evening?
**A. Probably one or two people.**
Q. Okay. And, then how many people worked overnight?
**A. Maybe one or two people. Sometimes mostly one.**
Q. One just in the front office?
**A. Yeah, yeah.**
Q. Okay. And you did not have a maintenance employee?
**A. Maintenance. That me.**
Q. That would be you? That's what I thought. And, the hotel never had any security guards or security employees, is that right?
**A. No. Andrew. Mr. Andrew.**
Q. Andrew Washington?
**A. Yes. He also a sheriff, and that's why I hired him. He have a law, a law enforcement, and he also do security as well.**
Q. Okay. So, was he a sheriff at the same time that he worked at the Super 8?
**A. He do what?**
Q. Did you say he worked for the sheriff?
**A. Yes.**
Q. Okay. So, was he working for the sheriff when



he lived at the Super 8?
**A. No, no. I don't know. But he say he off, he off, he off sheriff already. So, during the time he off, he worked for Super 8.**
Q. Okay. Was he actively a sheriff? Did he go to work during the day as a law enforcement officer and then come to the hotel at night?
**A. That's a good question. I don't know. I don't know. I only know that he work for sheriff, maybe he off sheriff already. And he stop work for me, and after he work for me, he go back. I don't know.**
Q. Okay.
**A. But because sheriff, I see he have go training every six months or like that.**
Q. Okay.
**A. So, probably.**
Q. So your understanding was that Andrew had some kind of law enforcement background?
**A. I Andrew what?**
Q. Your understanding was that Andrew Washington had some kind of experience in law enforcement?
**A. Yes, that's what my understanding, yes.**
Q. Okay. Yeah, let's do this. That's four. Here you are. Hear you are. Okay. And that one, the Broggs, we might return to, but yeah, just maybe keep



that in mind. Can you tell me what this is?
**A. This is the employee policy procedure.**
Q. Okay. Where did this come from?
**A. This one look like this one, it come from Wyndham.**
Q. So Wyndham wrote this?
**A. Yes.**
Q. Okay, and gave it to you?
**A. Yes.**
Q. Okay. Where did you find this when you were looking for documents? Where was this located?
**A. Okay. I have folder. A white folder like that. Small one, thinner. I put the three hole. I punch hole. Put it in. Yeah.**
Q. So, was this in that box of actual documents?
**A. I don't know where I found this one. That's interesting. Maybe from email. I think it came off from email or something. I don't know where I found this one. But I don't know. I have to look back to see.**
Q. Okay.
**A. But, I remember this one, but I don't know where exactly how I found it.**
Q. Okay. Let's just flip to the second page there. Let me see. Here under safety and security

Page 89

guidelines and procedures, do you see that in the middle of the page?
**A. Okay.**
Q. And then the fourth one says report accidents, injuries, or suspicious activity to management immediately.
**A. Yes.**
Q. Okay. And so, was it a requirement for hotel employees to report suspicious activity to the management?
**A. Yes.**
Q. Okay. And who all would management include?
**A. They could report to Louis, Shanisha (ph), Andrew or me.**
Q. Okay.
**A. And if they go at night time, those people report to me in the morning when I come in.**
Q. Okay. And so, did that happen a lot that there was suspicious activity to report?
**A. Yes. Yes.**
Q. And what kind of suspicious activity was reported?
**A. People making noise. Vandalism car. Homeless.**
Q. What's that again?

Page 90

**A. Homeless. Homeless, homeless people break in the room.**
Q. Oh, homeless. Okay. Gotcha.
**A. Break in the room. Fighting. Things like that.**
Q. Okay. And then, if you look down here about customer complaint policies and procedures.
**A. Where that, okay.**
Q. At the bottom, the first one says all customer complaints must be documented and reported to the supervisor or hotel manager. And so, was it a requirement that these customer complaints needed to be documented?
**A. Yes. When they report to the supervisor or front desk, they write out a piece of paper so that in the morning, they report to me.**
Q. So, that was written down, what you were just telling me about?
**A. Yeah. It was written down on the paper, yes.**
Q. Okay. And did you keep those documents?
**A. I keep the documents, yes.**
Q. Okay. You don't have those anymore?
**A. I don't have those anymore, yes.**
Q. Okay. What was the do not rent list like?
**A. Do not rent list is just like in computer and**

Page 91

**they have the box, like three box that we check them. So, if do not rent list, we check the red one. When we put the name do not rent list, so automatically when the guest come back, next couple month or year, we put the name in, the list will pop up and they have a color red. So that's how we know that this is.**
Q. Okay. And, that would be within the Wyndham computer system?
**A. Yes.**
Q. Okay. Was there any other kind of do not rent list or anything?
**A. In the short term, we write on the paper, but that only last like a week or two weeks and they forget.**
Q. Okay.
**A. But mostly we put on the system.**
Q. Okay. Let's see. So let's flip to the next page. Let's see. Is that right? Sorry, I'm trying to see if I need to ask about this stuff or not. Okay. I've actually flipped to the fourth page. I'm sorry. So flip one more page that has professional conduct at the top. And then, if you look down to law enforcement involvement.
**A. Yes.**
Q. You see that. And so, the first one says the hotel manager must be notified immediately when law

Page 92

enforcement is contacted or on site. Was that a policy or a requirement of employees at the hotel?
**A. Well, it depends on what situation. If something urgent or something feel danger, and then they call the police. If not, then we take care of it in our team.**
Q. Okay. Did you expect yourself or one of the other managers to be notified any time the police...
**A. Yes. Yes, they do. yes, yes.**
Q. -- are on the property?
**A. Yes, yes.**
MR. TRIVEDI: Just let him pose the question.
MR. TRAN: I'm sorry.
MR. TRIVEDI: When it becomes too much, then you can't get everything down. Okay.
MR. TRAN: Okay. Okay.
MR. TONGE: (Resuming)
Q. Okay. So, you expected one of the managers to be notified every time the police were on the property?
**A. Yes.**
Q. Okay. And then the second one under that says employees should not interfere with police investigations and must remain cooperative. Was that a requirement in policy?
**A. Correct.**

Page 93

Q. At the Super 8? Yes?
**A. Yes.**
Q. Why is it important to cooperate with the police?
**A. Because you tell them the truth, it's more easy for them to do the work.**
Q. Okay. If hotel employees were warning people at the hotel when the police were there so that they could hide, would that be cooperative, or would that not be cooperative?
**A. Ask me the question again?**
Q. Yeah. If hotel employees were warning guests when the police were on the property so that they could hide, would that be cooperating with the police?
**A. No, that not.**
Q. Okay. So, that would violate this policy?
**A. Right.**
Q. Okay. And so, down there at the last section, it says employees must remain alert to unusual guest behavior or activity indicative of criminal conduct.
Q. Is that a policy at the Super 8?
**A. Yes.**
Q. Okay. Would what we were talking about earlier, a lot of men come into one room, would that be the kind of unusual guest behavior that employees should

Page 94

be alert to?
**A. That one of it, yes.**
Q. And then, the second one under there says, report any suspicion of sex trafficking, drug use, or prostitution immediately to hotel manager or police.
**A. Yes, correct, yes.**
Q. And that was a policy at the hotel?
**A. Yes.**
Q. But so far today, you don't recall any suspicion of sex trafficking, drug use, or prostitution that you were made aware of at the Super 8?
**A. Correct.**
Q. Okay. So, if employees saw sex trafficking, prostitution, or drug use at the property and did not report it to you or the managers, that would violate that policy, is that right?
**A. Yes.**
Q. Okay. Did you have a rule about how often housekeeping had to enter a room?
**A. They only do it if they have the checklist to come in. I mean the room checklist, check out, so they know what room to come in. And only they do it during the working hours, 8 to 2 o'clock, so after 2 o'clock they finish, they don't want to come back, this when they go home.**

Page 95

Q. Okay.
**A. They get the key back, the master key.**
Q. I think I'm asking something different, but say if a guest, did you have Do Not Disturb signs at the hotel?
**A. Yes, I do.**
Q. So, if a guest left the Do Not Disturb sign on their room...
**A. I wouldn't come in.**
Q. If they left it on there for a week, would you come in?
**A. They left for a week, and then we probably... I don't have that situation, you know. But, I don't have that situation, because they have to pay.**
Q. Yeah, I'm saying they're still paying for the room. As long as they're paying for the room, if they have a Do Not Disturb sign on, would you not go in that room at all?
**A. I go in, I ask my staff to go in. We have to go in every two days or three days.**
Q. Okay.
**A. The reason we do that is because we don't get the guests to stay too long in one room. When they build up the smoking, the trash, everything like that, it's harder to clean up the room. So after one day, two**

Page 96

**days, they just start making mess so we can t easily clean the room.**
Q. Okay.
**A. So that's my policy.**
Q. If somebody wanted a later checkout time, or they needed a little extra time to pay for their next day, what would the hotel do?
**A. They call late checkout. Late checkout, we charge them maybe, I don't know, probably $20 or something more for an hour. Late checkout.**
Q. Okay. To stay longer and then maybe pay later?
**A. No, no, no, no. Usually they have to come pay first.**
Q. Okay.
**A. Yeah. And then we let them late checkout. Otherwise, the hotel keeper will bother them.**
Q. Okay.
**A. And knock on the door.**
Q. Okay. I think I'm done with that. What number did I put on the front of that? Do you know. I don t think I wrote it on all of them.
**A. Number four.**
Q. That was 4. Okay. I was thinking I was on five. Okay.

Page 97

MR. TRIVEDI: Is it about six.
MR. TONGE: How many do we have there?
MS. WYNN: It's four. It s four.
MR. TONGE: It s four?
MR. TRIVEDI: Okay.
MR. TONGE: Okay.
MR. TRIVEDI: I just wanted...
MR. TONGE: Did I write that?
MR. TRIVEDI: I don't know.
MR. TONGE: Okay. Sorry about that.
MR. TONGE: (Resuming)
Q. Okay. Let's go to exhibit five. So, this was produced to us. Is this the poster that you were talking about?
**A. No, not this one. More bigger and more detailed.**
Q. Okay. And so, this, there's a...
**A. Some of the language here and there, but I think it's bigger, more detailed, big poster.**
Q. Okay. And so this is not the poster that you received from somebody at the state when you first opened the hotel?
**A. Probably. They have some language similar like this in that poster as well.**
Q. Right, but this is not that poster.

Page 98

Q. Is that right?
**A. It is. Yeah, I don't remember. This is long, Center, labor. Okay. They have a labor poster as well. And sex trafficking poster, it's two separate posters.**
Q. Okay. But this is not the poster that you got in early 2020.
**A. I don't remember. I don't remember, to be honest with you. It looks similar, but I don't remember exactly.**
Q. Do you have any idea where this came from?
**A. From state. I know the guy from state, Georgia.**
Q. I mean, was it... Did you find this in the same binder?
**A. Oh, this one from me? I don't remember.**
Q. Yes, this was produced by you guys.
**A. I don't remember. Maybe... This is some of their language. Same thing, you know? You know, like... They did help, and then they have different languages. I remember all the languages. They say something about the phone the help number, and Spanish and English. Yes, but...**
Q. But this is just a different version of the poster?
**A. Yes.**

Page 99

Q. Okay. Do you know if this was posted in the hotel?
**A. Yes, yes.**
Q. This one was, and the other one?
**A. And the other one, yes.**
Q. It probably was...
**A. Two bigger ones. Two bigger ones, yes.**
Q. Okay.
**A. Not the main one.**
Q. Okay. I think I'm good on that. So, this is... Quality paper. Nice. Okay. You can flip through that, and just let me know when you're ready. Do you know what this is?
**A. Yes.**
Q. Okay. What is it?
**A. The human traffic training.**
Q. Okay.
**A. Yes.**
Q. And where did this come from? This was produced by you guys.
**A. Yes, this was probably... This was probably in the computer, or something like that. Because, when it come, and then we have to take it, and then probably go online, and do something, do some study. I remember I have to do some study, and then mark it, and print them out, something like that, yes.**

Page 100

Q. Okay. I would be a little surprised if this was the Wyndham one, because...
**A. Yeah it s probably not the Wyndham. They have two. One from Wyndham, and one from the State.**
Q. Okay. And after the States, they give us the poster. They make me go online and study, and make sure to check, check, check, and then print out something like that. So maybe I did that, and I print out what...
Q. And so this is... Because this one just... So if you flip to the first page, or flip one page over. That's Marty Kemp, who is the governor of Georgia's wife, and this appears to be... If you could flip to page... Let's see. Page four at the bottom. It's under module introduction. It says, As a state employee, and as a citizen of Georgia, you play an important role in all aspects of Georgia business. Bless you. So, this appears to me to be written as a training for employees of the state of Georgia. And so, I was just wondering, how did you receive this, and what did you do with it, I guess?
**A. We were probably for the owner to... That was my best memory. For the owner, I have to go online, and I study before, and I try to make sure I do it, so make sure they have it.**

Page 101

Q. Okay.
**A. Probably for the state documents.**
Q. Okay. And, so...
**A. And then I have to study it. And then I print out, keep it. So, that's what they tell me to do.**
Q. Okay. And so, all of your employees took the training... You tell me. Did all of your employees take the human trafficking training in the Wyndham system, or just you?
**A. It's me, and also I show employees the state what the instructions, that all employees must read that poster.**
Q. The poster, yeah.
**A. It's all the education, you know, whatever, include a phone number to call. Be aware of any trafficking sexual, minor, things like that.**
Q. I'm just trying to figure out what other employees at the hotel got. Did everybody that worked at the hotel have to do the Wyndham training?
**A. No.**
Q. Okay. Which employees had to do the Wyndham training? Do you know?
**A. Actually, the owner had to do it.**
Q. So just you?
**A. Just me, yeah.**

Page 102

Q. Did any other employee have to do, or did any other employee do the Wyndham training?
**A. The Wyndham training, no, they only have to look over. They don't have to do the training. They look over. They look over the state, and I wrote, they look over the Wyndham, it's also the book, I put in the book, like that, like the folder.**
Q. Yeah, yeah.
**A. And I live on the table, so they have to look over. And I guess when I say training, I do want to make sure we're talking about the same thing. I'm not talking about the two-day training that you went to in person.**
**A. Right.**
Q. There's some kind of online human trafficking training from Wyndham. Is that right?
**A. No, no, no. They don't have to take online. I remember they have a letter after they read all the postal training, they sign that they have read, things like that. So, I put in the folder. Because the state department, they come by, they check once in a while. So, I have to show them what all employees have read and understand.**
Q. Okay.
**A. Okay, so.**

Page 103

Q. And so, just to confirm, are you the only person who took the Wyndham human trafficking training?
**A. So far, yes, I do that. And employees, they take a different training. Employees, they must read, or the poster and understand, and sign the paper.**
Q. But that's for the, you're saying for the state of Georgia, right?
**A. That's for state of Georgia.**
Q. Okay. So, let's set the state of Georgia thing aside.
**A. Right.**
Q. We're just talking about there's, there is some kind of Wyndham human trafficking training that is online. Is that right?
**A. Yes, that they are Wyndham University, so manager, they take that.**
Q. Okay. And so, you took, you did that? I did that in person.
**A. Okay. So, you got some of that in person.**
Q. Did any other employee at the Super 8...
**A. Yes, manager.**
Q. -- have to do that?
**A. I think the manager, they do that.**
Q. Was it the three, or the front desk managers you talked about?

Page 104

**A. Yeah, the front desk, yes.**
Q. Okay. All right. So, let me just ask this. So, the front desk managers that you talked about earlier all took some version of the Wyndham human trafficking training online?
**A. Yes.**
Q. Okay. All right. And then did people, did all the employees have to take this training, or did they just have to look at the poster?
**A. They just have to look at it.**
Q. Look at this, or look at the poster?
**A. Both, the poster and all this stuff, I have one folder.**
Q. Yeah, let me, I'll just do this one too, real quick. So, this would be Exhibit seven. There's that.
**A. Yeah, this one, this one they have to sign here. Yeah.**
Q. And so, all of your employees signed this?
**A. Yes.**
Q. Because all of your employees read this?
**A. Yes.**
Q. Okay. Aand by this I mean all of your employees read this State of Georgia training and then all of your employees acknowledged that as well?
**A. Yes. Yes.**

Page 105

Q. Okay. Okay. Let's keep this separate from that because they're two different ones. Hang on to that for just a second, let me see. So, I do, let's go through this kind of quickly. So, go to page 2, please.
**A. What page?**
Q. Number 2, so back towards the front. And, the Super 8 is near the Atlanta airport, right?
**A. The Atlanta airport, yes.**
Q. Yeah. So, here this says that bullet point number says 7,200 men purchase sex from a minor every month in Georgia. Do you agree with that statement from the training?
**A. That's what they say and then I agree.**
Q. Okay.
**A. I think so, yes.**
Q. And then, the next to last bullet says around 65% of men who buy sex with young females do so in and around suburban and metro Atlanta, with 9% near the airport. And so, do you agree with that? That 9% of the men that buy sex with young women do it near the airport?
**A. Yeah, that's what they say, yes.**
Q. Let's see, let's go to page 6. Page 6 at the bottom there. And so, this is defining some sex trafficking and so do you agree with the training that

Page 106

if a girl is under the age of 18 and she's sold for sex that that is sex trafficking?
**A. Where that? Which one?**
Q. The first sentence. The commercial sexual exploitation of children or CSEC is any situation in which someone under the age of 18 performs a sex act or is otherwise sexually exploited and something of value financial or otherwise is exchanged.
**A. Yes.**
Q. Okay.
**A. And, let's go to page 8. And, under that table it says vulnerable populations are frequently targeted by human traffickers including runaway and homeless youth who begin as minors and continue through adulthood.**
Q. Do you agree that runaway and homeless youth are at risk of being sex trafficked? It says vulnerable populations right under there.
**A. Yeah.**
Q. Vulnerable populations are frequently targeted by human traffickers including runaway and homeless youth who begin as minors. Do you agree that runaway youth...
**A. Yes, yes.**
Q. - and homeless youth...

Page 107

**A. Yes.**
Q. -- are at risk of being targeted by sex traffickers?
**A. Yes.**
Q. Let's see. And then just stay on that page for a second.
**A. Where.**
Q. Page 8.
**A. Oh, page... Okay.**
Q. That's the page.
**A. Okay.**
Q. And, then that says sex trafficking occurs in a range of venues including fake massage businesses via online ads or escort services in residential brothels, on the street, or at truck stops, or at hotels and motels. Do you agree with that statement?
**A. Yes.**
Q. Okay. Let's go to page six. Two pages before that. And, under, at the bottom. In the last paragraph it says the situations that sex trafficking victims face vary dramatically. Many victims become romantically involved with someone who then forces or manipulates them into prostitution. Others are lured with false promises of a job such as modeling or dancing. Some are forced to sell sex by their parents or other family

Page 108

members. Based on the training that you looked at do you agree with that statement?
**A. Yes.**
Q. Okay. That's right there. Let's see. Sorry, I'm trying to see but I can skip to do this. So, go to page nine please. So, in the second paragraph this says under Georgia law children under sixteen cannot legally consent to sex. Which is the age of consent. And children under eighteen cannot be willing participants in commercial sex. And then it says in a nutshell regardless of how they act or appear Georgia law recognizes these youth as victims of human trafficking and victims of child abuse. So, do you agree...
**A. Yes, yes.**
Q. -- that regardless of how they act or appear that any minor involved in commercial sex is a victim of sex trafficking?
**A. Okay. Ask me the question again?**
Q. Yeah. Regardless of how the victims act or appear, do you agree that a minor involved in commercial sex is a victim of sex trafficking?
**A. Yes.**
Q. Okay. And then, flip to the next page on page ten. If you look at the very bottom paragraph, it says human traffickers are not just the persons who pimp the

victim, but any person who provides transportation assists or knowingly provides a room for said acts. Do you agree that someone knowingly providing a room for sex trafficking is sex trafficking in Georgia?
**A. Do I agree with you?**
Q. At the bottom.
**A. Right, right, right.**
Q. -- in that paragraph. The last paragraph it says that anyone any person who provides transportation assists or knowingly provides a room for said acts is a human trafficker.
**A. Yes.**
Q. Do you agree with that?
**A. Yes.**
Q. Without, and, I don't know that we need the training for this, but you agree that traffickers may physically and emotionally abuse their victims?
**A. Yes.**
Q. Do you agree that traffickers may use physical violence or substance abuse to control their victims?
**A. Yes.**
Q. So, it wouldn't be surprising if sex trafficking victims were on drugs while they were being trafficked?
**A. Yes.**



Q. Yes, you agree?
**A. Yeah, I agree.**
Q. Okay. Let's see. Go to thirteen please.
Q. Number twelve?
**A. No, thirteen. Let's see.**
Q. If you look at the one, two, three, the fourth paragraph it says human trafficker controlled trafficking. Human traffickers pride themselves on tricking their victims into selling their bodies for money and thinking they have freely chosen to do it. Do you agree with that statement?
**A. Yes.**
Q. Okay. And so, a victim could look like she was choosing to do sex work but that doesn't mean she's not a victim of sex trafficking, right?
**A. Yes.**
Q. Okay. Let's see. I'm going to skip some of that. Yeah, I think we've covered a lot of that. So, if you go to page fifteen please.
**A. Okay.**
Q. And, if you just kind of review that page, it's talking about some of the signs that we talked about earlier. You remember when I was asking you if you agreed that these could be signs of sex trafficking? Do you remember those?



**A. On this?**
Q. No. Earlier when you and I were talking.
**A. Okay.**
Q. And I was listing out things and you were agreeing with whether they were signs of sex trafficking.
**A. Right.**
Q. So, this is listing signs of sex trafficking. There's two bullets under poor physical health, lack of control. And then it talks about other signs.
**A. Yes.**
Q. And it says, the last paragraph says keep in mind that this list is not exhaustive, and represents only a selection of possible indicators. The red flags in this list may not be present in all trafficking cases. Take each individual indicator in context and not in isolation or as proof that sex trafficking is occurring. Did I read that right? And my question is just whether I've read that correctly.
**A. Yes.**
Q. Okay. And so do you agree that a person, that the hotel should not take any of those signs in isolation but should look at them in context to determine whether someone is being trafficked?
**A. I got lost.**



Q. Yeah. Do you agree that a person shouldn't just look for one or two of these signs in isolation but should look at what's happening in the context to determine whether a victim is being trafficked?
**A. Yes.**
Q. Okay. And, if hotel staff did suspect that someone was being trafficked at the hotel, what should they do?
**A. Could you tell me the question again?**
Q. If a hotel employee did suspect that someone was being trafficked at the Super 8, what should they do?
**A. Oh, they either tell me or they call directly to the police.**
Q. Okay.
**A. Yeah. They have full, right control to call the police directly.**
Q. Okay.
**A. If that's illegal activity. Can we take a break real quick?**
Q. Sure.
MR. TRIVEDI: We can.
MR. TONGE: Yeah, yeah, yeah. Absolutely. Yeah, yeah. I'm trying to just burn through.
MR. TRIVEDI: Mr. Tran, Mr. Tran.

Page 113

MR. TONGE: You have a microphone on.
MR. TRAN: Oh, okay.
MR. TONGE: Nobody wants to hear that.
MR. VIDEOGRAPHER: We're now off the record at 3:11.
(Break)
MR. VIDEOGRAPHER: We are now back on the record at 3:24.
MR. TONGE: (Resuming)
Q. Okay. We just took a short break. I have a list of the employee names from the W-2s and the payment information and I'm just going to go down this list and I would like you to tell me what their job title was. Front desk, housekeeping, whatever.
**A. Okay.**
Q. To the extent you remember. Andrew Washington.
**A. Front desk.**
Q. Okay. Brenda Casillas. Brenda C-A-S-I-L-L-A-S.
**A. Probably housekeeper**
Q. Okay. Carlton Ramon Bachelor.
**A. I can't remember. Probably front desk. I don't know. Yeah.**
Q. Okay. Carmen U. Arms.

Page 114

**A. From laundry.**
Q. Was there a separate laundry job?
**A. Yes.**
Q. Okay. And then you said this earlier. Is that Kenesha?
**A. Shaneesha Walton. Yeah, front desk.**
Q. Shaneesha Walton. Front desk. DeAnthony White.
**A. Front desk.**
Q. Destiny Koontz.
**A. Housekeeper.**
Q. Okay.
**A. I don t remember.**
Q. Iosias Zudina. Oh, no. This one. This one. Front desk. I'm sorry. Excuse me. Yeah. Front desk.
Q. Francisco Pagan.
**A. That is the carpet installer. Carpet installer.**
Q. Carpet installer. Okay. And so, was that like a...
**A. Independent contractor.**
Q. And, he did that and then he was done?
**A. Yes.**
Q. That's all he ever...
**A. When the room real messed up, he called me to**

Page 115

**replace the carpet.**
Q. Oh, okay. He could do like one room at a time?
**A. Right, right, right, right.**
Q. Okay. Jody S. Knowlton.
**A. Jody, Jody, Jody. It sounds familiar, but I cannot remember.**
Q. Okay.
**A. I don't remember. Yes.**
Q. Lori S. Stewart.
**A. Oh, Lori, Lori, Lori. Housekeeper.**
Q. Okay. Louis Vu.
**A. Front desk.**
Q. Kazi M. Moorshed.
**A. I wonder. That look like the owner. Kazi. Kazi, that look like the owner. Sell seel me the, issue, the hotel.**
Q. The previous owner before you?
**A. The previous owner, yes.**
Q. Okay.
**A. I don't know why he's down there.**
Q. Okay.
**A. Or maybe somebody have the same name, but his name is Kazi too.**
Q. Okay.

Page 116

**A. Yes. I can't remember.**
Q. Sylvia Garcia.
**A. Sylvia Garcia. Housekeeper.**
Q. Starra Harris.
**A. Front desk.**
Q. And you... I have one more. From the payroll stuff. Susie Edwards.
**A. I don't remember.**
Q. Fo Wong.
**A. That is... That probably the electrician.**
Q. So is the electrician, somebody that regularly work for you?
**A. Only one troubleshoot. Regular I do it, but the big one troubleshoot, I ask him.**
Q. Mariana A. Barrera Guajemala.
**A. That is probably laundry.**
Q. And is laundry different than housekeeping?
**A. Yes. Laundry they only do the washing and the folding.**
Q. Okay. That's all they do?
**A. The sheets and towels.**
Q. Okay.
**A. And I pick... They take that and they go clean the room and they put, place in the room.**
Q. Okay. Aaron Lee Roberts Jr.

**A. Aaron Lee, Aaron Lee, Aaron, Aaron. Probably front desk.**
Q. Winkiesha Vatterpool.
**A. Hmm.**
Q. Not sure?
**A. I don't remember, yeah.**
Q. Latasha Smith.
**A. Latasha Smith. Probably housekeeper. No, the, for laundry.**
Q. Okay. Danita Bledsoe.
**A. Probably housekeeper.**
Q. Emmanuel Gebrey.
**A. I don't know, I forgot them.**
Q. I don't know how to pronounce this. Gwen Duong.
**A. She come by to train the housekeeper, and front desk, housekeeping for a short period of time. She train them, she do housekeeping for them.**
Q. Did she come from Wyndham or what?
**A. No, that is... I know the people from California. So she come over and help me.**
Q. To train them to do what?
**A. The front desk. No, no, no, not front desk. Housekeeping.**
Q. Okay. On how to clean rooms?


**A. Yeah, how to clean rooms, yeah.**
Q. Jonicia Veal.
**A. I don't remember.**
Q. Titus Veal.
**A. I have no idea.**
Q. Starnisha Lindsay.
**A. I have no idea. Probably housekeeper or laundry or something like that.**
Q. Okay.
**A. I'm not sure. Jonica Fakins.**
Q. That is probably housekeeper.
Q. Valencia Smith.
**A. I don't know. I can't remember.**
Q. Dung Duong.
**A. Hmm. Dung Duong. I don't remember.**
Q. Willie Anthony Cooley.
**A. Willie Anthony. I can't remember.**
Q. Talia Dallas.
**A. I don't remember that as well.**
Q. Nyjah Mark.
**A. I have no idea.**
Q. Miranda McGinty.
**A. Yeah, sorry.**
Q. Y'all had a pool too, right?
**A. Yes.**


Q. Who did the pool maintenance? Did a staff member or did y'all call people in?
**A. The pool, it happened for a while, but it closed. It was closed. Fill up, closed the pool.**
Q. While you guys owned it, you closed the pool?
**A. Yes, yes.**
Q. Okay. When you had it, who did the maintenance?
**A. We paid the company. I forgot the name, but it come probably one or two weeks, something like that.**
Q. It was an outside company that came?
**A. Yeah, outside company, yes.**
Q. Okay. Okay. Let me get back on track here. And so you produced, and when I say produced, that means that you guys gave to us some of these documents. And so you guys produced this human trafficking training, you produced the employee handbook, everything over there, the acknowledgments.
**A. Yes, yes.**
Q. Other than those documents, do you have any other documents about safety and security at the hotel?
**A. Probably no.**
Q. Probably or you're sure?
**A. Okay. Ask the question again?**
Q. Other than these documents that we've looked


at, do you have any other documents about safety and security at the hotel?
**A. No, no.**
Q. Okay. Let's see. Other than the human trafficking training that we talked about, was there any other kind of safety and security training for employees at the hotel?
**A. No.**
Q. Okay. Do you consider the Super 8 to be in a high crime area?
**A. At this time I do. But before I don't know. When I work there I don't know, I know it's a trouble area. Not a good area. But I have no time to think or identify exactly what it is.**
Q. So, at the time that Lincoln owned it, did you think it was a high crime area?
**A. I know the crime, yes. High crime, yes, yes.**
Q. Okay.
**A. You can say yes.**
Q. If a hotel is in a high crime area, what should it do to keep its guests safe?
**A. I have to keep my eye out. The budget is very minimum. And we have to control the budget. That why I work there twelve hours a day. Maybe more. Seven days a week.**

Page 121

Q. Why do you bring up the budget?
**A. Because, if you say, it high crime, and you have to hire a lot of security, you have to hire a lot of people, staff here and there. But we have a minimum, so that's why I work mostly doing other jobs.**
Q. Okay. And, so you're saying that the Super 8 didn't make enough money to warrant security, or didn't make enough money to pay for security?
**A. Yeah, if you're talking like 24-hour security, things like that. But the police come there a lot, so we feel safer, we feel better. But I don't know, high crime, how you can see that, I don't know. High crime, but we feel safe because we have police there a lot.**
Q. Did you think the police kept you safe there?
**A. I believe so, yeah, because we called, they come right away. They know the area, yes.**
Q. Do you think the police did a good job in patrolling around the Super 8?
**A. I think so, yes.**
Q. Do you think the police can do things to stop crime?
**A. At the present, I think they appear to stop crime.**
Q. And, you said at the present, I'm talking about when you owned the Super 8. Did you think the

Page 122

police could do things to stop crime then?
**A. Yes.**
Q. Okay, let's see. Let's do this. I don't know, this is kind of complicated. I will represent to you that we asked a series of requests for admission. And that's when we write something down and send it to you and ask if you, in this lawsuit, agree to that statement or not. And so, I will represent to you that in response to one of those requests for admission, Lincoln said that it had a written policy about prostitution.
**A. Lincoln have a policy?**
Q. Yes, did you have a written policy about prostitution?
**A. I don't think so, no. Not that I remember.**
Q. Okay. And,also in those requests for admission, and I'm not going to introduce them because I have to introduce the RFA requests and this type of thing.
MR. TRIVEDI: That s fine.
MR. TONGE: (Resuming)
Q. I'll represent to you that we asked you to admit that employees assisted or acted as lookouts for any of the plaintiff's traffickers. And Lincoln denied that. And Lincoln said that its employees did not

Page 123

assist or act as lookouts for any of the plaintiff's traffickers. Okay. Does that make sense to you?
**A. Yes.**
Q. Okay. How is it that you can deny that?
**A. What did I deny?**
Q. We asked if employees of the Super 8 assisted or acted as lookouts for the plaintiff, in our case, the traffickers, the sex traffickers.
**A. Right, right.**
Q. And, you said you haven't talked to any of your employees in several years. So, how can you deny that? How do you know that that didn't happen?
**A. How do I know that that happened? Because while I work there every day, so if something happened, I would know right away.**
Q. Okay.
**A. But I don't see anything happen. If I see something specific, then I can tell you right now, but I don't see this. If I don't see it, I don't think employees see it. That's what I think.**
Q. Do you think if there was an employee that was assisting sex traffickers at the hotel, do you think they would tell you they were doing that?
**A. Maybe yes, maybe no. Maybe no, I don't know.**
Q. Do you know anything about any of the four

Page 124

victim plaintiffs in this case?
**A. I don't even know the victim name. I don't know anything about the victim. I have no idea.**
Q. Okay.
**A. I never see them. I never heard anybody talking about sex trafficking in my hotel. If they do, then I can hear people whisper here and there, but nothing suspicious, so that's all I can tell.**
Q. Do you remember the police rescuing a girl who was being sex trafficked at the Super 8 around May of 2020?
**A. I don't remember.**
Q. Okay. Should Super 8 employees, after they check in a guest, should they be watching that guest to see how many people are going in the room?
**A. That's a question. Tell me the question again.**
Q. Should Super 8 employees, at the front desk, after they check someone in, should they watch on the monitors to watch that guest go into the room to see if they're bringing extra people in?
**A. Yes and no. If people come in with a ghetto car, with a car, a lot of them are here and there, you know, messy car. They're messy, and then we monitor them, make sure they go to the room, they're not**

Page 125

**bringing a lot of people with them or carrying a lot of people. I mean, a lot of stuff to the room. Maybe other than that, nothing suspicious. They act normal. They just check in, check out normal.**
Q. Okay. Should the employees be watching the cameras to see what kind of activity is happening around the rooms, in and around the rooms?
**A. Outside the room, not inside the room.**
Q. Well, I guess they can't see inside the room, but they can see people going in and out.
**A. Yes, yes.**
Q. They can see people walk every hallway. And so, did you expect your front desk employees to be watching the monitors for those kind of things?
**A. Yes. That's part of the job. That's why I put the monitor, big one, in front of the front desk. So they see it, and they will do something about it.**
Q. Okay. And, if they wanted to play back the monitor, if they wanted to say, see what was happening an hour ago, I understand that the control to do that is in the basement, and there is a passcode to get in the basement. Is that right?
**A. Yes, yes, I think it's in the control room in the laundry room in the basement.**
Q. So, did the front desk managers have the

Page 126

passcode to go in there?
**A. Yes, employee manager, they have a passcode. So, a lot of times when the police come, they want to see the camera, so they can bring the police down, so the police can show them the time, whatever they want to look for. So yes, the front desk manager, MQ, Janicia, or Louis, they have.**
Q. They would have the passcode to do that?
**A. Yes, they have the passcode to do that.**
Q. Would all the front desk people have that passcode, or just the managers?
**A. Probably those three, for sure. All the people maybe, yes or no, I don't remember exactly. But those people, they know where the camera is, and then they have access to look at it. Only look at it, they cannot delete or nothing like that. But they could watch the time here and there.**
Q. Did the hotel sell condoms?
**A. No, no, no, we don't sell no condoms.**
Q. Okay. We've talked a lot about the cameras, and we talked about the one employee who had a law enforcement background.
**A. The one who had what now?**
Q. The employee that you said had a law enforcement background.

Page 127

**A. Yes, yes, and Andrew, yes.**
Q. Or Andrew, I'm sorry. So, security cameras, Andrew had some kind of background in law enforcement. What other security measures did the hotel take?
**A. Andrew, he do walk every 30 minutes. I think Louis also do the walk every 30 minutes. Or Sam, you don't know them, or myself, we do walk every 30 minutes. We walk around, we lock the door. We walk around the property.**
Q. Okay. And, that should happen every 30 minutes?
**A. Every 30 minutes, yes.**
Q. Okay. The cameras that were in operation, were they the same the whole time that you owned it? Did you change anything about the cameras?
**A. No, no, no, I'm not changing anything.**
Q. Okay. So, the cameras were there when you got there?
**A. The cameras stood there until now, until today.**
Q. Or at least until you sold it, right?
**A. Yes, yes.**
Q. Okay. So, the walk, cameras, anything else?
**A. The walk, the camera, that's about it.**
Q. Okay. And, should the front desk people be

Page 128

monitoring the cameras at all times, 24-7?
**A. They should see it all the time, right in the front. Yeah.**
Q. And how long were the videos kept? I assume that they kind of auto-deleted at some point.
**A. To be honest with you, I don't know, maybe thirty days. Usually the system, it's like run normally on a system. It's just a standard system.**
Q. Okay.
**A. So, I don't know, I think thirty days.**
Q. Okay. Let's see. Can you go back to the ROG thing there, the March document?
**A. Which one?**
Q. The interrogatory response. If you look at page seventeen, and that's our request. Describe in detail how you supervise Super 8's employees, including specifically with respect to any crime deterrence or safety policies from 2017 through 2021. And, if you flip to the next page. In the paragraph that says subject to and without waiving said objection, there was no policy of supervision with respect to crime control. Do you see that?
**A. Yes, but I still try to understand, what did it mean?**
Q. That was going to be my next question. I'm

Page 129

not exactly sure what that meant.
**A. Okay.**
Q. And so, I was wondering if you knew what that meant or not.
MR. TRIVEDI: He doesn't know there's a question on the table.
MR. TONGE: Oh, I'm sorry.
MR. TONGE: (Resuming)
Q. Do you know what that means?
**A. I don't know what that means.**
Q. Okay, cool. All right. That's fine. Did Andrew Washington carry a gun when he worked?
**A. He do, yes.**
Q. And, he carried it while he was on the job?
**A. Yes.**
Q. Okay. Did any of the other employees carry guns while they were on the job?
**A. So far I remember only Andrew.**
Q. Okay. Would it violate any hotel policy if employees had guns that you didn't know about?
**A. I don't know. I don't know because he says he's good that he legally could carry a gun.**
Q. So, any other employees, should they have guns?
**A. I don't know. No, I don't think so.**

Page 130

Q. Okay. I'm saying should they. Does the hotel think that its employees should have guns while they're working?
**A. I don't know. I never think of that.**
Q. Okay. And, if a guest got arrested at the property, would they be able to come back and stay at the property again?
**A. The what now?**
Q. If a guest got arrested at the property, would they be able to come back and rent rooms there again or would they be on the do not rent list?
**A. Usually when the guest make a trouble, we put them on no rent list.**
Q. Okay.
**A. Yeah, because they will come back and repeat the same trouble again.**
Q. Okay. Yeah. Did the hotel ever store a guest's personal belongings if they got arrested to give them back after they got out of jail?
**A. Yes, we do.**
Q. How does that work?
**A. We put in the trash bag, the big one. We put the note with the guest name, and the room number.**
Q. Okay. And so how long would you keep that stuff?

Page 131

**A. We keep that for thirty days.**
Q. Okay. And where did you keep it? Which room?
**A. We keep it in the basement at the laundry room.**
Q. Okay. The laundry room is in the basement?
**A. Yes, sir.**
Q. And is that, did you ever learn how the fire started?
**A. It start out from the dryer or the washing machine, something like that. But that's what I know. But after the damage, it messed up everywhere. So, I have no idea where it start from.**
Q. Let's see. Did the hotel have a policy for guests to report safety or security incidents?
**A. Policy, policy. I think the policy posted on the door. It's like, call for the police if you're in an emergency or you're sick or something like that. And the fire is sheet, you know which way to go.**
Q. Okay.
**A. It's standard like that. It stick in the back of the door.**
Q. Okay. Okay. How often do you think the hotel staff called the police for some reason?
**A. Probably a couple of days.**
Q. A couple of times a day?

Page 132

**A. Sometimes a couple of times a day. Sometimes like one time every two, three days.**
Q. Okay.
**A. But I'm very sure every week.**
Q. Okay. And I think we talked about it. Is that mainly to trespass guests who hadn't paid?
**A. Trespass guests, they don't pay, don't want to check out, illegal parking, drunk, marijuana smoking, homeless come by, sleep, you know, things like that.**
Q. I saw some police reports about a park and fly situation. Did you guys let, was that you or was that someone like some other piece of the property?
**A. That's me.**
Q. Okay. So, you guys would have let people park their vehicles and go to the airport?
**A. Yeah, we have a big parking lot in front. I'll show you here. So the hotel here, and mostly our parking, guest only parking here. We have a big parking lot right here.**
Q. Okay.
**A. So, we let them park right here.**
Q. Okay.
**A. But the city don't want it, so we take it off.**
Q. And is that part of the Super 8's property?
**A. Yes.**

Q. You own that part of the property?
**A. Yes.**
Q. Okay. Have any of your employees been arrested while on the job?
**A. Arrested?**
Q. Uh-huh.
**A. I remember one time, actually Louis Vu, I have a lot of cops, a lot of cops, like 20, 30 cars come by. They're crazy, and they arrest him, but only for one hour. We thought something very serious. We have no reason. FBI, Georgia police, everything. But after that, like one hour, they release him. They drive him back to work normal. (**
Q. Did you ask him what that was about?
**A. I did ask him what about. I said, you don't even know. They come, and they say, you're in big trouble. He's there, they take him out. And an hour later, they come back like normal. The police drop him off.**
Q. Did you ask any of the police what that was about?
**A. I don't ask the police. They don't talk to me. They say, not your business. I tried to find out a report, see what happened, but nothing. No report, nothing.**



Q. So there were 20 or 30 police cars?
**A. Yeah, yeah. They come in, pull the gun, everything. Make it very serious. And I don't know, I thought he do something, I don't know, sell drugs or something. I don't know. Big deal, but after that, nothing happened.**
Q. And so, you never found out what that was about?
**A. I tried to find out, but I don't know. No report on that.**
Q. Okay.
**A. I asked him, but he said nothing. Nothing happened.**
Q. In the lobby, is the lobby glass bulletproof?
**A. The lobby glass door?**
Q. The glass in the lobby.
**A. Yes, yes.**
Q. Is that bulletproof? Why is that important?
**A. I don't know if it's bulletproof or not, but it's very thick. I think it is, but I don't know. It's a thick glass.**
Q. Okay.
**A. Only the night window, check in. But other than that, it's a regular glass.**
Q. Okay. All right, I'm going to have a number



of exhibits coming here. Let's see. Let's go to that, well you still have it, that's good. This, yeah. Did any of the people that didn't work for you, like carpet guy, electrician, pool people, did any of those people ever stay at the hotel? Was that ever part of their compensation, or did they happen to stay there?
**A. Very rarely, rarely. Like sometimes they got carpet guy, he work late, and he tired, he need to stay in a seperate room, and tomorrow he finish and he walk out.**
Q. Okay.
**A. Yeah, so rarely, not too often.**
Q. Did you say that was the carpet guy?
**A. Carpet guy, yeah.**
**Q.**
**Is that the only time you can think of that happening?**
**A. Maybe two times, sometimes two or three, the both.**
Q. Okay, always that guy, always the carpet guy.
**A. Yeah, yeah.**
Q. If you go to page fifteen and number fifteen.
**A. Page what?**
Q. Fifteen. Let's see. Here we were asking about people who reviewed online guest complaints or online reviews. And if you go to the last paragraph is



your answer, oh you're on sixteen, go back one more page.
**A. Seventeen, or sixteen?**
Q. Fifteen, yeah. And so, this last paragraph there, it says subject to and without waiving said objections, Tony Tran is aware of some of the online reviews and indicates that those reviews were left by individuals who had some kind of issue with the property while staying there as a guest. With respect to guest complaints, the front desk employee would receive the call and either handle it themselves or tell Mr. Tran. I'm on the top of the next page now.
And then, it says Mr. Tran recalls one complaint about a dirty room, another complaint about the AC not working properly, not enough toilet paper, limit to two in room. Towels, limit of two in the room, plus one extra per day. Excessive noise in adjoining room. With respect to towels, the guests would ruin towels which cost $3 per towel and the cost became too excessive. So Mr. Tran placed a limit of one extra towel per day. The reason I read that, it said you recalled a complaint about a dirty room, about the air conditioning, about toilet paper, about towels, and about noise.
**A. Yes.**
Q. Do you recall any other kind of online

Page 137

complaints or online reviews that complained about other issues?
A. **No, I don't recall them.**
Q. Okay. Do you recall ever seeing a review that complained about prostitution?
A. **No.**
Q. Drugs?
A. **No.**
Q. Okay. Did you... Tell me, did you monitor online reviews? Did you look at the online reviews?
A. **Not very often.**
Q. Okay. Did you respond to those reviews or did somebody that worked for you respond to reviews?
A. **Mostly an employee would do that.**
Q. Okay. Who would respond to it?
A. **Either Janicia or... The most majority is Janicia. Right now I remember.**
Q. So, Janicia would have responded. If there's a response to a review that says it came from the hotel, you think that...
A. **Because she worked there, she understands the story, so it's better for her to do the response.**
Q. Okay. And was she... She was front desk?
A. **he was front desk.**
Q. Okay. And was she a manager or no?

Page 138

A. **She was also the manager.**
Q. Okay. So, Janicia... Because there was a Jonicia also.
A. **Janicia**
Q. Are you talking about Ms. Walton?
A. **Ms. Walton? Walton, yes.**
Q. Walton, okay. I wrote down the wrong... I got you. Does it help business to get good reviews?
A. **They do, yes.**
Q. And does it hurt to get bad reviews?
A. **Yes.**
Q. Let's see. Do you know what websites she would look at?
A. **Oh, you know, I'm sorry. I'm confused. The review, we don't have enough people to go and manage the review.**
Q. Okay.
A. **I thought you said respond to complaint. They like to complain. People complain.**
Q. The ones that Wyndham sends you?
A. **Yes, the Wyndham system.**
Q. Okay.
A. **We respond to that. But not like Google review, things like that.**
Q. Not that kind of stuff?

Page 139

A. **We don't have time to look into that. Yeah.**
Q. Okay. This is a lot of exhibits, but I don't think they will take too long. Okay.
Q. All right, what was the last? Seven, four, five, six, seven. All right. So, this is going to be exhibit 8. And do you see that up here in the top left and the bottom left?
A. **Okay.**
Q. And so this is a, and if you look in the photo in the top left, it says photo May 2021. And, this review says do not stay here. I can't believe you charge people money to stay here. Multiple health and safety violations. This place should be shut down. Didn't feel safe at all. Random people walking in and out of the entire room and hotel was filthy. Let's see. There were many homeless people in the hallways, garbage everywhere, and that kind of thing. Did people sleep outside at the Super 8?
A. **Yes, yes. That what we monitor all the time, but in the morning, like two, three in the morning, everybody got tired. And they could sneak in and that happens sometimes.**
Q. Okay. So, does this look like an accurate picture of something that would be happening at the Super 8?

Page 140

A. **Yes, yes.**
Q. Okay. And then if you look down below this writing on the bottom left, there's a response from the owner. So, somebody from the hotel in May of 2021 responded to this complaint.
A. **Yes, probably. Yes. Somebody responded back. Yes.**
Q. Okay. So, somebody that worked at the hotel was aware of this complaint.
A. **Right, yes.**
Q. Okay. What did you do in response to that complaint? Do you remember anything?
A. **In response to which complaint?**
Q. Yeah. Did the hotel do anything in response to this complaint?
A. **Oh, yeah. That's why we walk around and we call the police the next day. I mean in the morning or whenever we see it. Like 7 o'clock I walk around and that's why I call the police and come kick them out, take them out.**
Q. Okay. I'm making a mess on your floor here. This will be exhibit number 9. This is actually the same complaint.
A. **Okay.**
Q. The words are the same. She posted several

Page 141

pictures.
**A. Right.**
Q. So, this is a picture of a door at the Super 8.
Q. Is that right?
**A. This looks like inside.**
Q. And so, if you look at where the lock is, it looks like there's nothing for that lock to attach to the door. Do you see that?
**A. It happens all the time. When we put it on in the morning, I go put it on and people at night they just slam it, broke it.**
Q. Okay.
**A. And that happens all the time.**
Q. So, this was pretty common that there would be a missing lock? It was pretty common for there to be a missing lock?
**A. Not common, but they happen here and there. The door breaking, they jam the door, they throw the furniture outside. Things like that happen.**
Q. Okay. Do you know what she did in response to this complaint?
**A. I don't know, but yes, probably some of my employees respond to that.**
Q. That was nine. This will be ten. Okay. And

Page 142

this review is dated August 31, 2021. And, it says security walking around pulling guns on people, talking about it's his trap. People sitting all out on the balcony distributing drugs and prostitution activities. And then it says there was a response from hotel management on September 17, 2021. Right? Is that right?
**A. So what was your question?**
Q. So, my question is, did you respond to this review?
**A. No, probably my manager. I don't know.**
Q. Okay.
**A. Probably, you know, some of the managers from that, they do that, the review, yes.**
Q. Did your manager inform you about this complaint about drugs and prostitution activity?
**A. Yes, I heard about this thing.**
Q. Do you remember hearing about this?
**A. I don't remember, but I heard. People complain all the time, you know, like, you know, drugs, things like that. They do complain once in a while, and it's regular language I heard.**
Q. S0,o do you think this is not true?
**A. Which one?**
Q. The complaint.

Page 143

**A. The complaint? I don't know. I don't know if it's true or not, but it does seem to my memory that's how it is. You know, people can overstate or they might say the right thing. I don't know.**
Q. Did you do anything in response to this complaint?
**A. People sitting all out on balcony. My balcony, I don't have a place for them to sit outside the balcony.**
Q. Okay.
**A. It's just only the hallway. They have no place to sit outside, but people sit all out on balcony, which will drug. So they have no place to sit outside the balcony. So, I don't know what balcony are they talking about.**
**A. Okay. Did you ever talk to Andrew about pulling guns on people at the hotel?**
**A. No, he don't. I know he carry gun, but he don't pull out a gun to the people.**
Q. Okay.
**A. I mean, this guy, he's not like crazy.**
Q. So here's my question. Do you recall doing anything specific in response to this complaint?
**A. I don't remember. I don't remember if I've seen it before.**

Page 144

Q. Okay.
**A. Yeah.**
MR. TRIVEDI: Are you expecting me to raise authenticity here? Or...
MR. TONGE: No, you can... Yeah, no, I assume that's one of the reserved for objections, yeah.
MR. TONGE: (Resuming)
Q. This will be eleven. And so, this one is days before the last one, August 21, 2021. Worst hotel when it comes to cleanliness, I'm going to skip some of that. People were partying in the parking lot and we were propositioned on our way to the room while the security guy was leaning on the railing. And then, there's a response from hotel management on August 28, 2021. Is that correct?
**A. I don't know. But sometimes people, they make a noise, they turn the music in the car up loud. So that's what we were going to kick them out. That's how this probably happened.**
Q. What do you understand it to mean when they say we were propositioned on our way to the room?
**A. Where?**
Q. On the last line, it says...
**A. Oh, okay. W**
Q. -- we were propositioned on our way to the

Page 145

room.
**A. People were partying in the parking lot and we were propositioned on our way to the room while the security guy was leaning on the railing. I think they go back to that room, right?**
Q. Do you know what the word proposition means?
**A. I don't know. I don t understand, yeah.**
Q. Do you recall learning about this review?
**A. I don't remember this review.**
Q. Okay. Do you recall doing anything specific in response to this review?
**A. No.**
Q. Okay. This one is 11 days before that one. August 10, 2021. Horrible place, condoms and fresh stains on bedspread. And there's a response from hotel management August 28, 2021. Was it common to find condoms on the bed?
**A. Not that common. No. It happens sometimes but not common.**
Q. How many times do you recall housekeeping finding condoms on the bed?
**A. Rarely. Sometimes, you know, one a month, you know, things like that. They found it, yes.**
Q. What kind of stains would be on the beds?
**A. What now?**

Page 146

Q. What kind of stains would be on the bed spreads?
A. I don't know. Could be any kind of stain. Blood stain.
Q. I'm sorry.
**A. Human stain. I don't know.**
Q. Was there ever blood on the bedspreads?
**A. They do have that, yes.**
Q. Do you recall doing anything specific in response to this review?
**A. I don't remember the review, yes.**
Q. So you don't recall being on the bedspreads?
**A. Yeah, yeah. I try to review that often, yes.**
Q. Okay. I don't remember that's twelve. So, this one is five days before the last one. Unless you're buying drugs, this is not for you slash family. Let's see. And, I'm going to skip to the end of the second line. The location had a lot of young men and women hanging around the banisters and entrance and the lot was dirty. Yeah. Just to be clear at the end, just to be clear, this location looks like a trap house parentheses drug location. There's a response August 29, 2021. Do you recall being informed of this review?
**A. I don't remember.**
Q. Would you expect these reviews that I've been

Page 147

showing you... I mean, do you agree that someone that worked at the hotel responded to this review?
(Whereupon, Exhibit 19 was marked.)
**A. I don't know. I did it my first time I see, I don't know.**
Q. Is there any way that somebody who didn't work for the hotel wrote a response from hotel management?
**A. No, mostly they did it. People should work in the hotel in order for them to write this type of review.**
Q. And so all these reviews are in the month of August in 2021? All the ones I've read you so far?
**A. Right.**
Q. Would you expect the staff person that wrote this response to all of these reviews to have mentioned this to you? To have told you like there's a bunch of reviews in August that people are complaining about drugs, prostitution, condoms on the bed, stains on the sheets? Would you have expected to be informed of this?
**A. I don't know. I don't monitor public review that much. So, I don't know.**
Q. Because earlier your policies that you got from Wyndham said that your staff is supposed to inform you in writing of unusual or suspicious activity right?
**A. Right.**

Page 148

Q. And so, would you consider these reviews to be reports of unusual or suspicious activity?
**A. The review, sometimes the accuracy, sometimes the not accuracy. People may be overstate or understate. I don't know. So, that's what I have the people in front they try to respond back. They also tell me the problem and what we do we all know the situation. So, we try to control the better that we could.**
Q. Would it violate the hotel's policy for a hotel staff member to know about these reviews and not inform you?
**A. If that's okay probably.**
Q. Okay.
**A. I might know. I don't know. It's been a long time I don't remember.**
Q. But if one hotel staff person learned of all these last four or five reviews that I showed you with those complaints. Would it violate the hotel's policy if that staff person didn't tell you about it?
**A. Probably yes.**
Q. This one is five or six days before the last one.
**A. Okay. This one says there was loud music and an obvious drug problem going on. We actually witnessed**

Page 149

**a man smoking something out of a glass pipe and there's a response from hotel management also on August 29th. Do you recall being informed of this?**
**A. It maybe happened because if something happened like this my manager or security might kick them out. So maybe those one of those situations happened. So I don't know. I cannot recall. I don't recall that.**
Q. So, that's my question is just do you recall being told about this particular review?
**A. Probably.**
Q. Probably you were?
**A. Yes.**
Q. Okay. And, what did you do in response to that?
**A. I have to tell to go kick them out. I'll call the police.**
Q. Okay.
**A. Kick them out.**
Q. Okay. This one is earlier. This is from March 9th, 2020. There were gun shots that woke us up at 1 a.m. And the room smelled like smoke. Response from Star, March 11, 2020. Is that Star Harris do you think?
**A. Probably yes. Star Harris, yes.**

Page 150

Q. Okay.
**A. So, something like that they called the police right away.**
Q. Okay.
**A. So, I don't know.**
Q. So, do you think somebody called the police about the gun shots?
**A. Yes.**
Q. Was it common to hear gun shots at the Super 8?
**A. Not common, but it does happen.**
Q. How often would it happen?
**A. I don't know. Maybe I remember. Maybe one time, two times.**
Q. Okay. Do you recall being told about this review?
**A. I don't recall the review, but the story that people party outside, cut them in the room, gun shot, smoking pipe, I hear that randomly.**
Q. So, the stuff that's in these reviews is not surprising to you? Is that what you're saying? You've heard complaints like that?
**A. Which one?**
Q. Well, you just said the gun shots, the people smoking, the fights.

Page 151

**A. Did it bother me? Yes.**
Q. Not did it bother you, but did you hear complaints like that from other...
**A. I think I hear complaints like that. I think yes.**
Q. Okay. Where would you hear those complaints from?
**A. Well, during the working time, you know, they might report to me in the morning. But they call the police at night, you know, because of gun shots or people party. So, they call the police, keep them out, so that was probably the room, you know, whatever room. We kick them out. We have problems last night, things like that. So, I should be aware sometimes.**
Q. Okay. This one is from February 2, 2020. This is Exhibit 16. Found sex toy in room. Management refused to do anything about it. There's a response from Kumar on February 4, 2020. I don't believe I've seen Kumar before. Do you know who Kumar would be?
**A. Do I know Kumar?**
Q. It says a response to...
**A. I don't know. I don't know.**
Q. Did you have an employee named Kumar?
**A. Probably. Probably. I don't remember. But probably some of them, but they use a nickname, a slang name. I don t know.**

Page 152

Q. The list of names I read you earlier, there was nobody named Kumar.
**A. Probably they use the same name.**
Q. Okay. But you don't know who that is?
**A. I don't remember.**
Q. Okay. Do you recall being told about this review?
**A. This one?**
Q. Yeah.
**A. Yes, people come there with girlfriend, boyfriend, maybe. I don't know. Maybe they have happened. So, that's why I, something like this, I meet it with the staff to make sure they look out for things like that so the problem won't come back.**
Q. And are you saying you think that's what you would have done or do you recall doing that? When you say I would meet with staff or do that, are you saying that hypothetically that's what you would do or that you remember doing that in response to that?
**A. Not specifically.**
Q. So, you don't remember doing anything specific?
**A. I don t know. I forget.**
Q. Okay. This one I pulled some because this

Page 153

came from a large Excel spreadsheet that Wyndham produced. And it's pretty hard to read that spreadsheet that way. Oh, shoot. Do you guys need me to go back and identify the numbers or is that okay?
(Not all exhibits have been identified by number.)
Q. Okay. I'm good without. It's written on them. Sorry about that. This is exhibit number 17. And so, these are two complaints that would have been collected by Wyndham in their system or somebody called and Wyndham wrote it up. And I pulled these two out of that to put them on here so we could just talk about these two. The first one was from September 26, 2020 by Jocelyn Smitherman. Room wasn't properly cleaned. Found sex toys under the bed. No hot water.
Q. I complained to a lady that night who was at front desk but she had an attitude. Yeah. And so, just that first one, this complaint.
**A. I see it.**
Q. Do you recall getting that information from Wyndham?
**A. I don't recall it generally but this type of language, it might, I probably ran through it. I probably see it somewhere, somehow.**
Q. If Wyndham got a report like this, they would have sent that to you?

Page 154

**A. They do.**
Q. Okay. Do you recall doing anything in response to that report?
**A. That's what my job, I do every day. I make sure the room is clean. I make sure I kick out the people because that's what the bad area and the bad people might probably get in and play, party. So, I overwatch it and that's how it happened. Yes. No party, no smoking, no go crazy stuff on my property. I try to keep control on that best as I can**
Q. And, then if you look at the second one there right below that one, this is from July 16, 2020. From a Tracy Brown and it says stop giving out keys to rooms that were already occupied, and then later she says too many prostitutes and drug dealers on the property, never have I ever been so disgusted and pissed off. Do you recall getting that complaint from Wyndham?
**A. I don't recall. I don't recall.**
Q. Do you recall doing anything in response to that complaint or either of these complaints?
**A. I don't recall.**
Q. Okay. Now do you have any, does this refresh your recollection that you received complaints about prostitution at the hotel?
**A. Say that again.**

Page 155

Q. Should I say prostitution at the hotel? Earlier. Earlier today?
**A. Yes.**
Q. And so, does this change your mind about that?
MR. TRIVEDI: Do you understand the question?
MR. TRAN: Do what now?
MR. TRIVEDI: Do you understand his question?
MR. TRAN: I understand the question.
MR. TONGE: (Resuming)
**A. I tried to get my answer to the bottom of my knowledge.**
Q. Your fine. Take your time.
**A. What s the definition of prostitution? I don t know. Because the guest come in, all the guest, they call it the ghetto hotel, the trap hotel. Because the area, I mean, okay. But, prostitution, I don t know. I don t know what the definition of prostitution is. Because, they see people smoke, they call it cup dua. (Ph) They see people wear, you now, like, sexy, or go late at night. They should call this prostitution? I don t know that definition.**
Q. Okay.
**A. But me, I don t. To be honest with you, I don t know. Maybe yes, maybe no. I don t know.**
Q. Okay. And, we kind of went over this, and so,

Page 156

Wyndham, in your franchise agreement with Wyndham, they would contact you and send you negative reviews. You would have to deal with them?
**A. Yes.**
Q. Or possibly get a fee for that?
**A. Yes.**
Q. This is exhibit 18. And, this is a customer case, that is also from the Wyndham system here. And there is information at the top here on the left. In the middle it would have the customer information, the name. Then over here on the bottom, it would say, kind of, user name, or name of person either at Wyndham, or with your hotel, who is speaking to this customer I take it, right? And so, the customer name here, Shamir Moore, and then Al Peters, I assume with Wyndham, is taking notes on that. Does that sound correct?
**A. Okay. Which one now?**
Q. Have you seen this kind of report before? Just this type of report?
**A. Yes, yes, yes.**
Q. And so, down here is where the, the complaint is documented. And it says, I was very dissapointed with my stay. One, the area was very unsafe. Drugs, prostitution, rude front desk service. Do you know who Al Peters is? Is that somebody with Wyndham?

Page 157

**A. I don't know.**
Q. Do you know who McCorncastle (ph) is?
**A. I don't know.**
Q. Is that fair to say that this is a guest complaint that came in from Wyndham?
**A. Yes.**
Q. Okay. And then Harris TA3.
**A. Star Harris.**
Q. Is that Star Harris?
**A. Yes.**
Q. Okay. Did she respond to these things for you?
**A. Yeah. Probably, yes.**
Q. Okay.
**A. Yeah, she do, probably the one do all this.**
Q. Okay. And, it looks like on the second page she wants to keep the same rate. It looks like this was resolved by letting her stay at the hotel.
**A. On the second page or front page.**
Q. Well, on the second page. It looks like this complaint was resolved. Closing case, pending further contact. And looks like the guest was given some time to stay at the hotel, or something like that. Did the hotel do anything in response to the report about drugs and prostitution?

Page 158

**A. I don't remember. I don't remember. (Unintelligible) front desk service. Dot, dot, dot, dot... I don't know. I don't remember. To be honest with you, I don t remember**
Q. Okay. This is another customer care report, Exhibit 19. June 29, 2020. Do you know anything about Robert Ledoux?
**A. No, I don't.**
Q. Okay. And, do you think this was Star Harris reviewing this for the hotel?
**A. Yes, sir.**
Q. Okay. Do you know who R. Boyce is? I have right here the initials, R. Boyce.
**A. Okay.**
Q. Do you know who that is?
**A. I don't know. I don't know.**
Q. Then if you go to page 2, under the first one, under McCornhastle, it looks like this is part of an email from Robert Ledoux because he signs it at the bottom here. And it says, oh, okay. So, we think maybe this is reversed and the beginning of the email is, hello, Robert. So see, so I think this is the beginning of the email.
**A. Okay.**
Q. And, it continues here to the bottom. So,

Page 159

let's see. In that first paragraph under hello, Robert, it says the front desk person who was wearing a large pistol on his right side gave me the impression that the property was most unsafe. Do you know of a front desk employee who wore a pistol on their hip?
**A. I don't know.**
Q. You don't recall ever seeing anybody?
**A. I don't recall, yes.**
Q. Okay. Would that violate your policies if one of your employees in the front desk was wearing a pistol on their side?
**A. Yes, yes, yes.**
Q. Okay. Do you recall doing anything in response to that complaint?
**A. I don't remember.**
Q. Actually, I do want to ask one more thing. If you look back at page 2.
**A. What page?**
Q. Ian the second page, he says in the second paragraph now as for the room 231, at the end of that paragraph he says, I could go on but the unsavory characters hanging out in various places on the property gave me the impression that drugs and prostitution was an all day, every day occurrence. Did you see that?
**A. This one?**

Page 160

Q. I could go on but the unsavory characters hanging out in various places gave me the impression that drugs and prostitution was an all day, every day occurrence.
**A. That's what people say. That's what people say.**
Q. And so, if you look at this back page, the third page, the complaint was made in June 29 and then at the bottom, Star Harris on 7-15, the next to last entry, says re-pulled this case, spoke to management, stated they spoke to the guest in person and also on the phone to work out a resolution. What does it mean to re-pull a case?
**A. What part? Yeah, okay.**
Q. You see?
**A. Oh, re-pull the case?**
Q. Yeah, what does that mean?
**A. Pull it out and bring the case back.**
Q. Okay.
**A. Yeah, they bring it back. The case**
Q. And so, Star says she's disputing why Wyndham charged you a customer care fee? Is that right?
**A. Where is that?**
Q. Right here. Why is there a customer care fee?
**A. Why is there a customer care fee on this case?**

Page 161

**We will not accept it. I would probably agree. Wyndham, they also charge people sometimes for partial of the payment and they complain. So, that's what Star responded back to them.**

Q. And, it looks like at the top there that this got resolved by giving him 15,000 Wyndham points.

**A. That Wyndham gave to them. We cannot give out the point. Wyndham gave to them.**

Q. Right, Wyndham gave the guy 15,000 points. Do you think that resolves the prostitution and drug complaint? What does that do to address this complaint that it looked like drugs and prostitution was an all day, every day occurrence?

**A. People can write whatever they want. I have no control of that.**

Q. Okay. Do you think that's not true?

**A. To my knowledge, I don't see that. But people say that they have their choice to say whatever they want. But I don't know. I have no idea.**

Q. Let's clean that up a little because this is open. I think I'm done with this. This will be Exhibit 20.

**A. Okay.**

Q. And so, this is a James Williams from July 10, 2020. And down at the comments it says James states

Page 162

that the manager was rude. He stated that there were prostitution and drug going on in the hotel. This is about ten days after the last one. Do you recall getting this complaint?

**A. I don't recall.**

Q. And then, it looks like Star Harris replied again, is that right?

**A. That's what the letter says, yes.**

Q. And so, Star Harris' response is, unfortunately we will not be processing a refund for an issue that isn't significant enough to cause the guest to not use their reservation or at a minimum cause for an early checkout. So, she did not think this was a significant enough complaint, right?

**A. Yes, we have a lot of different complaints. I don't know.**

Q. Do you think that a complaint about prostitution and drugs at the hotel is significant?

**A. To be honest right now, it's been a long time. I don't know. I don't recall. I don't remember.**

Q. I m sorry. Do you remember doing anything in response to that complaint?

**A. This the stuff I do every day. People mess up, people abandon, bad people come in, come out.**

Q. How often do you think you got complaints

Page 163

about prostitution?

**A. I hardly hear that to the best of my memory. Probably a few, probably drugs more often, and probably some prostitution maybe a couple of times. But that's what I'm there and that's what I try to manage. And then have all the security and look out for suspicious things and try to do the best that we could. But I don't know. To be honest with you, I don't know.**

Q. This is exhibit 21. This one if you go to page 2, it looks like this guest sent pictures. Can you look at page 2? This is the guest's complaint in the list of pictures. And, at the bottom of that paragraph the guest says drug deals in broad daylight, etc. And it looks like Star Harris responded again, is that right?

**A. Okay.**

Q. Is that right?

**A. I don't recall this one. I don't recall all these things.**

Q. Is that Star Harris?

**A. It looks like that, that's what her name was when she responded. The person, yeah.**

Q. And, you don't recall doing anything in response to this?

**A. I don't recall.**

Page 164

Q. This is exhibit 22. This one is from David Peppers. If you look under the initial comment from C. Cullinan here, if you go to the bottom of that paragraph. It says there was trash under the bed, there was white powder on the floor, there were cockroaches, people were doing drugs outside of their room, prostitutes were coming and going. Do you recall this complaint?

**A. I don't remember. I don't recall.**

Q. Do you recall doing anything specifically?

**A. I don't recall.**

Q. And is that Star Harris' username?

**A. No, that looks like Star Harris. But I don't recall. No, this stuff they look at the computer and then they respond themselves.**

Q. So, are you involved at all when Star is doing this, is Star telling you about these complaints?

**A. Maybe she do, maybe she don't, I don't recall.**

Q. If she did not tell you about these complaints, would that violate the hotel's policies?

**A. Yes.**

Q. This is exhibit 23 from Shane Joseph. And, the first line in the narrative says, guest states the property had drug dealers and prostitutes around. And is that Star Harris that responded?

Page 165

**A. No.**
Q. Is that Star Harris' name again?
**A. Yes.**
Q. Okay. Do you recall this complaint?
**A. I don't recall this complaint.**
Q. So, you don't recall doing anything in response?
**A. I don't recall, yes.**
Q. Let's see, I have a couple more. Exhibit 24. And this one, on the narrative part, it says Robert states that there was a lot of drug dealers and prostitutes at the hotel.
**A. Is that the second page?**
Q. No, no, at the bottom. It's like one sentence piece kind of right there. Do you recall this complaint?
**A. I don't recall.**
Q. Do you recall doing anything specific in response to this?
**A. No, I don't remember.**
Q. And if you flip to the back page, is that again Star Harris' username?
**A. Okay, okay.**
Q. Is that right?
**A. That looks right, yes.**

Page 166

Q. Okay. What number was that, 23?
**A. 24.**
Q. 24, so this will be exhibit 25. This is from Stephen Hoyt. He says he saw a girl break into the room next to him. Do you recall getting this complaint?
**A. I don't remember.**
Q. Okay. Is that Star Harris' username responding?
**A. No, I don't remember.**
Q. No, down there at the bottom.
**A. Start there.**
Q. Yeah, is that again Star's username? And he says, he states that he took pictures of the drug bagging found outside his room. Did you find drug paraphernalia frequently?
**A. No, no. The whole time, maybe I saw, I found one or two times sex toys. But that's the people, I don't know. Girlfriend, boyfriend, they live over, or whatever reason it is. We throw a lot away, but that's about it.**
Q. This is 26. It's the last one of these. So, Stephanie Beacham in November 2020 stated that there was a contraceptive on the trash can. She saw someone smoking weed. Her room smelled like weed. She stated that there were drug people walking around at night and

Page 167

she could not sleep. She stated that she did not feel safe staying in the property. Do you recall this complaint?
**A. I don't recall the complaint.**
Q. Do you recall doing anything specific in response to this?
**A. I don't remember, yeah.**
Q. On page 2, or actually just at the bottom of 1, is that Star Harris' user again?
**A. Yeah, she do a lot of reviews.**
Q. These customer care cases, the ones that we looked at, should Star Harris have told you about every one of these?
**A. Probably no.**
Q. Why not?
**A. I don't remember. I don't remember if she told me or not she told me. There's a lot of things going on and all this stuff, it's been a long time, I don't remember.**
Q. And so that's not my question. My question is, with your hotel's policy that your employees should report unusual or suspicious activity to you.
**A. Yeah, yeah.**
Q. Should she have reported these to you?
**A. She should, yes, she should. But maybe this**

Page 168

**is a very common thing and probably she ignored me. I don't know. Maybe she talked to me, maybe she did not talk to me.**
Q. Were complaints of drugs and prostitution common?
**A. No. People use the excuse to make a complaint all the time. So we know that, for the cash back. That is common, that's what I'm talking about.**
Q. Okay. I have a whole other box, but these I also think will be somewhat quick. Do you need a break?
**A. What now?**
Q. Break? Do you need a time out?
**A. No, no, it's okay.**
Q. All right. This is my last stack, actually, today.
MR. TRIVEDI: Actually, I do need a minute.
MR. TONGE: Yeah, Let s go off the record for a second.
MR. VIDEOGRAPHER: We are off the record at 4:43.
(Break.)
MR. VIDEOGRAPHER: We are back on the record at 4:51.
MR. TONGE: (Resuming)
Q. In your opinion, was the staff at the Super 8

Page 169

cooperative with the police?
A. **In my opinion, I do, yes.**
Q. Okay. And, why is it important to be cooperative with the police?
A. **Why important? I don't know, but that is just the nature and the natural nature of human beings. And I think they cooperate because they don't have nothing to hide.**
Q. Okay. I'm going to mark this as 27. And, there are several of these. These are incident reports that we received from the College Park Police Department.
A. **Right.**
Q. And it'll say the address up here on the first page.
A. **Right.**
Q. And all these will kind of look the same. It'll show the address and kind of what it was for.
A. **Okay.**
Q. And, this is for a missing person who was a juvenile. And, if you go to this page, it's like the third page.
A. **Okay. Number three.**
Q. Yep. That's called the narrative that the officer writes. And so, this is mainly what we'll be

Page 170

looking at on these kind of things. And, this talks about what the officer saw and is reporting on. And so, here it says on March 25, 2021, Detective Blankenship was advised there was a runaway juvenile from Florida within College Park. They initially thought he was at the Red Roof Plus. He sets up a date with her online. And if you go to this third paragraph, the undercover officer. Do you see that? The undercover officer.
A. **Here, okay.**
Q. Yes, that one. He says the undercover officer made contact with [redacted] and was told to meet her at 4995 Old National Highway, College Park. She then changed the location to Super 8 Hotel, Old National Highway 4979. And then, it says while units were on the way to the hotel, [redacted] was located at on foot near the entrance of the hotel and secured.
Q. So, do you recall anything about this juvenile being...
A. **I have, no, no.**
Q. - picked up?
A. **I have no recollection of it.**
Q. Okay. Let's see. So, you don't remember anything about this?
A. **I do nothing about that.**
Q. Okay.

Page 171

MR. TRIVEDI: Is that the official?
MR. TONGE: No, these are just mine. Yeah. So, this will be 28. Oh, and this is, yeah, if you go to the narrative. Actually, this goes back to something we were talking about earlier. Let me find it. If you look at the one, two, three, four, the fifth paragraph, the fifth paragraph in the narrative. I think you were already there.
A. **The last one, okay.**
Q. Oh, no. Go to here.
A. **Oh, okay. That's the third one, okay.**
Q. Yeah. It says I spoke with the hotel manager?
A. **Mm-hmm.**
Q. And so I spoke with the hotel manager later identified as Ankit Kumar Parekh. And so I was asking earlier about somebody named Kumar, you recall. Does this name sound familiar?
A. **I don't remember.**
Q. Okay. Do you think that person was an employee of yours?
A. **I don't remember, sir. I don't remember. I have no idea, yeah.**
Q. If he was an employee of yours, should you have some kind of record of paying him?
A. **Yes.**

Page 172

Q. Okay. Do you have any record of paying him?
A. **I don't remember. If you have, you see on the list there. I don't remember. I don't remember.**
Q. This will be 29. And this is from April 21, 2020. We go to the narrative. And yeah, you can just let me know when you're. Well, let s see where. And, there's this page with a kind of longer narrative. Did you read all of that?
A. **Yeah. You say, number three.**
Q. This is the last page. Yeah. No, the last page.
A. **Oh, the last page? Okay.**
Q. Well, it's the last page of mine. Do you have a narrative page that looks like this?
A. **Yes.**
Q. It says, plaintiff 5-8-8 at the bottom?
A. **Right.**
Q. Yes. Okay. That's the narrative of what happened. It says, Mr. K. Owen Thrasher made a report with an officer in reference to a handgun that was stolen from him. Mr. Thrasher said that he met a man whose name and other identifying information he's unaware of on a hook-up app called Skip the Games. Mr. Thrasher invited the male over to his hotel room at 4979 Old National Highway, the Super 8 Hotel. Mr. Thrasher

Page 173

stated that he and the male had sexual relations. And then afterwards this other male steals his gun, jumps the balcony, and runs away.
**A. I don't know. I don't recall anything like that.**
Q. Yeah, so you don't recall this incident?
**A. I don't recall anything like that.**
Q. Okay. And it says, where is this? And then the second to last paragraph. The next to last sentence, it says, I checked in with the front desk employee inquiring on Mr. Thrasher. It appears that Mr. Thrasher checked out on the day of the incident reported and has not been a guest at the hotel since. Right? Is that what it says?
**A. Yes, but I don't remember.**
Q. Okay.
**A. I don't know nothing about this thing.**
Q. Do you have any reason to doubt that the police officer that wrote this spoke to the front desk employee about this Mr. Thrasher?
**A. I have no idea.**
Q. Okay.
**A. Mostly I don't recall this thing, nothing.**
Q. Let me see. Hang on to that one second. There was. Yeah, that's good. That's 29. This will be

Page 174

30. Okay. Just let me know when you're done reading that. Do you remember that incident?
**A. I don't remember it. I see my name here and there, but I don't remember.**
Q. What I wanted to ask you about is it says that Mr. Tran also stated that there were no surveillance cameras near room 303?
**A. Yes, 303, yes.**
Q. But earlier you said the cameras covered the whole hotel.
**A. They see the whole hotel, but maybe this one is not clearly. Because from this end all the way to the last one, maybe they want to see exactly the face, things like that. But from this end to that, I don't know clearly.**
Q. That's what I wanted to ask you. So, this will be Exhibit 31. Exhibit 31. Do you remember this incident?
**A. I don't remember.**
Q. So, was it common to see women walking around completely naked at the hotel?
**A. I don't remember. I don't remember.**
MR. TRIVEDI: Mr. Tran, just listen to his question. Listen to the question.
MR. TRAN: Okay. Okay.

Page 175

MR. TONGE: (Resuming)
Q. So, was it common for you to see women who were completely naked around the Super 8?
**A. No common.**
Q. Okay.
**A. No, no. That rarely happened, but I don't remember.**
Q. And earlier you had said that someone being under the influence of drugs could be a sign of sex trafficking, right?
**A. Yes, yes.**
Q. And, people wearing sexual clothing could be a sign of sex trafficking?
**A. Yes.**
Q. Do you think someone being completely naked and under the influence of drugs and alcohol could be a sign of sex trafficking?
**A. I don't know. Maybe. I don't know. I have no idea. I can not speak for them, so.**
Q. That's pretty unusual, right?
**A. Right.**
Q. This will be Exhibit 32. This one is kind of long, but I will represent to you that this man says he is a truck driver. He checked into the Super 8. He said that he grabbed a 12-pack of beer and was drinking

Page 176

near the picnic tables outside the hotel. Mr. Scott said that he met two females which were trying to solicit him for sex.
He said that he told them that he didn't want that and gave them a few beers to drink with them. He said that one of the females asked if she could use his bathroom. Since his room was closer than her room. He said that he allowed her to use it and told her that the door was left wedged open. He said that the females left the area after a little while and three males walked up behind his vehicle armed with firearms. He said that they demanded his belongings and ran away on foot.
He said that the females reappeared after the incident occurred, asking him what happened since he was mad. He believes that the females set him up, but he never got any information for the females. Do you remember that incident?
**A. I don't remember.**
Q. Okay. Then it says at the bottom, the last paragraph, I went to the hotel on two occasions in an attempt to view the CCTV footage, but the manager, Ms. Walton, advised that the owner was not on scene. I gave her my business card and asked her to provide the card to the owner so that he can contact me when he is at the

Page 177

location. Detective Snow and I met with the manager again at the location to view the CCTV footage and she advised that the owner was out of town. She advised that she retrieved the passcode to the video system and was able to give me access, check the date and time of the incident, and I was unable to locate any footage due to the system only saving for two weeks. Shouldn't Ms. Walton have had that passcode already?
**A. Your question again?**
Q. You testified earlier that Ms. Walton and the other front desk managers had the passcode for the cameras.
**A. Yes, yes.**
Q. So, why wouldn't she have shown the cameras to the police when they asked?
**A. I don't know. I don't know why. Let's see what day this is. This was...**
Q. This is September 3, 2020.
**A. December 2020?**
Q. September.
**A. September, yeah. I don't know why. I don't know.**
Q. If she had access to those cameras and didn't let the police look at them, that's not very cooperative to the police, is it?

Page 178

**A. Maybe sometimes I change the passcode randomly, you know. But they should have it or they can ask me or something like that. But I don't know why. I have no idea.**
Q. Was it common for women to solicit men for sex in the parking lot?
**A. No, not that I know of.**
Q. This will be 33. Just let me know when you're done reading that if you don't mind.
**A. Yeah.**
Q. So, here I just want to... And so, in this incident, the front desk clerk saw people fighting and there had been a gunshot sound. Is that correct? I mean, that's what it says is what I'm asking.
**A. Maybe. I don't know. It probably happened, but I don't know. I have no idea.**
Q. And so, in the second paragraph it says, front desk clerk said she did hear what sounded to be gunfire, but could not tell where it came from, canvassed the area, did not locate anything, and dispatch was unable to get in contact with the caller. And so, that means that someone called the police, but it was not the front desk clerk, right?
**A. Probably.**
Q. And so, why wouldn't the front desk clerk call

Page 179

the police if she heard a gunshot?
**A. I don't know. Did they hear the gunshot?**
Q. It says the front desk clerk said...
**A. Because sometimes people drive my hotel next to the highway, and sometimes people shot outside the highway. I don't know. But did they hear? They don't hear? And why they call or not call, I don't know. I have no idea.**
Q. It says front desk clerk said she did hear what sounded to be gunfire.
**A. I don't know. Yeah, I have no idea, sir.**
Q. But you had testified earlier that if an employee heard gunshots at the Super 8, they should call the police, right?
**A. That's what it's supposed to be. But the situation, it depends how they hear it. Do they hear it directly from the property, or maybe just from around it? I don't know. So they make a determination on their own. I have no idea.**
Q. Okay. This is going to be 34. In this one, let's see where this is. In the third paragraph, so a woman calls and says that someone pointed a handgun to her head and took her two bags and a cell phone. In the second paragraph, the police make contact with a second woman called Ms. Leandra Tillery-House. Ms. House, this

Page 180

is a quote, Ms. Tillery-House advised that she knew the two subjects who committed the robbery. Ms. Tillery-House stated that the two subjects stopped at her room prior to the robbery. Ms. Tillery-House stated that she made plans with the two subjects to be a part of a sexual act.
Ms. Tillery-House stated that as the two subjects made it to her room, she advised them that she no longer wanted to be a part of the sexual act. Ms. Tillery-House stated that she then advised the two subjects of her friend, who also stayed on the property, identified as Ms. Ja'Portia Wilson. Ms. Tillery-House stated that she advised the two subjects of Ms. Wilson's room number and told them that she may want to be a part of the sexual act. Does that strike you as unusual or suspicious in your opinion?
**A. Very unusual.**
Q. Sir?
**A. Yes, very unusual.**
Q. Do you think these two women were prostitutes?
**A. This one is more like robbery, but this is very unusual when they come to the room of robbery like that. I have no idea, yeah.**
Q. Is it strange that...
**A. Because something happened like that, and they**

Page 181

**caught a cop, and then they work out with the cop. So, I don't know the story.**
Q. Okay.
**A. And after that, the cop and her settled down, and then I have no legal right to ask them what's going on with the story at that time. So, I don't know.**
Q. Okay. And, this looks like it happened at 12:34 at night. And in the last line it says, hotel staff advised that they would not have access to the cameras until 12/31/20, 1100 hours. What time did the morning shift start?
**A. Morning shift starts at 8, but sometimes they come late. They come like 9.**
Q. Why would the staff tell the police that they couldn't access the cameras until 11am that morning?
**A. Oh, because the door was locked. They locked the room door.**
Q. Okay.
**A. It's locked, and only one person had the key for that.**
Q. And so, it's not a passcode situation?
**A. No, no, no passcode.**
Q. Okay.
**A. The key lock.**
Q. Okay.

Page 182

**A. So, that's probably why they cannot access to the...**
Q. When is it key locked?
**A. It would be all the time. It's locked, and we have a chain. A chain, and we lock it. So, what does the passcode that we talked about earlier do?**
**A. Oh, the passcode? I probably don't understand clearly about the passcode. Is it like combination code? I thought like the code, like where is it, but actually the door is locked with the chain all the time.**
Q. And so, can the managers that you talked about earlier access where the security footage is for the police or not?
**A. Where the manager?**
Q. So, let's say Ms. Watson. You had said she was a manager that had the passcode that could show the police the videos, right?
**A. Correct.**
Q. And so...
**A. This is the problem. We have one key, master key. I keep one. The office have one. They hang on the wall. In the morning when the housekeeper come in, the laundry, they give the laundry. They open the door. Everybody can access. When they finish, they take the key, they bring back. Sometimes they forget it, they**

Page 183

**take it home.**
Q. Okay.
**A. So, that nobody have a key. I have to come in. I come in, open the door for them, I lock it back up. I wait for them back in the morning. The other one come back and they bring the key back.**
Q. And so, the only reason any employee could not get into that room that had the monitors...
**A. Probably because the key.**
Q. -- the key had been taken by...
**A. Right, right, right. And they forgot to put it back.**
Q. Let me just ask, so we can get a clean.
**A. I m sorry.**
Q. It's okay. We've been here a while. So, any employee could access the cameras if the key was there. Is that correct?
**A. No, not every employee. All the employees beside the manager, they don't know how to control that. They don't know the password, the code of the password.**
Q. Okay. So there's a...
**A. How to control that.**
Q. Okay. So let me ask you a question. So the door has a passcode that you punch in.
**A. No, the door don't have a code. The door have**

Page 184

**a chain lock.**
Q. Okay. And it...
**A. But the computer have a password.**
Q. Okay. All right. I think I see. The door to get in the room has a chain lock and the managers know where the key is unless someone took it home with them.
**A. Right.**
Q. Okay. And then the passcode is to log into the computer system...
**A. Yes, sir.**
Q. -- n order to watch the cameras.
**A. Correct.**
Q. Okay. All right. Thank you. That was... I was like, we're unwinding my whole understanding. All right, I think I understand that now. Thank you. But the managers should be able to get down there unless someone took the key home.
**A. Right.**
Q. Is that right?
**A. Right, right. All right.**
Q. This is exhibit 35. And this is a long narrative that I will just represent to you that three College Park police officers conduct a prostitution sting using the escort alligator website. So, they find a woman who is advertising sex on this website, they

Page 185

arrange a date for her, and they come and arrest her. And so, when they arrange the date with her, she was located in room 235 at the Super 8. When police officers did stings like that, did they tell you what they were doing there?
**A. No.**
Q. Okay. Do you remember anything about this incident?
**A. I have no idea.**
Q. Okay.
**A. I know the police come in now and they arrested some person, but I have no idea what the reason is.**
Q. Okay. So you would know that police came, and if they take somebody away, you can see they take somebody away, but you don't know what for?
**A. I don't know what's going on there.**
Q. Okay. Okay. This will be exhibit 36. Is there two? So, that's 36.
**A. Okay. That's him. I don't think he hears it. Okay.**
Q. Do you remember this incident?
**A. I don't remember. I have no idea why they do that. I have no idea.**
Q. Okay. So, in this incident, it sounds like a

Page 186

guest and Ms. Walton get into a big argument, throw things at each other, kick things around, and then Miss Walton gets a gun from behind the counter and walks outside pointing the gun at the guest. Does that violate the hotel's policies?
**A. Yes.**
Q. Okay. Should Ms. Walton have a gun behind the counter?
**A. Yes.**
Q. She should?
**A. Huh?**
Q. I said should Ms. Walton have had a gun behind the counter?
**A. No, she shouldn't.**
Q. Okay. Should Ms. Walton have pointed that gun at this guest? Should Ms. Walton have pointed her gun at a guest?
**A. No, I don't think so.**
Q. You don't recall Ms. Walton being arrested?
**A. I don't recall at all.**
Q. Do you know, did Ms. Walton continue to work for you throughout 2021?
**A. Probably. I don't recall exactly the day. But maybe.**
Q. Is this the kind of incident that should have

Page 187

been reported to you?
**A. This incident should be reported. Yes.**
Q. Okay. Okay. This would be Exhibit 37. In this one, I don't think you need to read the whole thing. Just in the narrative it says, where is it? In kind of the middle there, there's a paragraph that says, at that time I notified dispatch that I had one male in custody. And then it says the hotel clerk identified as Yetta Barber. Do you know who Yetta Barber is?
**A. I have no idea.**
Q. Do you think if she worked there that there should be payments, records to her?
**A. I don't remember the name. She might be the guest, I don't know. She might ne...**
Q. It says she's the hotel clerk.
**A. She's the hotel clerk, I don't remember her.**
Q. Okay. Okay. What's this one? All right, that was 37. All right, this is going to be 38. And my question about that is, is that the Super 8 hotel room behind this girl?
**A. I can't see exactly.**
Q. I'm sorry?
**A. I cannot see exactly. It looks like this is the motel, but I don't know exactly. I cannot tell. Yeah, this thing is ripped off so bad. When I was**

Page 188

**there, I tried to fix everything, so it's all ripped like this. I don't know. So, could be, could be not. I don't know. But it looks like the room.**
Q. It does look like the room.
**A. It looks like the hotel room, but I'm not sure 100%. That is my hotel room.**
Q. Okay. So, it looks like the hotel room at the Super 8, but you're not 100% sure.
**A. Not 100% sure.**
Q. Got you. All right, this would be 39. Same question. Does this look like the Super 8 behind this girl?
**A. Yes. It looks like the room, but I don't know exactly the room of my hotel or what. I'm not sure exactly. But it looks like the hotel room. Yes.**
Q. Okay. Hang on one second. I've got to find what might be my last... This one is large, but I will point you in the direction. It's much easier on zoom. So, this will be 40, I believe. Yes, so this is exhibit 40. And I'll tell you which pages to go to. This is a very long document. Earlier, you mentioned an incident where there were twenty to thirty police cars and Louis Vu was taken away with the police for about an hour.
**A. Yes.**
Q. Do you remember anything about that incident

Page 189

having to do with sex trafficking in May 2020?
**A. Actually, that day I wasn't there. I only heard a message relayed back to me, and I looked at the camera. That's it, but I don't remember exactly.**
Q. Okay, so you were not present.
**A. I'm not present.**
Q. At that time, okay. But you saw the camera, and there were... Yeah, I looked by the camera, and I saw I heard back from an employee that told me.
Q. Okay. If one of your employees knew that the police came there to investigate sex trafficking that happened at the Super 8, is that something that employees should have reported to you?
**A. Yes.**
Q. Okay. And so if the employee did not tell you that information, that would violate the hotel's policies?
**A. Yes.**
Q. Okay. All right. When I'm saying page numbers, I'm talking about this red number down at the bottom, okay?
**A. Okay.**
Q. So, let's go to 498.
**A. 91?**
Q. 98.

Page 190

**A. Okay.**
Q. And just...
MR. TRIVEDI: Hold on, hold on, hold on.
MR. TONGE: Oh, sorry.
MR. TRIVEDI: Let me just help you here.
MR. TRAN: Okay.
MR. TONGE: (Resuming)
Q. Oh, yeah, it's okay. And read that first paragraph, if you don't mind, and let me know. Not out loud, just to yourself, and let me know when you're done.
**A. Okay.**
Q. Okay. Oh, yeah, I was just...
**A. Go to the...**
Q. Yeah, I'm sorry.
**A. Okay.**
Q. So, in that first paragraph, it says that the police told Louis Vu about suspicious activity involving young girls at the Super 8, correct?
**A. Yeah.**
Q. Did Louis Vu report to you that the police told him about suspicious activity involving young girls?
**A. No, I don't know.**
Q. Should he have reported that to you?

Page 191

**A. Yes, he should.**
Q. Did that violate the hotel's policy by him not reporting that to you?
**A. It depends on circumstances. I don't know. But where the police take him go and come back, and then he talk to everybody that they have no problem. They come, they take him, and then they ask questions, and then they release him. And what time they did, like, 2 a.m. I don't know. They didn't tell me.**
Q. Okay.
**A. I think.**
Q. And it says that Mr. Vu told the police that he saw some younger girls at the location, but didn't pay close attention, right?
**A. Yes.**
Q. Did Louis ever report to you that he had seen younger girls around the hotel?
**A. He seen a younger girl in the hotel? Yeah, a lot of people go there, they come with the family. So the family, they have the children with them. You know, maybe some of them, they stay like six people, eight people. And they got, like, younger children. So, I have no idea what kind of girl coming in, coming out. But that, if that's the girl, that kind of girl I see. But other than that, I have no idea.**

Page 192

Q. And so, my question was, should Louis have reported that to you?
**A. No, he have not report on this case. This particular case, I just see it right now.**
Q. Okay.
**A. And I never see or hear nothing like it before.**
Q. Okay. And you saw that Louis said that he did not know a man who went by E, right?
**A. He didn't know what?**
Q. The police asked Mr. Vu if he knew a man by the name of E at the hotel. At the bottom of that paragraph, Mr. Vu said he did not know.
**A. That is their conversation. I don't know.**
Q. Okay. Did Louis report to you that the police were investigating a man in room 229 that was suspected of having young females in that room?
**A. I have not remember.**
Q. Okay. All right. So, let's go backwards a little bit to 496.
**A. 496?**
Q. Uh-huh.
**A. 47. 46. Okay.**
Q. So, I want to focus on the last paragraph. If you could read that and just read it to the... It ends

Page 193

on the next page. So if you could just read that whole paragraph.

**A. Okay.**

Q. Okay. And so that paragraph is talking about Mr. McCrary raping Ms. [redacted] and selling her for sex. And, it says that Ms. [redacted] stated that Mr. McCrary sometimes set up in-calls for her to work. In-calls mean the person comes to the hotel to have sex. Is that very common that women would have men come to the hotel to have sex?

**A. No, no common. I don't know nothing about it.**

Q. Okay. And, on the next page, if you flip one page, the first full sentence says, Ms. [redacted] also said to ask the manager at the front desk because he was being given drugs by Mr. McCreary.

**A. No. Not that I know.**

Q. Do you have any reason to think that any of your employees purchased drugs or were given drugs by anyone at the hotel?

**A. I don't know. They might smoke marijuana. Nut that s what I think. But, I, I don t know. The drug something more serious. More heavy. So, I don t know.**

Q. Okay. If an employee was getting drugs from a guest at the hotel, would that violate the hotel's

Page 194

policies?

**A. It did. Yes.**

Q. Okay. And then, the last sentence there, the last two sentences there say, Ms. [redacted] described Mr. McCrary as a light-skinned male with light-colored eyes and carrying a black book bag. Ms. [redacted] said the book bag would have a handgun inside of it.

**A. Which one is that?**

Q. It's the end of this paragraph right here. The last two sentences.

**A. I don't know. This is something.**

Q. Okay. So let's go to 499.

**A. 91? 99?**

Q. 99, yes. Okay. And just read the middle paragraph there. The Detective King then walked back.

**A. Okay.**

Q. Okay. And you remember in the first part that we...

**A. I have no idea.**

MR. TRIVEDI: Hold on.

MR. TONGE: (Resuming)

Q. Okay. Yeah, let me just ask the question. You remember in the first part that we read, the police officer wrote that he asked Mr. Vu if he knew a man named E and Mr. Vu said no, right?

Page 195

**A. Yes.**

Q. You remember that?

**A. Yes.**

Q. Okay. And now the victim, [redacted], has described what that guy looks like and then Detective King turns around the corner and he sees Mr. Vu talking to a man called E.

**A. Okay.**

Q. If Mr. Vu lied to the police about knowing that guy, would that violate the hotel's policies?

**A. This is something beyond my knowledge. Probably, yes, but this also is responsible with the law enforcement. I have no idea.**

Q. What do you mean by responsible with the law enforcement?

**A. He lied with the police and then he lied with the law enforcement, so you know what I'm saying?**

Q. Yeah, lying to law enforcement could be a crime also, right?

**A. Yeah, but that's all I know.**

Q. But if you found out one of your managers was lying to the police about something as serious as a minor being sold for sex in the hotel, would you fire that employee?

**A. Yeah, I do.**

Page 196

Q. Okay. Let's see. And so did Mr. Vu ever tell you anything about this incident?

**A. No, no.**

MR. TONGE: All right, I think if we can take a few minutes, then I am done.

MR. VIDEOGRAPHER: We are off the record at 5:37.

(Break.)

MR. VIDEOGRAPHER: We are back on the record at 5:46.

CROSS EXAMINATION

BY MS. CARSON WYNN:

Q. Mr. Tran, as attorney Tonge. Am I saying that right?

MR. TONGE: Tonge.

MS. WYNN: (Resuming)

Q. Tonge, mentioned it.

**A. I am representing one plaintiff.**

Q. I represent DB, okay?

**A. Okay.**

Q. So, I'm going to ask you a few questions and I'm going to try to streamline it, but mine's going to feel a little disorganized just because I'm going to be jumping from topic to topic because you've already covered a lot of ground today.

Page 197

A. **Okay.**
Q. Okay? If you don't understand something, say the same thing. Let me know, okay?
A. **Okay.**
Q. Do you know what loitering is?
A. **Do I what now?**
Q. Do you know what loitering is?
A. **Can you repeat the question again?**
Q. Yes. Do you know what loitering is?
A. **Loitering?**
Q. Uh-huh.
A. **I don't know.**
Q. You don't know what loitering is?
A. **No.**
Q. Okay.
A. **Is that the name, or what does that mean?**
Q. I'm sorry?
A. **Is that the name? What is your question?**
Q. So, when I'm talking about loitering in this context, I'm talking about people standing around on a property.
A. **People standing around property, okay.**
Q. Like outside the hotel room, on the property, standing around. So, if I say loitering, that's what I mean.

Page 198

A. **Okay. Okay.**
Q. Does that make sense?
A. **Yes.**
Q. Okay. Did you have a policy about loitering on the property?
A. **I don't have a policy, but most people in the hotel, they know that when they check in the room, they go to the room and keep quiet on the hotel property.**
Q. Did you observe people hanging out in the common areas of the hotel property?
A. **I do, yes, I do.**
Q. And did you allow that?
A. **I don't allow that. I try to tell them to stick in the room all the time. Because they make a lot of noises to bothering other guests.**
Q. Okay. So, in response to it, if I'm hearing you correctly, you would just tell people to go back to their rooms?
A. **Yes. But at nighttime sometimes, when they come in, a lot of people, they go crazy. That's where I call the police to help.**
Q. Got it. Okay. I'm going to show you what I've marked as Plaintiff's Exhibit 41, and this is another police report.
A. **What page that? Number three.**

Page 199

Q. I want you to turn to page number three. You see the page at the bottom, the page number? And, if you will, read that first paragraph for me.
A. **Which one is that, the top paragraph?**
Q. Yes, the top paragraph.
A. **Okay.**
Q. Okay, do you see about the third line down where it says, Craft advised Sergeant Emery that several men in the Super 8 Hotel were beating on her?
A. **Yes. I don't know.**
Q. You didn't know that was happening?
A. **I don't know what's happening.**
Q. Okay.
A. **Mostly, you see half the time here, mostly probably at nighttime and I go to bed already. I don't monitor the activity at nighttime.**
Q. Okay, and no one told you that?
A. **They don't tell me that.**
Q. Okay. Now, if you'll go back to the front page for me, if you'll go back to the first page. Do you see where it says, Others Involved?
A. **Where is that at?**
Q. It says it on the side. It's written, like, going down the side. It's right here.
A. **Okay, okay.**

Page 200

Q. Okay, and this says, this provides Patricia Craft's name. Do you see that?
A. **A prostitution? Okay.**
Q. And then an employer, it says that she was a prostitute. Do you see that?
A. **Yes.**
Q. So, but you were not aware that prostitutes were frequenting your hotel?
A. **No, I was aware, yes.**
Q. Okay. Now if you will turn to page eight for me.
A. **Okay.**
Q. Okay. In the first paragraph it says, I, on July 18th, 2020, I, Officer Yisrael, was patrolling the area of 4979 Old National Highway when I witnessed a man who I was familiar with for loitering at the location listed above. So, were you aware that the police were arresting people that they had seen frequently at your property?
A. **I see people often arresting people here and there, but I do not know the reason why.**
Q. And you do not ask why?
A. **I don't want to ask why because that is the biggest thing. Police go, they talk to them here and there, they handcuff, they take you go, and then I have**

Page 201

**no chance to contact them, so.**
Q. Did you know that the police knew that people were often loitering on your property?
**A. Probably, police know, yes.**
Q. Okay. I'm now going to show you Plaintiff's Exhibit 42. And I'm done with that one, so you can set it to the side. Okay. Mr. Tran, this is your, or Lincoln Bank Corp's, responses and objections to discovery.
Q. Now, I think you've gone over some of these for the other three cases. But this is for the DB case, okay?
**A. Okay.**
Q. Now, did you assist in drafting these responses?
**A. Did I what?**
Q. Did you assist in drafting these responses and writing the responses?
**A. This one here?**
Q. Yes.
**A. I don't know where these come from. Okay, this is the Lincoln Bancorp response. I probably do answer, but I not draft the response.**
Q. Okay. Do you believe that these are correct and accurate, these responses?

Page 202

**A. What is the correct answer? I don't know, I cannot read the whole thing and understand the whole thing in a short moment, so I cannot answer you.**
Q. So, you cannot say whether they're accurate or not?
**A. Say that again?**
Q. You cannot say whether these responses are accurate or not?
**A. Is this my response?**
Q. Yes, this is Lincoln Bank Corp's response.
**A. Okay. Give me a little time, let me read. Okay. You see the date on the page number five? It's from June 2017 to December 2020. That is not my date.**
Q. Okay. So, let's just go through a few of these then. Okay? We're just going to go through a few of the responses. Okay. All right, if you will turn to page number six.
**A. Number six? Okay**
Q. Yes. And in the second paragraph, it says that Defendant had approximately 24 cameras around the entirety of the property at CCTV. Defendant believes that the recording was on a 24-hour loop, such that there would be no recordings of any video feed. Tony would monitor the video feeds from his office. So, did you have approximately 24 cameras on your property?

Page 203

**A. Yes.**
Q. And were they on a 24-hour loop?
**A. Yes, 24-hour.**
Q. And what does that mean to you?
**A. That means they record 24 hours.**
Q. That means they record 24 hours a day?
**A. Yes.**
Q. Okay. And you would monitor those feeds from your office, is that correct?
**A. Yes, mostly. When I sit in the office, I look and I monitor them. I look at them all the time.**
Q. And then when you were not looking at them, you had front desk employees looking at the monitors.
**A. Correct.**
Q. Okay. All right. All right, and then if you'll look at page 7, I'm looking at the second paragraph.
**A. Okay.**
Q. And it says Defendant indicates, this is about halfway down the paragraph, okay. Defendant indicates that if Tony Tran, who would walk around the premises and monitor security cameras, saw somebody using drugs, or if guests were causing too much noise or bothering other guests, he would kick them out or call the police. When you saw someone using drugs, did you usually just

Page 204

kick them out or did you call the police?
**A. Okay. So, it depend on two different type of (unintelligible). If the drug (ph) are cool, I kick them out. But some of them too many, too much commission here and there, then I call the police.**
Q. So, if you thought they were cool?
**A. Yeah, they were like, something like homeless people like that, I kick them out. You know, they're sneaking, they smoke light drugs. It's okay. But some look like they carry weapons or something like that. I don't feel safe. Then I call the police.**
Q. Okay. So, you did not decide whether you were going to kick them out or call the police based on the type of drug they were using?
**A. Mostly, drug is drug. You know, a drug like pipi or they, you know, when they smoke pipe, I can smell like different kind of smoke. The marijuana, different type. I know marijuana is legal. So, half and half. You can kick them out. The police may not kick them out. But like cocaine, you smell different kind of smell. And, that is something more, I consider it more dangerous. So, cocaine mostly, I kick them out.**
Q. Okay. So, if you saw marijuana, you saw someone using marijuana, you may or may not kick them out.

Page 205

**A. Right.**
Q. If you saw somebody using crack cocaine...
**A. Yeah.**
Q. -- you're kicking them out.
**A. Yes.**
Q. Okay. And then you decided whether to call the police on them depending on if they looked threatening to you.
**A. Yes.**
Q. Okay. And if they did not look threatening, you just asked them to leave the property.
**A. Yes.**
Q. Okay. Okay. If you'll go to page ten for me. Page ten. Okay. Now I'm looking at number nine, okay.
**A. Number nine or number ten?**
Q. Number nine on page ten.
MR. TRIVEDI: Page ten, number nine.
MS. WYNN: (Resuming)
Q. Page ten, number nine.
**A. Oh, okay, okay.**
Q. Okay, if you'll go over to the response, which is technically on page 11. Okay. Do you see the response on page 11?
**A. Page 11 response, yes.**
Q. Yes. Okay. So, in the middle of the page is

Page 206

the last part of the response.
**A. The whole thing?**
Q. Yes, but I'm just looking at the middle paragraph in the page. It says subject to and without waiving said objections. Do you see that?
**A. Yes.**
Q. Okay. It says since Lincoln Bancorp had no knowledge of trafficking or prostitution at the motel, it cannot identify individuals who had knowledge of such occurrences. After going through the care reports, the customer care surveys we went through today, does that change your answer to number nine?
**A. I don't know. I don't know. It might be. It might not. I have no idea. The short time, because when people file a complaint, they always file it in their own opinion. And I am witnessing the fact, and also on their own opinion. So I have no idea. Maybe yes, maybe no.**
Q. Okay. I'm going to want you to turn now to page twenty-four. I want you to look at number eight.
**A. Okay.**
Q. Okay. It says identify and produce your policy and procedure manual, standard operating procedure manuals, and employee handbooks that were in effect at any time from June 20th, 2017 to December

Page 207

30th, 2020. The response is Lincoln Bancorp LLC had no such internal documents and otherwise refers plaintiff to the franchising agreement previously produced. But today we did look at a handbook that you had, correct?
MR. TRIVEDI: Yeah, I got to take the fall for that one. I mean, you can ask him, but I think that one's going to be on counsel, but you can ask.
MS. WYNN: (Resuming)
Q. But we did. We looked at a handbook today?
**A. Yes.**
Q. Okay. And you would be fine to produce that to us?
**A. Yes.**
Q. Okay. Perfect. Okay. And then if you'll turn to page twenty-five, I'm looking at number twelve at the very bottom of the page. Okay. And this one says identify and produce 1099 tax forms for all independent contractors who worked at the property on at least a weekly basis between June 20th, 2017 and December 30th, 2020.
Q. Did you have any independent contractors who worked on a weekly basis?
**A. Ask me again.**
Q. Did you have any independent contractors who worked at the Super 8 every single week?

Page 208

**A. Not every, one in a while, not every single week.**
Q. Not every single week.
**A. Randomly.**
Q. Okay. Perfect. Okay. And that's that with that one. You can put it to the side. All right. Mr. Tran, who did the accounting for Lincoln Bancorp when you owned Super 8?
**A. My wife.**
Q. Your wife did the accounting?
**A. Actually, the bookkeeper, not accountant.**
Q. Who did the accounting?
**A. Accountant we turned to the CPA.**
Q. Who's your CPA?
**A. I can write for you the name.**
Q. You can write the name?
**A. Yes.**
Q. Okay. Okay. So Wynn?
**A. Wynn Han (ph), yeah.**
Q. Wynn Han, okay, CPA. All right. Perfect. Thank you very much.
**A. You're welcome.**
Q. Okay. Just a couple more questions. I just want to clarify something you said earlier. You said that sometimes employees would write names of people who

Page 209

were going on the do not rent list on paper. Is that correct?

**A. Ask me again.**

Q. You said sometimes employees would write the names of people who were on the do not rent list on a piece of paper and leave it at the front desk.

**A. Correct.**

Q. Is that correct?

**A. Correct.**

Q. Okay. And you said they would do that sometimes, but they would forget.

**A. Correct.**

Q. What does that mean? What do you mean they would forget?

**A. Okay. During the work, it's busy. So, in case of, let's say, one front desk, they have like three, four people check-in, and one guest check out troublemaker. So, they don't have time to turn on different page of computer and write on the done checklist. So, they put the note here, you know, Mr. ABC, no rent list, and later they do it later. So, they put it.**

Q. Okay.

**A. Does that make sense?**

Q. So, they did not forget then.

Page 210

**A. They probably forget. They probably forget because after they finish, they maybe get tired, they go take a break, take a smoke, they come back, they forget to enter in, or they enter in, but that's how it is.**

Q. Okay. So, there were times where people were placed on the do not rent list, but it was never entered into the system.

**A. I don't know, but usually they do, but if you say like 100%, I'm not sure.**

Q. Okay. So, there could be people.

**A. There could be, yeah.**

Q. Okay.

**A. I cannot speak for them, so.**

Q. Okay. And then what type of misconduct would put you on the do not rent list?

**A. What do you mean?**

Q. What type of like conduct?

**A. Conduct?**

Q. Do you know what that means?

**A. I don't understand.**

Q. What kind of activities would put you on the do not rent list? What would you have to do?

**A. People bring a lot of people come in. They check in two people. Head up, they stay like maybe six, eight people. People make a noise. People bring in a**

Page 211

**lot of traffic at night. Come in the party, turn on the music loud, hang out, making noise. So, we know, identify the room. In the morning, we ask them to check out. We don't want to rent to them no more.**

Q. Okay.

**A. So, no other people, and then we remember, we silently put them on the no rent list.**

Q. Okay. What about the people that you kicked off the property who you saw were doing drugs? Did you add those to the do not rent list?

**A. That also. No rent list as well.**

Q. Okay. So anytime you saw anyone doing drugs on the property...

**A. Yes.**

Q. -- you would get their name?

**A. Yes.**

Q. And you would add them to the do not rent list?

**A. Yes, yes.**

Q. Okay.

MS. WYNN: Great. That's all from me.

MR. TRAN: Thank you.

MS. WYNN: Thank you very much. I appreciate it.

DIRECT EXAMINATION

Page 212

BY MR. ANKUR TRIVEDI:

Q. All right, Mr. Tran. I know we've been here a really long time. I'm sorry. I just have to ask just a couple of questions, okay? That really is just clean up questions. So, remember in the beginning, in the very beginning, you were talking about two email addresses.

**A. Three what now?**

Q. Two emails. You had two emails, a work email and personal email?

**A. Yes.**

Q. Okay. Would Wyndham, did Wyndham communicate with you on personal email or work email?

**A. Work email.**

Q. Okay. I want to go back to background checks.

**A. Okay.**

Q. Did you ever conduct a background check on Louis Vu?

**A. I don't remember because that is the beginning. When I took the hotel, there was some employee. So I don't know about the ... I don't take serious nothing about background check. And after that, Louis Vu come in. And after Louis Vu come in a couple months, I don't know, six, seven months, and I ran into some like missing cash on the front desk. And, that's why after that, and that I more stuff about consider**

Page 213

**people if they have ... I want to know more like employee, they stole the money from the previous job. And I start asking for the thing. But I don't remember if I do on Louis or not. I don't remember. It's been a long time, sir.**

Q. All right.

**A. Long time.**

Q. As you sit here today, are you or were you aware that Super 8 had rented rooms to individuals who were charged with trafficking?

**A. Ask me again.**

Q. As you sit here today, are you or were you aware that individuals who were charged with trafficking rented rooms at your hotel?

**A. Do I aware?**

Q. Yeah. Are you aware of that?

**A. Sex trafficking rent to the room? About that? I don't know. I mean, if they went to do something inside the room, there's no way I can know.**

Q. Okay.

MR. TRIVEDI: I thought I had more questions, but actually those are all the questions I have.

MR. TONGE: Okay. Yeah, I'm good.

MR. VIDEOGRAPHER: We are off the record at 6:10.

Page 214

(Whereupon, the above-entitled matter was concluded at 3:13 p.m.)

o0o

Page 215

C E R T I F I C A T E

STATE OF GEORGIA )
COUNTY OF NEWTON )

I hereby certify that the foregoing deposition was taken down by me, as stated in the caption; and the questions and answers were reduced to print by me; that the foregoing pages 1 through 214 represent a true, correct, and complete transcript of the evidence given on March 1, 2026. I am not a relative, employee, attorney or counsel of any of the parties; am not a relative or employee of attorney or counsel for any of said parties; nor am I financially interested in the action.

This certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript of proceedings or any part thereof, including exhibits, unless said disassembly or photocopying is done by the undersigned certified court reporter and/or under the auspices of Pope Reporting & Video, LLC, and the signature and original seal is attached thereto.

Pursuant to Article 8.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

Page 216

I am a Georgia Certified Court Reporter. I am here as an independent contractor of Pope Reporting & Video, LLC. The firm was contacted by the offices of The Stoddard Firm, to provide court reporting services for this deposition. I will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b).

I do not have a contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. I will charge the usual and customary rates of Pope Reporting & Video, LLC, to all parties in the case.

I further certify that the original of said deposition shall be filed under seal with Jonathan S. Tonge, ANDERSEN, TATE & CARR, P.C., One Sugarloaf Centre 1960 Satellite Boulevard, Suite 4000, Duluth, Georgia 30097.

This 3rd day of April, 2026.



Dennis W. Davis, CCR
Certified Court Reporter
No. 6061-6949-2566-8352