# EXHIBIT S

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

T.H, N.N., J.R. and D.B., )
)
Plaintiff(s), )
)
-vs- )
) NO. 1:25-cv-4310
LINCOLN BANCORP LLC ) 1:25-cv-4313
d/b/a SUPER 8 BY WYNDHAM; ) 1:25-cv-4629
AND LINCOLN PROPERTY ) 1:25-cv-05391
MANAGEMENT LLC, )
)
Defendant(s). )

VIDEOTAPED DEPOSITION OF LOUIS VU

TAKEN ON BEHALF OF

THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON APRIL 1, 2026

_____________________

REPORTED BY: SHELLEY MARBURGER, CSR

A P P E A R A N C E S

For the Plaintiffs T.H., N.N. and J.R. (via Zoom):

Jonathan S. Tonge
Attorney at Law
One Sugarloaf Centre
1960 Satellite Boulevard
Suite 4000
Duluth, Georgia 30097

For the Plaintiff D.B. (via Zoom):

Carson L. Wynn
Attorney at Law
1534 North Decatur Road
Atlanta, Georgia 30326

For the Defendant Lincoln Bancorp LLC (via Zoom):

Ankur P. Trivedi
Caitlyn Scofield
Attorneys at Law
One Sugarloaf Centre
1960 Satellite Boulevard
Suite 2000
Duluth, Georgia 30097

Also Present: Ben Savage, videographer
Natalia Hill(via Zoom)
Shauna Bates(via Zoom)

* * * * * * *

# TABLE OF CONTENTS

PAGE
STIPULATIONS....................................4
EXAMINATION BY MR. TONGE........................7
EXAMINATION BY MS. WYNN.......................100
REPORTER'S CERTIFICATE........................104

PLAINTIFFS'
EXHIBIT(S)



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | PHOTOS | 17 |
| 2 | INCIDENT REPORT | 75 |

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of LOUIS VU may be taken on behalf of the Plaintiffs on April 1, 2026, in Oklahoma City, Oklahoma, by Shelley A. Marburger, Certified Shorthand Reporter for the State of Oklahoma, pursuant to notice and agreement.

It is further stipulated and agreed by and between the parties hereto, through their respective attorneys, that all objections, except as to the form of the question and responsiveness of the answer, are reserved until the time of trial, at which time they may be made with the same force and effect as if made at the time of the taking of this deposition.

* * * * * *

THE VIDEOGRAPHER: We're now recording. It's 9:05 here on Wednesday, April 1st, 2026, here in Oklahoma City. We're here for the deposition of Louis Vu.

And there are two cases that we're working on here today. The first one is in the United States District Court for the Northern District of Georgia, Atlanta Division, Case Number 1:25-cv-04629-JPB, J.R. Plaintiff versus Lincoln Bancorp LLC, defendant.

The other case combined today is in the United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action File 1:25-cv-05391-AT, D.B. Plaintiff versus Lincoln Bancorp LLC, doing business as Super 8 by Wyndham and Lincoln Property Management, LLC.

If we could have the attorneys on the Zoom introduce themselves one at a time, then we can swear in today's witness.

MR. TONGE: Sure. I'm Jonathan Tonge, and I'll correct this in a second but I represent Plaintiff T.H., Plaintiff N.N., and Plaintiff J.R.

MS. WYNN: My name is Carson Wynn and

I'm with The Stoddard Firm and I represent Plaintiff D.B.

MR. TRIVEDI: This is Ankur Trivedi with GMKE, and we represent Lincoln Bancorp, LLC and in the D.B. case Lincoln Property Management as well.

LOUIS VU

of lawful age, being first duly sworn, deposes and says in reply to the questions propounded as follows:

MR. TONGE: Everybody good?

So I just wanted to note that are two other cases also that this deposition applies to, and that T.H. v. Lincoln Bancorp, LLC, and also in the Northern District of Georgia. That's 1:25-cv-4310, and N.N. v. Lincoln Bancorp, LLC, Number 1:25-cv-4313.

Yeah. And if I didn't get y'all notices of that. I will get you -- the court reporter that.

So this will be the deposition of Louis Vu taken pursuant to notice and agreement of counsel in those four cases mentioned. It's taken for all purposes allowed under the federal rules of civil procedure, including use of trial.

Ankur, would you like to observe -- object -- I mean, reserve objections other than form and responsiveness?

MR. TRIVEDI: Yes. Sounds wonderful.

MR. TONGE: Okay, great.

* * * * * * *

EXAMINATION

BY MR. TONGE:

Q. All right. Mr. Vu, my name is Jonathan Tonge. I represent three of the plaintiffs in the three of the cases, and then Ms. Wynn represents the fourth person. She's at a different law firm -- than -- than mine.

Can you -- would you mind stating your full name for the record?

A. Louis Vu.

Q. Do you have a middle name or anything?

A. No.

Q. Okay. Do you go by any other names?

A. No.

Q. Okay. Have you ever given a deposition before?

A. No.

Q. Okay. You understand that you're under oath?

A. Yes.
Q. Okay. And, let's see, have you ever testified in court or anything?
A. No.
Q. Okay. And so do you understand that your testimony will be used by the judge and jury in this case?
A. Yes.
Q. Okay. And you agree to give truthful and complete answers to the questions I ask today?
A. Yes.
Q. If you don't understand a question I ask -- I might word it wrong or I might, you know, say something in a confusing way -- so if you don't understand anything I'm asking just tell me that you don't understand, and I will -- I will work to rephrase the question until we understand each other. Okay?
A. Will do.
Q. Okay. And if you answer a question I ask I'm going to assume that you understood what I was asking. Is that fair?
A. Sure.
Q. Okay. And then just in conversation people talk over each other or there's no- -- you

know, will nod in agreement or something like that. And since we have a court reporter who's writing down everything we're saying, just if you could answer audibly, so say "yes" or "no" instead of like shaking your head or saying "huh-huh." Okay?

And do you understand that today we're going to be talking about the Super 8 by Wyndham motel that's located at 4979 Old National Highway in College Park, Georgia?

A. Yes.

Q. Okay. And I may refer to that as "the hotel" or "motel" or "the Super 8," and if I do that I'm talking about that hotel at 4979 Old National Highway. Okay?

A. Yes, sir.

Q. And when I -- when I ask you questions about that Super 8, just know that I'm only asking about it for the time period that Lincoln Bancorp owned the hotel, which was from the end of 2019 to the end of 2021. Okay?

So I'm just --

A. Yes.

Q. -- that time period is what I'm asking about. Okay?

Did you do anything to prepare for your deposition today?
A. You talking to me?
Q. Yes, sir.
A. Nothing because I just, you know, being received this one, this letter, last week.
Q. Okay.
A. I've been served this one last week.
Q. Okay.
A. Yeah.
Q. You didn't talk to anybody about the case or about the deposition?
A. No, sir.
Q. Okay. You didn't look at any documents or anything?
A. I don't have any document. Only this paper I've been served.
Q. Okay.
A. Yes.
Q. Okay. Can you tell me where you live now currently, what's your address?
A. I live in Oklahoma City.
Q. Okay. What's your address just in case we need to serve you with anything else or --
A. REDACTED, Oklahoma City.

The ZIP Code is 73127.

Q. Okay. And what is your current phone number?

A. REDACTED.

Q. REDACTED.

And how long have you lived at that address in Oklahoma?

A. More than a year.

Q. Okay. Are you personally -- do you -- are you a member, or an officer of any company? Do you own any companies that do any kind of business?

A. No, sir.

Q. Okay. Can you just give me a, kind of high-level view, of where you grew up and -- and sort of where you went to high school, if you went to college, that kind of thing?

A. I lived in French and moved to the States in 1993.

Q. Okay.

A. Yes.

Q. You grew up where, I'm sorry?

A. French, Paris.

Q. Okay. And so how old were you when you moved here in 1993?

A. A 21-year-old.
Q. Okay. And where did you move when you came here?
A. When I first came to the States?
Q. Yes, sir.
A. Virginia and after that California.
Q. Okay. And I assume you were working.
Can you give me a little background on your professional life?
A. I was in the hospitality business, you know, managing, you know, hotel and working --
Q. Okay.
A. -- for the hotel.
Q. Okay. And so is that something you had done in France?
A. No. Here in the U.S.
Q. Okay. So what was the first hotel that you worked for?
A. It's in -- also in Orlando, Florida.
Q. Okay.
A. Yeah.
Q. What was -- what kind of -- what brand was it?
A. No branch. It's independent franchise, you know.

Q. Okay.
A. Independent hotel.
Q. Do you remember the name?
A. Roomba Inn and Suite.
Q. How do you spell that first word?
A. Roomba, R-o-o-b-a [sic], Inn and Suite.
Q. Okay. And about how long did you work there?
A. About three year.
Q. Okay. And what did you do there, what was your role?
A. Front desk, front desk.
Q. And where -- where did you work after that?
A. It's also in Orlando as well, but Saratoga Resort.
Q. Okay. And was that the name is it, Saratoga Resort?
A. Yeah, Saratoga resort.
Q. Okay. And also working the front desk?
A. Yes.
Q. Okay. And how long did you work there?
A. Also a couple year.
Q. Okay. And what about after that?
A. After that I start to work for Super 8,

yeah.
Q. The Super 8 we're talking about here?
A. Yeah, uh-huh. On and off, yes.
Q. Okay. And so that was, I guess, an independent hotel in Orlando, and then the Saratoga resort, is that independent --
A. It's independent, too.
Q. -- or is that a brand over that?
A. Also an independent.
Q. Okay. Can you tell me when was the first time you met Tony Tran?
A. About 2- -- 2019.
Q. Okay.
A. Yeah. I apply for a job from him because he -- seen an ad on the newspaper so I call and apply.
Q. Okay. So you didn't know him, you just applied --
A. Yeah.
Q. -- for the job?
A. Yeah.
Q. Okay.
A. When I was in Orlando quitting the other job so...
Q. Yeah. And so that was just like

advertised on the internet?
A. Yeah.
Q. Okay.
A. On the newspaper, not the internet, yeah.
Q. Oh, from the newspaper. Oh, I see.
A. Newspaper, yes.
Q. Gotcha.
And so that was in 2019, and is that when you started working for the Super 8?
A. Yes, sir.
Q. Okay. Have you ever met Debbie To or To (pronouncing)?
A. Debbie To, his wife. Right?
Q. Yes.
A. Yeah. One or two times, you know. She's rarely there.
Q. Okay.
A. A couple of times.
Q. Was she ever at the Super 8?
A. When I first, you know, start to work I met her, yeah.
Q. Okay.
A. And the second time is on the period of the COVID saw her, the second time, yeah. That's the only two time.

Q. So once at the beginning and once kind of during COVID?
A. COVID, yeah.
Q. Okay. Do you know anything about -- about these lawsuits and what we're talking about?
A. I'm not aware of that because I quit -- been quit, you know. Been -- left the job, you know, at Super 8, 2022 or long, yeah. Before -- up to that, yeah. So I don't know -- I'm not aware of that, anything about this --
Q. So you don't know anything about these lawsuits?
A. No. And then suddenly, you know, I've been served for this one, and then I have to stop -- usually went back to California already with my family. I have to postpone the -- the -- the flight, you know, for --
Q. I'm sorry about that, but I appreciate -- I appreciate you taking the --
A. Yeah.
Q. -- time to be here. And -- and I really don't think this will take all that long this morning either. So I think we can get through it pretty -- fairly quickly, and let you get back to your life.

I'm going to share my screen and just show you some pictures.

MR. TONGE: Oh, I'm sorry. Ms. Court Reporter, can I get sharing turned on?

THE REPORTER: Yes. Give just a second.

MR. TONGE: I'll send a request.

THE REPORTER: Okay.

MR. TONGE: See if I can make that bigger.

(Plaintiffs' Exhibit No. 1 marked for identification purposes and a made a part of the record.)

Q. (By Mr. Tonge) Can you see that, Mr. Vu?
A. Yes.
Q. Okay.
A. Yeah. I forgot my glasses too, yeah.
Q. Okay. And I'm just going to scroll through these pictures and get you to --
A. Uh-huh.
Q. -- to tell me what they are. There's four -- maybe seven or eight on here.

Can you tell me what this is a picture of?
A. The property, you know, the Super 8.

Q. Okay. The Super 8 on Old National?
A. Yeah.
Q. And then this is the same picture --
A. This is the same picture, yeah.
Q. Yeah. And can you see that?
A. Yes.
Q. Can you tell me what that's a picture of?
A. Let me see. That's the -- kind of the entrance when we just get off the exit.
Q. Uh-huh. Yeah. This is the front entrance to the --
A. Uh-huh, yeah.
Q. -- Super 8?
A. Yeah. This is the other side's for the entrance from freeway. That's the exit, get into the Super 8.
Q. Okay. And then can you tell me what this picture is?
A. It's the side on the freeway.
Q. And this picture?
A. Side on the freeway, too.
Q. This picture?
A. Yeah. Same thing, side of the freeway, from the freeway yeah, if you're looking at -- same thing. Same thing, sir.

Q. Okay, okay. And that's it.
So I want to go back to this, kind of first picture. Sorry for scrolling around.
And so this is an overhead shot of the Super 8. Right?
A. Yes.
Q. And so this is I-285 and 85 up here. Is that correct?
A. Yes.
Q. Then you get off the exit --
A. You go in there. Yes, right there.
Q. -- it's Old National and this driveway that comes into the --
A. Yes.
Q. -- Super 8. Right?
A. Yes.
Q. And it looks like there used to be things here in this parking lot?
A. I don't know.
Q. And right now --
A. It's the same thing, you know, as the picture.
Q. Okay. So there was never --
A. It's an empty -- empty, you know, lot right there.

Q. Okay.
A. And people would used to park there, too. Park their car -- you know.
Q. What do you mean, just -- just randomly park your car there --
A. People park in that empty lot right there. And sometimes people park and the homeless people, you know, stay right there at the empty spot right there.
Q. Oh, okay.
A. Yeah.
Q. And is that property the Super 8's property also?
A. I have no -- I don't know that.
Q. You said the hotel didn't have any control over that --
A. Yeah, no.
Q. -- that piece of property?
And so it looks like a pretty straight shot, so can you tell me is the front office right where this little red dot is at the front of the hotel?
A. It's right there. You move up little bit, left. That's the front office.
Q. Okay.

A. Yeah. Right there.
Q. And so does the front office --
A. Yeah.
Q. -- look down that driveway?
A. Uh-huh. That's the front office.
Q. Can you see all the way to Old National from the front office, like can you see all the way to the road?
A. It's far away.
Q. Yeah.
A. Yeah.
Q. But can you see it, like -- like is there any -- like if you're standing in the front office --
A. It's kind of up the hill, you know, when -- if you're standing in front of the office, look at the -- go toward the freeway, it's kind of up the hill. It's very hard to see.
Q. Oh, okay.
A. Yeah.
Q. Let me get to this picture here, then. And so this is sort of --
A. Yeah. You see the -- the hill right there?
Q. Yeah.

A. It's this cover -- you know, it cover your -- your view.
Q. So about --
A. If you see from the -- from the -- how you call it? -- the office, the lobby, look now by the guy right here. Very hard because it's the bump, big bump right there, kind of a little hill, very hard to see, yeah.
Q. So how far up the driveway could you -- so you're saying like from the front office seeing this guy might be difficult --
A. Uh-huh.
Q. -- or you couldn't see him. Right?
A. Uh-huh. You couldn't see him.
Q. Do you see like this billboard here, where -- and where that is, kind of --
A. That's kind of far away, too.
Q. Okay. So where do you think you could see to?
A. You have to go up the hill.
Q. Let me go back to the overhead.
And you see how the driveway's divided --
A. Uh-huh.
Q. -- and there's these --
A. You can only see from the -- the front of

this, to the edge of the green right here (indicating).
Q. In between --
A. No, no, no. More up, just in front. More, more. You see the two-story hotel right there, the side -- that's the only thing you can see right there. That's where the hill, you know, start.
Q. Okay. So that's the hill right there?
A. Yep.
Q. Okay.
A. You cannot see anything, you know, beyond that.
Q. Okay. But this is the only way to come into the hotel property. Right?
A. Yes.
Q. That one driveway?
A. Yes.
Q. There's one way in, one way out?
A. One way out, yes.
Q. Okay. And then I'm going to zoom in some here because there's not any great pictures in the parking lot like from Google Maps. But -- so I have zoomed in some on the building.
And so anybody that's coming to park at

the hotel has to come here and either turn right here, and there's --
A. Or go straight, yeah.
Q. -- straight here. Right?
A. Yes, yes.
Q. And then the front office is at this corner --
A. Yeah.
Q. -- where that happens. Right?
A. Yes.
Q. Okay. So is there anybody that would come to the hotel whose vehicle you could not see when they came in from the front office?
A. Sometime you cannot see because the office kind of hidden, you know, from the view of the entrance when you --
Q. Okay.
A. Yeah.
Q. Okay. So you --
A. You should go to take a look, you know, at the hotel.
Q. Yeah, yeah.
A. It's very hard, you know, from the inside to see out at people, when they get in or they drive in or when they drive out. It's very hard

because it's kind of blocked of the office. They have the wall and also -- how you call? -- the front window with -- you know, the big culvert. It's very hard to see the people outside, yeah.

Q. So, and I have not been in the front office and need to do that. But --

A. Yeah, you need to.

Q. -- if you're standing -- if you're standing there and you're looking up the hill and all that, are you saying that to your right -- if you're standing looking up the hill, to your right is a wall and you can't see to the right from the front office?

A. Yeah.

Q. Okay.

A. Uh-huh. It's very hard to see the people drive in or drive out.

Q. Okay.

A. You're kind of hidden because also the way the building -- how you call it? -- the that, the lobby is kind of hidden inside. So either the view is blocked by the window and also the wall, so it's very hard. And also the -- it's higher and the -- the -- I don't know how to explain that. They have the step, you know, to go down.

Very hard to see people when they get into the office, the lobby, yeah. It's kind of hidden.

Q. Okay. No. That's very helpful.

A. You kind of -- you know, see it look like two story in front of the -- the entrance.

Q. Uh-huh.

A. Yeah. You should go there and take a look.

Q. Okay. I'll do that, yeah.

So the other thing I want to ask you about is do you -- there were security cameras at the hotel. Correct?

A. We have camera everywhere.

Q. Okay.

A. When I used to be there, yeah. We have camera about everywhere.

Q. I'm going to see if I can -- I'm going to see if I can draw on this. Okay?

Can you tell me where the cameras are, and I'm going to make a little mark on here? Like --

A. I just remember, you know, some of it in front.

Q. But did you -- well, I guess, for other -- rather than doing that, you said you had them

everywhere.
I mean, can you see every room in the hotel, every door to every room?
A. I always look at the screen right in front of me at the office, you know, where the -- the lobby. We have -- we have the big screen -- TV screen over there so I can see all the area I need to see.
Q. And did the cameras cover the entire hotel?
A. Yes. But some area is kind of, you know, aren't -- the camera is sometime on and off, too.
Q. Which -- do you remember which parts of the hotel were hard to see?
A. It's all the way to the back because no signal. The signal very bad.
Q. Okay.
A. Yeah.
Q. And I'm going to -- I can take this away, but is it like the literal backside, like right here (indicating) --
A. Yeah, that. And also toward the freeway, the front freeway as well, and that's, you know, the -- that area, yeah.
Q. Like right above where it says "ATM"?

A. Little bit further. Go to this --
Q. Like above this money sign symbol?
A. You see -- no. This side, the end, at the end, near the end. See, little bit further. Yeah. That's area, the whole -- yeah.
Q. Towards the front?
A. From half of the building down.
Q. So like here?
A. No, no. In the back, sir, not the front.
Q. Oh, other way?
A. Other way.
Q. Like here?
A. Yes. All the way down, so that's a dead area.
Q. Okay. So kind of this corner beside the exit, and then the very back of the hotel has bad signal --
A. Yeah. The cameras' signal very weak -- yeah.
Q. And so other -- so there's those two spots, but the rest of the hotel was covered well by the cameras?
A. Kind of, yes.
Q. Okay. All right. I'm going to --
MR. TONGE: Just, Court Reporter, I'm

going to save that with those two marks on it, and I will send an updated exhibit there.

THE WITNESS: Because I remember every -- every floor we have a camera, you know, one in the front, one in the back because it's harder, yeah.

Q. (By Mr. Tonge) So on a different -- here, let me -- let me go down.

So there's two floors, and so you're saying like on this -- on this corner you would have a camera like looking down that area --

A. Uh-huh, yeah.

Q. -- on the first --

A. From the back, you know, you go here toward the -- the office, and the other one look toward the other side, to the freeway.

Q. Okay, okay. Gotcha. Okay, great. I'm going to take that away.

Okay. And so you said -- you said you worked there until 2022. I'll just represent to you that I believe Lincoln Bancorp sold the hotel like on December 30th, 2021.

A. Yeah. That's right. I don't -- I don't recall --

Q. Did you work there after that?

A. It's been almost six year already, yeah. Because I work on and off, you know. Sometime when they -- they are shortage of people they call me to work, and sometime, you know, I -- by that time, you know, I have no place to stay so I stay in the hotel.

Q. Okay.

A. Yeah.

Q. But you kind of worked there from sometime in 2019 until at least --

A. Yeah. Before up to the sell, yeah, they sell the hotel.

Q. You did not work for any new owners?

A. No. Just for one week, you know, for -- for transition, you know, for doing the paperwork you get back to -- to the new owner. That's it.

Q. And who was -- to your understanding, who was your employer, like who paid your salary?

A. Tony.

Q. Okay.

A. Lincoln Bancorp because I receive check from Lincoln Bancorp.

Q. Okay. That's --

A. And Tony, he's the one who give me the check, you know. I work part time, not -- not

full time so --
Q. Does Lincoln Property Management, LLC, mean anything to you?
A. No. I just know that Lincoln Bancorp because I received the paycheck from them. I -- Super 8, I don't know about the Lincoln Property, yeah.
Q. Okay.
A. All I know is Lincoln -- Lincoln Bancorp because I receive a check, name it on the check, so that's all I know.
Q. And so how -- you -- you said that it was off and on and part-time, can you give me a ballpark of what your work schedule was like?
A. Sometime, you know, depending. Sometime on the weekend, sometime in the -- from Monday to Wednesday. Sometime, you know, Friday to Sundays. It's depending if we have a lot of guests or we short people. In the beginning I work full time. But up to that, you know, kind of slow up to the COVID we slow so we on and off, on and off.
Q. Okay. And where was your -- what was your role at the Super 8?
A. Front desk.
Q. Front desk?

A. Yeah.
Q. Okay. And so in the beginning, so like early 2020 -- late 2019, early 2020 you were working full time?
A. Yeah.
Q. And then COVID would happen around March of 2020 --
A. Yeah.
Q. -- and it would probably be bad for a few months --
A. Yeah.
Q. -- and so after that March of 2020 --
A. And I come back to work, yeah. I don't recall what month, but I off a while for a couple month and then come back because no job. Because the hotel closed -- most closed around the COVID time, you know.
Q. Yeah.
A. No customer.
Q. And so that time that you were working full time, before COVID --
A. Uh-huh.
Q. -- were you working day shift, night shift, anything?
A. Depending. It's hard to tell because

sometime we have people work in the mornings, sometimes we don't have people work the morning. I have to work in the morning. Sometime I have -- we have -- they have people and working -- short people in the evening. I work in the evening because I stay at property, yeah.

Q. And did you live at the hotel the entire time you worked there?

A. No. On and off because I have to go to my friend house, too, you know.

Q. Okay. Where was your friend's house you were going, also in Atlanta or where?

A. In Atlanta, yeah.

Q. Okay.

A. Just visiting for a weekend and things like that.

Q. Okay. And so were you -- was you living there a part of your compensation for working?

A. No. Because he give me the -- that free -- free room because sometime, you know -- I have a hardship that time, so he give me the room to stay and whenever I work I get paid.

(Technical difficulties.)

Q. (By Mr. Tonge) Sorry about that, Mr. Vu.

So off and on you were living there, and

you said that it was a free room that was not part of your pay --
A. No.
Q. -- for working at the hotel?
A. No.
Q. Okay. How much did you get paid to work at the hotel?
A. I -- about $2,000 a month.
Q. 2,000 a month?
A. Uh-huh.
Q. Got it.
A. Approximately. I don't recall, honestly.
Q. But that was --
A. Yeah.
Q. -- an estimate?
A. I work part time or whenever they needed, uh-huh.
Q. Okay. And so were you -- would -- would Mr. Tran just call you and say, "Hey, we need you right now" or "We need you tomorrow" or something?
A. Yeah.
Q. Okay. How often was Mr. Tran at the hotel?
A. Sometime he stay there. Sometime he leave for a while and he come back.

Q. When he was gone who was in charge of the hotel?
A. Not in charge but, you know, front desk. So I take care of, you know, whatever I can for him.
Q. So would it be like whoever's kind of working the front desk --
A. Yeah.
Q. -- is in charge?
A. Anybody because we have four or five people, you know, work there. We take charge of everything. Whoever, you know, on the schedule to work that day, so in charge of everything.
Q. Okay.
A. From, you know, the housekeeping to check in guest, check out guest, and supply, everything.
Q. Did you do housekeeping if it was needed?
A. Yeah, we do -- you know, we do everything. We do that in the hotel.
Q. As the front desk what -- what were your job responsibilities, can you describe your job for me?
A. Check in guests and check out guests.
Q. Okay. Did you have -- I know you said you could watch the cameras kind of live. Was

there a passcode to get to this, like to rewatch stuff or anything, or could you just -- could you watch what happened an hour ago pretty easily?
A. It's very hard because you have to go down to the -- to the basement of the hotel to get into the access, but I don't have a code for that. Only thing I watch live on the TV by the -- the check-in computer. We have a big screen TV right there so I can watch what going on.
Q. Okay.
A. Yeah.
Q. But to back it up and rewatch it, you're saying you need a code --
A. Yeah.
Q. -- to get in that door?
A. Yeah. I don't -- I don't have access for that, yeah.
Q. I gotcha.
Did anybody have access to that code?
A. No.
Q. So no employees that you know had access to get --
A. I don't know. For me, I don't know. But the other -- for the other person I really don't know.

Q. Okay.

A. I don't need to -- to know the password to look for, so I didn't ask, yeah.

Q. Yeah, yeah. Yeah. I was just trying to see how it worked.

But so you could watch stuff happening in real time, you just couldn't go down and access it --

A. Yeah. You know, I only watched the live, you know, screen. That's it. Uh-huh. For anything record or want to rewatch, you know, we have to call Tony or -- yeah.

Q. Right. And part of your job was -- was interacting with the guests. Is that right?

A. Yeah. Check in and check out the guests.

Q. Check in/check out?

A. Uh-huh.

Q. Do you remember what time check-in and check-out were?

A. The check-in time is 11:00 -- or no, the check-out time is 11:00. The check-in is 3:00 p.m., 2:00, 3:00 p.m. And sometime if we have an opening room, we can get -- let a guest, you know, check in early. But the minimum is 2:00 p.m. for check-out -- or for check-in, but

the check-out time is 11:00 every day.
Q. Okay.
A. Yeah.
Q. And I have a list of names that look like they worked at the Super 8 that I'm going to ask you about.
But, just generally, were there different shifts, like what were the shifts --
A. We have three shifts, you know, three shifts.
Q. Three. Okay.
A. We have three shifts.
Q. So a day shift, a night shift --
A. Yeah.
Q. -- and kind of a overnight shift?
A. Yeah.
Q. How many employees would be working on each shift at a time?
A. One or two, depending, yeah.
Q. So there would be --
A. On a busy day it's two people. If not busy, one.
Q. You mean, two people at the front desk?
A. Yeah.
Q. Okay.

A. Sometime, you know -- how you call it? -- the other people from the housekeeping stay in the front.
Q. Housekeeping?
A. Yeah. Because in the morning the house -- head of housekeeper have to be at the front desk to receive the list of people check in -- check out for the day, yeah.
Q. And is that the two main categories of workers: there's front desk people and there's housekeepers?
A. Yeah.
Q. Was there any kind of maintenance person or anything?
A. Maintenance, no. We -- we called it out. If anything happened we called the outside people. We have people to do that for --
Q. Okay.
A. -- for us for any, you know, incident at the hotel. Like plumbing or anything, we have people to do that.
Q. Okay. And was there somebody at the front desk at all times?
A. Yes, have to be.
Q. Yeah. 24 hours?

A. Yeah.
Q. How --
A. But some -- but after that -- you know, when COVID hit we only opened, you know, two sh- -- you know, the morning shift and the evening shift. That's it.
Q. Okay.
A. And we close at, you know, 8:00 p.m. already. So nobody after 8:00 or 10:00, depending on the day. But we don't have the third shift, yeah.
Q. Like on the night shift did you guys lock the front office?
A. Yes.
Q. Like when -- was there a night --
A. Yeah.
Q. -- window --
A. Uh-huh.
Q. -- for people to check in?
A. Yeah.
Q. Okay. So other than front desk and housekeeping staff was there any other kind of employee at the hotel?
A. No.
Q. Okay. Was there ever any kind of

security guard or anything?
A. We used to -- to have but they on and off, too.
Q. Say that last part again?
A. They on and off, too, sometime. Because they stay at the hotel and they do, you know, free security for us. You know, not security but anything happen like fighting or something and they -- they -- they have -- have us to clear out the people or call the cop to clear out people. But we don't have the security, permanent security.
Q. And so there were -- I need to -- I'm not sure I understand all that.
So there were people that would offer free security?
A. Yeah. Because that's -- they was a guest who stayed there.
Q. So they were staying there?
A. But they were the real security for other company, but they stay at the hotel. And sometime they -- you know, they help us to -- you know, sometime used to people are fighting, so they get involved and help us to call the cop and thing. That's it, but we have no security.

Q. They might break up fights or --
A. Yeah. Break up the fight and call the cop.
Q. Okay. Was guest safety part of your job responsibility?
A. I'm sorry?
Q. Was guest safety, did that fall within any part of your job?
A. Yes. We have to, you know, protect the guest just in case, you know, something happen. We have to call -- you know, call the authority right away, like call the cop right away because fighting and things happen at the hotel.
Q. Yeah.
A. Yeah.
Q. Okay.
A. Especially in this area -- in this area is very dangerous, too --
Q. Okay.
A. Yeah.
Q. The area where the Super 8 is?
A. Yeah. The lot, you know, in the -- in the front entrance when you exit, there's a bunch of people, homeless people always stay at the entrance all the way out so that's why, so...

Q. Oh, up by the road?
A. Yeah, they by the road, yes.
Q. Okay. And so, I guess, was guest safety like part of everybody's job that worked at the hotel?
A. Yeah.
Q. Okay. Did most of the employees live at the Super 8?
A. Some of them. Some live outside and come to work.
Q. Okay. And you stayed there -- unless you were staying with your friend in Atlanta, you -- you would have a room at the Super 8?
A. Yes.
Q. Okay.
A. But every -- when I work, you know, that full time I -- I take, you know -- I work only three weeks of a month -- out of the month and one week I take off and go back to -- to my family. So sometimes I work for one month, I take two week off or three week off, depending. Because the -- look for low season or anything, I go back to home in California, yeah.
Q. In California?
A. Yeah.

Q. Where at in California was that?
A. Los Angeles.
Q. Okay.
A. Yeah.
Q. How did the hotel, how did Lincoln keep track of employee hours? Were you guys paid by the hour or you were paid a flat -- a flat rate?
A. I got by --
Q. Did you guys clock in and clock out?
A. -- by hour.
Clock in/clock out.
Q. So was there a way that you clocked in and clocked out?
A. Yeah, yeah. We have a timecard.
Q. Okay.
A. Yeah. They have machine, we have a time clock. Everybody had to clock in and clock out.
Q. Okay. Do you remember what system, like what computer system you used to check in guests?
Do you remember what that was called?
A. That's from Wyndham. I don't really -- Sinex, something. Wyndham, you know, they use only one software. I think it's Sinex or -- Sinex.
Q. Okay. How do you spell that, do you

think -- if you were guessing?
A. Sinex, S-i-n-e-x -- -e-x, yeah. Sinex.
Q. Okay.
A. Yeah. Most, you know, Wyndham hotel franchise uses one system, Sinex.
Q. Okay. What kind of information would you -- like if somebody comes in to rent a room that you've never seen before, what information do you have to get from that person to put into that system?
A. First we need their ID to check in.
Q. Okay.
A. And a credit card.
Q. Anything else?
A. And credit card for security deposit or incidental deposit.
Q. If somebody was paying cash would there be a deposit?
A. Yes. Sometime we require, you know, deposit, too. If we look -- the person, you know, they are messy and think we afraid they will steal something or damage the room, we will ask them for security deposit.
Q. Okay. And so that was just sort of a -- based on your discretion --

A. Yes.
Q. -- you would do that?
A. Uh-huh. Because sometime people don't have a credit card, so they can deposit by cash and we refund it back. People that have credit card or pay with debit card, we can -- we use that for security deposit.
Q. Okay. Would you make copies of the ID that people gave you?
A. Sometime yes.
Q. Okay. What information off the ID did you enter into the Wyndham system, like what information --
A. The full name.
Q. -- did you have to put in?
A. The full name. That's all they need, yeah, for the system. Yeah, the system ask for the name.
Q. Okay.
A. And check mark if they have ID and that's it.
Q. Okay.
A. And the -- the address on the ID you have to enter that.
Q. Okay. So the name and address would go

in the system?
A. Uh-huh.
Q. Okay. Would you confirm the photo on the ID with the photo of the person that was there?
A. Yes.
Q. Okay. Was there an age requirement for renting a room?
A. I believe it's over 18.
Q. Okay. If there were going to be multiple people in a room did you take down the guests' names or anything like that?
A. No. We don't do, because -- put -- if they rent the king-size room they have -- they allow two people. If they rent a double room they allow four people. We only take one person, the ID for the man.
Q. Okay. You said the ID for the male?
A. No, no. For the people who rent the room. That's it. And the rest we don't ask for.
Q. Okay. And then later can you search a name and see -- like after they checked out, could you search a name in the system and see if they had been there before?
A. I think so, yeah.
Q. Okay. Did you get any information about

the cars or the vehicles like license plate numbers or anything like that?

A. We asked the guests to write down their license plate and sometime they do, sometime they don't. Because on the -- how do you call? -- the registration form, they have a place for you to input your license plate. But sometimes guest, you know, write out their license plate, sometimes they don't.

Q. Right.

A. It's not our control, yeah.

Q. Did the Super 8 only rent by the day, or did they have weekly rates?

A. We only have the daily rate.

Q. Okay.

A. Yeah.

Q. Did you have people that stayed there long periods of time?

A. Yes.

Q. Were there people that stayed there when you started working there that were still there when you left?

A. No. They move a lot. Because due to COVID, so a lot of people moving. The COVID shut down the hotel a while, too.

Q. Okay.
A. Yeah.
Q. How long was the hotel shut down during COVID, do you know?
A. I think a couple weeks, yeah. Because very slow and no -- people cannot afford to pay and we have to shut down for a while, yeah. I don't recall how many week but for a while.
Q. Okay.
A. Yeah.
Q. And did people -- did everybody move out of the hotel --
A. Yeah, uh-huh.
Q. -- for those weeks?
A. Uh-huh.
Q. Okay. Can you tell me about the training that you got when you came to work at the Super 8?
A. The human trafficking law and labor law because everything, you know, is -- they have a poster at the front of -- in the office clearly, yeah. And minimum wage, all kind of, you know, law in the break room.
Q. You said like -- like so there was a human trafficking training, and there was a labor training about --

A. Uh-huh.
Q. -- about wages and things like that?
A. Yeah.
Q. Okay. Any other kind of training that you remember?
A. Safety training in case, you know, get in fire or emergency.
Q. Okay.
A. Yeah. That's all.
Q. Okay. Did you get any kind of training on like how to run the front desk or anything?
A. Yes. I have to. I had to get training, yeah.
Q. And were these trainings that came from Wyndham, or did these trainings come from the hotel?
A. From Wyndham people.
Q. And so how do you know they were from Wyndham, did you have to like log in to a system or something?
A. Yeah. They come with a -- the badge and they always make appointment before they come to come to see us for -- because they come most -- mainly to check, you know, the -- the hotel and things so...

Q. And so somebody -- and so a person from Wyndham came to the hotel and trained people in person?
A. Yeah.
Q. Okay. And so was there any other kind of training besides what that in-person Wyndham --
A. No.
Q. -- did?
A. No.
Q. Okay.
A. Sorry, I'm sleepy. I work a lot of night shift so I'm a bit sleepy.
Q. Oh, I'm sorry. You worked the night shift last night?
A. Yeah (nodding head).
Q. Okay. So do you know what sex trafficking is?
A. Yeah. They -- they force people, you know, to sell their body.
Q. Uh-huh.
A. Yeah, that's it. That's all I'm aware of.
Q. Yeah. That's fair, yeah, yeah.
How did you learn that?
A. Because when you work there at the hotel

you have to know that rule first because that's a part of the training.

Q. Okay.

A. And they c- -- come all the time to -- to give us the -- how you call? -- the flier for human trafficking number. In case we need it we can call, yeah.

Q. Okay.

A. Because we next to the cop, you know, station.

Q. Uh-huh.

A. The hotel.

Q. You're next to the what station?

A. The -- the police station. Very close to the Fulton police station, very close.

Q. Yeah.

Did you ever call that hotline number from the hotel?

A. No.

Q. Okay. And do you know what prostitution is?

A. Yeah.

Q. How is that -- well, what is prostitution?

A. People sell their body.

Q. And how is that different than sex trafficking?

A. That's, honestly, I don't pay attention. Okay. Sex trafficking is people being forced to -- to sell their body, and prostitution -- prostitution is people, you know, do it with their -- their own will.

Q. Uh-huh. When you worked at the Super 8 did you ever have any suspicions that sex trafficking may have been happening at the hotel?

A. No, sir.

Q. Okay.

A. Because I only stay, you know, at the front desk and the lobby, yeah. Doing the paperwork, you know, checking people.

Q. And so you're saying you didn't see anything around the hotel that would make you think there was sex trafficking?

A. No, sir.

Q. When you worked at the Super 8 were you ever concerned that prostitution was happening at the hotel?

A. Yes. But it's not my job for that because I only -- my job is only checking people in, check out people, do -- you know, grab the

housekeeping list thing. And busy for -- for -- for that. In the morning it's very busy, you know, time. And evening sometime when I work people have a second shift to work from 4:00 p.m. to midnight or depending, yeah.

Q. Okay. So are you saying it wasn't your job to report prostitution at the hotel?

A. No. I don't know anything so how do I report?

Q. Oh, okay. So you -- okay. I think I misunderstood that.

A. Yeah.

Q. So you're saying that never once when you worked at the Super 8 did you see anything --

A. No.

Q. -- that looked like prostitution?

A. No, sir.

Q. Okay. And then never once when you worked at the Super 8 did you see anything that looked like sex trafficking?

A. No, sir.

Q. Okay. Are you aware of any other kind of sex crimes that happened at the Super 8 when you guys -- when you were working there?

A. No, sir.

Q. Okay. Are you aware of any violent crimes that happened at the Super 8 while you worked there?
A. Yeah. We have people fighting all the times.
Q. Uh-huh.
Was there a lot of -- was there a drug problem at the Super 8?
A. I have no -- I don't know.
Q. Okay. And so you don't have any re- -- you never suspected any kind of illegal drug dealing or anything going on --
A. No, sir.
Q. -- at the Super 8 when you were --
A. I don't want to get into trouble with people, so I just do my job. And beside that, beside the office, I don't pay attention unless you have a problem, you know, with the guests fighting or guest needs something. Yes, I get involved.
Q. Okay.
A. Yeah.
Q. So unless it was involving people fighting --
A. Yeah.

Q. -- you didn't pay --

A. I have people call us, call to the front desk, they need something or they need help if, you know -- or they get into the argument, something. We have to go there and break the fight or the argument.

Q. If it's not getting physical, though, drug use or things were not -- not your concern. Is that right?

A. I don't know how people use that, sir. I am not, you know, a detective to go to every single room to look at what they're using in the room.

Q. Okay.

A. You know my job is only the front desk. I'm not allowed -- and I'm not permit get into the customer room.

Q. Okay.

A. Yeah. Whatever happened inside a room I don't know.

Q. Okay.

A. My job is outside guest room.

Q. Did you -- did you ever walk the property, was that part of your job? Did you have to circle the property --

A. Yes, I did --
Q. -- to see if there were any problems?
A. -- for trash cleaning -- if there's too much trash in the property or the property need, you know, to clean up or to make the property nice and neat and clean, I had to walk around the property.
Q. Okay.
A. Yeah.
Q. So it was mainly for -- for physical trash?
A. Yeah. For -- for, you know, for maintenance just in case we need something or dumping the trash because we have to maintain the property nice and neat for the guest.
Q. Okay.
A. So the walking around the property is a part of my job, too. I have to keep the property clean, nice and neat.
Q. Okay.
A. Yeah.
Q. Were you aware of the police coming to the property a good bit or --
A. That's happened sometime because the -- how you call? -- the guest call the cop. Or they

get into an argument or something, they call the cop. Yeah.

Q. How many times in a week do you think the police came to the Super 8?

A. It's very hard to tell because we -- on the spot, the police, you know, get in and out all the time. So I don't know when they call it or they just come to -- how do you call? -- patrolling.

Q. Uh-huh.

A. Yeah.

Q. Yeah. So I'm saying put those two things together, so if somebody calls or there -- or the police are just patrolling --

A. Right.

Q. -- how many -- how many days a week do you think you saw the police at the Super 8?

A. I don't really recall. Sometime one day, two day, three day, depending. Because, like I say, the police station very close to the -- the hotel, so they patrolling a lot at the hotel. And that the --

Q. Okay.

A. -- the area is a lot of -- with a lot of homeless people and a lot of crime, you know,

fighting in the front of the -- of the street when you enter.
Q. Uh-huh.
A. Yeah. So that's why the cop gets around there.
And there only one way to get in, so to get in they have to around the -- the property, you know, to get out. You see the picture already.
Q. Uh-huh. And so if they have to go around the whole property to get out, so like would you see the police every time they came on there --
A. Yeah.
Q. -- because they would have to circle --
A. Yeah. They'd have to circle, uh-huh.
Q. So if the police came on the property you were --
A. Sometime I see, sometime I don't. Like I said, from my -- in the lobby it's very hard to see outside. You should go to the office and take a look how difficult to look from the lobby at the street.
Q. Because they have a circle there --
A. Yeah, uh-huh.
Q. -- they have to drive right by the lobby.

Right?

A. Yeah. Which sometime you can see, sometime you don't.

Q. Okay. When the police were there did you ever ask them why they were there?

A. Sometime I asked, sometime I don't. Because when we have a trouble to kick out a guest from the property, they don't want to get out, we have to call the cop to get involved to move the customer out. And sometime -- that's -- that's the time I'm aware because we have to call the -- the police to -- to remove a guest. But sometime the guest call the cop. We don't know.

Q. Okay.

A. Yeah. I only aware of when we need the cop to remove a customer out of the property because --

Q. Okay.

A. -- over there it happen --

Q. Like, why would you call the police? Was it to remove guests?

A. To remove them because the check-out time is 11:00. Sometime they stay till noon or 1:00. They don't want to get out and they get, you know, aggressive and we don't want to -- to ge- -- get

into trouble. So we call the cop to ask them to remove the guest from the property and see if he can handle it.

Q. So getting -- removing the guest is one.

Was there any other reason you would call the police?

A. No. That's only, you know, removing the guest. Or we have a big fight, you know, people fighting, guest fighting. We don't want to get involved so we call the cop. So they get to solve the problem.

Q. Okay.

A. That's happened almost, you know, every couple days.

Q. Every couple days --

A. Yeah.

Q. -- you would have to call the police --

A. No, no. Yeah. Sometime -- yeah. And the cop come, you know, like I say, they just patrolling the -- the property. But they very close and -- and they check for suspicious, you know, car so they can tow it.

Q. Uh-huh.

A. People sometimes park on that street inside -- or in front of the Super 8, and the --

how do you call? -- the code enforcement, you know, will go over there and check.

Q. Did the Super 8 get in trouble with code enforcement while you were working there?

A. In the beginning we -- we don't know so we park there -- we let the guests park in front of the -- the empty lot. You remember, you asking me about there? Yeah. And the code enforcement say we cannot park there, so we have to tell the guest. You know, because sometime you cannot tell the guests where to park. You tell them, Don't park in the empty lot, but they still park. So...

Q. Right, right.

A. You cannot control the guests. You tell them, Please don't park there, or we put a sign, too, "No Parking" but they still. And the code enforcement come and give us a citation.

Q. Uh-huh.

What -- you said you had some safety training from Wyndham, what were the -- as you understand it -- what were the safety and security policies at the Super 8?

A. You know, for life-and-death situation we call the cop or, you know, the paramedic. Because sometime we have a guest, you know, collapse and

pass out so we c- -- we call 911.
Q. Uh-huh. And so if you saw something --
A. Uh-huh.
Q. And so you called the police for removing guests and things like that?
A. Yeah.
Q. What other things would you call the police if you saw?
A. People fighting, that's all.
Q. Uh-huh. And that's it?
A. Yeah.
Q. Okay. Did you report -- if you called the police, were -- did you have to report that to Mr. Tran?
A. Sometime I do, sometime I don't.
Q. Okay.
A. Yeah. Because it's not important because -- that's a little thing I can handle. We just call the cop to remove a guest or break a fight. That's it.
Q. Okay.
A. No major, you know, incident at the hotel, yeah.
Q. Were there ever incident reports like pieces of paper or something in a computer that

you had to write about an incident that happened at the hotel?
A. I recall, no.
Q. Okay. So you don't remember -- like if you reported it to Mr. Tran it would be in a phone call or a face to face, it would not be written down?
A. Phone call, yeah. Phone call.
Q. Okay. And you've mentioned this a couple of times, but -- but you -- you consider the Super 8 to be in a high crime area?
A. Kind of. Because a lot of people fighting in front of the -- the hotel from the outside. Not from -- sometime the inside but most people fighting from the -- from the outside of the hotel where the hill start, you know.
Q. So stuff would happen there in that driveway --
A. Uh-huh.
Q. -- like off of --
A. Whatever not belong to the, you know -- the guy -- the property line.
Q. What kind of stuff would happen up there?
A. People always fighting or dealing, yeah. Like I say, a lot of homeless people staying at

the entrance, the outside. Not the inside of the property.

Q. Did you get the --

A. You should get a report from the police, you know, from Fulton County to ask for the high crime or not. I'm not the police, so I don't -- I don't know about anything high crime or low crime in this area.

Q. Yeah.

A. Yeah. But what I know is it's a lot -- the people, homeless people staying outside.

Q. Did you think the Super 8 itself was safe?

A. Yes.

Q. Okay. So you were not concerned about your safety at the hotel?

A. No.

Q. Okay.

A. Why we have a police for, anything happen we call the police and they show up within a minute. The -- the police station is very close to us, like I say.

Q. Okay. Did you think the police did a good job?

A. Yes.

Q. At the Super 8 when you worked there?
A. Yes, sir. When we need them they show up right away.
Q. Okay. Did you carry a gun when you worked at the hotel?
A. I only use taser.
Q. You had a taser?
A. Yeah.
Q. And was that yours, or did the hotel give that to you?
A. It's mine for my safety. Because sometime I go out close to the street. A lot of people, you know -- homeless people jump on you and asking for money, things, so I have to have this one for my protection. It's a taser. That's all I carry is a taser.
Q. Did you ever have to use it?
A. No, never use it.
Q. Okay. And so you brought that. That was not a hotel policy --
A. No.
Q. -- you brought that to protect yourself.
A. Yeah.
Q. Right?
Okay.

A. And it's allowed because it's the open-carry state, too, yeah.
Q. Sure. Yeah, yeah. I'm not saying there's anything wrong with it.
A. Yeah.
Q. I was just wondering if you did.
Do you know if any other employees carried guns --
A. No.
Q. -- when they worked at the hotel?
A. I'm not aware.
Q. Do you know if Mr. Tran carried a gun when he worked --
A. No.
Q. -- at the hotel?
A. No, sir.
Q. Okay. Did you get any security training at the other two hotels you worked at?
A. No.
Q. Okay. Did you ever talk to the police when they were there about crime on the property?
A. When -- no. Whenever they, you know -- any incident, they ask me what happened and I just tell them whatever I know. Or what it's my shift -- was in my shift, yes. I just tell them

whatever I know, or they ask me for -- how you call? -- guest registration so they could have a name and address and things. That's it.
Q. Okay. If a guest asked you to call the police, would you do that?
A. Yes, of course. You have to.
Q. Okay.
A. Because sometime, you know, they don't have a cell phone. They come to -- to the front desk asking us to call the police when they get --
Q. And did that --
-- into a fight. Yeah.
Q. Did that happen?
A. Yes, it's happened.
Q. Okay. How many times do you think that happened?
A. Just couple of times because sometime the husband and wife get into the argument and, you know, boyfriend/girlfriend, and they don't have the cell phone and they come to the front desk asking for -- for -- to use the phone. We have to let them use it, yeah.
Q. Did guests ever complain about feeling unsafe on the property?
A. No, no.

Q. Okay. Did you -- was part of your job -- any part of your job looking at complaints that people made to Wyndham or online guest reviews?
A. No, sir, not my -- my job.
Q. Did you ever look at them, anyway, out of curiosity or anything?
A. Yeah. Sometime I do.
Q. Okay. What was your impression of the reviews?
A. Sometime people lie, yeah. They can put whatever they -- they want on the review.
Q. And so do you think the negative reviews were not true?
A. Some of them, some no.
Q. Okay.
A. Yeah.
Q. Did you see guest reviews where people complained about prostitution at the hotel?
A. That, I'm not aware of.
Q. Okay. Did you see guest reviews where people said they felt unsafe at the hotel?
A. Like I say, it's not a part of my job to look into the review.
Q. Yeah. And I'm -- and I'm -- you had said that you looked at some, and so --

A. Yeah.
Q. -- I'm just asking, did you --
A. Yeah. Just once, one or a couple of times. That's it.
Q. Okay.
A. Yeah.
Q. Did any of the other staff that worked at the hotel, did they talk to you about feeling unsafe at the hotel?
A. No.
Q. Okay. Do you think there was a lot of drug dealing going on at the Super 8?
A. I have no clue.
Q. Okay. Did you think there was a lot of prostitution happening at the Super 8?
A. I don't know, sir. I have no --
Q. Okay.
A. -- clue on that part. Like I say, I just work at the front desk. Whatever's -- you know, from the outside. I know from the inside, I don't know if inside of a guest room. I'm not allowed to know. Don't know.
Q. Okay. Were they -- did a lot of people loiter around the Super 8?
And I don't mean up by the road, I mean,

around the -- the sides and back of the Super 8 did people loiter around all day?

A. Yes. Guests, they can do whatever they want, you know, at the -- at the property.

Q. Okay.

A. Yeah.

Q. So there's no policy about -- about loitering at the hotel?

A. No.

Q. Okay. What do you remember about the human trafficking training that you took?

A. I don't remember anything nowaday.

Q. How long do you think it lasted?

A. Last what, sir?

Q. How long did the training last?

A. One or two hour, I don't recall much.

Q. Okay. And did you get that training right at the beginning of when you started working there or was it later on?

A. Later on.

Q. Okay. Do you have any idea about when?

A. A couple months after I start -- I start.

Q. A couple months --

A. Yeah.

Q. -- after you started?

A. Yeah.
Q. So sometime in early 2020, you think?
A. Kind of, yes.
Q. Was it before or after COVID, do you think?
A. Before COVID.
Q. Okay. So you don't remember any of the signs that you were supposed to look for to identify sex trafficking?
A. No.
Q. Okay. I'm just going -- and some things we already talked -- I just have a list here, sir, and so a lot of this we've already talked about.
A. Yeah.
Q. I'm just marking things off to try to -- try to get out of here.
Was it part of your job to monitor the security cameras?
A. No, sir.
Q. That was not something that you were --
A. No.
Q. -- expected to do?
A. Yeah. Whenever -- when I see something I just look, my head, because -- how do you call? -- the TV screen is right on the right side --

Q. Okay.
A. -- by my computer where the check-in, you know, computer. So sometime we look --
Q. Was it anybody's job to look at the security cameras?
A. No.
Q. Okay. Other than the security cameras were there any other kind of security measures that you're aware of at the Super 8?
A. Anything happen we just call the police.
Q. Okay. So I'm going to represent to you I represent T.H., and her name is REDACTED [redacted]. Her name is protected by a protective order in this case.
Do you remember the sex trafficking investigation of REDACTED [redacted]?
A. I don't recall, sir.
Q. Okay. It would have been --
A. Because it's been a while, and I don't remember every single name. I don't recall the guest name.
Q. Okay.
A. Yeah.
Q. But you had said you weren't aware of any incident of sex trafficking. Right?

A. No.
Q. Okay. All right. I'm going to show you this other exhibit here if I can find it. Hang on, I'm sorry. I've got to close this, so that you don't see my -- my entire internet history, I guess.
This will probably involve a little bit of reading on your part, so let me know if I need to zoom in on any of this so that you can see it better.
Okay. Do you see that, where it says "Human Trafficking"?
A. Yes.
Q. Okay. And so this is from the South Fulton police Department?
A. Uh-huh.
Q. And it lists three victims here, and one of the victims is Ms. REDACTED.
Do you see that?
A. Yeah.
Q. And so these pages are numbered, and these are the suspects: Quasim Cherry, Eron McCrary, Antonio MaGee, and Tanatrious MaGee.
And these all have a red page number in the bottom right.

A. Uh-huh.

Q. Do you see that?

I'm going to kind of refer to that number so that the court reporter knows where I'm at in this document.

THE REPORTER: Are you marking this one as an exhibit?

MR. TONGE: Yes. This is Exhibit 2.

(Plaintiffs' Exhibit No. 2 marked for identification purposes and made a part of the record.)

Q. (By Mr. Tonge) So I'm going to start at Page 498.

So if you would, look at this first paragraph and then tell me when you're done, where -- the one starting on May 6th.

Can you see that okay?

A. Yeah.

Yes, I have read it.

Q. Okay. And so this says that the police, Detective King, told you about suspicious activity involving young girls at the Super 8. Is that right?

A. Yeah. That one day they came and asked me, yeah. They brought me to the station and

asked me some question for this one.
Q. So that's true, they came -- what's in here is true. They came and asked you about some suspicious activity involving young girls?
A. Yeah. But I say I don't know because inside of room and also was the -- how do you call? -- it was rented by different people.
Q. Okay.
A. I'm not aware of this because whoever, you know, provide valid ID and pay the -- the rent, I just check them in.
Q. Yeah. And you're not --
A. And if they are guests -- how can I get, you know, know anything happen inside, sir?
Q. Sure.
A. It's not part of my job. My job's only like I told you, I only check in people and whoever pay and I get the ID and then check them in.
Q. Okay.
A. Like I told the detective I don't know anything. I don't pay attention because my job is only checking people in, checking people out, and who rent -- whoever rent it with a valid ID and pay the rent I check them in.

Q. Okay. And so it's true that you told the police that you saw some younger girls but didn't pay close attention?

A. Yeah.

Q. Is that --

A. They look like regular guests, you know. Every day you 100 -- 100 people walk into the hotel, walk into the lobby. How can you know, you know, who's the -- who -- you just don't know, whoever, you know, want to check in the room or check out, pay the -- the room. That is part of my job, yeah.

Q. Okay. And then where it said that, in that paragraph, that you said that you didn't know if there was a young female in Room 229 and you did not know a man who went by the name of "E" at the hotel. Correct?

A. That's correct.

Q. Okay. All right. So now I'm going to go to Page 496. And I would ask you to read this last paragraph that says "On May 2nd, 2020," and let me know when you're done with that.

A. Yes. I read it.

Q. Okay. And so Ms. REDACTED there is talking about Mr. McCrary raping her and selling her for

sex. Right?
A. This one I don't know, sir.
Q. No. I'm just saying that's what the paragraph says.
A. Oh, yeah.
Q. I'm not asking if you know about it --
A. Uh-huh.
Q. -- but that's what this paragraph is talking about. Correct?
A. Uh-huh. I read that and that the thought, you know, is on the paper right there --
Q. Uh-huh.
A. -- but whatever happened to them I don't know. It's in the room. I don't know.
I don't know those people too, I don't know who is "E", those people. I don't recall.
Q. And is it part of your job to be concerned with what's happening in the room?
A. No, no. I say it's not a part of my job to know what inside of room because I only check in and check out people.
Q. Uh-huh.
A. No law that allow you to get into the guest room.
Q. Uh-huh.

A. I don't have, you know, opportunity to get into the guest room unless they have an emergency. I have to enter, I will knock on the door and ask them permission to get into the guest room.

Q. Uh-huh.

A. That's it.

Q. And it says Ms. REDACTED stated that "Mr. McCrary sometimes set up in calls for her to work. In calls means the person comes to the hotel to have sex."

Did I read that right?

A. Yeah. You know, this one -- why you ask me this question because I don't know anything about this one.

Q. Okay. Well, just, you know, let me ask the question and then we'll -- you can -- if you don't know you can tell me you don't know. That's fine.

Are you aware of girls who had in-calls who had men come to meet them --

A. No, sir, I don't recall.

Q. I'm sorry. Let me -- let me finish and then answer just so the court reporter can write everything down right.

And so are you aware of girls at the Super 8 who had men come to the hotel to meet them for sex?
A. I'm not, sir. I'm not aware.
Q. Okay.
A. Every day we have 100, 100 people come to the hotel. I don't recall every single one, yeah.
Q. Do you think some of those 100 people were selling sex at the Super 8?
A. I don't know, sir.
Q. Okay. And then I'm going to scroll down here. And if you could, this is the end of that paragraph you just read. If you could just read the first four lines on the page, "provided a room number of 229"?
A. Yeah. I read it but nothing to do with my job, yeah.
Q. Okay. So it says "Ms. REDACTED also said to ask the manager at the front desk because he was being given drugs by Mr. McCrary."
Were you being given drugs by Mr. McCrary?
A. No, sir.
Q. Okay. And then it says "Ms. REDACTED described Mr. McCrary as a light skin male with

light colored eyes and carrying a black bookbag. Ms. REDACTED said the bookbag would have a handgun inside of it."

Do you know who she's talking about right now?

A. I don't recall.

Q. Okay. So I'm going to go to 499. And just read that paragraph at the top that says "Detective King then walked back to the front office."

A. I read it.

Q. Okay. And so after the police found people in the room with guns and drugs, Detective King "started to turn the corner of the building, he noticed Mr. Vu speaking to a light skin black male with light colored eyes, and carrying a black bookbag." Is that true?

A. I don't recall.

Q. Okay. And so this is the man that you had just told the police you did not know. Correct?

A. I don't recall.

Q. Okay. And then it says that "Detective King approached the man and asked him if [sic] they called him 'E' and the man said yes. Is that

correct?
That's what it says in the -- on the paper.
Did I read that right, Mr. Vu?
A. Yeah, but, honestly, I don't recall every single people name, and every day I see a lot of guests.
Q. Was it common for you to be involved in a -- in an investigation with people getting arrested at the Super 8 for -- for having a lot of young girls around the room?
A. Sometime, you know, the -- the cop come to ask for a question if we get into the problem. That's it. Besides that, I don't know.
Q. Sure. Do you remember talking to any police about this incident?
A. They asking me question. That's it. If --
Q. You remember that -- you remember that happening?
A. Yeah. They asking me who -- who rent the room. I say, you know, just a lady who rent a room and pay for the room and beside that I don't know. Like I say, all I need for people to check in is their ID and the payment, yeah.

Q. Did you know the guy named "E"?
A. I don't recall.
Q. Okay. Did you know a guy named Quasim Cherry?
A. I don't recall.
Q. Okay. And so just from your training with the -- the Wyndham sex trafficking thing, if REDACTED [redacted] was under the age of 18 and sh- -- men were coming to the Super 8 to pay for sex with her, would you consider that sex trafficking?
A. I don't know.
Q. Okay.
A. I know when -- when this happened I didn't know anything about her, so I don't recall.
Q. Okay. From your training, is it your understanding that if a person under the age of 18 is sold for sex that that's sex trafficking?
A. Yes. But how do I know her? She certainly -- you know.
Q. Uh-huh. I'm going to go to 500 -- or, actually -- oh, I'm sorry. Let me go to 5- -- now I'm going to skip down a ways to a different document in this exhibit.
So this says -- this is page -- the Bates number is 523, and it says the date is May 6,

2020, City of South Fulton Police, Criminal Investigations division.

In the middle paragraph it says "on May 15th, 2020, Detective King interviewed Mr. Louis Vu. The interview was recorded on audio and video. Mr. Vu admitted that" and then it's blank.

Do you see that?

A. Admit what, sir?

Q. That's what -- that's my next question is if I get this recording -- video recording of you being interviewed by the police, what did you admit to the police?

A. Whatever I know, whatever I saw, and they asked me so I --

Q. Did you admit that you got drugs from Mr. Cherry?

A. No. I think those had been arrested already. They just questioning me about the -- who rent the room. That's what I recall, who rented the room.

Q. Okay.

A. And that room who -- you know, who's in that Room 2- -- 229.

Q. So that's your testimony is the only

thing that you talked with the police about was who rented the Room 229?

A. They asking me who rented the room for -- for -- for -- for room 229, who rent that room. And I had to pull out all the paperwork to show them who rented that room.

Q. And did they ask you about getting drugs from Quasim Cherry?

A. Yes. But I said "no." I didn't admit that.

Q. Okay. Did many employees get drugs from guests at the Super 8?

A. I don't know, sir.

Q. And you said here when the police came that you did see a lot of young girls around. Right?

A. I didn't say that. I didn't recall.

Q. Let's go up here. Up here on Page 498 it says "Mr. Vu claimed he saw some younger girls staying at the location but he did not pay close attention."

So do you remember telling the police that you saw some young girls at the Super 8 that day?

A. Yes. They asking me about the people

staying. Every day you will see a lot of people there, the guests. I don't know who -- who -- who was that, yeah.

Q. Was it common to see young girls at the Super 8?

A. No. Sometime they -- they come with different guests, you know, a group of three or four people. How do I know, you know, they a family or they related to each other?

Okay. I will take my Fifth. I'm tired.

Q. I'm sorry, what was the last thing you said?

A. I will take Fifth, sir. I'm very tired, sir.

Q. Are you saying you're -- you're going to plead the Fifth Amendment?

A. Yes, sir. I'm so tired. I need to rest because I work all night already.

Q. So -- okay. Well, I mean, I don't represent you and as far as I know nobody on this call represents you.

A. Yeah.

MR. TONGE: Ankur --

I'll just tell you that you have to -- my understanding is that you -- you would

have to say that you're taking the Fifth to every question that you're going to do that to. Okay?

And, Ankur, is that fair? Just...

MR. TRIVEDI: I mean, that's fair. I just -- I don't know -- I don't know what was incriminating about that question, you know, because --

MR. TONGE: I -- I don't either. I just don't want to like do anything improper, and so I'm just -- I'm going to -- I'm asking you, Ankur, if you agree. Like, if he's going to plead the Fifth then --

Mr. Vu, you just need to say that in response --

THE WITNESS: Yeah. I need to take the Fifth.

MR. TONGE: -- to a question. You can't just sort of blanket say "I'm done. I plead the Fifth." Okay?

MR. TRIVEDI: So, yeah. I think -- I think you're going to have to go through every question, and then if he wants to plead the Fifth he's going to have to say "I plead the Fifth."

THE WITNESS: I plead the Fifth, yeah. That's what I told him.

Q. (By Mr. Tonge) Okay. I -- I'll move on. But just, you know, I don't want to -- this is not a criminal case and so --
A. I understand that, sir.
Q. -- I don't want to get into that, but yeah. And I am pretty close to being done here.
Did you see -- like at the Super 8, you know, you said the cameras showed most of the hotel, did you ever see like rooms where like a lot of men came and -- came into the room for a short period of time and then left?
A. No, sir.
Q. Okay. Did you ever see, you know, girls walking around the hotel that were dressed in -- in provocative clothing?
A. I don't pay attention for that thing, sir.
Q. Okay.
A. That's not a part of my job.
Q. Okay. Do you still think -- after going through this last thing, do you still think that you're not aware of one instance where anyone --
A. I don't answer questions, sir.
Q. Are you saying that you're going to take the Fifth Amendment --

A. Yes, sir.
Q. -- to that question?
A. I don't want to answer any more question.
Q. And is it your testimony that the hotel did not -- did not know -- or, you as an employee, did not know that there was sex trafficking or prostitution at the Super 8 --
A. I don't answer the question, sir.
Q. Are you taking the Fifth Amendment?
A. Yes, sir.
Q. Okay. This is -- so this is different, this next part, I think, but this is just about you personally, not the Super 8.
Have you ever been arrested?
A. No, sir.
Q. Okay. Not for anything, ever?
A. Before, yes, but it been expunged 20 years ago.
Q. In 2006?
A. Yeah.
Q. Can you tell me what happened in 2006?
A. Me and my wife argue, domestic violence. That's it but it been expunged already.
Q. Okay.
A. Yeah, expunged.

Q. Did you get charged with attempted murder?
A. No. Everything has been expunged.
Q. Before it got expunged, if it was expunged, did the police charge you with attempted murder?
A. No.
Q. "No," that didn't happen?
A. No.
Q. Okay.
A. All the charge been dropped. Only domestic violence.
Q. Okay. Was part of that elder abuse?
A. No.
Q. There was no part of that that had to do with --
A. No.
Q. -- falsely imprisoning an elderly person?
A. No.
Q. Okay. And so did -- you pled to domestic violence?
A. No. Everything been expunged, sir. My record is clean now, sir. It's been 15 years, 20 years. Everything is clean now, sir.
Q. Did you serve any time --

A. No, sir.
Q. -- for that?
A. No, sir.
Q. Okay.
A. All the charge been dropped.
Q. Okay. And the one thing I wanted to kind of follow up on just to -- and then I'm going to take a quick break and I might be done. So I -- real quick.
So you said you came to America in 1993 when you were 21 years old. You worked at a hotel in Orlando for three years, and then you worked at a Saratoga Resort for a couple of years but you didn't start at the Super 8 until 2019. And so that's -- so there's five years or so where you worked for two hotels after 1993.
What else are you doing in that time frame?
A. Self-employed.
Q. You were what?
A. Self-employed, sir.
Q. Oh, self-employed?
A. Yes, sir.
Q. What -- what were you doing?
A. Do I need to answer the question?

Q. Yes.
A. Handyman and fixing house.
Q. Fixing houses?
A. Yeah.
Q. Okay. And that's what you did -- that was the only other job you had --
A. Yes, sir.
Q. -- other than those two hotels until you started working at the Super 8?
A. Yes, sir.
Q. Okay. And what do you do now?
A. Self-employed, too.
Q. And what -- what does that entail?
A. Uber, I work for Uber. Uber (pronouncing).
Q. Oh, Uber. Okay. Yeah, yeah.
Do you also do commodity trading?
A. Huh?
Q. Do you do commodity trading with a company called Asia Trading Commodities?
A. I used to do that, yes.
Q. Okay. You don't do that anymore?
A. No.
MR. TONGE: Okay. Okay.
Ankur, if you'll give me -- we take a

five-minute break and then I might be done. And -- and then Ankur may have some questions, also Carson may have some questions. But can I just take one break to look at my stuff, and then I'll be back at, let's say, 11:37. Is that good?

MR. TRIVEDI: Yeah. That's fine.

THE VIDEOGRAPHER: We're off the video.

(A short break was taken.)

THE VIDEOGRAPHER: All right, everybody. We're back here recording, and the time is 10:41.

Q. (By Mr. Tonge) Okay. Mr. Vu, we just took a short break.

A. Yes, sir.

Q. And I am almost done.

I just want to confirm on that human trafficking training you took one of those trainings and it was before COVID and that's the only human trafficking training that you had?

A. Yes, sir.

Q. Okay. One thing I skipped over, did the hotel have a do-not rent list?

A. Yes, we do. Sometimes, you know, we'll have a troublemaker we have to put on the bad

list.

Q. And is that something that lives inside the Wyndham system, or is that a physical thing?

A. We took -- write down the name and put next to the computer so we know if we match the name we --

Q. Okay.

A. -- we blacklist them.

Q. And so is that a long list or is it a few names or?

A. Just -- I don't recall much, sir. A few people --

Q. But each name would be on a piece of paper?

A. Yeah, a piece of paper. Whoever we call the police to -- to kick them out we put the name there on the list.

Q. Okay. And that would just be up at the front desk?

A. Yeah.

Q. Okay. Do you remember the room number or where in the hotel the room that you stayed in was?

A. Just right behind the -- the front desk, sir.

Q. Okay. Was -- was it connected to the front office --
A. Yes.
Q. -- like -- okay.
And --
A. Behind the front desk they have the room. But they have door -- everything separate, you know, from the front desk.
Q. Okay. And did other employees -- did employees -- did people who worked at the Super 8 and who also stayed at the Super 8, were their rooms like all in one area or was that --
A. Scattered, yeah.
Q. -- were they all --
A. They pay rent like everybody, yeah. But I don't -- I don't recall who -- who stayed which room, yeah.
Q. Okay. But --
A. Some of them -- not all of them, only one or two people stay there. And sometime they stay for a week or two and they move out and they come back. But most people, you know, they -- they have their own apartment or house, I don't know.
Q. Okay.
A. Yeah.

Q. And then if a guest was locked out of their room, like they l- -- they lost their room key, what was the process to --

A. They go to the front d- -- front desk, provide a ID so we can give a -- make a duplicate for them.

Q. And so -- and then that -- so it has to be the person that has the ID that -- that rented the room?

A. Yeah.

Q. Okay. And if people want to renew for one day, what is the process for that? Do they need an ID, or do they just come up to the front --

A. No. They just come out, you know, with their -- the key card and tell you, say for some room, 110, and they want to extend it one day, two day, and they pay the rent. That's it. We don't ask for it.

Q. Does it have to be the person that rented -- like, say like, you know, if there's a double room there could be four people in the room.

Does it have to be the person that rented the room --

A. Yeah. Rented the room, yes. Uh-huh.

Q. Okay.
A. You've got to 11:00. If you don't pay we have to kick them out, remove them, yeah.
Q. And were you there when I believe the Super 8 caught on fire towards the end?
A. Yeah.
Q. Were you --
A. Yeah. I was there.
Q. How -- how much damage did that -- I know it -- it started in a laundry room or something?
A. Laundry room, yeah.
Q. How much damage did that cause?
A. Almost, you know, the whole entire building had to shut down.
Q. Oh.
A. Yeah.
Q. Did it damage the front office?
A. Not the front office, yeah. But just on the top of the office, but a couple room close to the office, yeah.
Q. So was that room -- was it just the one room that was damaged?
A. No, no. A whole -- a lot of room on first floor by the front desk. They have one, two -- about five room. But the first three on

this side (indicating) is damaged. Only two next to the office no damage. But the second floor, the front side and the backside is damaged, too. Because laundry is at the end of the building on the office side.

Q. Let me just -- because that's a lot to keep up with, so I'm sorry. Let me just share my screen one -- one last time.

A. Uh-huh.

Q. And this is just going back to Exhibit 1.

And just looking at this picture from earlier, when -- so where is the laundry room?

A. Okay. Move up by the -- you see the white -- next -- a little bit more, more, more. Go to the back, toward the back. Yes, right there, sir. A little bit, do you see the white thing on the top.

Q. Oh, yeah. Here?

A. No, no, no. Not that area. By the middle. Next to that. A little bit more further. Yes. Right there. That's the laundry room that's burned --

Q. Okay.

A. -- burned -- you know. The round room onto the -- on the first floor, burned through the

second floor. That's half -- half of the building's damaged.
Q. And so did it burn from the laundry room --
A. Laundry room up to the --
Q. -- toward the --
A. -- second -- second floor.
Q. Like, is it going towards 285 or is it going towards the woods there?
A. Like I say, the whole, you know, back part is damaged.
Q. Oh, okay. That whole back side?
A. Yeah. And the whole thing -- yeah. The whole backside damaged and some of the room close to the -- the office, too.
Q. Okay.
A. Yeah. It is damaged -- right there, right there. Stop. Up, up, right by the white one. The white -- white thing on the roof -- the second one, sir. Down further. Go down further. Yeah. Right there.
Q. Oh, okay.
A. Yeah.
Q. I see. Okay.
A. You can say two-third of the building is

damaged.

Q. Oh, wow. Okay.

And that was right before they sold the hotel?

A. I don't know when they sold it. I just know it's --

Q. It's okay. Yeah. I was just curious. I saw some reference to that and didn't know.

MR. TONGE: I don't -- Mr. Vu, I appreciate your time. I know that --

THE WITNESS: Yes, sir.

MR. TONGE: -- you were up late last night and have work and are traveling, and so I appreciate your time. I don't have any more questions. These other two lawyers might, but I don't know that. But thank you for taking the time today.

THE WITNESS: So we done. Right?

THE REPORTER: Well, they might have other questions for you.

THE WITNESS: Oh, okay.

EXAMINATION

BY MS. WYNN:

Q. I just have a couple questions for you, Mr. Vu. Like I told you, I represent Plaintiff

D.B., and so I just want to ask you a couple of things.

When you would rent the rooms how many keys would you provide if it was a king bedroom?

A. Normally we provide two, but sometime, you know, the guest only take one. If they are --

Q. Gotcha.

A. Yeah.

Q. And that's the same for double rooms?

A. I'm sorry?

Q. And is that the same for double rooms, you provide two keys?

A. Yeah.

Q. Okay. And then were you considered a manager?

A. To the front desk manager, yeah, title. I just take a title like that so I have power to talk with the guests. When they don't want to check out I have to use a power, you know, as the manager.

Q. Gotcha. Okay.

And then how often -- you said sometimes you worked with housekeeping, how often did housekeeping clean the rooms during a stay?

A. Every day, depend on the guest request,

too. Yeah. Sometime they don't want to do the cleanup, so they put a tag on the door so the housekeeper don't clean.

MS. WYNN: Okay. That's it for me. Thank you very much, Mr. Vu.

THE WITNESS: Thank you, dear.

MR. TRIVEDI: Hi, Mr. Vu. I represent Lincoln Bancorp. I don't -- I don't have any questions for you.

THE WITNESS: Thank you, sir.

THE REPORTER: Do you want to advise him on reading and signing?

MR. TONGE: Sure.

Mr. Vu, you have a right -- so the court reporter's going to write this transcript. She's going to write down everything that got said here, and then you have the right to get a copy of that. And then you have 30 days to make any changes that -- that you think are incorrect in the transcript if you -- if you want, or you can waive that and say "I don't care," and --

THE WITNESS: I can waive it, yeah. I don't need that.

MR. TONGE: All right. All right. So he's going to waive reading and sign.

Yeah, so I think that's it.

THE VIDEOGRAPHER: Okay. 10:50, we're off the record.

(Deposition concluded.)

C E R T I F I C A T E

STATE OF OKLAHOMA )
)SS:
COUNTY OF OKLAHOMA )

I, Shelley A. Marburger, a certified shorthand reporter within and for the State of Oklahoma, certify that LOUIS VU was sworn to testify the truth; that the deposition was taken by me in stenotype and thereafter transcribed by computer and is a true and correct transcript of the testimony of the witness; that the deposition was taken on April 1, 2026, at 9:05 a.m., at 914 North Broadway Avenue, Suite 210, Oklahoma City, Oklahoma; that I am not an attorney for or a relative of either party, or otherwise interested in this action.

Witness my hand and seal of office on April 6, 2026.

__________________________

Shelley A. Marburger, CSR
For the State of Oklahoma
CSR #1904