# EXHIBIT A

Psychological Associates of Buckhead

**Expert Report of Anique Whitmore**
**Dated May 11, 2026**

United States District Court for the Northern District of Georgia
Atlanta Division

*J.R.*

v.

*Lincoln Bancorp, LLC*

Civil Action File No 1:25-cv-04629-JPB

## TABLE OF CONTENTS

I. Biography

II. Description of Assignment

III. Background: What is sex trafficking?

IV. Psychology of Sex Trafficking

- A. What characteristics make a person vulnerable to sex trafficking?
- B. What techniques do sex traffickers use to recruit their victims and cause them to engage in commercial sex?
- C. Why might trafficking victims not try to escape or not seek help from family, medical professionals, or law enforcement?
- D. What are the psychological consequences of sex trafficking on the victim?

V. Assessment of Plaintiff REDACTED

Exhibit A – Case Documents Considered in Forming Opinions

Addendum A – Curricula Vitae

Addendum B – Retention Agreement with Fee Schedule Addendum

Addendum C – Consulting Testimony as of March 2026

## I. Biography

My name is Anique Whitmore. I am a double graduate of Northwestern University with over 25 years' experience as a licensed psychotherapist. I specialize in forensic psychotherapy and forensic interviewing, and I have provided expert testimony in the areas of sexual abuse, sexual exploitation and human trafficking, intimate partner abuse, trauma-based therapy, and child and adolescent development. I have interviewed or worked in some capacity with more than 500 sex trafficking victims over the past 25 years.

I served as the Director of Forensic Services from 2006 to April of 2014 for the Fulton County District Attorney's Office in Atlanta Georgia where I oversaw forensic services in Superior and Juvenile Court, assisted with pre-trial preparations by collaborating and educating attorneys about an individual's capacity to communicate his or her trauma, and functioned as a resource on how to effectively question experts and analyze victim/witness statements.

I was an instructor for the national forensic training Child First for twenty years, have presented at national conferences, have spoken to Atlanta's high-risk youth, law enforcement, and legal audiences on topics of Child Sexual Abuse, exploitation and human trafficking, domestic violence, child development, and forensic interviewing.

I have been qualified as an expert to testify in hundreds of cases spanning 32 different jurisdictions in the United States and abroad, including federal court, the US Armed Forces, Superior Court, and Juvenile Court. I have testified in both criminal and civil cases and on behalf of civil plaintiffs, civil defendants, prosecutors, and criminal defendants. I consult and instruct with the U.S. Army Judge Advocate General ("JAG") on cases involving trauma and testify in Court Martials nationally when subpoenaed by the Pentagon.

My private practice encompasses a broad spectrum of clientele ranging from adolescents to adults, most of whom present with interpersonal conflict, trauma, and/or relationship discord. My fee is $400 per hour for high-risk populations, including victims of sex trafficking, and this rate is comparable to the rates of my colleagues providing similar services with comparable work history and other experience.

I previously served as the Executive and Clinical Director of the Northwest Georgia Child Advocacy Center and as Program Manager for the Georgia Center for Child Advocacy Center in Fulton and Dekalb Counties.

Finally, I have appeared and analyzed cases as an invited guest expert on CNN,

TvOne, the Nancy Grace Show, CBS, and Fatal Attraction. And I have appeared as a special invited consultant on Jada Pinkett Smith's CNN documentary "The Freedom Project," exposing the world of human trafficking.

## II. Description of Assignment

The law firm of Andersen, Tate & Carr retained me to provide an expert report in the matters styled J.R. v. Lincoln Bancorp, LLC Civil Action File No 1:25-cv-04629-JPB pending in the United States District Court for the Northern District of Georgia. I have been asked to examine the nature of the Plaintiff's trafficking and determine whether vulnerabilities, methods of exploitation, inability to escape, impacts, and environment are consistent with those common in sex trafficking incidents. In providing this report, I have relied on, among other things, my 25+ years of experience as a licensed psychotherapist. I am providing my professional expert opinion as to the matters below. I am not providing any legal opinions.

I have also provided my current curriculum vitae (Addendum A), my retention agreement including schedule of fees (Addendum B), and a list of the cases on which I have provided expert testifying services (Addendum C).

## III. Background: What is sex trafficking?

Sex trafficking of minors occurs when a minor is induced into a commercial sex act, and does not require any force, fraud, or coercion, though those factors are often also present.[1] Sex trafficking of adults occurs when a perpetrator, often referred to as a trafficker or pimp,[2] takes an 'action' (induces, recruits, harbors, transports, provides) and then employs the 'means' of force, fraud or coercion for the 'purpose' of compelling the victim to provide commercial sex acts.[3] On the other hand, prostitution is when an adult engages in commercial sex without force, fraud, or coercion.

From my experience, laypersons often misunderstand sex trafficking. The most pervasive myth about sex trafficking is that it often involves kidnapping or physically forcing someone into a situation.[4] In reality, most traffickers use psychological means

[1] Polaris Project, The Action-Means-Purpose (AMP) Model.

[2] In this report, I am using the terms "trafficker" and "pimp" interchangeably to refer to the person who traffics persons for sex.

[3] Polaris Project, The Action-Means-Purpose (AMP) Model.

[4] Dr. Dominique Roe-Sepowitz, an Associate Professor at the School of Social Work and Director of the Office of Sex Trafficking Intervention Research (STIR) at Arizona State University.
Trick Roll Study: Forced Criminality in Sex Trafficking Situations.

such as tricking, defrauding, manipulating or threatening victims into providing sex, often in exchange for money or some other thing of value. Thus, in many cases, the trafficker succeeds in trafficking his victims by controlling the mind of the victim. As anthropologists Christina and Richard Milner have explained, "A pimp wants his woman's mind more than her body. It is love, loyalty, and obedience he requires as well as a capacity for self- discipline." Brock, a pimp, put it to the Milners this way: "You create a different environment. It's a brainwashing process; the whole thing is creativity."

Laypersons often falsely believe that human sex trafficking only involves humans being sold through complex schemes, transported internationally, or preyed upon by the rich and famous. Although these occurrences do, or could, exist, it is far more common to find sex trafficking between a victim and one or more traffickers. Often, these trafficking scenarios involve local victims being sold by similarly local traffickers. A trafficking operation might be simple, relying on only internet ads to sell victims for sex. This dynamic can resemble a business transaction where there is a "CEO" and his/her employees. These employees may market their 'services' online in such places as Megapersonals, Plenty of Fish, Craigslist, Facebook, Twitter, etc. Other times, the traffickers find locations that allow the victims to walk the parking lot or street to find "Johns"[5] who will pay them for sex.

Moreover, traffickers are not always strangers to their victims. Indeed, a person can be trafficked by their own family members or legal guardians, spouses and intimate partners. Finally, sex trafficking can occur in any business – not just in sexually oriented businesses like escort services or strip clubs. One of the most prevalent places to find sex trafficking is in the hotel industry, where traffickers find a location conducive to their victims to providing sexual acts.

Early in my career, it was more common to see sex trafficking victims physically advertising themselves on the street at the direction of their traffickers. As internet-based services allowed victims to be advertised online, the vast majority of trafficking migrated there. This increased the amount of trafficking occurring over and over in the same location, like a hotel. The victim could remain in one location and advertise to John's online, and then direct them to the hotel. As some hotels or motels were permissively allowing this activity, it created growth in sex trafficking by offering anonymous, easy, and relatively safe environments for Johns to buy sex.

## IV. Psychology of Sex Trafficking:

### A. What characteristics make a person vulnerable to sex trafficking?

[5] "Johns" is a common slang term for buyers of commercial sex.

Sex traffickers typically prey on vulnerable individuals, including individuals who are economically insecure, socially isolated, drug-dependent, or psychologically weak.

Victims come from all walks of life, but most are vulnerable. There is no broadly accepted definition of the terms "vulnerable" and "vulnerability" in relation to trafficking. In much of the literature on trafficking, the terms "vulnerable" and "poor" have been used synonymously, and poverty is often cited as a leading cause of trafficking. Vulnerability, however, is not the same as income-poverty or poverty even more broadly defined. In published literature, for example, vulnerability does not refer to lack or want, but rather to exposure and defenselessness. Vulnerability refers to the condition of a person in a specific context. Thus, one may be vulnerable due to external factors, such as poverty, but also internal ones, like one's coping mechanisms that enable the individual to protect him or herself against a negative impact from those external conditions.

Often, victims of sex trafficking have experienced some degree of hardship or trauma making them vulnerable to sex trafficking. Such experiences might include unstable living conditions with limited economic opportunity, a lack of consistent and safe relationships with supportive adults, prior sexual assault or other forms of victimization, and other types of emotional or behavioral traumas.

These and similar experiences—along with the allure of opportunity, the relentless demand for products or services, and the desire for reliable income—drive people into potentially dangerous situations where they are at risk of being exploited.

### B. What techniques do sex traffickers use to recruit their victims and cause them to engage in commercial sex?

Traffickers use various physical, emotional, and psychological techniques to cause a victim to engage in commercial sex.[6] Below is a non-exhaustive list of several common methods for recruiting and grooming sex trafficking victims. Although each case of trafficking might be different, the result is often very similar: Victims are brainwashed to believe that their treatment and living conditions as a sex trafficking victim are normal, which makes the victims even more submissive. The more submissive the victim the less resistant toward their trafficker they become, which leaves the victim vulnerable to emotional and physical abuse.

**<u>Lover Method</u>**

Sex traffickers, along with many other criminal organizations, often use the "lover" method to recruit and control victims. In this method, a trafficker convinces his

---

[6] *See* Author, The Pimp Game: Instructional Guide (2018) (describing the psychological manipulation that traffickers use to control the minds, bodies, and spirits of others).

victim that there is a love relationship between them. This love deception is common in many sexual exploitation cases as well.

Sex traffickers often continue to groom their victims by using false romantic love, friendship, and familial love to manipulate victims into cooperating in their own exploitation. The way love is weaponized and wielded depends on the type of trafficking situation. Romantic love is a powerful part of the trafficking arsenal. The classic scenario involves "Romeo pimps" who purposefully target women or girls and sweep them off their proverbial feet, then slowly and carefully convince the victim that the pimp's love requires her to sell sexual services.

In the hands of human traffickers, love is one of the most powerful weapons. While the myths and stereotypes about human trafficking make it seem like most trafficking begins with kidnapping and violence, the reality is that a large percentage of sex trafficking victims were exploited by someone they loved and trusted. The way in which this process plays out is not always the same and not always blatant. But if one understands how sex traffickers groom their targets through manipulation of love, an observer can see it happening and predict the grave outcome.

This lover method may also involve the presentation of gifts, from large gifts such as cars or fancy clothes to something as simple as a cell phone and the chance for the victim to call an ailing family member. Likewise, traffickers might dole out their love strategically, displaying favoritism to certain victims over others to manipulate and retain loyalties. The rotation of favorites often creates confusion and discord among victims leading to isolation, distrust, and competition to become what traffickers call the "bottom bitch," *i.e.*, the victim who is at the top of a hierarchy of prostitutes within a sex trafficking operation.

Once emotionally involved, victims are even more vulnerable to manipulation by the trafficker through, for example, threats, drugs, and psychological coercion. One survivor of exploitation passionately described this method as follows:

> When a pimp hits on a woman or teenager who is resistant, "prudish," or scared, he usually does not introduce prostitution immediately. He'll just be a nice guy who buys her a meal and offers her a place to stay. Then he makes his play for her as a lover. When a sexual relationship between them is established and he is sure she loves him, his next move is to set her up to prostitute herself as a condition of her love for him, with lines like, "If you love me, you'll do anything for me." If she resists or refuses, he will likely pout, create a scene, and insist that she does not truly love him. To restore his affection, she finally agrees to do what he asks, telling herself that "one time won't hurt," or "what does it matter." This rationale, used by women faced with unwanted sex from husbands, fathers, lovers, and rapists alike, is an entry into prostitution too. When she concedes to it, he

has her hooked. When she turns one trick, he starts pimping her. He gives her nightly quotas, takes the money she earns, and begins to treat her as the slut he intends to make her think she is. He tells her, "You are nothing but a goddamn whore," and makes her believe that only out of the goodness of his heart will he have anything to do with such a despicable creature. She knows that is what society thinks of her. She knows she is a criminal. And most likely, she has nowhere else to turn.[7]

**Force, Threats of Force, and Verbal Abuse**

Traffickers often use force or threats of force, including rape, beating, captivity, and isolation, to recruit and control a victim. The early period of this type of victimization is often referred to as the "seasoning process" in which the traffickers gain control through violence. Victims are often terrified and succumb at the hands of their traffickers. New victims may be forced to watch physical abuse, forced sexual acts, rape, and torture of other victims to ensure adherence and obedience. These coercive acts of violence keep victims fearful and controllable. Traffickers also often use verbal abuse, including debasing remarks, to demoralize victims and belittle their already fragile self-worth. Traffickers who rely largely on brutal violence to control their victims are often referred to as "gorilla" or "guerilla" pimps.

**Manipulation**

Similarly, to ensure unbreakable control, the trafficker toys with the victims' emotions and diminishes the victims' trust and friendships with others. In this method, victims are kept emotionally and physically on edge to create an invisible bond, where the trafficker may be seen as the potential source of comfort and humiliation at the same time. As the relationship grows, the trafficker slowly cuts the victim off from friends and loved ones, strengthening the sense of dependency.[8]

**Other Fraud and Deception**

The trafficker typically also uses other forms of deception to recruit and control their victims. This includes false statements and concealment of facts. For example, traffickers often initially suggest false or misleading facts about the work the victims will engage in, hiding the existence of commercial sex. Traffickers also might make false promises of a glamorous future.

One survivor explained this method as follows:

---

[7] Barry, K. (1996) The Prostitution of Sexuality. NYU Press.

[8] Buncab, Heirendt (2017). Human trafficking. Medical Response to Adult Sexual Assault: A Resource for Clinicians and Related Professionals.

> All the promises made in the first meeting -- glamour, travel, money, affection, protection, even childcare if she is on her own with a small child -- turn out to be means of enslavement. When the pimp controls his woman's body and soul, then she is set up to bring other women to him. And the cycle of loving her, seasoning her, and pimping her starts all over again.[9]

**Drug Dependence**

Many sex trafficking victims were victimized because of their own drug addiction. Human traffickers often use drugs as bait to recruit people who have a substance use disorder. Or traffickers may use drugs as a means of control over their victims; to force compliance, harder work, longer hours, create dependency, to keep them "drugged out" so they do not attempt escape, or withhold the source as a form of punishment.

**C. Why might trafficking victims not try to escape or not seek help from family, medical professionals, or law enforcement?**

One question I often get is, "Why don't sex trafficking victims try to escape?" Or to put it another way, "Why do these victims endure such suffering without reaching out for help to law enforcement, family members, or friends?"

There are many reasons why a sex trafficking victim would be unable to escape or reach out for help. Below, I have identified several of these reasons, but these are not mutually exclusive or exhaustive. And each victim is different and impacted by these factors in different ways based on their own experiences and vulnerabilities.

*First*, although it may be clear to outsiders that the victim is being trafficked for sex, often the victim herself does not perceive it that way. Indeed, in most trafficking situations, the victim does not realize she was a victim until long after the trafficking has ended or once they've become too embedded to try to escape. Over time, this behavior becomes normalized, so that the victim thinks she is making decisions on her own.

*Second*, even if a victim might perceive at times that she is a victim of sex trafficking, in many cases, the victim may have formed a "trauma bond" with her trafficker. A trauma bond is a close attachment formed between a perpetrator of abuse and the person they perpetrate against. Trauma bonding occurs as a result of calculated, repetitive infliction of psychological trauma, which is intended to instill terror and helplessness, to destroy the victim's sense of self in relation to others, and to foster a pathological attachment to the perpetrator. Interestingly enough, many victims endure

[9] Barry, K. (1995) Pimping: The World's Oldest Profession. OTI Magazine Online.

continued abuse and/or "stay" in order to 'relieve' other victims from the attention of their trafficker. Thus, because of their shared trauma, victims will at times form undeniable, yet untold, interpersonal connections. This may develop much more quickly for a vulnerable person who does not perceive themselves as having other options for food, shelter, or emotional support.

The dramatic ups and downs of a trafficker-victim relationship often result in a powerfully unhealthy relationship infused with trauma bonds. In order to survive, trauma survivors develop a keen awareness of everything their perpetrator does, says, and wants. As a result of this prolonged intense focus on their perpetrator, the trauma survivor risks eventually disconnecting from their own sense of self, needs, and values.[10] When this type of bonding occurs, the trauma survivor is likely to express feelings of love toward her abuser, in addition to fear, and maybe even hatred.

Psychological literature defines trauma bonded victims similar to how forensic psychotherapists define the trafficked human victim. Victims who are coerced into a trauma bond were more likely to have experienced:

- *Prolonged abuse* in a context of captivity – with an abuser who uses power and control tactics to keep the survivor submissive, isolated, and unable to flee
- *Terror* – as a result of ongoing violence and/or threats of violence or death against themselves and/or their loved ones and pets
- A *loss of identity* and sense of independence
- *Loss of control* over their body and bodily functions – due to the perpetrator's control over every aspect of their daily life (e.g., if, when, and what they can eat; when and how long they are allowed to sleep).
- *Social Isolation* – from everyone except the perpetrator – so that the only emotional connection the survivor has available is with the perpetrator.
- *Coercion* – by the perpetrator, to witness or engage in the violation of others

In many cases, due to the sustained manipulation and brainwashing, a trafficker simply needs to order his victims not report anything, and the victims—out of the loyalty

[10] Theresa Miller (2021). Trauma Bonding: A Therapeutic Help To Break The Cycle of Psychological Abuse.

to the trafficker that the trafficker has cultivated, just comply.[11]

*Third*, a fear of violence might animate a trafficking victims' decision not to try to escape or seek help. In some cases, traffickers directly threaten their victims with violence if the victims try to escape or seek help from outsiders. Traffickers might also threaten violence against the victims' family or friends if the victim tries to escape. And a sex trafficking victim might be unwilling to attempt an escape from her trafficker for fear that another, scarier or more dangerous pimp might traffic them instead.

*Fourth*, similarly, the sex trafficking victim may fear the uncertainty of life outside of trafficking more than the known fear of her trafficker or the trafficking itself. This happens often when a victim has become drug addicted and/or is homeless. Not unlike the adage of, "the grass isn't always greener on the other side". Many victims are coerced and manipulated to believe there 'is' no other 'side' outside of the exploiter's control.

*Fifth*, often a trafficking victim fears law enforcement. This could be because of a history of negative interactions with law enforcement. But in many cases, this fear grows out of warnings from her trafficker that if the victim reports the trafficking to law enforcement, the victim herself will face serious criminal consequences or violent consequences from the trafficker or his associates, even if he were arrested.

*Sixth*, a trafficking victim may feel like there is no point in reaching out for help or trying to escape if the victim has been surrounded by others who are trafficked and has either seen others unsuccessfully try to escape or seek help or has herself tried, but failed, to get help or escape.

The reasons above are not the only ones that factor into a victim's inability or hesitancy to seek help or try to escape, but they are some of the most common ones.

### D. What are the psychological consequences of sex trafficking on the victim?

Sex trafficking has an impact on the individuals it victimizes in all areas of their lives. As previously stated, every stage of the trafficking process can involve physical, sexual and psychological abuse and violence, deprivation and torture, the forced use of substances, manipulation, economic exploitation and abusive living conditions.[12]

Trafficking usually involves prolonged and repeated trauma. This trauma can lead to a variety of psychological problems including, for example, post-traumatic stress disorder, anxiety, depression, alienation, disorientation, aggression and difficulty

---

[11] Sanchez RN, Rosario & Stark, Sharon W. PhD. (2014). The Hard Truth About Human Trafficking.

[12] *See* Panigabutra-Roberts. (2021). Human Trafficking in the United States. Part I. State of the Knowledge.

concentrating, and homicidal or suicidal ideations. Moreover, studies have indicated that trauma worsens during the trafficking process and persists beyond the end of any exploitive act or acts.[13] This means that, without proper help, a trafficking victim's psychological condition could last throughout their life.

The results of the traumatic experience of trafficking often manifest when a trafficking victim is asked to communicate about the trafficking. In many cases, a victim may be unable to comprehend what happened to her without extensive psychological treatment. And even then, victims often feel instantly re-traumatized when they are asked to talk about what occurred. This can make the process of questioning sex trafficking victims very challenging.

I have worked extensively with the Atlanta FBI Drug and Special Forces division to help guide law enforcement and others in how to talk to sex trafficking victims. In my experience, it is often difficult to find the balance of questioning for evidence and the well-being of the victim themselves. Victims may appear to those around them, even support persons, to be uncooperative, irritable, hostile, aggressive or ungrateful. The stigma attached to them as victims has been shown to have a significant and ongoing impact on their lives, including the trauma experienced by the individual victim as well as the possibility of physical rejection by family and/or community when reintegration is attempted. The long-term consequences of human trafficking on individuals are complex and depend on many factors, with no guarantee of recovery. Revictimization is often a further consequence of the trafficking, for which public policy has yet to find a solid resolution.

The trauma of trafficking could also have an effect on a victim's memory. A traumatic incident can cause a great deal of stress in both short term and long term memory. Trauma-based memory loss occurs when trauma creates stress that negatively affects the brain. Trauma can shut down episodic memory and fragment the sequence of events. Trauma can prevent information from different parts of the brain from combining to make a semantic memory, *i.e.*, a memory of meaning.

Severe injuries and physical trauma can also produce post-traumatic stress disorder, which can cause temporary memory loss to help a person cope with the traumatic event that caused the injury. In the case of physical trauma, the length of memory loss depends on the severity of the injury. And factors such as malnutrition, physical exhaustion, and drug addiction can also increase the extent of a trafficking victim's memory loss caused by PTSD.

Emotional or psychological trauma can also affect memory. Memory loss is a natural survival skill and defense mechanism humans develop to protect themselves from psychological damage. Emotional or psychological trauma can also lead to PTSD

[13] United Nations Office on Drugs and Crime (2008). An Introduction to Human Trafficking: Vulnerability, Impact and Action.

stress disorder, which can manifest itself in different ways including flashbacks of the event and intrusive, unwanted thoughts about the trauma. Repressed memories and PTSD are also common. Without treatment, these repressed memories may resurface at any time with a trigger event and if they are revisited over and over, the brain continues to experience the trauma once again each time.

Return and reintegration for a trafficked individual is a long-term and complex process. Even when physical problems can be addressed and stigma overcome, trauma and psychological damage make recovery a difficult task rendered even more so by the problems in accessing necessary resources and when trying to communicate their nightmare with support persons and family. Victims learn survival skills in order to make a better life for themselves at the hands of their traffickers, but at some point, victims may reach total mental defeat and hopelessness. In this way, the trafficked individual faces a long road to recovery because of the mental and coercive manipulation sustained.

Some trafficked victims may not be able to adjust to a lifestyle that they previously considered "normal" without significant and persistent intervention, home relocation, intense trauma informed psychotherapy, and emotion regulation treatment focused on safety and stabilization. If employment can be found, a trafficked person's behavior, as a result of the experiences of severe trauma, may make it difficult to retain employment. The need to find trusting, loving, and empowering interpersonal relationships is dramatically skewed by the trafficking experience. Healthy, loving, relationships do not involve violence and abuse and are characterized by physical and emotional safety, mutual respect, honesty, accountability, fairness, shared responsibilities to name a few. The trauma bonded relationship is the opposite, involving violence and a lack of physical and emotional safety, mutual respect, honesty, etc.[14] In addition, many victims don't seek the before noted available assistance nor do they dare ask for help because they lack the awareness that help exists and they have essentially been brainwashed into fear which disallows them to visualize an afforded opportunity to seek another life's path.

In my experience with victims of sexual assault, I have often seen how one acute incident, such as a rape, creates long-term, at times life-long traumatic effects on some victims. Victims of sex trafficking, however, suffer not just one acute traumatic event, but compound traumatic events over and over throughout the days, weeks, or months of being trafficked. This repeated psychological and sexual abuse in turn compounds the effects of the trauma, with each incident building on the prior traumatic events.

[14] *Zimmerman, Hossain, & Watts. (2021). Human trafficking and health: A conceptual model to inform policy, intervention and research. Social Science & Medicine.*

## V. Assessment of JR

The law firm of Andersen, Tate & Carr has asked for a clinical assessment of the plaintiff in the above-referenced case. I have been asked to evaluate and provide my opinion as to the following:

1. What vulnerabilities were present in the victim's life that were consistent with common vulnerabilities found in sex trafficking victims?
2. Were the methods of exploitation used by each victim's trafficker consistent with the common methods of exploitation found in other sex trafficking victims?
3. Were the reasons for each victim's inability to escape or seek help consistent with those commonly found among sex trafficking victims?
4. Were the effects of each victim's trafficking consistent with the effects commonly found among sex trafficking victims?
5. Was the trafficking environment reported by each victim consistent with environments commonly used in sex trafficking operations?

To reach my conclusions, I interviewed JR via Zoom and reviewed the documents identified below as well as the allegations of sex trafficking in her case. In doing so, I explored JR's historical trauma, past and present behavior, and the possible impact her experiences, including the trafficking, have had on her current social and emotional endurance.

When I met with JR, I informed her that the purpose of my interview was to provide an evaluation in the context of this case. I also explained the confidentiality limitations. I explained that no client-treating relationship would be established between us, and that the information she shares with me would inform a written report I would issue to the Plaintiff's attorneys. I also explained to JR that my professional responsibility was to provide an objective evaluation that would consider a variety of available information, including her own self-report.

My conclusions below are based on the information made available to me and my own expertise in this subject. If additional information is provided after the report is submitted, an appended report may be provided. The additional information may or may not change the opinions and conclusions contained within.

In rendering my opinions, I considered the documents that the plaintiff's attorneys provided me listed in Exhibit "A".

## A. REDACTED

### 1. Sources of Opinion

I interviewed JR on May 4, 2026. Throughout the assessment, JR remained attentive, fully oriented to her environment, and willingly participated in the interview process. She demonstrated the ability to remain present-focused and applied consistent effort to all tasks presented. Attention and concentration were adequately maintained. JR appeared to comprehend the mental health assessment procedures and instructions without difficulty. In the opinion of this examiner, the information obtained during this assessment is considered reliable and valid.

### 2. Opinion

**<u>JR's Vulnerabilities</u>**

JR was born in Macon, Georgia, and primarily raised in Atlanta beginning around age 12, with periods of residence in Conyers. She grew up in a blended family with four step-siblings and viewed one of their fathers as her stepfather throughout childhood and around age 14, JR learned the identity of her biological father. According to JR, her parents never maintained a relationship, and her mother reportedly withheld information due to the circumstances surrounding his marriage at the time; JR expressed disappointment that her biological father was not involved in her upbringing. She described her family relationships as emotionally distant, though she reported that her relationship with her mother has improved over time. Her mother currently resides in Warner Robins, Georgia.

JR disclosed a history of childhood sexual abuse by a male babysitter identified as "Mr. Johnny." The abuse reportedly began around age five while her mother was frequently working. JR became tearful while discussing these experiences and explained that as a child she did not initially recognize the abuse as inappropriate or harmful. Greater awareness developed around ages 10–11 after gaining internet access and researching sexual behaviors related to her experiences. JR recalled that her mother later discovered the internet searches and reacted with shock but appeared uncertain about how to emotionally address the situation or provide support.

JR stated that the childhood sexual abuse impacted her sexual development and contributed to hypersexual behaviors and confusion regarding intimacy. She

described becoming increasingly curious about sexual experiences during adolescence and attempting to understand sexual feelings at a young age. JR reported first engaging in "consensual" sexual activity at age 13 within the context of a relationship. JR stated she did not receive guidance regarding sexual health, menstruation, relationships, or personal boundaries from caregivers and often felt she had to learn independently.

Educationally, JR reported attending school through approximately the 10th or 11th grade, with her last school attendance occurring around 2018. JR reported involvement with DFCS beginning around age 14 due to behavioral concerns and family stressors. JR stated her mother became overwhelmed and eventually dropped her off at the DFCS office. She described instability while in DFCS custody, including multiple placement changes and episodes of running away, though she attempted to continue attending school during those periods; but never graduated.

JR further reported being temporarily placed with her biological father while involved with DFCS. During that placement, she described an incident in which her father, reportedly under the influence of drugs, physically assaulted her after accusing her of stealing some of his drugs. JR stated law enforcement responded to the incident, after which she was returned to DFCS custody.

She was subsequently placed in a group home in Union City and attended school briefly while there. JR stated that after approximately one week, she reconnected with a former acquaintance named Bree, whom she knew from previous DFCS placement involvement. According to JR, Bree encouraged her to leave the placement, telling her she did not have to remain there. She reports the two packed their belongings and ran away together.

Overall, JR's history reflects significant early family disruption, adolescent behavioral instability, subsequent state involvement, and placement in group home settings. Her vulnerabilities included her mother's frequent absence, the lack of a consistent male role model, no knowledge of her biological father until age 14, and a history of childhood sexual abuse. Children placed in state custody commonly experience emotional distress and instability, and it is not uncommon for youth with prior histories of running away, as in JR's case, to continue this behavior while in group home placements. Such circumstances often contribute to multiple vulnerabilities, including the absence of a stable, reliable, and emotionally supportive home environment.

Additionally, JR reported that her mother abruptly leaving her at DFCS contributed to a significant loss of healthy attachment, love, and affection, leaving her emotionally vulnerable. These unmet emotional needs were later exploited by her trafficker, Goose. JR expressed a profound desire during that period for care, protection, stability, and acceptance, needs she reported were not being adequately met.

These vulnerabilities, including the grooming and targeting of runaway youth, are consistent with risk factors commonly observed among victims of sex trafficking, including the majority of trafficking victims I have evaluated and interviewed.

**JR's Traffickers' Methods of Exploitation**

JR's reported history reflects multiple methods of recruitment, grooming, coercion, and control commonly associated with the trafficking and commercial sexual exploitation of minors. At the time of these events, JR was approximately 15 years old, on runaway status, homeless, separated from stable supports, and particularly vulnerable due to her age, trauma history, lack of resources, and absence of a safe support system. After becoming separated from Bree and being left alone outside during rainy weather, JR reported being approached by an adult male known as "Goose," who initially presented himself as concerned for her well-being. According to JR, Goose engaged her in conversation, asked whether she was okay, and inquired about smoking and drinking, thereby establishing rapport and creating a perception of care, safety, and acceptance.

JR stated that Goose offered her half of an unknown pill, telling her it would help her relax. She reported ingesting the substance and later awakening inside a Super 8 motel room with limited recollection of what had occurred. JR recalled waking to food being offered to her and noticing that her underwear had been displaced, leading her to believe sexual activity may have occurred while she was incapacitated. JR's account suggests the use of substances and impairment as a means of reducing resistance and facilitating exploitation.

According to JR, Goose subsequently introduced her to two other females and reassured her that they would "make sure she was good," which further normalized the environment and fostered a false sense of belonging and protection. JR reported that during the first night Goose provided cocaine and instructed her regarding sexual activity. Although JR initially resisted and expressed that she did not want to engage in sexual activity with multiple individuals, she reported being coerced into sexual encounters with approximately eight to ten adult men that same night. JR described becoming physically ill the following morning, including nausea and vomiting, and stated that once the effects of the substances subsided, she immediately wanted to leave the environment.

JR reported that Goose responded to her attempts to leave with verbal aggression, intimidation, and financial coercion. Specifically, she stated he told her she could not leave because she had already consumed his drugs and therefore needed to "make his money back." According to JR, this created a sense of obligation, fear, and entrapment, particularly given her lack of housing, money, transportation, or supportive adults. JR further reported that Goose worked alongside another trafficker

identified as "Scarface," and that the two coordinated commercial sexual activity within motel rooms. JR described a pattern in which one trafficker supervised the girls while the other coordinated encounters with buyers, thereby maintaining continuous oversight and limiting opportunities to leave.

JR stated that physical violence and threats were also used to secure compliance and maintain control. She described Goose as physically abusive and recounted one incident in which he choked her after she requested to leave, causing her to fear losing consciousness and believe she was going to die. JR additionally reported that Scarface later provided her with Percocet, telling her it would help her relax. After ingesting the substance, JR stated she felt emotionally detached, sedated, and increasingly numb while continuing to engage in commercial sexual activity under the influence of drugs. JR reported that the other girls involved also appeared to be minors.

JR stated she remained involved in the trafficking environment for several months and was instructed she could only leave the motel area for purposes connected to the commercial sex operation, including engaging in commercial sex acts and activities that furthered the operation, such as purchasing clothing or getting nails done. She described going outside at times, where adult men approached her requesting "dates."

Goose maintained control over her involvement in commercial sexual activity by advertising her through websites and apps, including MegaPersonals and Plenty of Fish (POF), and arranging encounters with buyers in the motel parking lot and rooms. The motel environment was compared to an "apartment complex" characterized by continual exposure to drugs, alcohol, excessive condoms in the rooms, and ongoing trafficking-related activity, which normalized the exploitation and reinforced her dependence on the traffickers.

JR further reported that Goose sold drugs from the motel rooms, resulting in a constant flow of individuals entering and leaving the premises and contributing to his appearance of authority and control within the environment. College Park Police reports reviewed corroborate these conditions, with over one hundred reports documenting illegal activity at the Super 8 motel, including drug-related offenses and exploitation.

JR described feeling psychologically trapped and unable to safely leave the situation. She reported that when she attempted to leave, she often returned due to manipulation, fear, emotional dependence, and lack of financial resources or stable housing. According to JR, individuals involved in the trafficking environment reinforced the belief that leaving would become increasingly difficult unless additional money was generated. JR's account reflects patterns of coercion and control commonly observed in trafficking situations, including isolation, intimidation, financial manipulation,

environmental normalization of exploitation, and the creation of perceived dependence on the trafficker for survival and stability.

**<u>JR's Inability to Seek Help and Escape</u>**

JR's account reflects several factors that contributed to her inability to seek help or safely leave the trafficking environment. According to JR, she believed motel employees were familiar with both the traffickers and the ongoing commercial sexual activity occurring on the property. She specifically recalled employees delivering towels, soap, tissue, and other requested items directly to the motel rooms, rather than requiring the girls to go to the front desk. JR recalled observing an Asian male employee outside smoking while men continuously entered and exited the property and commercial sexual activity openly occurred in the hotel rooms and parking lot. She was often required to walk down the hotel's long driveway past the front desk and past this same employee to meet buyers.

JR also recalled approaching the same Asian male employee while dressed in "ho clothes" to ask for directions to a train station and permission to use the phone. He denied both requests. JR viewed this interaction as an attempt to seek help and understood that she had been turned away by the same man who watched her work. JR further observed the employee interacting casually with her trafficker, greeting him by saying, "What's up, Goose?" These observations contributed to JR's belief that adults within the environment would not intervene or provide protection.

Additionally, employees confirmed the nature of the environment and the extent to which the hotel was being operated amid ongoing human trafficking activity. Employees who lived on the property reported that the hotel's policy was not to call the police for drugs or prostitution. A live-in housekeeper at the Super 8, Ms. Santana Phillips, witnessed front desk employees being paid by pimps to serve as police lookouts, and observed employees call pimps to warn them when police arrived. A second housekeeper, Ms. Vanterpool, called the police once after discovering a 16-year-old girl being sold for sex. In response, her manager told her they handle situations like that in-house and to not call the police. Ms. Phillips also confirmed that she had seen JR at the Super 8 and knew that JR was being sold for sex at the hotel. That JR did not seek further help from hotel staff is not surprising. Instead, it was a rational response to the conditions she encountered at the Super 8 and consistent with similar responses in many of the other sex trafficking victims I have worked with.

JR additionally described significant control over the girls' appearance, movement, finances, and daily activities. According to JR, traffickers dictated the clothing the girls wore, often requiring lingerie, lace outfits, and revealing attire intended to attract buyers. Goose either purchased the clothing himself or transported the girls shopping near Old National Highway. JR reported having no access to her own phone

and spending prolonged periods outside the motel waiting for buyers before escorting men back to motel rooms for commercial sexual encounters. She also described hiding in motel bathrooms while other girls rotated through encounters, contributing to ongoing fear, emotional distress, and psychological exhaustion.

JR reported experiencing persistent fear, hopelessness, emotional numbness, and a sense of entrapment throughout the trafficking period. Although she frequently wanted to leave, she stated that constant pressure regarding money generation, threats of punishment, and fear of consequences made her feel unable to safely escape. According to JR, the girls were only permitted to leave the property for purposes connected to the commercial sex operation, including engaging in commercial sex acts and activities that furthered the operation, such as purchasing clothing or getting nails done. She described the environment as highly active and normalized, with people frequently socializing outside, consuming alcohol, smoking, and remaining on the premises for extended periods. JR further explained that, due to her runaway status, she believed the motel location was unlikely to be discovered by her mother, caseworkers, or law enforcement, which reinforced her sense of isolation and hopelessness.

JR estimated that approximately eight to nine girls were often operating out of a single motel room at one time. She reported that the girls were instructed to stand or walk outside while waiting for men seeking "dates." JR also recalled coordinated warnings whenever police entered the area, including verbal alerts such as "12 is coming," signaling everyone to hide inside motel rooms until law enforcement departed. According to JR, individuals on the property would quickly disappear from view when police arrived, making the trafficking activity appear less suspicious and reinforcing the perception that detection and intervention were unlikely.

JR further described the role of another female associated with Goose, known as "Star," who presented herself in a nurturing and supportive manner by complimenting the girls, purchasing food for them, and helping them feel attractive, while simultaneously participating in recruitment efforts for Goose. JR reported that noncompliance or disobedience resulted in consequences including verbal abuse, punishment, or being "put out," which created additional fear surrounding homelessness and abandonment. She also recalled traffickers falsely claiming they were saving money on behalf of the girls while taking the proceeds generated from commercial sexual activity. JR estimated earning approximately $1,000 nightly through 6 to 15 commercial sexual encounters and reported being instructed to slide money under the bathroom door after each encounter while Goose remained nearby observing and controlling behavior and emotions.

Overall, JR's account reflects numerous barriers to seeking help or escaping which are common in sex trafficking cases, including isolation, fear of violence and abandonment, financial control, environmental normalization of trafficking, restricted movement, lack of access to communication, emotional manipulation, perceived

complicity or indifference from surrounding adults, and psychological dependence created through ongoing coercion and exploitation.

**Impact of Trafficking on JR**

JR reported that the effects of the trafficking experience continued long after her physical escape from the trafficking environment. Following her escape, JR reported attempting to rebuild stability by reconnecting with school peers, obtaining under-the-table employment as a chef, and later entering a relationship with the father of one of her children.

However, JR reported that her subsequent adult relationship reflected many of the same dynamics present during her trafficking experiences, including domestic violence, emotional instability, and unhealthy relational patterns. According to JR, exposure to trafficking, abuse, and coercion during adolescence normalized violence and exploitation, leading her to believe such treatment was "just how life was supposed to be." She stated that she remained in this relationship throughout much of her transition into adulthood and described it as the only adult relationship she had experienced at that time. JR stated that in July of the previous year she sought assistance due to escalating safety concerns.

JR reported ongoing psychological and emotional consequences associated with the trafficking experience. . JR described persistent fear that individuals associated with the trafficking operation could locate and harm her. She reported that repeated threats made during the trafficking period, combined with witnessing violence against other girls, contributed to an enduring belief that serious harm or death could occur if she attempted to leave or disclose what had happened.

Throughout the assessment, JR became tearful while discussing these experiences and stated that recounting the events made her realize she had "never healed" from the trauma. She described her transition into adulthood as significantly disrupted by prolonged exposure to trafficking, abuse, instability, and violence. JR reported ongoing symptoms consistent with chronic trauma exposure, including hypervigilance, excessive fear, anxiety, difficulty trusting others, and persistent beliefs that others may intend to harm her. She described episodes of waking with intense fear, chest tightness, nervousness, and sensations of her "heart dropping into her stomach." JR attributed these symptoms to months of trafficking-related abuse, domestic violence, repeated instability, and prolonged exposure to unsafe environments while involved with DFCS. She further expressed that the trafficking experience represented a significant emotional "breaking point" that continues to remain prominent in her thoughts and emotional functioning.

JR additionally reported ongoing substance use as a means of emotional coping and self-medication. She described consuming alcohol approximately every other day

and intermittently using Percocet and cocaine to manage emotional distress, anxiety, and intrusive thoughts related to her trauma history. According to JR, cocaine initially produces a calming effect but later contributes to agitation, appetite suppression, and prolonged periods without eating. She also reported smoking marijuana at night in an attempt to improve sleep, noting ongoing difficulty falling asleep and episodes of remaining awake for extended periods. JR acknowledged that her alcohol and substance use are frequently triggered by overwhelming emotions, trauma-related memories, and ongoing psychological distress.

JR described the emotional and psychological effects of the trafficking experience as unresolved and ongoing. She stated that her current legal involvement and recent discussions regarding the trafficking have intensified her anxiety, fear, and emotional instability. JR reported that she has recently sought out treatment in an effort to begin addressing the long-term impact of her trauma experiences.

During the assessment, JR disclosed a history of suicidal ideation and self-harm behaviors, including cutting, and displayed visible scars on her arm. She described engaging in self-harm during periods of overwhelming emotional pain, hopelessness, and thoughts of not wanting to exist, explaining that cutting functioned as a means of releasing emotional distress rather than directing anger toward others. JR reported experiencing temporary emotional relief following self-harm, which was later followed by shame and emotional distress as the injuries healed. Although she acknowledged continued intermittent thoughts of hopelessness and self-harm, she reported she has not engaged in cutting behaviors for approximately three years.

Despite these struggles, JR identified her children as a primary source of motivation and emotional grounding. She stated she wants to remain emotionally present and available for them and expressed sadness and shame regarding the possibility of one day having to explain her trafficking experiences to her daughter. JR reported that she currently resides with her mother, continues co-parenting arrangements involving her children, and is attempting to establish greater stability in her life. However, she also described ongoing socioeconomic instability, including unemployment and transportation difficulties after recently purchasing a vehicle that is no longer operable. JR additionally reported continued exposure to unstable environments. JR also expressed uncertainty regarding the paternity and exploitation-related circumstances involving "Jada's father," stating he may have been one of the individuals involved in her trafficking.

JR's reported functioning appears significantly impacted by longstanding childhood trauma, emotional neglect, instability, and child exploitation. She reported that at approximately age 13 or 14 she overdosed on prescription medication, including Adderall, after ingesting a large quantity of pills and barricading herself inside the home. According to JR, this occurred shortly before entering DFCS custody. She subsequently

described recurrent psychiatric hospitalizations throughout adolescence, estimating more than five inpatient admissions.

JR additionally described longstanding disturbances in trust, attachment, self-worth, and interpersonal functioning that she associated with her trafficking experiences. She reported feeling obligated to repay kindness, care, or support from others through sexual behavior, explaining that this pattern contributed to repeated exploitation and unhealthy relationships. JR stated that she now struggles with persistent fears that others may intend to harm, manipulate, or take advantage of her. Although she maintains some social relationships, she described these relationships as emotionally superficial and reported becoming increasingly withdrawn, isolated, and antisocial over time.

JR also expressed chronic feelings of being misunderstood, emotionally invalidated, and negatively judged by others. She reported obtaining a tattoo on her forehead reading "misunderstood" shortly after entering DFCS custody, explaining that she frequently felt emotionally dismissed by caregivers and peers and believed others viewed her as "too difficult to deal with." The meaning she attributed to this tattoo appears consistent with longstanding feelings of rejection, low self-worth, and emotional isolation. These themes are also commonly observed among survivors of exploitation and trafficking, particularly individuals struggling with unresolved trauma, anger, shame, and feelings of worthlessness resulting from chronic abuse and victimization.

Overall, JR's history reflects the profound and enduring impact of chronic trauma, trafficking-related exploitation, disrupted attachment, emotional neglect, repeated victimization, and instability across developmental years. These experiences appear to have significantly impaired her emotional regulation, self-worth, trust in others, interpersonal functioning, coping abilities, and overall psychological well-being, with ongoing effects continuing into adulthood.

Considering all materials reviewed, it is in this assessor's expert clinical opinion that JR reports experiences and symptoms associated with significant trauma. JR's reported symptoms, including triggers, anxiety, depression, flashbacks, inability to trust others, difficulty with interpersonal relationships, are consistent with the symptom profile of post-traumatic stress disorder as catalogued in the DSM-5. These effects from JR's sex trafficking experience are consistent with the effects found in many other victims of sex trafficking.

**B. <u>Common Trafficking Environment</u>**

There are several commonalities among the description of this Super 8's environment that are consistent with the environments commonly reported as venues of significant sex trafficking activity. The Super 8 is located right off of a busy interstate. This is often the case in sex trafficking contexts because such a location provides easy

access, but also escape, for the traffickers and Johns.

JR reported being trafficked on the back side of the hotel, which is not easily accessible or visible. Ms. Vanterpool reported that the Super 8 deliberately placed drug dealing and prostitution on the back side of the building. Being intentionally placed in hard to observe areas of a property is a common tactic of sex traffickers and the environments in which trafficking occurs because eluding the police is in the traffickers' and Johns' interests.

The volume of trafficking activity reported was also consistently high and suggested that illegal commercial sex, like sex trafficking, was common at the Super 8. This, too, is consistent with other trafficking cases. Traffickers are often aware of the busy areas for commercial sex and frequently congregate in the same environments in order to maximize their business – the sale of children for sex. In many ways, this is similar to how most businesses find their location. Children are sold for sex frequently in areas where commercial sex is a more common occurrence. In other words, it is easier for traffickers to find buyers for illegal commercial sex in the places where buyers of illegal sex are already comfortable frequenting.

Ms. Phillips, who lived on the property practically 24 hours a day, reported that drugs and prostitution were commonplace at the Super 8. According to Ms. Phillips, there were always girls dressed in skimpy clothes and lots of men coming in and out of rooms for short periods. According to her, many of the girls being sold looked like they were in middle school or high school.

Ms. Vanterpool similarly reported that girls younger than 18 were openly walking the parking lot selling sex, and that she regularly found used condoms, dildos, drugs, and guns in the rooms she cleaned. Ms. Vanterpool further reported that there were always men renting rooms with multiple girls staying in them.

The Super 8's manager, Louis Vu, also reported that he saw younger girls at the hotel. In addition, the Super 8 acknowledged that women engaged in prostitution regularly frequented the property. This level of activity normalizes the illegal activities like sex trafficking for the traffickers, Johns, and the victims. It encourages traffickers and Johns in their activities by feeling safe from the police and welcomed, while at the same time, discourages victims from escaping because by appearances, many of the people in this environment either seem to be involved, or accepting of the normalization of sex trafficking.

Considering all the material reviewed, the environment fostered at the Super 8 is consistent with the environments reported by most sex trafficking victims I have encountered or worked with. It is possible for trafficking to happen anywhere, but in reported cases, environments permissive of crime, specifically of illegal sex like prostitution or sex trafficking, are the most commonly-utilized environments in which to

traffic victims, as was the case with JR.

Signed: ____________________ Date: 5.11.26

# Exhibit A

- JR Complaint & Exhibit
- Deft's Answer to JR Complaint
- NN Complaint
- Deft's Answer to NN Complaint
- TH Complaint
- Deft's Answer to TH Complaint
- DB Complaint
- Deft's Answer to DB Complaint
- Rocker Complaint
- Pltf ROG Resps JR
- Pltf RPD RESP JR
- JR 1st RFA to Defendant
- JR 1st Rogs to Defendant
- JR 1st RPDs to Defendant
- Pltf RFA Resp JR
- ROG_Verification_JR_
- DEF Rogs, RPDs and RFAs to Plt J.R. 2.18.26
- DEF Lincoln Bancorp COS Resp to Plt Rogs, RPDs, and RFAs (J.R.) 2.6.26
- DEF RESP to Rogs, RPDs (J.R.) - 4908-8921-5885
- 025.0-30(B)(6) NOD Lincoln Bancorp, LLC
- 026.0-Pltf NOD Louis Vu JR
- 027.0-Pltf's NOD Tony Tran JR
- 029.0-Deft's NOD of Pltf JR
- NOD NN
- Tony Tran Dep Transcript & Exhibits
- Lincoln Bancorp 30(b)(6) Dep Transcript & Exhibits
- J.R. Dep Transcript & Exhibits
- Louis Vu Dep Transcript & Exhibits
- NN Depo Transcript & Exhibits
- Santana Phillips Declaration
- Winkeisha Vanterpool Declaration
- Declaration of Terrell Evans Super 8
- TH Fulton DA File
- PLAINTIFF JR 1406- 02ba2bffe7cc4b3da5ef3d690a3253e9.MOV
- PLAINTIFF JR 1407- 060c6544159f444594eb89d4fd4c7ae8.MOV
- PLAINTIFF JR 1408- 3683918836194296b88a08775b52e20d.MOV
- PLAINTIFF JR 1409- 8400ca8eb4fd45fd847d5f1fb6205b62.MOV
- PLAINTIFF JR 1410- 923E14A1-1A14-45D8-A43E-AB8DCB4EF31B.JPG
- PLAINTIFF JR 1411- 1542 case numbers.xlsx
- PLAINTIFF JR 1412- AF68C612-3A96-4AC1-8BE9-A8C8347292F9.JPG
- PLAINTIFF JR 1413- at hotel.PNG
- PLAINTIFF JR 1414- e4258b86c4d24297808063cd29565dcf.MOV
- PLAINTIFF JR 1415- F9283D67-A99F-4B3B-8107-8100837A6403.JPG
- PLAINTIFF JR 1416- ORR PD-2025-1542 (2) (1).xlsx
- PLAINTIFF JR 1417- ORR PD-2025-403.xlsx

- PLAINTIFF JR 1418- SUPER8-OLD NATIONAL- Snapchat-1523419314.jpg
- PLAINTIFF JR 1419- SUPER8-OLD NATIONAL-Snapchat-277277342.mp4
- PLAINTIFF JR 1542- 2020- Missing Person- REDACTED
- PLAINTIFF JR 1543- 2020.4.30 JR missing post Facebook.png
- PLAINTIFF JR 1544- 2021-5-9 JR missing post Facebook.png
- PLAINTIFF JR 1545- 2025-8-11 JR Missing post.jpg
- PLAINTIFF JR 1546- JR ID.jpg
- PLAINTIFF JR 1547-TH ID.jpeg
- 11Alive - Person shot, killed at motel in College Park.pdf
- 2021-07-14-Yelp-Review-Super8, Old National.pdf
- 95.5 WSB - Police investigating body found at College Park motel near airport.pdf
- 95.5 WSB - Suspect arrested after 13-year-old abducted from motel in College Park.pdf
- AJC - Argument leads to deadly shooting at College Park.pdf
- ANF - 13-year-old girl rescued, suspect arrested after possible abduction at College Park motel, police say.pdf
- ANF - 5 arrested after undercover College Park prostitution sting.pdf
- ANF - Dozens evicted as officials shut down Super 8 after operating without a permit.pdf
- ANF - Police searching for gunman, woman after man found dead near College Park hotel.pdf
- ANF - Teen rescued after possible kidnapping at College Park motel.pdf
- Fox 5 - Human trafficking investigation opened after 13-year-old girl reportedly kidnapped in College Park.pdf
- Fox 5 ATL - 5 arrests made in College Park prostitution sting.pdf
- Fox 5 ATL - Couple sought in deadly shooting at Super 8 motel in College Park.pdf
- Fox 5 ATL - Motel near Atlanta's airport evacuated after fire in laundry room.pdf
- Fox 5 ATL - South Fulton Police rescue human trafficking victims, suspect in custody.pdf
- PD Press Release - Prostitution Detail.pdf
- Super 8 - 4979 Old National Hwy Reviews.pdf
- Super 8 - 4979 Old National Hwy reviews - Copy_Redacted.pdf
- WJCL - Police in Georgia make arrest after reported child kidnapping at motel.pdf
- WSB-TV ATL - 5 arrested following undercover prostitution sting in College Park.pdf
- WSB-TV ATL - Man shot to death after argument at Super 8 motel near airport, police say.pdf
- WSB-TV ATL - Suspect arrested after 13-year-old girl abducted from motel in College Park.pdf
- Calls for Svc 4979 ONH 20130101-20250225.pdf
- Calls for Svc 4979 ONH.pdf
- College Park PD Incident Report.pdf
- Incident_2000168.pdf
- Incident_2000326.pdf
- Incident_2000378.pdf
- Incident_2000487.pdf
- Incident_2000566.pdf
- Incident_2000731.pdf

- Incident_2001111.pdf
- Incident_2001126.pdf
- Incident_2002111.pdf
- Incident_2002123.pdf
- Incident_2002132.pdf
- Incident_2002595.pdf
- Incident_2003685.pdf
- Incident_2004788.pdf
- Incident_2004840.pdf
- Incident_2004954.pdf
- Incident_2005180.pdf
- Incident_2005571.pdf
- Incident_2005647.pdf
- Incident_2006021.pdf
- Incident_2006026.pdf
- Incident_2006186.pdf
- Incident_2006322.pdf
- Incident_2006600.pdf
- Incident_2007021.pdf
- Incident_2007241.pdf
- Incident_2007278.pdf
- Incident_2007363.pdf
- Incident_2007376.pdf
- Incident_2007498.pdf
- Incident_2007684.pdf
- Incident_2007760.pdf
- Incident_2007774.pdf
- Incident_2007825.pdf
- Incident_2008140.pdf
- Incident_2008195.pdf
- Incident_2008346.pdf
- Incident_2008451.pdf
- Incident_2008739.pdf
- Incident_2008741.pdf
- Incident_2008852.pdf
- Incident_2008943.pdf
- Incident_2008986.pdf
- Incident_2008988.pdf
- Incident_2009139.pdf
- Incident_2009578.pdf
- Incident_2009667.pdf
- Incident_2009823.pdf
- Incident_2009824.pdf
- Incident_2009825.pdf
- Incident_2009937.pdf
- Incident_2010005.pdf
- Incident_2010016.pdf
- Incident_2010073.pdf
- Incident_2010079.pdf
- Incident_2010125.pdf
- Incident_2010143.pdf
- Incident_2010179.pdf

- Incident_2010238.pdf
- Incident_2010270.pdf
- Incident_2010634.pdf
- Incident_2010708.pdf
- Incident_2010890.pdf
- Incident_2011274.pdf
- Incident_2011400.pdf
- Incident_2011476.pdf
- Incident_2011565.pdf
- Incident_2011964.pdf
- Incident_2012298.pdf
- Incident_2012478.pdf
- Incident_2012494.pdf
- Incident_2012692.pdf
- Incident_2012694.pdf
- Incident_2013066.pdf
- Incident_2100076.pdf
- Incident_2100129.pdf
- Incident_2100303.pdf
- Incident_2100446.pdf
- Incident_2100701.pdf
- Incident_2100843.pdf
- Incident_2100865.pdf
- Incident_2101000.pdf
- Incident_2101217.pdf
- Incident_2101480.pdf
- Incident_2101729.pdf
- Incident_2101833.pdf
- Incident_2101927.pdf
- Incident_2102011.pdf
- Incident_2103024.pdf
- Incident_2103024_1.pdf
- Incident_2103430.pdf
- Incident_2103432.pdf
- Incident_2103435.pdf
- Incident_2103481.pdf
- Incident_2103504.pdf
- Incident_2103741.pdf
- Incident_2103745.pdf
- Incident_2103848.pdf
- Incident_2104387.pdf
- Incident_2104467.pdf
- Incident_2104563.pdf
- Incident_2104570.pdf
- Incident_2104659.pdf
- Incident_2104922.pdf
- Incident_2104924.pdf
- Incident_2104925.pdf
- Incident_2105006.pdf
- Incident_2105082.pdf
- Incident_2105087.pdf
- Incident_2105169.pdf

- Incident_2105244.pdf
- Incident_2105433.pdf
- Incident_2105747.pdf
- Incident_2105831.pdf
- Incident_2105893.pdf
- Incident_2106075.pdf
- Incident_2106103.pdf
- Incident_2106175.pdf
- Incident_2108887.pdf
- Incident_2109014.pdf
- Incident_2109017.pdf
- Incident_2109106.pdf
- Incident_2109117.pdf
- Incident_2109162.pdf
- Incident_2109282.pdf
- Incident_2109398.pdf
- Incident_2109708.pdf
- Incident_2109819.pdf
- Incident_2200025.pdf
- Incident_2200247.pdf
- Incident_2200289.pdf
- Incident_2200760.pdf
- Incident_2200800.pdf
- Incident_2200911.pdf
- Incident_2200943.pdf
- Incident_2201142.pdf
- Incident_2201144.pdf
- Incident_2201145.pdf
- Incident_2201274.pdf
- Incident_2201285.pdf
- Incident_2201676.pdf
- Incident_2208081.pdf
- Incident_2302987.pdf
- Incident_2303289.pdf
- Incident_2303305.pdf
- Incident_2305892.pdf
- Incident_2306110.pdf
- Incident_2306527.pdf
- Incident_2306835.pdf
- Incident_2306838.pdf
- Incident_2307737.pdf
- Incident_2308909.pdf
- Incident_2309413.pdf
- Incident_2309945.pdf
- Incident_2310687.pdf
- Incident_2311981.pdf
- Incident_2312453.pdf
- Incident_2313039.pdf
- Incident_2314053.pdf
- Incident_2314080.pdf
- Incident_2400158.pdf
- Incident_2400643.pdf

- Incident_2402284.pdf
- Incident_2403142.pdf
- Incident_2403170.pdf
- Incident_2403206.pdf
- Incident_2403573.pdf
- Incident_2403759.pdf
- Incident_2403858.pdf
- Incident_2404426.pdf
- Incident_2405247.pdf
- Incident_2407706.pdf
- Incident_2407973.pdf
- Incident_2408069.pdf
- Incident_2408125.pdf
- Incident_2408553.pdf
- Incident_2409140.pdf
- Incident_2409142.pdf
- Incident_2413569.pdf
- Incident_2414033.pdf
- Incident_2414427.pdf
- Incident_2500264.pdf
- Incident_2500639.pdf
- Incident_2501537.pdf
- Incident_2501826.pdf
- Incident_2503179.pdf
- Incident_2504175.pdf
- Incident_2504655.pdf
- Incident_2504700.pdf
- Incident_2505852.pdf
- Incident_2507245.pdf
- Incident_2507467.pdf
- Incident_2507887.pdf
- Incident_2507977.pdf
- Incident_2508310.pdf
- Incident_2508696.pdf
- Incident_2508881.pdf
- Incident_2509136.pdf
- (1) CGL PAV0220391 2019-20.pdf
- (10) 2020_W-2s (PO).pdf
- (11) 2021_Employee Wages (PO).pdf
- (12) Evanston Excess 2019 - 2020.pdf
- (13) Human Trafficking Poster.pdf
- (14) Super 8 - Employee Policy and Procedure Handbook.pdf
- (15) Super 8 - Human Trafficking Awareness Pamphlet.pdf
- (16) Trafficking Training Ack.pdf
- (2) CGL PAV0277177 2020-21.pdf
- (3) Evanston Excess 2020-21.pdf
- (4) ROR - Lincoln Bancorp.pdf
- (5) ROR - Lincoln Property.pdf
- (6) Franchise Agreement and Addendum (PO).pdf
- (7) Super 8 FDD_no financials.pdf
- (8) Super 8 Hotel_Vendors Report.pdf
- (9) Super 8 Hotel_Payroll Report (PO).pdf

- Production Document List.xlsx