# Exhibit 1

PROCEEDINGS

ANIQUE S. WHITMORE

THE VIDEOGRAPHER: We are on the record. The time is 11:14 a.m. on September 3rd, 2026. This is the beginning of the video deposition of Anique Whitmore. Would counsel present please identify yourselves for the record.

MR. MCDONOUGH: Pat McDonough for the plaintiff, plaintiffs.

MR. BYRD: Chris Byrd on behalf of the defendant.

MS. MASHELKAR: Shubhra Mashelkar on behalf of the defendant.

MS. CROXALL: Carol Croxall on behalf of the plaintiffs.

THE VIDEOGRAPHER: Thank you. The court reporter may swear in the witness:

THE REPORTER: Do you solemnly swear or affirm that the testimony you'll give today will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE REPORTER: Thank you.

ANIQUE S. WHITMORE,

after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BYRD:

Q Good morning, Ms. Whitmore.

A Good morning.

Q My name is Chris Byrd. We're here to take your deposition. In a few cases, I think you heard us talking before, we'll try our best to get through as much as we can. Given the, kind of the, I guess the load associated with each individual case, we may have to continue your deposition and come back and wrap up at a later date. But we'll cross that bridge when we come to it towards the end of the day. The first part of your deposition will be related to your qualifications that I think would apply generally to three cases. And then we'll get specific into J.R. I guess we'll start by if you can state and spell your name for the record.

A Sure, it's Anique Whitmore, A-N-I-Q-U-E, W-H-I-T-M-O-R-E.

Q Okay.

A Excuse me.

Q And what do you do for a living, Ms. Whitmore?

assessments and what I rely upon. So, I do not believe, or it has not been established within my experience, that recording would elicit truth or untruth.

Q How long did this particular--- Zoom call last with J.R.?

A Approximately three hours.

Q How do you know that it lasted approximately three hours?

A I recall Jazz was very talkative and very cooperative. And, specifically, I remember I had something personal in my personal life that I needed to attend, and I was very late for. So that's how I know it went beyond the time that I had anticipated.

Q Okay. How long had you anticipated?

A I anticipated two.

Q Is there--- when you're--- prior to the Zoom call, did you have any exposure to or discussions with J.R. at all?

A No.

Q Was anyone else on the Zoom call other than you and J.R.?

A Not that I recall. There are often times in which Pat might be on it for a few seconds to introduce the two of us. And then he'll excuse

victims of traumatic events, can be untruthful about what occurred, right?

A Well, you can't have both, that they are victims and then untruthful. So, there may be details that were not spoken about, but that doesn't mean the act did not happen.

Q I guess in theory I believe you, but my question is that you can be a victim and bad things happen to you, and yet the story you tell about the bad things can be untruthful. It can be partly true, it can be mostly true, or mostly false, right?

A That's possible, yes.

Q Okay. And even though you're a victim, when you're making accusations about what occurred, you should be truthful about those accusations, right?

A I agree.

Q I will show you what I've marked as Exhibit 5. This is a police report from the South Fulton Police Department, dated January 22, 2020. And if you look on the--- I guess on the page 2 of--- I don't know why this just says 207. It says 207. I mean, I don't--- I think we cut off the explanation for all the redactions, and I think the follow-up report was mostly redacted. But in any event, if you take a look at the narrative, you know, this, it talks about that

J.R. running away, and it mentions a person that she ran away with. And if you look at the first page, there's a name there, Brianna Williams. Do you see that?

(Exhibit 5 marked for identification)

A I do.

Q Okay. And so--- do you remember in your discussion with J.R., did she provide with you any sort of timeline as to when she ran away? That first time that she ran away with Brianna, did she tell you when that was?

A I would have noted it, and I don't believe---

Q Okay.

A ---it's in my report of dates and times in which she met her.

Q Okay. Well, I'll represent to you that this date, January 2020, roughly lines up with the allegations in this case, that she was trafficked starting in 2020. Do you know of--- other than the single occasion when she mentioned to you that she ran away with Brianna, did she ever mention to you running away with Brianna on any other occasion?

A Not to my recollection.

Q Okay.

A She remembers running away, or she states that she ran away often. To my recollection, she mentioned one time with Brianna.

Q Okay. And that would be the time that after she ran away, they got separated, and then after that, it was on to Goose, Scar, and Star, right?

A I believe so, yes.

Q Exhibit 6, this is another South Fulton Police Department report. It talks about how the officer is responding to a call from a reporting party named Christiana Mindy, who stated that when she was transporting a juvenile, the juvenile got out of the vehicle and ran towards Roosevelt Highway. And it has a description. And if you look at the front page of this report, the juvenile, the suspect is identified as J.R., do you see that?

(Exhibit 6 was marked for identification)

A I do.

Q Okay. So this would have been, the date of this is April 15, 2020. This is an occasion when J.R. would have, obviously she was on her own, right? She had been in the custody of a caregiver, or at least someone who was, who, I guess, was at least watching over her at the time, right?

A Right.

Q She was not with--- she was not at the Super 8, she was not with the three traffickers, right?
A Agreed.
Q And this is an incident, her, however, her getting away from them, not something she mentioned to you, the details of her being, I guess, with Christiana Mindy, that she didn't share those details with you, and she didn't share with you how she came to run away.
A She did not. And again, I didn't conduct a forensic interview that I would have conducted a much more detailed information. I'm assessing for her current mental health and cognitive functioning, but I agree, she did not mention it to me.
Q Now, do you remember just a little while ago, I thought you said that a clinical interview was when you get all this other information to suss out what happened, because I asked you about the forensic, and you said, no, no, that's a clinical. And now you're saying the forensic interview is when you need to get all that information.
A That's inaccurate. The forensic is getting those details because that is what law enforcement would use to go forward or not go forward.
Q Okay.

A The clinical is more longevity of who they are as a person.
Q Okay. When you're--- when you're looking at a, someone being charged with a crime, the details underlying that crime are important, right? Because you don't want to charge somebody with a crime based on false pretenses.
A That wouldn't be my role, but I would agree with you.
Q Right. That's why in the forensic interview that sort of stuff is important.
A It is important.
Q Okay. In a civil case, when someone is being accused of behavior that causes damages, for their behavior or inaction, it's still important, right, to know the underlying aspects, to know whether or not the story being told is truthful, right? Your still--- that's still important, even though it's a civil case.
A There is of importance to it.
Q Okay. If you had had this information, would you have asked J.R., hey, tell me about this, what happened here?
A No, because I don't read detailed information until after the interview.
Q Okay. And when you read detailed information

such as this after the interview, you typically, you said if it causes you concern, if it's a red flag, you would notify the people that retained you, right?

A I would.

Q Here's Exhibit 7. This is another one. South Fulton Police Department. And this one is dated April 8, 2020. So, I got these out of order. It's a few days before the last one. But if you turn to the second page, you'll see there that the officer here that's responding to 5526 Old National Highway, and then it says, untapped potential group. Do you know what that is, untapped potential group?

(Exhibit 7 marked for identification)

A I do not.

Q In reference to a moving juvenile, a missing juvenile. And it says that, "on arrival, made contact with Donell Lewis, who stated that a juvenile had run away from the group home." And Mr. Lewis stated that he's a behavior aid at the location. And last saw the juvenile at about 1,300 hours, and he describes her. And if you look at the front page there, again, we've got the name J.R. as the victim here. This would be another event that J.R. did not discuss with you.

A Agreed.

Q And another event that you were unable to

explore the details of with her, because it wasn't shared, right?

A I would agree. I would also say, though, you know, speaking about runaways, and she indicated she ran away from a lot of group homes, so I don't know if she was indicating it, and I did not ask further questions. I don't know the--- I don t know the details at that moment.

Q Okay. Well, I would, I would think that if during your interview she had shared with you the fact that she was able to get away, prior to her ultimate escape in 2021, yet she went back, that would be something you'd want to discuss with her. Right?

A I would either want to discuss it or gather more information that has some more context to it. Again, not inconsistent with trafficked individuals.

Q You would agree with me that someone who's being trafficked, and I understand that she's a minor and we can talk about the definition of trafficking, but in the context of commercial sex, someone can... There are prostitutes who aren't trafficked. Is that a statement that you agree with?

A Agreed.

Q Okay. And even though when someone is underage and involved in commercial sex, they're

considered trafficked, right, without coercion, that's you're understanding?

A Say that again?

Q If it's a minor victim, there's different definitions of trafficking that apply to minors as opposed to adults.

A If a minor--- yes, different between minor and adult, correct.

Q Okay. That being said, someone can be a minor and participate at least voluntarily, right?

MR. MCDONOUGH: Objection.

BY MR. BYRD:

Q In other words, they're not being forced or compelled to do so. Regardless of whether the act is ultimately trafficking or not, someone can be in that situation because they want to be.

MR. MCDONOUGH: Objection.

THE WITNESS: Are you asking for a legal reasoning or?

BY MR. BYRD:

Q I'm just asking whether or not it's possible, whether you accept that it's possible that a 15-year-old, 16-year-old, 17-year-old can choose to engage in commercial sex.

A Whether they choose or not, it's still an

illegal act, right? In my experience, out of the hundreds of cases in which I've worked, those young individuals have been coerced, they've been tricked, they have been Romeoed by their trafficker to believe that this is how they're going to exist in the world. So voluntary is a very tricky word. That's not a word that I would use. Or you used--- I think you used a different word.

Q I just asked if they could choose to do it or not.

A In my experience, it's not about choice.

Q I don't understand. Did you say mop?

A In my experience, it's not about choice.

Q Oh, about choice.

A Yes.

Q Okay. Again, I'm just asking what I thought to be a simple question, whether or not an individual who's a minor can choose to engage in commercial sex, regardless of whether--- I agree that it's still a crime. They can choose to do it. Right? Minors can choose to commit crimes all the time.

A Agreed.

Q Okay.

A That part I agree with. I can also say, on the surface, it may look like a choice. It's

oftentimes much more complex than that.

Q And you would want all of the underlying details to make that determination, right?

A If it was a choice or not?

Q Yeah.

A I would gather any information that's available to me that would help me give an opinion.

Q Sure.

THE VIDEOGRAPHER: There is an issue with the audio. Can we go off the record for a minute?

MR. BYRD: Sure.

(Off the record at 4:06 p.m.)

THE VIDEOGRAPHER: Back on the record at 4:11 p.m.

Q All right. I think I put, I can't remember what the last one was.

THE WITNESS: Exhibit eight.

THE REPORTER: We we're on seven, but I don't know if you marked eight.

THE WITNESS: I have a seven and an eight.

MR. BYRD: I think I just marked eight and handed that. That one's the one dated June 4, 2021?

(Exhibit 8 was marked for identification)

THE WITNESS: Yes.

MR. MCDONOUGH: Do you have an extra one?
MR. BYRD: Oh, yeah, sorry.
BY MR.BYRD:
Q And this one, if you look down, there's a, on the second page, in the narrative, it talks about a runaway juvenile. And this, just to kind of summarize what's here, the juvenile was identified as J.R. The reporting party was Michelle Strange. And it involved another juvenile named Shondria Craft. Do you see that?
A I do not see Craft.
Q The second line after the...
A I see it. Thank you.
Q And does the name Shondria Craft ring a bell to you at all?
A It does.
Q Who is Shondria Craft?
A I want to say Craft is an individual which she ran with.
Q Okay. Did Miss--- did J.R. say anything about Shondria Craft in her interview with you?
A Not in my interview.
Q But in any event, this is, as I read this, it appears that J.R. ran away with Shondria Craft. And this is on June 8, 2021. This is another incident, at

least the fact that she ran away. And what she was doing before running away is something that you did not discuss and that was not offered up to you by Miss J.R. during your interview, right?
A Not the specifics. She did, however, indicate she was in multiple group homes. She ran from many of them. But specific to this police report, no.
Q Yeah, and let me also point out something. When I saw the Brianna Edwards name, I thought Brianna. But it identifies this Miss Edwards as a behavior specialist for Georgia Hope. Do you see that?
A Brianna Edwards, case notes, yes.
Q Yeah, and do you know Brianna Edwards?
A I do not.
Q Do you know what Georgia Hope is?
A It is a group home for behavior-issued kids.
Q Okay. Would you, would Georgia Hope, if you're in an house, like this, like Georgia Hope, do you get any sort of, is there any sort of support offered to the people that are there?
A I don't know.
Q Okay. I'm going to mark this as Exhibit 9. Exhibit 9 is a photo that was produced by the plaintiff's in this case, or a screenshot that was produced by the plaintiff's in this case. Do you---

physical abuse.

A Yes, but when you look at what--- how Goose treated her compared to the other traffickers, there's a difference, right? And so, I don't know what was inside of her head. No, she didn't report all the different incidences, so I'm unable to kind of opine on that.

Q When you have a clinical interview conducted with someone and you determine later that there are facts that were omitted or facts that were potentially untrue, are you as a clinician or as a counselor, do you have, can that cause you concerns about the veracity of other things that they have told you?

A It would be of note, yes.

Q The report that you gave, if I can find my copy, can you tell me what your, I guess your ultimate opinion was as to the condition of J.R.?

A It's lengthy. It stems from page 21 to 23.

Q Well, let me ask you this way. On page 23, yeah, on page 23, right above common trafficking environment, you state that, "considering all materials reviewed, it is in this assessor's expert clinical opinion that J.R.'s reports, experiences, and symptoms associated with significant trauma." J.R.'s reported symptoms, and you mentioned triggers,

"anxiety, depression, flashbacks, inability to trust others, difficulty with interpersonal relationships, are consistent with the system profile of post-traumatic stress disorder as cataloged in the DSM-5." Do you see that?
A I do.
Q And you say consistent with, did you diagnose J.R. with post-traumatic stress disorder?
A I did not make a diagnosis.
Q Okay, and if you had done a diagnosis, that would have required going to the DSM-5 and providing, going through and determining if the criteria within the DSM-5 were met and basically identifying the criteria that are met, right?
A That's correct.
Q And that's not something you did?
A I did not.
Q And if you were to do that, then some other psychotherapist could take that diagnosis and kind of check your work, so to speak, right? They could take a look at it and they could determine, based on what you've reported, they could look at it and say, okay, yeah, I see where she's going and agree or disagree, right?
A Yes and no. Personally, clinically,

ethically, I don't take soulfully the word of another clinician without doing my own assessment, but I would take it into consideration.

Q Okay. And so, because you haven't gone through and done that work, we are not able to, well, let me ask you this. When you say associated with significant, when you say that her systems are consistent with the system profile of post-traumatic stress disorder, as cataloged in the DSM-5, and you did not perform a diagnosis, is it your opinion that she has post-traumatic stress disorder?

A I have not, I did not diagnose her. If you want my professional opinion on what's consistent with, she's presenting with intrusive thoughts, she's presenting with anxiety, she presented with cognitive and behavioral present day thoughts of what triggers her back to those moments of when she was trafficked. All of that is consistent with PTSD.

Q People can have symptoms consistent with PTSD, but not have PTSD, true?

A I don't know how to answer that. Clinically, if an individual comes in and I'm to diagnose them, and they present with three of the four standards of PTSD, and they tell me what they've experienced, what they've been exposed to, what was forced upon them,