# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| N.N.,<br><br>Plaintiff,<br><br>v.<br><br>LINCOLN BANCORP, LLC,<br><br>Defendant. | CIVIL ACTION FILE<br><br>NO.<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff files her Complaint and shows the Court as follows:

1.

N.N. is a victim of sex trafficking at the Super 8 located at 4979 Old National Highway, College Park, Georgia 30349 ("Super 8"). In 2021, N.N. was trafficked at the hotel when she was a child of only 17 years. Given the nature of the case, Plaintiff is identified in this complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel will disclose her full name to defense counsel as soon as they are known or as soon as an appropriate protective order is in place. [1]

[1] Contemporaneously with this Complaint, Plaintiff filed a Motion for Protective Order and Leave to Proceed Anonymously because the allegations in the Complaint, which include child sex trafficking, are intimate and personal in nature and raise concerns for N.N.'s own personal safety.

2.

Defendant Lincoln Bancorp, LLC, is a foreign limited liability company organized under the laws of California, authorized to transact business in Georgia, and subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent: Registered Agents, Inc., 300 Colonial Center Parkway, Suite 100N, Roswell, Georgia 30076.

3.

Defendant Lincoln Bancorp, LLC has been properly served with process in this action.

4.

Jurisdiction and venue are proper as to Defendant Lincoln Bancorp, LLC.

5.

At all times herein, Defendant owned, operated, maintained, controlled, managed, or was responsible for securing the Super 8, from which it benefitted financially.

6.

Defendant knew of the rampant sex trafficking and prostitution at the hotel for years, before, during, and after Plaintiff's trafficking. Defendant knew because:

(a) Defendant knew about Plaintiff while she was sold for sex at the Super 8;

(b) Defendant's employees knew of and permitted sex trafficking and

prostitution to occur at the Super 8;

(c) Defendant knew about several other sex trafficking victims at the Super 8 before, during, and after Plaintiff;

(d) Defendant knew about frequent and similar crime occurring at the Super 8;

(e) Defendant knew about the reports of Super 8 guests regarding sex trafficking and prostitution-related activities; and

(f) Defendant had knowledge of sex trafficking generally in the Atlanta area and at the Super 8 specifically.

7.

A person under the age of 18 cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e., "minor sex trafficking") is criminal sex trafficking under federal and Georgia law, regardless of whether the child had a trafficker/pimp or was subjected to "force, fraud, or coercion." 18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B). Every person who engages in commercial sex with a child is sex trafficking that child under § 1591(a)(1).

8.

Sex trafficking and prostitution were common occurrences at the Super 8 and Defendant chose to ignore, allow, condone, facilitate, support, or permit such activity at the hotel. Defendant is liable to Plaintiff for its actions and failure to act.

Case 4:25-cv-00321-RH Document 16-1 Filed 08/11/26 Page 4 of 47

Defendant's liability to Plaintiff is straightforward:

(a) The Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a) provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person ***knew or should have known*** has engaged in an act in violation of" the TVPRA. Defendant knowingly benefited from participation in a venture that it knew or should have known engaged in an act in violation of the TVPRA. While operating the hotel, Defendant (i) rented a room to Plaintiff's traffickers so Plaintiff could be violently sold for sex at the hotel, (ii) collected fees for rental of those rooms, and (iii) did so despite what it knew or should have known about Plaintiff being a victim of sex trafficking at the hotel. As a result of Defendant's conduct, Plaintiff suffered physical and mental harms, and Defendant is liable to Plaintiff for the damages arising from those harms under the TVPRA.

(b) Defendant negligently breached duties imposed by law, assumed by contract and behavior, and voluntarily undertaken. Defendant knew or should have known of the foreseeable risk of sex trafficking and other sex crimes at the Super 8 and failed to act as similarly situated businesses would in like circumstances. As such, Defendant is liable to N.N. for her

damages under Georgia common law.

(c) The Super 8 constituted a public nuisance under Georgia law because the hotel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the Super 8, including rampant prostitution, crimes against women, dangerous illegal activity, drugs, violence, harboring missing and runaway underage girls, false imprisonment of underage girls, harboring wanted felons, sex crimes, and sex trafficking. As a direct result of this nuisance, Plaintiff was sold for sex at the Super 8, causing her substantial harm.

(d) Because N.N. was a child when she was trafficked at the Super 8, and because Defendant knowingly facilitated her trafficking, Masha's Law, 18 U.S.C. § 2255, provides a civil remedy to N.N. for the substantive violation of 18 U.S.C. § 1591.

9.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant at the Super 8.

**I. N.N.'s trafficking at the Super 8.**

10.

From early 2021 through March 25, 2021, when she was only 16 years old, N.N. was sold for sex at the Super 8.

11.

N.N.'s trafficker forced her to perform sex acts on him in exchange for her room at the Super 8.

12.

While N.N. was trafficked at the Super 8, she was made to have sex with roughly three men each day. Defendant knew or should have known that the number of daily, older male visitors to the room was clearly indicative of child sex trafficking.

13.

N.N. frequently appeared throughout the hotel and on the hotel premises and approaches wearing very little clothing.

14.

While she was trafficked at the Super 8, N.N. exhibit in the common areas numerous well-known and visible signs of a child sex trafficking victim, which Defendant knew or should have known, including her young age and inappropriate appearance, fatigue, sleep deprivation, injuries, loitering, soliciting male patrons, and monitoring and control of N.N. by her trafficker.

15.

Defendant knew or should have known that N.N. was being trafficked based on these signs and behaviors.

16.

Employees at the Super 8 were familiar with N.N.'s trafficker and actively participated in facilitating her trafficking. The trafficker paid employees to act as lookouts and notify him whenever law enforcement was present on the property. And the employees did so.

17.

Defendant had a policy not to call the police regarding known or suspected sex trafficking at the hotel. Defendant followed this policy in the case of N.N. as well as other sex-trafficking victims.

18.

On one occasion, an employee of the Super 8 asked N.N.'s trafficker if he could purchase the child sex-trafficking victim for sex.

19.

N.N. was sex trafficking on the backside of the Super 8 property, where sex trafficking victims were intentionally placed by Defendant to keep them out of public view. By intentionally placing N.N. in the rear of the hotel, Defendant concealed N.N.'s traffickers' operation and minimized their risk of detection.

20.

Defendant knew or should have known of its policy and practice to conceal sex trafficking from public view by housing sex trafficking victims at the back of the property, thereby allowing sex trafficking to operate without disruption.

21.

Front desk staff at the Super 8 prioritized N.N.'s trafficker, consistently ensuring that his needs were promptly addressed. If there was an issue with a hotel room, employees would reassign him to a different room within the hour. Additionally, it was common practice for Super 8 employees to rent rooms by the hour or even by the half-hour, accommodating the demands of the trafficking operation.

22.

N.N. specifically recalls an Asian employee who regularly worked at the front desk and was frequently present at the hotel. She often saw this employee outside, smoking cigarettes and observing the activity on the property.

23.

N.N. once applied for a housekeeping position at the Super 8. However, the same front desk employee recognized her as one of the women involved in the trafficking operation and consequently did not hire her.

24.

Illicit activity at the Super 8 was pervasive and impossible to ignore. N.N. frequently heard the sounds of sexual activity and catcalls from truck drivers. Arguments among guests were common, and gunshots were heard on a regular basis.

25.

When N.N. was trafficked at the Super 8, she saw many other girls and women who were obviously being sold for sex at the hotel. N.N. estimates she saw at least six young girls being trafficked at the Super 8, three of which she knew personally. These young girls and women were often seen in revealing clothing, such as lingerie, short shorts, and see-through clothing. At times, girls being sold for sex would stand outside of their hotel room in nothing but a thong.

26.

Traffickers were openly violent with young girls and women being sold for sex at the Super 8. It was not uncommon for N.N. to witness other traffickers who were running their sex operations out of the Super 8 physically assault other women and girls being sold for sex.

27.

Once, N.N. witnessed a pimp dragging a victim by her hair down the driveway of the Super 8. When her wig came off, he continued to pull her by her shirt to the front of the Super 8. Both N.N. and a housekeeper witnessed this incident.

Case 1:25-cv-04291-JPB Document 106-1 Filed 09/16/25 Page 11 of 48

28.

Defendant's hotel operated as a one-stop shop for trafficking-related activity. N.N., along with other women and girls being sold for sex, had access to liquor, drugs, snacks, and condoms without ever needing to leave the premises. A well-known resident, referred to as the "candy lady," regularly sold these items, including condoms, Plan B pills, and drugs, further enabling the commercial sex trade occurring at the hotel.

29.

N.N. was rescued from the Super 8 by law enforcement on March 25, 2021.

30.

Defendant had a policy to allow and facilitate sex trafficking at the Super 8, including the sex trafficking of N.N. Defendant enacted that policy by, among other things, agreeing to house N.N.'s trafficker and his trafficking venture, his associates, and victims. Defendant also accepted payments from N.N.'s trafficker in exchange for providing lookout services to evade law enforcement intervention.

## II. Defendant's knowledge of crime at the Super 8.

31.

The Super 8 had a well-established reputation for criminal activity, including prostitution and sex trafficking. It was commonly known that people came to the Super 8 to buy two things: sex or drugs (or both).

32.

Defendant owned and operated the Super 8 and employed the employees there, giving it specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the hotel during that period.

33.

The back of the hotel had constant activity, with buyers of commercial sex coming and going from multiple hotel rooms after staying for short periods.

34.

Before, during, and after N.N.'s child sex trafficking at the Super 8, prostitution, sex trafficking, and child sex trafficking were rampant and frequent occurrences at the hotel and were obvious to employees and guests.

35.

Beginning in 2019, another child was trafficked for sex at the Super 8 when she was just 14 years old.

36.

Beginning in 2020, another child was trafficked for sex at the Super 8 when she was just 16 years old.

37.

Ms. Phillips, whose declaration is attached to this Complaint[2], was employed as a housekeeper and resided at the Super 8 for approximately one year, from 2020–2021. During that time, she was at the Super 8 "practically 24 hours a day."

38.

According to Ms. Phillips, there was prostitution around the clock at the Super 8. She observed numerous men coming and going from guest rooms in short intervals, consistent with prostitution and sex trafficking.

39.

And Ms. Phillips witnessed pervasive drug activity and prostitution on the property. She regularly observed girls who appeared to be very young—likely of middle- or high-school age—walking around the hotel dressed in revealing clothing. These girls were "always walking around the hotel looking for men to buy them for sex at the hotel."

40.

Ms. Phillips witnessed Super 8 staff regularly rented rooms by the hour for purposes of prostitution, accept payments from traffickers to act as lookouts, and even warn the traffickers when police were present. She also witnessed employees buy sex from girls at the hotel.

---

[2] *See* Ex. 1, Santana Phillips Declaration

41.

While cleaning the hotel rooms, Ms. Phillips would find various sex paraphernalia, including condoms, lubricants, multiple AIDS tests, and other sex items.

42.

According to Ms. Phillips, a woman known as the “candy lady” lived at the Super 8. The candy lady would sell snacks, candy, and condoms to the girls being sold for sex at the hotel. It was well-known that the candy lady also sold drugs.

43.

According to Ms. Phillips, Defendant’s policy was not to call the police for drugs or prostitution at the hotel.

44.

The environment at the Super 8 fostered illegal activity and facilitated N.N.’s exploitation. Guests and residents routinely shouted “12” to alert others of police presence, prompting individuals to temporarily conceal their conduct until law enforcement left, after which criminal activities, including the sex trafficking of N.N. and other women and girls, resumed without interruption.

45.

Defendant provided a market and beds for sex traffickers to sell victims to buyers of commercial sex. That is why N.N.’s sex traffickers brought her to the Super 8 to be sold for child sex.

Case 1:25-cv-04629-JPB-HC Document 10-1 Filed 09/16/25 Page 14 of 47

46.

Defendant knew or should have known of sex trafficking, prostitution, and other criminal activity existing at the Super 8 before N.N.'s sex trafficking there.

47.

Defendant had actual or constructive knowledge of the Super 8's publicly available online reviews of the Super 8 report prostitution and crime occurring at the hotel, including the following (reproduced verbatim):

1. August 22, 2014, from Yelp.com:

    The motel is the cheapest in the city and i guess its like the saying goes, u get what u pay for! however i did not pay for roaches,MOLD, mildew, prosititution or any other disgusting thing u can think of! however they did have beautiful rooms in the front of the motel and upstairs i guess thats the non smokers section!O and dont be mislead by the continental breakfast... wifi messes up ur technology!

2. December 12, 2015, from Yelp.com:

    I have never given a bad review--but in this case I feel a responsibility to warn others that this place is scary filthy and that it has become a prostitute haven. . . .

3. July 13, 2016, from Yelp.com:

    This place is beyond horrendous. I ended up sleeping in my car. While driving out of this location I realized the women running to the doors and walking around are prostitutes. NASTY! I rated this place with one star because I could not post my review without one. But Super 8 own me stars.

4. May 2017, from Google.com:

I will start by saying that this place is very ghetto! I was scared to take my child to the pool and when we did go it was closed because people from other places where there, the water and pool looked nasty. Breakfast literally sucks! Next to a very busy high way. I will say the room was okay but very old fashion and the restroom need some work done. I believe prostituion goes on, drug deals, ect. Employee don't care smoke on the job. DONT WAIST YOUR TIME OR MONEY HERE !

5. July 2017, from TripAdvisor.com:

This place was horrible. it had an awful smell to the rooms. there were holes in the walls. The breakfast was not eatable. customer service was awful. bad attitudes. the shower curtain had mold on it! The floor was so dirty that the bottoms of her feet were black from just walking and playing without socks or shoes on! There was trash all over the ground outside. There were prostitutes there using the rooms to do their business! You could tell by looking at the people that they were working girls. The TV had to warm up before it would play so that we could see it. The noise from the traffic that is right beside the hotel interferes with your sleep. No microwave. No refrigerator. The bed sheets were not changed once while we were there. Had to ask for clean towels and rags. Do not stay here please. It was awful. We stayed gone all day because we did not want to sit in those rooms all day.

6. July 2017, from TripAdvisor.com:

This place was disgusting. I could understand if it was $40 but we paid $91 at a DISCOUNT! We booked it through the Super 8 hotline while on the road stating we just needed a clean room to stay in between drives. This place was advertised as just that. The sink regurgitated something of throw up (noodles), the tv and internet didn't work, the a/c didn't work, the bathroom was gross and the toilet leaked on the floor, there were wiped stains on the curtains. We looked at the conditions of the check out policy and we wouldn't have been refunded after the first 15 minutes. Also, we were 2 women that were in a city on a Saturday night and it was raining.

We had no choice but to stay. I complained to the the attendant in the office and she said no one from housekeeping was there. I asked for liquid plummer for the sink. It was under lock and key so I asked for a coke to see if that would unclog it. Then a prostitute came in. She was nice but funny she even said it was overpriced! We tried to sleep. Until I felt something crawl on me. A bed bug!!! We asked for garbage bags to put our things in until we could get home. Most disgusting place EVER!!!

7. July 2017, from Kayak:

This is not a hotel for travelers, bring wet wipes, and some twenties for the professional "ladies"

8. May 2018, from Google.com:

It's a dump full of drugs and prostitution

9. November 5, 2018, from Expedia.com:

**DO NOT STAY HERE.**

Look at the pictures.....nuff said. Condoms in the vending machine right next to the Oreos....

10. September 24, 2018, from Expedia.com:

I paid extra for breakfast however the breakfast was just a few bagel, bread, and muffins and orange juice. Although I asked for a non-smoking room but when I was in there with my fiancée and 9 month-old son, the room smelled like a drug infested room. In addition, we weren't able to sleep throughout the night because there were people making noise and banging on the next door like it was prostitution or drugs dealing.

11. July 2019, from TripAdvisor.com:

**Dirty, Noisy, Unsafe**

Overall safety is a concern on this property. There are constantly people walking around look like they are not staying at the hotel. It

has a very drug dealer / prostitution feeling about it. Although none of that can be confirmed, it does affect the feeling of the environment. There's too much loitering in my opinion. The room that I had was not cleaned very well. Hair was in the toilet and bathtub. There are stains of either blood or ketchup or BBQ sauce on the walls and sheets. I was only there for two nights and that is the reason why I did not report these things to the front desk. I just needed my stay to be fluid and without incident as much as possible. However, these concerns definitely need to be addressed. I understand that the price is low, but a good reputation is always precedent over money. If this hotel would invest in the upkeep & creating a safer culture then it could probably charge more. It should also be noted that aircrafts land overhead which is very noisy and hotel is located right on the interstate and that means lots of noise from the traffic.

12. July 9, 2019, from Expedia.com:

ROACHES EVERYWHERE. PROSTITUTION. OLD BUILDING. TERRIBLE. STAY AWAY I SHOULD HAVE LISTENED TO THE PEOPLE DOING REVIEWS.

13. July 31, 2019, from Yelp.com:

Stayed here two months and was discriminated against due to being trans and the staff member MIKE sexually harassed me the whole time off and on I was place on do not rent for not performing sexual request to mike who is the person who works front desk and walk into guest rooms unannounced while guest are away from property items come up missing they don't know what happened mike will lie on you and say you did something that u couldn't have done and when caught in a lie he get mad and says you are yelling at him etc this Super 8 is staffed with horrible disgusting people who are money hungry don't care about customer service at all I would recommend the best American inn, Ramada, quality inn, days inn Super 8 will be a WASTE OF MONEY PROSTITUTION AND STAFF INDULGENCE STAFF SNORT COCAINE AT WORK SMOKE WEED AT WORK WHILE ON THE CLOCK STAFF BRING THEY CHILDREN TO WORK WITH THEM AND LET THEM RUN WILD AROUND THE PROPERTY LEAVING TOYS ETC STAFF BREAKING INTO CARS belonging to people

who park and fly DONT PARK AND FLY HERE DONT LEAVE YOUR CAR HERE THEY DONT WATCH ANYTHING CAMERASDONT WORK

14. February 2, 2020, from Expedia.com:

Found sex toy in room management refused to do anything about it reimbursing money and had to sleep in a dirty room on the floor because they refused to reclean or move me to a new room. DO NOT STAY HERE

15. March 9, 2020, from Expedia.com:

There were gunshots that woke us up at 1 AM. Our non smoking room still smelled of smoke.

16. March 2021, from TripAdvisor.com:

**Horrible & Unsanitary**

The place needs to be closed. The trims stink, no amenities, paint chipped walls, filthy carpet, uncomfortable bedding. It looks like a prostitution hotel. Definitely not a safe.

Even the person checking me in had a gun in their hip and looked like a drug dealer. Drug users hanging outside.

17. August 10, 2021, Expedia.com:

Horrible place, condoms and fresh stains on bed spread

18. August 31, 2021, from Expedia.com:

Security walking around pulling guns on people talking bout it's his trap…. People sitting all out on balcony distributin drugs… and prostitution activities

19. September 14, 2021, from Expedia.com:

Kids cleaning rooms instead of hotel staff..no towels or washcloths in the room as well as roaches all over the place while prostitution was evident....i will never go there again in life nor book for a family

> member that came from orlando for a function. There is no word to describe the experience but poor.

48.

Defendant knew or should have known that these and other customer reports showing the dangerous nuisance of the property and the rampant crime that occurred on the premises.

**III. Defendant's Knowledge of Sex Trafficking Generally**

49.

Defendant knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Victims of Trafficking and Violence Protection Act of 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

50.

Defendant knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that crime was prevalent in the city, including at the Super 8. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta has one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly earnings of roughly

$33,000.00.[3] Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendant received and retained some of those illicit profits through renting hotel rooms used for the trafficking of N.N.

51.

Defendant knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[4] and as "the number one city for child sex trafficking."[5]

52.

Defendant knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as… rendezvous sites where child sex workers meet their clients on threat

---

[3] See Christian Boone, Study: Atlanta's Sex Trade Highly Profitable, Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM (last visited June 31, 2025); see also Meredith Dank et al., Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities 30-32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-maj or-us-cities (last visited June 6, 2025).

[4] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month (Jan. 29, 2015), https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-deliversremarks-justice-department (last visited June 6, 2025).

[5] *Id.*

of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428-29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J. and Thomas, J.).

53.

Defendant knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received involving motels and hotels reported sex trafficking, and another 2.6 percent reported a combination of sex and labor trafficking.[6] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[7] And the Polaris Project found that "75 percent of [trafficking] survivors…reported coming into contact with motels at some point" during their exploitation.[8] Unfortunately, "94 percent" also "disclosed they never received any assistance, concern, or identification from motel staff."[9]

---

[6] National Human Trafficking Hotline, National Hotline Cases Occurring in Motels and Motels: United States 1/1/2012-12/31/2016, at 3, https://humantraffickinghotline.org/sites/default/files/Motel%20and%20Motel%20Topical.pdf (last visited Sept. 9, 2021).

[7] Jon Conte et al., Businesses Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation 5 (July 2014), [http s://web.archive.org/web/20210511135432/https://www.bestallance.org/uploads/5/0/0/4/50047795/ittprogram_evaluation.11_without_appendix.pdf] .

[8] Polaris Project, On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking 16 (2018), https://polarisproj ect.org/wp-content/up loads/2018/08/A-Roadmap-for- Systems-and-Industriesto-Prevent-and-Disrupt-Human-Trafficking-Motels-and-Motels.pdf (last visited Sept. 9, 2024).

[9] *Id.* at 23.

54.

Defendant knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in or around motels,[10] and that the industry had been warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[11]

55.

Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[12]

56.

Defendant knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps motels and hotels can take:

---

[10] Rich Keating, Human Trafficking: What Is it and How It Impacts the Hospitality Industry 6 (presentation at AHIA Sprint Conference 2013), [https://web.archive.org/web/20191030203754/http ://www. ahiattorneys.org/aws/AHIA/as - setmanager/getfile/92983].

[11] *Id.* at 19.

[12] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited June 31, 2025).

Case 1:25-cv-04631-SHC Document 1-1 Filed 08/01/25 Page 23 of 47

(a) Establish corporate policy and procedures against sexual exploitation of children;

(b) Train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

(c) Include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(d) Provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(e) Support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(f) Report annually on the company's implementation of Code-related activities.

57.

Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given motels and hotels the tools to address the scourge of sex trafficking at motels.

58.

Defendant knew or should have known that during the relevant time period the Department of Homeland Security ("DHS") published guidelines to help motels and hotels detect and respond to human trafficking. DHS' guidelines instruct

housekeeping maintenance, front desk, and security, among other motel personnel, to be vigilant in looking for signs of human trafficking at motels and hotels, such as:

(a) Persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(b) Persons who lack freedom of movement or are constantly monitored;

(c) Persons who have no control over or possession of money or ID;

(d) Persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e) Requests for room or housekeeping services (additional towels, new linens, etc.), but denial of motel staff entry into the room;

(f) The presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(g) Extended stay with few or no personal possessions in the room;

(h) Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.)

(i) The same person reserves multiple rooms;

(j) A room is rented hourly, less than a day, or for an atypical extended stay;

(k) Attempts to sell items to or beg from patrons or staff;

(l) Cars in the parking lot regularly parked backward, so the license plates

are not visible; and

(m) Loitering and solicitation of male patrons.

**COUNT I**
**STATUTORY LIABILITY: SEX TRAFFICKING**
**18 U.S.C. § 1595**

59.

Plaintiff incorporates the paragraphs above as if fully restated herein.

60.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendant knowingly benefitted from participating in a venture that Defendant knew or should have known engaged in acts in violation of the TVPRA.

61.

Defendant knowingly benefitted from Plaintiff's sex trafficking by receiving revenue generated by the operation of the Super 8, including the revenue generated for the rooms in which Plaintiff was trafficked. Each day Plaintiff was trafficked at the Super 8, Defendant knowingly benefitted by receiving money from Plaintiff's trafficking in the form of room rental fees.

62.

Defendant participated in a hotel venture and knew or should have known that their the hotel engaged in acts prohibited by the TVPRA such as harboring, maintaining, and providing N.N., who was being falsely imprisoned, so that she could be

Case 1:25-cv-04621-JPB-HC Document 101-1 Filed 08/01/26 Page 26 of 47

sold for sex at the Super 8.

63.

The venture in which Defendant participated was in or affecting interstate commerce.

64.

Defendant knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives, participated in Plaintiff's sex trafficking at the Super 8. Defendant knew or should have known of this participation.

65.

Defendant knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives knew or should have known of other sex trafficking and sex crimes at the hotel before and while Plaintiff was trafficked for sex at the Super 8.

66.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of its agents and representatives.

67.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendant's participation in

this venture.

68.

Defendant is liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damage under 18 U.S.C. § 1595(a).

69.

Defendant is jointly and severally liable for damages arising from the indivisible injuries it caused Plaintiff, whose damages were proximately caused by the acts discussed in this count.

**COUNT II**
**NEGLIGENCE**

70.

Plaintiff incorporates the paragraphs above, as if fully set forth herein.

71.

At all relevant times, Defendant controlled the operation and management of the Super 8.

72.

At all relevant times, Defendant owed a duty to invitees to the Super 8, including Plaintiff, to exercise ordinary case in keeping the premises and approaches of Super 8 safe from criminal activity, especially child sex trafficking. Defendant

also voluntarily undertook actions that created additional duties to provide adequate safety and security at the Super 8.

73.

Defendant breached its duty to N.N. and failed to act as similarly situated businesses would in like circumstances by failing to exercise even ordinary care to keep the premises and approaches of the Super 8 safe and by negligently permitting criminal activity, especially child sex trafficking, to exist and flourish at the Super 8.

74.

Defendant knew or should have known the steps to take to prevent the Super 8 from being used as a venue for N.N.'s child sex trafficking. "The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity . . . . From check-in to check-out there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property . . . With proper training, a front desk agent or a housekeeper can notice that something is not right and respond."[13]

75.

Defendant knew or should have known ECPAT's Code. Regardless, Defendant negligently failed to implement appropriate steps to prevent child sex trafficking at the Super 8, such as:

---

[13] https://www.ecpatusa.org/hotel-training (last visited June 31, 2025).

(a) establishing corporate policies and procedures against sexual exploitation of children;

(b) training employees in children's rights, the prevention of sexual exploitation, and how to report suspected cases;

(c) including a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(d) providing information to travelers on children's rights, the prevention of sexual exploitation of children, and how to report suspected cases;

(e) supporting, collaborating, and engaging stakeholders in the prevention of sexual exploitation of children; and

(f) reporting annually on the company's implementation of Code-related activities.

76.

Defendant knew or should have known the Department of Homeland Security's guidelines on the prevention of sex trafficking. Yet Defendant negligently failed to implement appropriate steps, such as training its employees, managers, and agents, on those guidelines and on warning signs that indicate the presence of sex trafficking on the hotel premises, including:

(a) persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(b) persons who lack freedom of movement or are constantly monitored;

(c) persons who have no control over or possession of money or ID;

(d) persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e) requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

(f) the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(g) extended stay with few or no personal possessions in the room;

(h) excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

(i) the same person reserves multiple rooms;

(j) a room is rented hourly, less than a day, or for an atypical extended stay;

(k) attempts to sell items or beg from patrons or staff;

(l) cars in the parking lot regularly parked backward, so the license plates are not visible;

(m) loitering and solicitation of male patrons;

(n) waiting at a table or bar and picked up by a male (trafficker or customer);

(o) persons asking staff or patrons for food or money; and

(p) persons taking cash or receipts left on tables.

77.

ECPAT's Code and DHS's guidelines were only two of the many authorities Defendant could and should have relied on to address and combat sex trafficking at the Super 8. For example, the American Hotel and Lodging Association links to a "free" ECPAT training that is only "30-minute[s]" and easily available "online."[14] Defendant knew or should have known it had access to such free training materials for its employees, managers, and agents.

78.

Despite what Defendant knew or should have known about the illegal activity at the Super 8, including multiple reports and arrests related to sex trafficking and other sex crimes at the Super 8 before Plaintiff's child sex trafficking, Defendant negligently failed to implement reasonable, appropriate, and adequate measures to protect its invitees, including N.N., from becoming a victim of sex trafficking at the Super 8. To the contrary, Defendant continued its venture to profit from the operation of the Super 8 and the child sex trafficking and other sex crimes incorporated into the Super 8's operations.

---

[14] https://www.ahla.com/issues/human-trafficking (last visited June 31, 2025).

79.

Defendant negligently failed to implement policies and procedures to prevent, identify, and deter sex trafficking at the Super 8 and to ensure it was not profiting from sex trafficking, as required by state and federal law.

80.

Prior to and including the time when N.N. was trafficked at the Super 8, Defendant negligently maintained, inspected, secured, patrolled, managed, and operated the Super 8. Defendant had knowledge, both actual and constructive, of the need to properly maintain, secure, inspect, patrol, manage, and operate the premises, but negligently failed to exercise ordinary care, thereby creating an unreasonable risk of injury to invitees, including Plaintiff.

81.

Defendant had actual and constructive knowledge of criminal activity, including sex trafficking and other crimes, at and around the Super 8 prior to Plaintiff's child sex trafficking.

82.

Defendant had actual and constructive knowledge of the dangerous and hazardous conditions existing at the Super 8 due to the knowledge of its employees, managers and agents and due to the prior criminal activity and dangers associated with the property and surrounding high crime area.

83.

Plaintiff's child sex trafficking was foreseeable to Defendant because it knew or should have known about the actual events with N.N. at the Super 8, as well as the history of sex trafficking and other sex crimes at the Super 8 and other hotels in the area and the history of criminal activity at or around the Super 8 and in the surrounding high-crime area.

84.

Defendant breached the duty it owed to Plaintiff by failing to exercise ordinary care to keep its premises safe and negligently permitting criminal activity, especially child sex trafficking, to exist and remain at the Super 8.

85.

Defendant knew of, or in the exercise of ordinary care, should have known of the dangerous and hazardous conditions existing on the premises, and the failure to maintain, inspect, secure, patrol, and manage the premises, and that these conditions were likely to, and did, result in sex trafficking and other sex crimes at the Super 8 and again to Plaintiff.

86.

Despite its actual or constructive knowledge of criminal activity, including child sex trafficking, Defendant negligently failed to protect invitees, including N.N., from the risks of child sex trafficking and other violent crimes.

87.

Despite its actual and constructive knowledge of criminal activity, including child sex trafficking, Defendant negligently failed to warn Plaintiff and other invitees of the dangers at or around the Super 8.

88.

Despite its actual and constructive knowledge of criminal activity, including child sex trafficking, Defendant negligently failed to maintain adequate security devices and personnel to ensure proper use of the property, thereby causing an unreasonable risk of injury to invitees, including N.N.

89.

Despite its actual and constructive knowledge of criminal activity, including child sex trafficking, Defendant negligently failed to maintain policies, procedures, or systems for investigating, reporting, and warning of child sex trafficking and other crimes, and negligently maintained the Super 8.

90.

Despite its actual and constructive knowledge of criminal activity, including child sex trafficking, Defendant negligently failed to maintain policies, procedures, or systems for investigating, reporting, and warning of child sex trafficking and other crimes, and negligently maintained the Super 8.

91.

Despite its actual and constructive knowledge of criminal activity, including child sex trafficking, Defendant failed to take appropriate action to remedy or reduce the danger to its invitees and allowed the dangerous environment at the Super 8 to worsen and continue to exist unabated, thereby creating a nuisance.

92.

Because Defendant had knowledge of, or in the exercise of reasonable care should have knowledge of the dangerous environment at and around the subject premises, Defendant is liable for the negligent supervision, hiring, training, and retention of its managers, agents, and employees and the entrustment of said property to its managers, agents, and employees. Said negligence proximately caused the damages and injuries to N.N.

93.

Defendant negligently represented to invitees that the Super 8 was properly maintained and that the property was safe.

94.

Defendant was negligent and said negligence proximately caused N.N.'s injuries in the following ways, to-wit:

(a) Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

(b) Negligently failing to keep the premises in a state of good repair;

(c) Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

(d) Negligently failing to provide appropriate and effective security personnel during N.N.'s child sex trafficking at the hotel;

(e) Negligently failing to properly inspect and maintain the premises;

(f) Negligently failing to properly train and supervise its employees regarding sex trafficking and other sex crimes at the hotel;

(g) Negligently failing to properly retain, hire, train, and supervise said employees;

(h) Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

(i) Negligently failing to respond to online reviews and publicly available information;

(j) Negligently failing to prevent loitering and trespassing;

(k) Negligently failing to remove loiterers and trespassers;

(l) Negligently failing to inspect, patrol, or appropriately monitor the property;

(m) Negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access,

adequate signage, cameras, patrols, inspections, physical, and other landscaping adjustments, and other measures available;

(n) Negligently failing to remediate a long history of crime at the Super 8 and the area nearby;

(o) Negligently failing to warn invitees of known hazards at the property; and

(p) Negligently representing to invitees that the property was safe.

95.

Each of the foregoing acts and omissions constitute an independent act of negligence on the part of Defendant and one or more or all above stated acts were a proximate cause of the injuries sustained by N.N.

96.

Defendant is liable for N.N.'s injuries sustained, pain and suffering, the expenses of treatment, and all other elements of damages allowed under the laws of the State of Georgia, including all special, compensatory, incidental, consequential, economic, and punitive damages.

97.

Defendant is liable for the child sex trafficking of N.N.

98.

Defendant negligence discussed in this count was a cause in fact and a proximate cause of N.N.'s substantial physical, emotional, and psychological harm and other damages.

**COUNT III**
**NUISANCE**

99.

Plaintiff incorporates the paragraphs above, as if fully set forth herein.

100.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

101.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

102.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right

of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

103.

O.C.G.A. § 41-3-1 provides that "whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges[15] shall be guilty of maintaining a nuisance, and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed a nuisance."

**Public Nuisance**

104.

The Super 8's history of rampant crime and illegal sex activity created a spill-over effect that led to other crime occurring in the surrounding area.

105.

The Super 8 caused or contributed to a blighting effect on the surrounding

---

[15] O.C.G.A. § 41-3-1 defines "sexually related charges" to mean trafficking a person for sexual servitude, public indecency, prostitution, keeping a place of prostitution, pimping, pandering, or masturbation for hire.

community, so that the Super 8 negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Super 8, although the effects on each person may have varied.

106.

The illegal prostitution and sex trafficking nuisance occurring at the Super 8 had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

107.

Defendant controlled the nuisance because it controlled the hotel. It could have *not* allowed the rampant prostitution and sex trafficking at the Super 8, including Plaintiff's sex trafficking, but instead it chose to facilitate, conceal, and participate in that activity so that they could reap the ill-gotten profits of Plaintiff, and others, suffering.

108.

The acts and omissions of Defendant in permitting prostitution and sex trafficking at the Super 8 caused special damages to Plaintiff, as she was a victim of sex trafficking at Defendant's nuisance hotel and suffered damages to her health, including mental and emotional harm, pain and suffering, and Defendant is liable to Plaintiff for all such damages.

Case 1:25-cv-04629-JPB-HC Document 101-1 Filed 08/11/25 Page 41 of 47

109.

The Super 8 constituted a nuisance per se under Georgia law because the hotel knowingly and/or negligently allowed and facilitated illegal sexually related crimes to occur at the hotel including rampant prostitution, pandering, pimping, and sex trafficking. In other words, the Super 8 was a "lewd house."

110.

Prior to and following the child sex trafficking of Plaintiff, Defendant failed to act on its knowledge of prior prostitution and sex trafficking, and failed to act to correct, prevent, or warn of the prostitution and sex trafficking occurring at the hotel, and the dangerous environment created on the property. Defendant's failure to take appropriate action to remedy or reduce the danger to the public, including Plaintiff, allowed the dangerous environment at the Super 8 to continue to exist, unabated, thereby creating a nuisance that continues to this day.

111.

Plaintiff was directly harmed as a result of the Super 8 being a nuisance hotel that permitted illegal sexual activity to occur there.

112.

Defendant is liable for their public nuisance by reason of their failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious condition and of which Defendant had

Case 1:25-cv-04629-JPB Document 1-1 Filed 08/15/25 Page 42 of 47

express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

**COUNT IV**
**STATUTORY LIABILITY: MASHA'S LAW 18 U.S.C. § 2255**

113.

Plaintiff incorporates the paragraphs above, as if fully set forth herein.

114.

As described above, Defendant directly participated in the child sex trafficking of N.N. by knowingly assisting and facilitating N.N.'s sex trafficking at the Super 8 because Defendant's employees openly participated in N.N.'s trafficking, *supra* ¶¶ 10–30. Thus, Defendant committed the predicate offense of a violation of 18 U.S.C. § 1591 as of to N.N.

115.

N.N. was under the age of 18 when she was trafficked at the Super 8.

116.

N.N. was a victim of violations of 18 U.S.C. § 1591 at the Super 8.

117.

N.N. Suffered injuries as a result of Defendant's violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255.

118.

Defendant knew or recklessly disregarded that means of force, threats of

force, fraud, coercion, or any combination of those means would be used to cause N.N. to engage in commercial sex acts at the Super 8.

119.

Defendant knowingly harbored, falsely imprisoned, provided, obtained and maintained N.N. at the Super 8 by providing N.N. and her trafficker rooms in the hotel, extra illegal services, in and affecting interstate commerce.

120.

Defendant knowingly benefitted financially or by receiving anything of value, from participation in the ventures of renting rooms to N.N.'s sex trafficker who violated 18 U.S.C. § 1591 as to N.N.

121.

Thus, as described herein, Defendant is jointly and severally liable to N.N. for compensatory and punitive damages, in an amount to be determined at trial.

**DAMAGES**

122.

Plaintiff incorporates the paragraphs above as if fully restated herein.

123.

As a proximate and foreseeable result of Defendant's violations of the TVPRA, Masha's Law, and Georgia law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible

Case 4:25-cv-04629-JPB-HC Document 10-1 Filed 08/15/25 Page 45 of 48

under Georgia and federal law against Defendant for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiff seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

(a) Personal injuries;

(b) Past, present and future conscious pain and suffering;

(c) Loss of enjoyment of life;

(d) Medical expenses;

(e) Mental anguish and emotional distress;

(f) All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

(g) Consequential damages to be proven at trial.

124.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendant and its employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

125.

Defendant's actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover their necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to them and against Defendant for the following:

(a) Process issued as provided by law;

(b) Plaintiff be awarded actual damages in amounts to be shown at trial from Defendant;

(c) Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

(d) Plaintiff be awarded a trial by jury; and

(e) Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on August 1, 2025.

ANDERSEN, TATE & CARR, P.C.

*/s/ Patrick J. McDonough*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

ANDERSEN, TATE & CARR, P.C.

*/s/ Patrick J. McDonough*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile